# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————————

STATE OF MISSOURI, et al.,

Plaintiffs-Appellees/Cross-Appellants,

v.

JOSEPH R. BIDEN, JR., et al.,

Defendants-Appellants/Cross-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Missouri

———————————

## BRIEF FOR APPELLANTS

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
  *Attorneys, Appellate Staff
  Civil Division, Room 7533
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC 20530
  (202) 305-0173*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

The Department of Education (Department) adopted a rule that makes various improvements to statutorily required plans that allow millions of Americans to make student-loan payments based on their income. One of the improvements shortened the timeline to loan forgiveness for certain small loans from what was available under previously existing regulations. The district court held this part of the rule—alone—likely exceeds the Department's statutory authority and preliminarily enjoined any further loan forgiveness under this provision. A panel of this Court subsequently granted in part and denied in part plaintiffs' motion for injunction pending appeal, prohibiting the Department from "any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing [the rule's] payment-threshold provisions" for "any borrower whose loans are governed in whole or in part by the terms" of the rule.

The government believes that oral argument would aid in the consideration of this appeal and respectfully suggests that an allotment of 20 minutes per side would be appropriate.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT ................................................................. i

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ............................................................. 3

STATEMENT OF THE ISSUE .................................................................... 3

PERTINENT STATUTES ........................................................................... 4

STATEMENT OF THE CASE ..................................................................... 4

    A.    Statutory and Regulatory Background ............................................ 4

    B.    The Final Rule .................................................................................. 9

    C.    Prior Proceedings .......................................................................... 13

    D.    *Alaska* Litigation ......................................................................... 20

SUMMARY OF ARGUMENT .................................................................... 20

STANDARD OF REVIEW ......................................................................... 23

ARGUMENT .............................................................................................. 23

I.    The government is likely to prevail on the merits. ............................ 23

    A.    Plaintiffs lack standing. ................................................................ 23

    B.    The SAVE plan's shortened timeline to forgiveness is
        lawful. ............................................................................................ 31

        1.    The HEA clearly authorizes loan forgiveness at the
            conclusion of ICR plans. ..................................................... 31

2.      The major-questions doctrine does not alter that conclusion.................................................................40

II.     The equitable factors greatly favor the government. ............................46

A.      Plaintiffs fail to demonstrate irreparable harm absent preliminary relief. ..............................................................46

B.      The balance of equities and public interest weigh against injunctive relief.................................................................52

III.    At a minimum, the preliminary injunction should be narrowly tailored.........................................................................55

CONCLUSION.......................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                     **Page(s)**

*Adventist Health Sys./ SunBelt, Inc. v. HHS,*
    17 F.4th 793 (8th Cir. 2021) .......................................... 48, 50, 53, 54

*Alabama Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ............................................................................ 42

*Alaska v. U.S. Dep't of Educ.,*
    No. 24-1057-DDC-ADM, 2024 WL 3104578 (D. Kan. June 24, 2024) ... 20, 40

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ...................................................................... 46, 47

*Biden v. Missouri,*
    595 U.S. 87 (2022) ............................................................................ 33

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ........................ 3, 14, 25, 30, 41, 42, 43, 44, 45, 47

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ............................................................................ 55

*Chevron U.S.A. Inc. v. Echazabal,*
    536 U.S. 73 (2002) ............................................................................ 38

*City of Chicago v. Fulton,*
    592 U.S. 154 (2021) ............................................................................ 37

*Dakotans for Health v. Noem,*
    52 F.4th 381 (8th Cir. 2022) .............................................................. 55

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
    601 U.S. 42 (2024) ...................................................................... 37, 38

*Edwards' Lessee v. Darby,*
    25 U.S. (12 Wheat.) 206 (1827) ........................................................ 33

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ............................................................................ 24

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................... 58, 59

iv

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) ................................................................. 39

*Gill v. Whitford,*
585 U.S. 48 (2018) ................................................................... 55

*Gomez-Perez v. Potter,*
553 U.S. 474 (2008) ............................................................. 38-39

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor,*
510 U.S. 1301 (1993) ................................................................ 52

*Labrador v. Poe ex rel. Poe,*
144 S. Ct. 921 (2024) ........................................................ 52, 56

*Lewis v. GEICO,*
98 F.4th 452 (3d Cir. 2024) ..................................................... 29

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020) ................................................................. 40

*Lomax v. Ortiz-Marquez,*
590 U.S. 595 (2020) ................................................................. 40

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024) ............................................................. 33

*Louisiana v. Becerra,*
20 F.4th 260 (5th Cir. 2021) .................................................... 57

*Louisiana ex rel. La. Dep't of Wildlife & Fisheries v.*
*National Oceanic & Atmospheric Admin.,*
70 F.4th 872 (5th Cir. 2023) .................................................... 28

*Louisiana ex rel. Landry v. Biden,*
No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022) ........ 53-54

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ................................................................. 24

*Marx v. General Revenue Corp.,*
568 U.S. 371 (2013) ................................................................. 38

*Maryland v. King,*
    567 U.S. 1301 (2012)................................................................52

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) .............................................58

*Morehouse Enters., LLC v. ATF,*
    78 F.4th 1011 (8th Cir. 2023) .................................... 46, 52

*MPAY Inc. v. Erie Custom Comput. Applications, Inc.,*
    970 F.3d 1010 (8th Cir. 2020) ........................................ 23

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) ...................................... 3, 24, 31

*Nebraska v. Biden,*
    52 F.4th 1044 (8th Cir. 2022) ...................... 25, 47, 57, 58

*Ng v. Board of Regents of the Univ. of Minn.,*
    64 F.4th 992 (8th Cir. 2023) ........................................ 48

*NLRB v. Wyman-Gordon Co.,*
    394 U.S. 759 (1969) ...................................................... 49

*Novus Franchising, Inc. v. Dawson,*
    725 F.3d 885 (8th Cir. 2013) ....................................... 47

*Phyllis Schlafly Revocable Tr. v. Cori,*
    924 F.3d 1004 (8th Cir. 2019) ..................................... 48

*Quarles v. United States,*
    587 U.S. 645 (2019) ...................................................... 36

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) .................................................. 23

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ...................................... 28

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ...................................................... 23

*United States v. American Trucking Ass'ns,*
    310 U.S. 534 (1940)......................................................33

*United States v. Texas,*
    599 U.S. 670 (2023) .................................................. 24

*Watkins Inc. v. Lewis,*
    346 F.3d 841 (8th Cir. 2003) ................................... 55

*Wendt v. 24 Hour Fitness USA, Inc.,*
    821 F.3d 547 (5th Cir. 2016) ................................... 28

*West Va. Univ. Hosps., Inc. v. Casey,*
    499 U.S. 83 (1991) .................................................. 34

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ....................... 41, 41-42, 42, 43, 44

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................. 3-4, 23, 52, 55

**Statutes:**

College Cost Reduction and Access Act,
    Pub. L. No. 110-84, 121 Stat. 784 (2007):
        tit. II, § 203, 121 Stat. at 792-95.................38
        tit. IV, § 401, 121 Stat. at 800-01.................38
        tit. II, § 205, 121 Stat. at 795-96.................33

Higher Education Act of 1965,
    Pub. L. No. 89-329, 79 Stat. 1219 ......................4

Student Loan Reform Act of 1993,
    Pub. L. No. 103-66, 107 Stat. 341 ......................4

20 U.S.C. § 1071(d) .................................................. 8

20 U.S.C. § 1078(b)(9)(A)(iv) ................................ 36

20 U.S.C. § 1078-3(b)(1)(D) ................................... 9

20 U.S.C. § 1078-3(b)(5) .......................................... 9

20 U.S.C. § 1087e(d)(1) ........................................... 4

20 U.S.C. § 1087e(d)(1)(C) ........................................ 36

20 U.S.C. § 1087e(d)(1)(D) ........................ 1, 4, 5, 11, 31, 32, 35, 36, 45

20 U.S.C. § 1087e(d)(1)(E) ........................................ 7

20 U.S.C. § 1087e(d)(5)(B) ........................................ 35

20 U.S.C. § 1087e(e) ........................................ 36

20 U.S.C. § 1087e(e)(1) ........................................ 5

20 U.S.C. § 1087e(e)(2) ........................................ 4

20 U.S.C. § 1087e(e)(4) ........................................ 5, 36, 45

20 U.S.C. § 1087e(e)(5) ........................................ 5

20 U.S.C. § 1087e(e)(7)(B)(i) ........................................ 34

20 U.S.C. § 1087e(m) ........................................ 8, 38

20 U.S.C. § 1087e(m)(1) ........................................ 9

20 U.S.C. § 1087e(m)(1)(A)(iv) ........................................ 8

20 U.S.C. § 1089(c)(1) ........................................ 12-13

20 U.S.C. § 1089(c)(2) ........................................ 13

20 U.S.C. § 1098e ........................................ 7

20 U.S.C. § 1098e(a)(3)(B) ........................................ 8

20 U.S.C. § 1098e(b)(7) ........................................ 38

20 U.S.C. § 1098e(b)(7)(B) ........................................ 8

20 U.S.C. § 1098e(b)(7)(B)(iv) ........................................ 39

20 U.S.C. § 1098e(e) ........................................ 8

28 U.S.C. § 1292(a)(1) ........................................ 3

28 U.S.C. § 1331 ................................................................. 3

**Regulations:**

34 C.F.R. § 685.219(b) ...................................................... 9

34 C.F.R. § 685.220(f)(1)-(2) ............................................ 9

**Legislative Materials:**

*Student Loan Reform: Hearing on S. 920 Before the S. Comm. on Labor & Human Res.*, 103d Cong. 48 (1993) (statement of Madeleine M. Kunin, Deputy Secretary, U.S. Dep't of Educ.) ........................................... 33

H.R. Rep. No. 110-210 (2007) ...........................................39

**Other Authorities:**

59 Fed. Reg. 24,278 (May 10, 1994) ................................... 5

59 Fed. Reg. 61,664 (Dec. 1, 1994) ................. 5, 6, 30, 32, 42

77 Fed. Reg. 66,088 (Nov. 1, 2012) ................... 5, 6, 32, 42

80 Fed. Reg. 67,204 (Oct. 30, 2015) ............ 5, 6, 7, 30, 32, 42

86 Fed. Reg. 28,299 (May 26, 2021) .............................. 9-10

88 Fed. Reg. 1894 (Jan. 11, 2023)...................................10

88 Fed. Reg. 43,820 (July 10, 2023) ............ 6, 9, 10, 11, 12, 13, 18, 25, 35, 43, 53

88 Fed. Reg. 72,685 (Oct. 23, 2023) ................................ 13

89 Fed. Reg. 2489 (Jan. 16, 2024) ................................... 13

Order, *Alaska v. U.S. Dep't of Educ.*, No. 24-3089 (10th Cir. June 30, 2024) ..............................................20

## INTRODUCTION

Over 30 years ago, Congress directed the Department of Education to offer student-loan borrowers an "income contingent repayment plan," under which a borrower must make payments "based on the [borrower's] income" for "an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Having established this general framework, Congress left most of the details up to the Department to implement via rulemaking, including how large the payments must be and how long a borrower must make payments. The Department has created various income contingent repayment (ICR) plans over the years, each of which requires borrowers to pay a defined percentage of their discretionary income for a fixed term and provides for the forgiveness of any outstanding balance that remains at the end.

In July 2023, the Department published a final rule that, among other things, amended one of those plans and renamed the updated offering the Saving on a Valuable Education (SAVE) plan. Nine months later, after several key features of the SAVE plan had been implemented, the plaintiff States brought suit.

The district court concluded that "the Secretary has clear congressional authority to promulgate the vast majority of the provisions of the Final Rule." App. 371; R. Doc. 35, at 46.[1]  But the court thought that the statute was "silent" on the availability of loan forgiveness under ICR plans, making it "equally as likely" that Congress intended for borrowers at the end of their terms to either repay "the entire loan amount" or "default."  App. 369; R. Doc. 35, at 44.   The district court therefore preliminarily enjoined any further loan forgiveness under the Department's new rule.

The district court erred.  To start, no plaintiff has Article III standing to seek the injunction.  Even if there were standing, the Department's rule is plainly lawful.  The plain text of § 1087e(d)(1) contemplates a particular type of plan—a plan that allows the borrower to make income-contingent payments for the duration of a prescribed period and then forgives any outstanding balance at the end of that period.  For that reason, as the district court recognized, every Secretary of Education to exercise the congressional authority to create an ICR plan has construed the statute to provide for the forgiveness of any balance remaining after a borrower has completed the designated repayment term.  And quite apart from their failure on the

---

[1] Citations to the Joint Appendix are abbreviated App.__.

merits, plaintiffs failed to make the necessary showing that the equities justify any interim relief here. This Court should reverse the district court's order and allow the Department to continue to implement ICR plans in the same manner it has done for the past 30 years.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. App. 17; R. Doc. 1, at 8. As explained below, however, the district court lacked subject-matter jurisdiction because no plaintiff has established Article III standing. The district court entered a preliminary injunction on June 24, 2024, App. 387; R. Doc. 36, and the government filed a timely notice of appeal on June 27, 2024, App. 388; R. Doc. 37. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court erred by preliminarily enjoining "any further loan forgiveness for borrowers under the Final Rule's SAVE plan." App. 387; R. Doc. 36.

The most apposite authorities are *Murthy v. Missouri*, 144 S. Ct. 1972 (2024); *Biden v. Nebraska*, 600 U.S. 477 (2023); *Winter v. Natural Resources*

*Defense Council, Inc.*, 555 U.S. 7, 20 (2008); and 20 U.S.C. § 1087e(d)(1)(D), (e)(4).

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

**1.**  Congress enacted the Higher Education Act of 1965 (HEA) to provide financial assistance for students in postsecondary and higher education.  Pub. L. No. 89-329, 79 Stat. 1219.  In 1993, Congress amended the HEA to authorize the Secretary to lend money directly to student borrowers. Student Loan Reform Act of 1993, Pub. L. No. 103-66, 107 Stat. 341.  As amended, the statute requires the Secretary to give borrowers the choice of various plans to repay their Federal Direct Loans.  20 U.S.C. § 1087e(d)(1). One type of plan that the Secretary must offer is "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."  *Id.* § 1087e(d)(1)(D).

As the name of the plan suggests, the amount that a borrower must repay under an ICR plan depends on the borrower's income.  *See* 20 U.S.C. § 1087e(e)(2).  The statute expressly authorizes the Secretary to

"determine[]" the "appropriate portion" of the borrower's income on which payments shall be based. *Id.* § 1087e(e)(4); *see also, e.g.*, *id.* § 1087e(e)(1) ("The Secretary shall establish procedures for determining the borrower's repayment obligation on [a direct] loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment."); *id.* § 1087e(e)(5) ("The Secretary may promulgate regulations limiting the amount of interest that may be capitalized on such loan . . . ."). The statute also explicitly authorizes the Secretary to "prescribe[]" the "period of time" over which the borrower makes payments. *Id.* § 1087e(d)(1)(D). That must be an "extended" period, "not to exceed 25 years." *Id.*

**2.** Since 1993, the Secretary has offered several different ICR plans. The Secretary created the original ICR plan in 1994. *See* 59 Fed. Reg. 24,278 (May 10, 1994); 59 Fed. Reg. 61,664 (Dec. 1, 1994). In 2012, the Secretary created a new ICR plan, known as the Pay As You Earn (PAYE) plan. *See* 77 Fed. Reg. 66,088 (Nov. 1, 2012). And in 2015, the Secretary created another new ICR plan, known as the Revised Pay As You Earn (REPAYE) plan. *See* 80 Fed. Reg. 67,204 (Oct. 30, 2015).

The original ICR plan, the PAYE plan, and the REPAYE plan differed in their details but shared the same essential features. First, each plan involved a determination by the Secretary regarding the amount of a borrower's income that should be "protected from [loan] payments." 88 Fed. Reg. 43,820, 43,827 (July 10, 2023). Each plan calculated a borrower's discretionary income by subtracting that protected amount from the borrower's adjusted gross income. *See* 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698. Second, each plan involved a determination by the Secretary regarding the percentage of a borrower's discretionary income that should "go[] toward [monthly] loan payments." 88 Fed. Reg. at 43,827; *see* 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698. Third, each plan involved a determination by the Secretary regarding the period "of time borrowers must pay before repayment ends." 88 Fed. Reg. at 43,827. Under each plan, the Secretary forgave any outstanding loan balance (principal plus interest) at the end of that period. *See* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666.

Under the 2015 version of the REPAYE plan, for instance, the amount of income protected from loan payments was 150% of the federal poverty line. 80 Fed. Reg. at 67,239. This meant that every borrower earning less

than that amount would have a $0 monthly payment. *See id.* at 67,229

("[B]orrowers with incomes below 150 percent of the poverty line have zero

payments[.]"). Any income above that amount would be considered

discretionary income for purposes of the plan. Monthly loan payments were

capped at 10% of a borrower's discretionary income. *Id.* at 67,239. All

borrowers could qualify for loan forgiveness after making payments for 20 or

25 years. *Id.* at 67,241. And "monthly payment amounts of $0 under any of

the IDR plans, including the REPAYE plan, count[ed] as qualifying

payments toward loan forgiveness under those plans." *Id.* at 67,223.

**3.** In 2007, Congress amended the HEA to provide two additional

opportunities for loan forgiveness. First, Congress directed the Department

to offer an income-based repayment (IBR) plan. *See* 20 U.S.C.

§§ 1087e(d)(1)(E), 1098e. IBR is another type of repayment plan under

which a borrower's payment amount is based on income, but IBR plans differ

from ICR plans in key respects, including that they are available to

borrowers with different types of loans (not just Direct Loans, as in ICR)

and are subject to statutory limitations that Congress did not impose on

ICR. For example, starting in 2014, IBR plans require payments of 10% of

the borrower's discretionary income (calculated as income exceeding 150% of

the federal poverty line) for a period of time "not to exceed" 20 years.  *See id.*
§ 1098e(a)(3)(B), (b)(7)(B), (e).

Second, Congress created the Public Service Loan Forgiveness
(PSLF) program.  *See* 20 U.S.C. § 1087e(m).  Under that program, the
Department must cancel the remaining student-loan balance for eligible
borrowers who make 120 monthly payments while employed in a public
service job.  *Id.*  PSLF-qualifying payments may be made under multiple
repayment plans, including both ICR and IBR plans.  *Id.*
§ 1087e(m)(1)(A)(iv).

**4.**  When the HEA was first passed and before the Direct Loan
program was created, most federal student loans were issued through the
Federal Family Education Loan (FFEL) program.  Under that program,
private lenders made loans to students that were subsidized and reinsured
by the federal government.  No new FFELs have been issued since 2010,
when Congress ended the program to make the Direct Loan program the
main source of federal student loans.  *See* 20 U.S.C. § 1071(d).  But FFELs
issued before that date remain outstanding even as millions of borrowers
have paid down their existing balances.

FFEL borrowers have the option to "consolidate" their loans into Direct Consolidation Loans.  If a borrower elects that option, the Department issues a new loan to the borrower, with the proceeds used to repay the FFEL lender for the principal and interest outstanding on the borrower's existing loan.  *See* 20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1)-(2).  Borrowers who consolidate their FFELs into Direct Consolidation Loans generally have more repayment options available, including ICR plans, and may be eligible for other benefits, including PSLF.  *See* 20 U.S.C. § 1078-3(b)(5) (authorizing various repayment options for Direct Consolidation Loans); *id.* § 1087e(m)(1) (authorizing PSLF for borrowers with "any eligible Federal Direct Loan"); 34 C.F.R. § 685.219(b) (*Eligible Direct Loan* includes "a Direct Consolidation Loan").

## B.    The Final Rule

**1.**  More than three years ago, the Department announced the establishment of negotiated rulemaking committees that would consider numerous changes to the Federal student financial aid programs, including to income-driven repayment (IDR) plans.[2]  86 Fed. Reg. 28,299, 28,300 (May

---

[2] Income-driven repayment is the "umbrella term" that the Department now uses to refer collectively to ICR and IBR plans. 88 Fed. Reg. at 43,820.

26, 2021).  In January 2023, the Department published a notice of proposed rulemaking soliciting comments on its intended changes to the IDR regulations.  88 Fed. Reg. 1894 (Jan. 11, 2023).  Citing the immense (and growing) deleterious effects of student-loan debt on American borrowers, the proposed rule took aim at elements of the repayment rules then in effect that inhibited borrowers' ability to repay.  *Id.*  Among the anticipated changes, relevant here were several alterations to the REPAYE plan: an increase in the amount of income exempt from the calculation of monthly payments; a decrease in the share of discretionary income borrowers must pay monthly on undergraduate loans; a shorter maximum repayment period for borrowers with low original balances (to be followed by discharge of remaining balances at the end of that period); not charging accrued interest remaining after accounting for a borrower's monthly payment; and modifications clarifying the time periods to be credited toward loan forgiveness.  *Id.* at 1895 (summarizing these changes).

**2.**  In July 2023, nine months before this lawsuit was filed, the Department published a final rule that broadly tracked its proposal.  88 Fed. Reg. at 43,820 (the Final Rule or Rule).  The Rule made four changes to the preexisting REPAYE plan that are particularly relevant here.  First, the

protected-income provision increases the amount of income protected from loan payments from 150% to 225% of the federal poverty line (*i.e.*, $32,805 for a borrower without dependents in 2023). *Id.* at 43,881, 43,901. Second, the payment-calculation provision lowers monthly payments for undergraduate loans from 10% to 5% of a borrower's discretionary income, defined as income above the threshold described above. *Id.* at 43,901. Third, the shortened-repayment-period provision "provid[es] for a shorter repayment period and earlier forgiveness for borrowers with smaller original principal balances," starting at 10 years for those who borrowed $12,000 or less. *Id.* at 43,880; *see id.* at 43,902-03.[3] Fourth, the accrued-interest provision decreases the amount of accrued interest charged to a borrower's loan balance after the monthly payment has been applied (from 50% to 0%). *Id.* at 43,827, 43,832. The Rule provides that this amended version of REPAYE can also be referred to as the SAVE plan. *Id.* at 43,822.

---

[3] The Rule provides for forgiveness after one additional year for each additional $1,000 in original loan balance above $12,000, up to 20 or 25 years, the latter of which is the statutory maximum. 88 Fed. Reg. at 43,903; 20 U.S.C. § 1087e(d)(1)(D). A REPAYE borrower whose original balance was $14,000, for example, would be eligible for forgiveness after 12 years of qualifying payments.

The Department explained that these changes are "distinct and significant improvements" that have been "determined independently," and are therefore "independent and severable" from each other and the rest of the Final Rule. 88 Fed. Reg. at 43,827-28.

The Final Rule also makes various changes that apply to other IDR plans or to IDR plans generally. For example, it credits certain periods of deferment or forbearance, including for borrowers receiving cancer treatment or serving in the military, toward the time needed to obtain loan forgiveness. 88 Fed. Reg. at 43,903. It allows certain delinquent borrowers to be automatically enrolled in an IDR plan. *Id.* at 43,904. And it allows borrowers to authorize the Department to use federal tax information to automatically recertify their income. *Id.* at 43,865. The Final Rule ended new enrollments in the two older ICR plans (*i.e.*, the original ICR plan and PAYE), but it does not require borrowers currently on those plans to switch. Thus, for example, "a borrower already enrolled in PAYE will be able to continue repaying under that plan." *Id.* at 43,836. Millions of borrowers remain in those plans.

The HEA generally requires that final regulations for federal student-financial-aid programs go into effect the following July 1. 20 U.S.C.

§ 1089(c)(1).  The HEA also confers on the Secretary discretion to designate certain provisions for early implementation.  *Id.* § 1089(c)(2).  As announced in the Final Rule and several Federal Register notices, the Secretary exercised that early-implementation authority with respect to several provisions in the Rule.  These include the protected-income provision and the accrued-interest provision, which were implemented on July 30, 2023, as well as the shortened-repayment-period provision, which was implemented on January 21, 2024.  89 Fed. Reg. 2489 (Jan. 16, 2024); 88 Fed. Reg. at 43,820-21; *see also* 88 Fed. Reg. 72,685 (Oct. 23, 2023) (designating additional provisions for early implementation).  The result is that, from July 2023 to July 2024, millions of borrowers received—and paid—bills that reflected the Rule's protected-income and accrued-interest provisions, and some borrowers had their loan balances forgiven under the Rule's shortened-repayment-period provision as early as February 23, 2024, well before this lawsuit was filed.

### C.    Prior Proceedings

Seven States filed this suit on April 9, 2024, App. 10; R. Doc. 1, at 1, some nine months after publication of the Final Rule and eight months after early implementation began.  Plaintiffs waited another week before seeking

emergency relief to enjoin the Final Rule, which they claim exceeds the Department's statutory authority and violates the Administrative Procedure Act (APA).

**1.** On June 24, the district court denied the government's motion to dismiss and granted in part and denied in part plaintiffs' motion for a preliminary injunction. Plaintiffs had offered several theories of standing, including that the Final Rule harms their ability to retain and recruit employees, decreases their tax revenue, and takes business away from the Bank of North Dakota. App. 40-49; R. Doc. 1, at 31-40. The district court characterized these theories as "tenuous at best," but it did accept a different one. App. 363-64; R. Doc. 35, at 38-39. Specifically, the district court held that "Missouri has adequately alleged that the Final Rule has and will harm Missouri via early forgiveness of loans serviced by MOHELA." App. 363; R. Doc. 35, at 38. The court reasoned that similar allegations "were sufficient to establish Missouri's standing just last year in *Biden v. Nebraska*," 600 U.S. 477 (2023). App. 361; R. Doc. 35, at 36. The court rejected the government's argument that significant factual differences between the two cases counseled a different result. App. 363; R. Doc. 35, at 38.

On the merits of the statutory authority claim, the district court concluded that plaintiffs' "arguments regarding the Secretary's authority to set payment schedules and interest accrual limitations are unlikely to succeed on the merits." App. 367; R. Doc. 35, at 42. The court observed that "the plain language of the statute" gives the Secretary "significant discretion" to set the terms of an ICR plan, including by determining "what constitutes discretionary income," capping "the amount of discretionary income that can qualify for payment calculations," and "limit[ing] interest accrual." Id.[4] But the district court found that plaintiffs' challenge to the shortened-repayment-period provision "present[s] a more difficult issue." App. 368; R. Doc. 35, at 43. While the court recognized that forgiveness under ICR plans "is not new," it read § 1087e(d)(1)(D) to be "silent on loan forgiveness," in contrast to "other portions of the HEA that explicitly permit loan forgiveness," in programs such as PSLF and IBR. App. 368-69; R. Doc. 35, at 43-44. The court therefore concluded that plaintiffs "have a 'fair chance'" of succeeding on their claim that the Secretary lacked authority to

---

[4] The court also held that plaintiffs were unlikely to succeed on their other APA claims, including that the Final Rule is arbitrary and capricious and that it fails to comply with the APA's procedural requirements for notice-and-comment rulemaking. App. 372-79; R. Doc. 35, at 47-54.

include "a loan forgiveness provision as part of the SAVE program."  App. 370; R. Doc. 35, at 45.

Turning to the equitable factors of the preliminary injunction analysis, the court found that "Missouri has adequately alleged a threat of irreparable harm" from "early loan forgiveness," and that the public interest "does not particularly weigh in favor of either party."  App. 382-83; R. Doc. 35, at 57-58. Finding the shortened-repayment-period provision of the Rule severable from the rest (and noting that plaintiffs had "conceded at oral argument" that they were primarily seeking relief "only" from this provision), the court preliminarily enjoined "any further loan forgiveness for borrowers under the Final Rule's SAVE plan."  App. 383-84, 386; R. Doc. 35, at 58-59, 61.

**2.**  The Department appealed and immediately complied with the district court's order.  "Upon receipt of the preliminary injunction and in compliance with it, [the Department] immediately ceased processing any additional loan forgiveness for borrowers enrolled in SAVE on the shortened timelines provided for in the Final Rule."  R. Doc. 44, at 1.  The Department informed the district court that it did not understand the injunction to apply to preexisting regulations "that authorize loan forgiveness after 20 or 25 years of payments."  *Id.*

Plaintiffs cross-appealed and sought an injunction pending appeal from the district court to prohibit "[d]efendants from implementing other provisions of the Final Rule—specifically, the two payment threshold provisions and the interest accrual provision." App. 395; R. Doc. 41, at 7.

The district court denied the motion because plaintiffs "ha[d] not provided an adequate basis" to enjoin "any additional provisions of the Final Rule." App. 402; R. Doc. 45, at 1. The court further "found that [p]laintiffs' delay in bringing this case undermines their request for immediate relief." App. 403; R. Doc. 45, at 2. Plaintiffs then filed a "motion for clarification" asking the district court to declare that its injunction prohibits any use of "ICR authority to forgive loans for any borrowers enrolled in the SAVE plan," including pursuant to previously adopted regulations that provided forgiveness after 20 or 25 years. App. 404-05; R. Doc. 48, at 1-2. The district court also denied that motion, explaining that it would not "extend this injunction beyond the scope of the Final Rule as [p]laintiffs only sought injunctive relief from implementation of the Final Rule." App. 423; R. Doc. 54.

As a result, the status quo following the district court's injunction was that (1) the original ICR and PAYE plans remained in effect (with certain

modifications unrelated to payment amounts or the timeline to forgiveness), and (2) the REPAYE plan was partly amended and renamed, governed by the terms of the Final Rule except for the shortened-repayment-period provision. This state of affairs followed from the plain terms of the district court's injunction and application of well-established severability principles. *See* App. 385; R. Doc. 35, at 60; App. 432; R. Doc. 54; 88 Fed Reg. at 43,828.

**3.** Plaintiffs moved this Court for an injunction pending appeal and an administrative stay. On July 12, the Court granted an administrative stay, prohibiting the government from "implementing or acting pursuant to the Final Rule." Order (July 18, 2024). The government filed a notice of compliance on July 19 explaining its understanding that the Court's order encompassed every part of the Final Rule, including payment provisions challenged by plaintiffs but not enjoined by the district court, as well as many other provisions that were never specifically challenged at all. The Department accordingly placed millions of borrowers on the SAVE plan into forbearance because their payment schedules could not be lawfully applied.

On August 9, the Court granted an injunction pending appeal prohibiting the Department "from any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further

implementing SAVE's payment-threshold provisions" for "any borrower whose loans are governed in whole or in part by the terms of the [Final Rule]." Inj. Op. 9. The precise scope of this injunction is unclear, and the Department has accordingly sought clarification as to whether it prohibits (1) loan forgiveness offered under statutory authorities other than ICR (such as IBR or PSLF) for a borrower on any type of repayment plan governed in part by the Final Rule, or (2) loan forgiveness offered to borrowers enrolled in previously existing ICR plans (*i.e.*, the original ICR plan or PAYE) on timelines established as part of those plans. At a minimum, the government understands this injunction to prohibit not only the Rule's shortening of the REPAYE plan's repayment periods for certain loans, but also the REPAYE plan's preexisting provision of forgiveness after a repayment period of 20 or 25 years. The government also understands the injunction to block the changes to the REPAYE plan made by the Rule's protected-income, payment-calculation, and accrued-interest provisions.

The government has asked the Supreme Court to vacate or narrow the injunction pending appeal or, in the alternative, to grant certiorari before judgment and set the case for expedited briefing and argument. *Biden v. Missouri*, No. 24A173 (U.S. Aug. 13, 2024).

### D. *Alaska* Litigation

Another group of States separately challenged the Final Rule in Kansas. The district court there believed that the HEA's "plain text authorizes the SAVE plan" but ultimately concluded that statutory context did not provide sufficiently clear authorization. *Alaska v. U.S. Dep't of Educ.*, No. 24-1057-DDC-ADM, 2024 WL 3104578, at *7-12 (D. Kan. June 24, 2024) (emphasis and capitalization omitted), *appeal docketed*, Nos. 24-3089, 24-3094 (10th Cir.). That court enjoined the Department from implementing parts of the Final Rule set to become effective on July 1, 2024. *Id.* at *20-21. The Tenth Circuit stayed the district court's injunction pending appeal, Order, *Alaska v. U.S. Dep't of Educ.*, No. 24-3089 (10th Cir. June 30, 2024), and scheduled oral argument for August 21, 2024. The plaintiffs have asked the Supreme Court to vacate the Tenth Circuit's stay. *See* Application to Vacate Stay, *Alaska v. Department of Educ.*, No. 24A11 (U.S. July 5, 2024).

### SUMMARY OF ARGUMENT

This Court should reverse the district court's preliminary injunction under the traditional four-factor test for equitable relief.

**I.** Plaintiffs cannot succeed on the merits. As an initial matter, plaintiffs have not demonstrated standing. The district court accepted only

the theory that the Final Rule would injure Missouri by reducing MOHELA's servicing revenues, as some borrower accounts it services would be closed sooner. But the Final Rule also offers financial benefits to MOHELA, and plaintiffs made no effort to show that any costs exceed those benefits such that a financial harm actually would materialize. That problem aside, MOHELA itself requested that the Department reduce the number of accounts it services. Plaintiffs do not normally ask for actions that injure them. It therefore makes little sense to describe any reduction in accounts serviced by MOHELA as an "injury."

Even if plaintiffs could demonstrate standing, they could not demonstrate a likelihood of success on the merits because the HEA clearly authorizes the shortened-repayment-period provision. The statute sets an explicit statutory cap on the length of a borrower's repayment under ICR plans, which requires the Department to forgive any remaining balance. Every ICR plan ever offered has therefore included a loan-forgiveness component. Other textual and contextual clues reinforce that conclusion. The major-questions doctrine thus does not apply, but even if it did, the statute provides clear authorization for the enjoined provision.

**II.** The preliminary injunction also should be reversed because the equities greatly favor the government. MOHELA's request for a large reduction in the size of its servicing portfolio means Missouri hardly can claim irreparable harm from reduced servicing fees. Plaintiffs' nine-month delay in bringing suit underscores the lack of irreparable injury.

On the other side of the balance, the preliminary injunction imposes certain and serious harms on the Department, borrowers, and the public. The government is irreparably injured by an order preventing it from carrying out its obligations to administer ICR plans, and the injunction will lead to the deleterious financial consequences for borrowers that the SAVE plan was designed to ameliorate.

**III.** Assuming some relief were proper, this Court should narrow the overbroad injunction. Injunctive relief must be no more burdensome than necessary to remedy a plaintiff's injury, so the district court should have tailored its relief to match the theory of injury it accepted. Instead, it entered a universal injunction—preventing the Department from offering the shortened timeline for any borrower, anywhere, even absent any relationship to MOHELA—without any explanation. And it enjoined the

President, even though the Supreme Court has disapproved such injunctions. Accordingly, the Court should at a minimum narrow the injunction.

## STANDARD OF REVIEW

This Court reviews a district court's ultimate ruling on a preliminary injunction for abuse of discretion, but underlying legal conclusions are reviewed de novo. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020).

## ARGUMENT

"[A] plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs do not succeed on any factor.

## I. The government is likely to prevail on the merits.

### A. Plaintiffs lack standing.

The requirement that plaintiffs demonstrate Article III standing "is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (quotation marks omitted).

Federal courts do not exercise "general legal oversight" of the Executive Branch. *Murthy v. Missouri*, 144 S. Ct. 1972, 1997 (2024). Standing doctrine thus "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system," *United States v. Texas*, 599 U.S. 670, 675-76 (2023), even though that "means that the federal courts decide some contested legal questions later rather than sooner," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

To establish standing, a plaintiff must demonstrate (1) that it has suffered or likely will suffer an injury in fact, (2) that the injury likely was caused or will be caused by the defendant, and (3) that the injury likely would be redressed by the requested judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Both the district court and the motions panel of this Court relied on a single theory of injury pressed by the plaintiff States: that MOHELA, a Missouri instrumentality, will lose "administrative fees when loans it services are forgiven" pursuant to the Final Rule's shortened-repayment-period provision. App. 363; R. Doc. 35, at 38; Inj. Op. 6. Both courts reasoned that a similar theory was "sufficient to establish Missouri's standing just last year in *Biden v. Nebraska*." Inj. Op. 6 (quoting

App. 361; R. Doc. 35, at 36). But the significant differences between this case and *Nebraska* underscore the lack of standing here.

In the *Nebraska* litigation, the loss of servicing fees was the sole effect that the challenged administrative action had on MOHELA. In that context, the Supreme Court determined that the loss of fees would directly "cut MOHELA's revenues," causing it a "financial harm." *Nebraska*, 600 U.S. at 490-91. This Court similarly reasoned that "the challenged student loan debt cancellation presents a threatened financial harm to the State of Missouri" because "the total revenue MOHELA recovers will decrease if a substantial portion of its accounts are no longer active." *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) (per curiam).

Here, however, the effects of the Final Rule on MOHELA's total revenue are not determined solely by the loss of servicing fees. MOHELA has already received more than $1.6 million in transition costs related to the implementation of the SAVE plan. App. 235; R. Doc. 22-2, at 6. And there is reason to believe that MOHELA would benefit financially from the Rule's implementation. Because the Final Rule "will help borrowers avoid delinquency and default," 88 Fed. Reg. at 43,824, borrowers' accounts will remain open longer and cost less to service, while MOHELA avoids the

reduction in fees required by its contracts when borrowers default. *See* App. 232-34; R. Doc. 22-2, at 3-5. Because of the reduced payment amounts, more borrowers in payment status will owe $0 per month, so their accounts will cost almost nothing to service while MOHELA's fee remains the same. *Id.* And to the extent that the shortened timeline to forgiveness does result in a smaller and more manageable portfolio, that reduction could help MOHELA avoid error-related penalties, *see* App. 233; R. Doc. 22-2, at 4 (noting a recent $7.2 million penalty for servicing errors). All of this suggests that MOHELA's finances should improve, not suffer, meaning that Missouri will suffer no financial harm.

Even if MOHELA's net revenues do decline as a result of account closure, however, that would still not be a cognizable harm sufficient to support Article III standing in this case. The Department's contracts with loan servicers "provide expressly for rebalancing of borrowers among servicers, from weak performers to strong performers." App. 234; R. Doc. 22-2, at 5. Rebalancing decisions may be made unilaterally by the Department and do not give rise to claims against it. *Id.* The same month that plaintiffs filed suit (and several months after the shortened timeline went into effect), MOHELA affirmatively requested a rebalancing by asking

the Department to transfer "1.5 million borrower accounts to one or more different loan servicers" because it was unable to "meet important deadlines" related to its new contract.  App. 241; R. Doc. 22-3, at 1; *see* App. 231-33; R. Doc. 22-2, at 2-4 (discussing the implementation of a new framework under the new contract).  The Department agreed that "reduc[ing] MOHELA's borrower account volume" would "help mitigate any harmful effects on borrowers" and therefore committed to transfer "up to 1.5 million borrowers for this purpose."  App. 246-47; R. Doc. 22-4, at 2-3.

At that time, around 28,000 borrowers serviced by MOHELA had seen their loans discharged as a result of the Final Rule, and approximately 53,000 other such borrowers had been identified as eligible for forgiveness.  App. 236, R. Doc. 22-2, at 7.  Thus, while Missouri argued in litigation that any reduction in the number of borrower accounts is a legally cognizable injury, MOHELA itself was seeking to drastically cut that number—by an amount nearly 20 times the number of borrowers identified for forgiveness under the Final Rule's shortened timeline.  A party cannot claim injury from an event that benefits it.

The district court mistakenly believed that it could not consider the benefits that MOHELA would receive under the Final Rule, relying on the

Fifth Circuit's admonition that "once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." App. 363; R. Doc. 35, at 38 (alteration omitted) (quoting *Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015)). But even if other aspects of the parties' relationship should be excluded from the standing analysis, the Fifth Circuit has made clear that a court appropriately considers "offsetting benefits that are of the same type and arise from the same transaction as the costs." *Texas*, 809 F.3d at 155. Here, any monetary benefits and purported harms to MOHELA from the SAVE plan are plainly of the same type and arise from the same transaction—the adoption of the Final Rule. So they must be considered even under the Fifth Circuit's approach. *See Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882-84 (5th Cir. 2023) (holding that the plaintiff State lacked standing to challenge a federal rule based on "alleged increased enforcement costs" where those costs would be "offset" by funding from the federal government); *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 n.10 (5th Cir. 2016) ("[W]hen 'the costs and benefits ar[i]se out of the same transaction,' the [c]ourt may consider the benefits the plaintiff received to

determine whether the plaintiff has 'demonstrated injury' for the purposes of Article III standing."); *see also Lewis v. GEICO*, 98 F.4th 452, 460 (3d Cir. 2024) ("Even if the condition adjustment harmed the Lewises by $1,006, as they allege, these other adjustments more than offset it."). Indeed, a failure to do so "would impermissibly divorce [a plaintiff's] standing to sue from any real-world financial injury." *Lewis*, 98 F.4th at 460.

As for the request to reallocate borrowers, the district court stated that "the loss of administrative fees when the Secretary reallocates Direct Loans" is "not of the same type nor does it arise from the same transaction" as the "loss of administrative fees when loans it services are forgiven by the Secretary." App. 363; R. Doc. 35, at 38. It is difficult to understand the contention that these situations do not inflict the "same type" of harm. They are both financial harms resulting from the loss of administrative fees earned by servicing student-loan accounts. Whether or not the two losses arise from the same transaction is immaterial. The government's argument is not that the loss of 1.5 million borrower accounts from reallocation offsets the loss of a smaller number of borrower accounts from forgiveness. Rather, the argument is that a reduction in the number of borrower accounts is not a cognizable harm at all because MOHELA affirmatively requested that its

borrower portfolio be significantly reduced and plaintiffs identify no independent harm to Missouri that does not derive from MOHELA.

Plaintiffs' lack of standing is especially clear with respect to their challenge to ICR forgiveness on preexisting timelines (*i.e.*, 20 or 25 years). Unlike in *Nebraska*, Missouri cannot attribute the loss of any "fees that it otherwise would have earned" to these preexisting provisions of forgiveness. *Nebraska*, 600 U.S. at 490. Such forgiveness has been a part of those plans since they were created—nearly a decade ago for REPAYE and nearly thirty years ago for original ICR. 80 Fed. Reg. at 67,209; 59 Fed. Reg. at 61,666. Since it began servicing federal loans in 2011, MOHELA has done so with the understanding that, under those plans' preexisting timelines, loans on ICR plans would be "forgiven" after "20 or 25 years of qualifying payments." 80 Fed. Reg. at 67,209; *accord* 59 Fed. Reg. at 61,666. Thus, unlike implementation of the new loan-forgiveness plan in *Nebraska*, continued application of preexisting timelines for forgiveness will not cost MOHELA any "fees that it otherwise would have earned under its contract with the Department." *Nebraska*, 600 U.S. at 490.

The States have never attempted to show otherwise. And because it is their burden to establish standing, *see Murthy*, 144 S. Ct. at 1986, that failure should be dispositive.

## B. The SAVE plan's shortened timeline to forgiveness is lawful.

Even if plaintiffs could establish standing, the government likely will prevail in this suit. The district court enjoined only a single provision of the Final Rule: the shortened timeline to forgiveness for borrowers with smaller initial balances. *See* App. 385; R. Doc. 35, at 60. Because that provision is clearly authorized by the HEA, plaintiffs have not shown the requisite likelihood of success on the merits.

### 1. The HEA clearly authorizes loan forgiveness at the conclusion of ICR plans.

**a.** Since 1993, Congress has required the Department to offer "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Until this litigation, no court had ever questioned the Department's ability to forgive a borrower's remaining balance at the end of her specified repayment period. That is for good reason.

The plain text of Section 1087e(d)(1)(D) establishes two principles:

First, how much a borrower repays each year will be "based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D). Second, no borrower will be required to make payments indefinitely; rather, borrowers will make payments for "an extended period of time prescribed by the Secretary, not to exceed 25 years." *Id.* The only type of plan that complies with both of those principles is one that allows the borrower to make income-contingent payments for the duration of the prescribed period and then forgives any outstanding balance at the end of that period. Any other type of plan would violate one or both of the principles that Congress enacted into the text. If, for instance, a borrower were to reach the end of the prescribed period and then be required to repay any outstanding balance in full, the plan would violate the first principle because the borrower's final payment would be based not on her income, but rather on her outstanding balance—defeating the whole point of an "income contingent repayment plan." *Id.*

It should come as no surprise, then, that every Secretary of Education since the 1993 enactment of Section 1087e has understood ICR plans to forgive any outstanding balance at the end of the repayment period. *See* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666. The

agency's "longstanding practice . . . in implementing the relevant statutory authorit[y]" strongly supports this interpretation. *Biden v. Missouri*, 595 U.S. 87, 94 (2022) (per curiam). That is "especially" true here because the Department's "interpretation issued contemporaneously with the enactment of the statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (observing that such contemporaneous agency interpretations "could be entitled to 'great weight'" (quoting *United States v. American Trucking Ass'ns*, 310 U.S. 534, 549 (1940))); *accord Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210 (1827).[5]

When Congress amended Section 1087e in 2007, it reaffirmed the Department's understanding. *See* College Cost Reduction and Access Act, Pub. L. No. 110-84, tit. II, § 205, 121 Stat. 784, 795-96 (2007). The 2007

---

[5] The Department articulated that understanding to Congress prior to the ICR statute's enactment as well. *See Student Loan Reform: Hearing on S. 920 Before the S. Comm. on Labor & Human Res.*, 103d Cong. 48 (1993) (statement of Madeleine M. Kunin, Deputy Secretary, U.S. Dep't of Educ.) ("[T]here is a provision in the bill that says the Secretary will make some designation as to when you call it quits and you are forgiven. One possibility is around 25 years or so."). That "interpretation gains much persuasiveness" because the Executive Branch "suggested the provision['s] enactment to Congress." *American Trucking*, 310 U.S. at 549; *see Student Loan Reform*, *supra*, at 67 (statement of Sen. Kassebaum) ("[T]he administration is recommending that probably after 25 years—although this has still not been determined for certain—loans would be forgiven under income-contingent repayment.").

amendments instructed the Department to count certain "time periods" (such as periods in which a borrower is "in deferment due to economic hardship") toward a borrower's repayment period. 20 U.S.C. § 1087e(e)(7)(B)(i). Those amendments would be inexplicable unless covered loans are forgiven at the end of the repayment period: Otherwise, counting those time periods would only accelerate a borrower's obligation to repay her loan in full, perversely making it *more* difficult for a borrower who has experienced economic hardship to afford her loan. Courts must "make sense rather than nonsense out of the *corpus juris,*" including "the body of both previously and subsequently enacted law." *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100-01 (1991). And the only understanding that makes sense of the statutory provisions governing ICR plans is that any outstanding balance is forgiven at the end of the specified period.

**b.** Notwithstanding the statute's plain text and that longstanding consensus, the district court concluded that "it is at least equally as likely" that the statute limits the time that "borrowers can be in repayment before the entire loan amount must be repaid or borrowers must default."[6] App. 369;

---

[6] The district court did not suggest that, if the HEA authorized loan forgiveness under ICR, 10 years would not qualify as an "extended period of

*Continued on next page.*

R. Doc. 35, at 44.  Neither alternative identified by the district court provides a plausible alternative to forgiveness.

As an initial matter, there is no reason to believe that Congress established a student-loan repayment plan that would end in a borrower's default.  That would set ICR plans apart from every other repayment plan, each of which satisfies the borrower's obligation to the Department when completed.  Moreover, Congress viewed ICR payments as a possible solution to the problem of borrowers' defaulting.  A borrower who has defaulted may be required to "repay the loan pursuant to an [ICR] plan."  20 U.S.C. § 1087e(d)(5)(B).  Given that provision, it would make little sense for an ICR plan to end in default, as that would lead borrowers who struggle to make payments to the same adverse outcome that Congress sought to ameliorate with ICR.

Plaintiffs embrace the other alternative offered by the district court: that an ICR plan must result in full repayment, which would require the Department to set ICR payment amounts "high enough for actual repayment

_____

time." 20 U.S.C. § 1087e(d)(1)(D).  As the Department explained, "borrowers with low balances are most commonly those who enrolled in postsecondary education for one academic year or less," meaning that the minimum period of repayment would generally be "10 times longer" than the duration of the borrower's postsecondary education.  88 Fed. Reg. at 43,833.

within 25 years."  Mot. for Inj. Pending Appeal 4; *see also* R. Doc. 10, at 15

("[T]he ICR program expressly requires payment in full.").  But the text

does not refer to "full repayment"; it refers to "*income contingent*

repayment."  20 U.S.C. § 1087e(d)(1)(D), (e) (emphasis added).  Plaintiffs'

view that a borrower must pay in full, regardless of her income, cannot be

squared with that text, nor would it permit payments that "vary in relation to

the appropriate portion of the annual income of the borrower . . . as

determined by the Secretary."  20 U.S.C. § 1087e(e)(4).  On plaintiffs' theory,

payments would instead be mathematically dictated by the loan balance and

remaining repayment term.  "That result not only would defy common sense,

but also would defeat Congress' stated objective of" setting ICR payments

based on the borrower's income.  *Quarles v. United States*, 587 U.S. 645, 654

(2019).  Such a "self-defeating" statutory interpretation must be avoided.  *Id.*

It also runs headlong into the canon against superfluity.  Congress

provided for "an extended repayment plan" as an alternative to ICR plans.

*See* 20 U.S.C. § 1087e(d)(1)(C).  In an extended repayment plan, a borrower

pays "a fixed annual or graduated repayment amount" "over an extended

period of time, not to exceed 25 years."  *Id.* § 1078(b)(9)(A)(iv).  Requiring

ICR payments that would fully repay a loan would make the extended

repayment plan redundant, violating fundamental statutory-interpretation principles. *See City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

**c.** Both the district court and the motions panel drew a negative inference about the Department's authority to offer loan forgiveness from the fact that certain other HEA provisions require the Secretary to cancel student loans in certain circumstances. App. 369-70; R. Doc. 35, at 44-45; Inj. Op. 7.

The premise of that comparison is mistaken: Section 1087e is not silent on forgiveness. As explained above, any plan that fails to forgive any outstanding balance at the end of the repayment period cannot be squared with the text of either Section 1087e(d)(1)(D) or the 2007 amendments to Section 1087e(e). Here, as in other contexts, "Congress need not state its intent in any particular way." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,* 601 U.S. 42, 48 (2024) (citation omitted). And "the fact that Congress chose to use certain language" to invoke forgiveness in one provision of the HEA "hardly means it was 'foreclosed from using different

language'" to invoke forgiveness in a "different" provision of "the same law." *Id.* at 52 (brackets, citation, and ellipsis omitted).

In any case, "the force of any negative implication . . . depends on context." *Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013). Here, context does not support a sensible inference that those other provisions negate the Department's authority to forgive the remaining balance at the conclusion of an ICR payment term. The relevant provision governing IBR, 20 U.S.C. § 1098e(b)(7), requires the Secretary to "repay or cancel" a borrower's remaining balance if she has enrolled in IBR at any point and has made the number of payments required by statute. Similarly, the relevant provision governing PSLF, 20 U.S.C. § 1087e(m), requires the Secretary to cancel the balance of any loan due after a borrower has made 120 qualifying payments while employed in a public service job. In both cases, "statutory language suggesting exclusiveness is missing," *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002), so the negative-inference canon provides little guidance here.

Moreover, both the PSLF and IBR provisions were added in 2007, *see* Pub. L. No. 110-84, tit. II, § 203, tit. IV, § 401, 121 Stat. at 792-95, 800-01— well over a decade after Congress enacted the ICR statute. *Cf. Gomez-*

*Perez v. Potter*, 553 U.S. 474, 486 (2008) (rejecting a negative inference when the relevant provisions "were not considered or enacted together"). There is no indication that the 2007 amendments were intended to curtail the Department's longstanding interpretation of its ICR authority. To the contrary, Congress viewed IBR as "build[ing] on the existing Income Contingent Repayment Program offered in the Direct Loan program and extend[ing] this option to individuals participating in the FFEL . . . program." H.R. Rep. No. 110-210, at 44 (2007); *see also id.* at 71 (Congressional Budget Office estimate describing IBR as providing "similar relief" as "the current ICR plan"). In that vein, Congress decided to credit ICR payments toward loan forgiveness under the IBR program. *See* 20 U.S.C. § 1098e(b)(7)(B)(iv).

The heavy reliance placed by the district court and the motions panel on the negative-implication canon was thus misplaced. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 555 (2022) (declining "to give much weight to [a] negative inference" after considering the statutory text and context). When a borrower's payments under ICR are insufficient to fully repay a Direct Loan, the Department properly forgives any remaining balance at the end of the set repayment term.

39

**d.** Ultimately, plaintiffs' suggested interpretation imposes an atextual limitation on the Department's authority to offer ICR plans. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (courts may not "impos[e] limits on an agency's discretion that are not supported by the text"). In effect, it "inserts the word 'full' in the statute, rendering it to require 'full repayment.'" *Alaska*, 2024 WL 3104578, at *9. That is not a permissible interpretation of the statute, as courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600 (2020).

### 2. The major-questions doctrine does not alter that conclusion.

The district court also suggested that "to the extent it is necessary to invoke the major questions doctrine here," that doctrine "confirm[ed]" its conclusion that ICR plans may not conclude with debt forgiveness. App. 371; R. Doc. 35, at 46. The motions panel relied even more heavily on the doctrine to conclude that the ICR statute does not authorize forgiveness. Inj. Op. 7. That was mistaken: the major-questions doctrine does not apply in this case, but even if it did, the HEA clearly authorizes the Secretary to forgive loans at the end of a borrower's repayment term.

**a.**  In certain "extraordinary cases," the Supreme Court has held that "separation of powers principles and a practical understanding of legislative intent" counsel caution before "read[ing] into ambiguous statutory text the delegation claimed to be lurking there."  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks omitted).  In such cases, the agency "must point to clear congressional authorization" for its action.  *Id.*

The major-questions doctrine is not implicated here, however, where the relevant program is longstanding and the agency has exercised its statutory authority to adjust some of the policy's parameters.  Instead, the Supreme Court has applied the major-questions doctrine in cases where an agency has "claimed to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority."  *West Virginia*, 597 U.S. at 724 (alterations and quotation marks omitted); *see also Nebraska*, 600 U.S. at 502 (agency action "would effect a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind" (alterations and quotation marks omitted)).  In making that assessment, the Court has looked to the agency's "past practice under the statute" to determine whether the action is "unprecedented."  *Nebraska*, 600 U.S. at 501, 504; *see also, e.g.*, *West Virginia*, 597 U.S. at 725-

28 (same); *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam) (same).

**b.** As both the district court and the motions panel recognized, providing forgiveness to borrowers enrolled in an ICR plan "is not new." App. 368; R. Doc. 35, at 43; *see* Inj. Op. 2-3. For over 30 years, every ICR plan has included a provision that forgives a borrower's remaining balance at the conclusion of the repayment term. *See* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666. The motions panel described such plans as "relatively uncontroversial." Inj. Op. 3. That "established practice"—dating back to the ICR statute's enactment—demonstrates that the Department has exercised no new or uncontemplated regulatory authority. *See West Virginia*, 597 U.S. at 725; *see also id.* at 747 (Gorsuch, J., concurring) (observing that a "'contemporaneous' and long-held Executive Branch interpretation" may illuminate "the statute's original charge"). Indeed, the Department's explanation of the loan-forgiveness aspect prior to the ICR statute's enactment underscores that Congress passed the statute "with such power in mind." *Nebraska*, 600 U.S. at 504; *see supra* note 5.

Under the SAVE plan's revised parameters, some borrowers will achieve forgiveness more quickly than they otherwise would have under

preexisting regulations.  But that change is incremental, not transformative.  Approximately 30% of borrowers would benefit from the shortened timeline to forgiveness if they elect to enroll in SAVE (and only 16% would be eligible for forgiveness after 10 years of payments).  88 Fed. Reg. at 43,891.  The other approximately 70% of borrowers would still be required to make between 20 and 25 years of payments under the SAVE plan, as they were previously.  *Id.*  Thus, the challenged action has not "created a novel and fundamentally different loan forgiveness program."  *Nebraska*, 600 U.S. at 496.  Instead, it fits comfortably within "an unbroken list of prior [ICR] rules" that included a loan-forgiveness component.  *West Virginia*, 597 U.S. at 726.

Without weighing those considerations, the district court and the motions panel cited the "economic and political significance" of the Final Rule as the reason the major-questions doctrine might apply.  App. 371; R. Doc. 35, at 46; Inj. Op. 7-8.  But because "each portion of the Final Rule is severable," App. 385; R. Doc. 35, at 60, each provision of the rule must be analyzed separately.  The shortened-repayment-period provision accounted for only $4 billion of the rule's final cost of $156 billion (before the Supreme Court's decision in *Nebraska*).  88 Fed. Reg. at 43,890 (Tbl. 5.4).  More

fundamentally, economic and political considerations, on their own, have never been enough to trigger the doctrine. Rather, the Supreme Court has considered other surrounding circumstances, including the "history and the breadth of th[at] authority" and whether the agency has relevant "expertise." *West Virginia* 597 U.S. at 721, 729 (quotation marks omitted); *see also, e.g.*, *id.* at 747-48 (Gorsuch, J., concurring) (same); *Nebraska*, 600 U.S. at 501, 504 (same); *id.* at 519 (Barrett, J., concurring) (same). As explained above, those circumstances do not "provide a 'reason to hesitate before concluding that Congress' meant to confer such authority" to set the terms of ICR plans, including the timeline to forgiveness. *West Virginia*, 597 U.S. at 721. It follows that the major-questions doctrine is inapplicable here.

**c.** Even if it applied, however, the major-questions doctrine would not support the conclusion that the Department lacks authority to offer loan forgiveness through ICR plans. That doctrine is a particular application of the principle that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 597 U.S. at 721 (quotation marks omitted). As a result, the doctrine "is a tool for discerning—not departing from—the text's most natural interpretation." *Nebraska*, 600 U.S. at 508 (Barrett, J., concurring).

Here, the text's most natural interpretation allows for loan forgiveness. As explained above, Congress expressly granted the Secretary discretion to set ICR payments based on the borrower's income. 20 U.S.C. § 1087e(e)(4). Congress also explicitly capped the length of a borrower's obligation: payments must be made over "an extended period of time prescribed by the Secretary, not to exceed 25 years." *Id.* § 1087e(d)(1)(D). Some borrowers will therefore be unable to repay their loans in full within the statutory timeframe. That explains why every Secretary has concluded that ICR plans should forgive the remaining balance for borrowers whose incomes are insufficient to fully repay their loans. Congress has never disturbed that understanding—to the contrary, it has subsequently amended the HEA in ways that build on, rather than refute, that core aspect of ICR plans.

Given that the statutory text and context all reinforce the same conclusion, the major-questions doctrine does not demand a contrary result. After all, that doctrine "does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority." *Nebraska*, 600 U.S. at 516 (Barrett, J., concurring). Accordingly, even if the major-questions doctrine applies, the SAVE plan's shortened timeline to forgiveness is lawful.

## II.     The equitable factors greatly favor the government.

Even if plaintiffs could establish a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam).  The equitable factors weigh against injunctive relief, providing several independently adequate grounds to reverse the preliminary injunction.

### A.     Plaintiffs fail to demonstrate irreparable harm absent preliminary relief.

To establish irreparable harm, plaintiffs must show that, in the absence of a preliminary injunction, they are likely to suffer a harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).  Plaintiffs failed to do so here.

1.  Because plaintiffs have not shown any Article III injury, they necessarily have not shown irreparable harm.  *See supra* pp. 23-31.  But even if this Court finds that MOHELA has suffered injuries sufficient to give plaintiffs standing, plaintiffs have not established that any injury to Missouri is so "certain and great" as to justify interim relief.  *Morehouse Enters.*, 78 F.4th at 1017.  As explained above, MOHELA asked the Department to transfer 1.5 million of its borrowers to other servicers.  Given MOHELA's

own request to reduce the number of borrower accounts it services (which will, in turn, reduce its revenue), plaintiffs cannot credibly claim that MOHELA is greatly and irreparably injured by the far more modest reduction in servicing revenue caused by the Final Rule. *See* App. 236; R. Doc. 22-2, at 7 (Approximately 28,000 borrowers serviced by MOHELA have had their loans discharged under SAVE, and an estimated 53,000 other such borrowers have been identified for forgiveness). Nor does a finding of irreparable harm follow from this Court's decision in *Nebraska*, 52 F.4th 1044. Under the action at issue there, "roughly half" of the five million accounts serviced by MOHELA would be closed, at an estimated cost to MOHELA of $44 million per year. *Nebraska*, 600 U.S. at 490. The provision at issue here affects far fewer borrowers.

Plaintiffs' significant delay in seeking injunctive relief further undermines their claim of irreparable harm. *See Benisek*, 585 U.S. at 159 ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) ("[D]elay alone may justify the denial of a preliminary injunction when the delay is inexplainable in light of a plaintiff's knowledge of the conduct of the defendant."). Plaintiffs waited nine months after the

publication of the Final Rule—and after the effective date of several provisions, including the shortened timeline to forgiveness—to file this suit. Then, they waited another week before seeking a preliminary injunction. App. 381; R. Doc. 35, at 56. "Without question, '[a] long delay by plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'" *Adventist Health Sys./ SunBelt, Inc. v. HHS*, 17 F.4th 793, 805 (8th Cir. 2021). And this Court has rejected claims of irreparable harm based on delays comparable to (or shorter than) plaintiffs' nine-month delay here. *See, e.g., Ng v. Board of Regents of the Univ. of Minn.*, 64 F.4th 992, 999 (8th Cir. 2023) (13-month delay fatal to request for injunctive relief); *Adventist Health*, 17 F.4th at 806 (same, for 12-month delay); *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1010 & n.4 (8th Cir. 2019) (same, for 5-month delay).

The reasonableness of any delay, of course, is "context dependent," *Ng*, 64 F.4th at 998, but plaintiffs have not offered any reasonable explanation for their delay. In district court, they argued that they did not bring suit earlier because they believed "it would have been dismissed as unripe." App. 381; R. Doc. 35, at 56. According to plaintiffs, they did not believe they had a basis to

sue until February 2024, after the Department announced it had forgiven some student loans pursuant to the Final Rule.[7] *Id.* The district court rightly "question[ed] the bases of [p]laintiffs' arguments," *id.*, which offer no valid justification for plaintiffs' delay.

The district court recognized that plaintiffs' "delay in bringing this case diminishes [their] claims of imminent harm." App. 382; R. Doc. 35, at 57; *see also* App. 381; R. Doc. 35, at 56 (noting that "[b]ecause of [p]laintiffs' delay, some alleged harms have already occurred," which "weighs" against their claim for interim relief). But the court reasoned that "because [p]laintiffs have explained that they seek only prospective relief, their delay does not undermine a finding that they are facing irreparable harm." App. 381; R. Doc. 35, at 56. That was error. In *Adventist Health*, this Court affirmed the district court's denial of a preliminary injunction that sought only prospective

---

[7] Although the shortened-repayment-period provision was actually implemented a month earlier, in January 2024, plaintiffs' counsel explained at oral argument that they were unaware of that fact because they do not "read the Federal Register every day." App. 477; R Doc. 55, at 44. *But see NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (noting that "publi[cation] in the Federal Register" is "the statutory and accepted means of giving notice of a rule as adopted").

relief—the enjoining of an HHS policy on the eve of its scheduled implementation—based in part on plaintiffs' delay in seeking an injunction. 17 F.4th at 805. The Court specifically rejected as an "implausible assertion of law" the plaintiffs' argument that their delay did not bear on irreparable harm because they sought to enjoin an unimplemented policy before it harmed them. *Id.* The delay by plaintiffs in this case militates even more strongly against finding irreparable harm because the shortened-repayment-period provision was in effect for months before plaintiffs sought emergency relief. Plaintiffs' delay belies any claim of irreparable harm, and this Court should accordingly reverse the preliminary injunction.

**2.** The motions panel mistakenly believed that *any* forgiveness under REPAYE/SAVE, even on timelines that predate the Final Rule by decades, "work[s] the same irreparable harm on MOHELA that the district court sought to enjoin." Inj. Op. 8. But the district court made its intentions clear, explaining that "[p]laintiffs' alleged harms are entirely focused on the Final Rule's *early loan forgiveness provisions*, and this is what they seek to stop." App. 381, R. Doc. 35, at 56 (emphasis added); *see also* App. 382; R. Doc. 35, at 57 ("Plaintiff Missouri has adequately alleged a threat of irreparable harm in the form of this early loan forgiveness.").

The motions panel further suggested that the Department's continued implementation of those preexisting timelines reflected a new "hybrid plan" that "render[ed] the [district court's] injunction largely a nullity." Inj. Op. 8. Again, the district court took a different view. The district court preliminarily enjoined a single change to the REPAYE plan—the Final Rule's shortening of the repayment period for certain loans. App. 383-84, 387; R. Doc. 35, at 58-59; R. Doc. 36. The court then concluded that the relevant provision of the rule was severable and left everything else undisturbed. App. 385; R. Doc. 35, at 60. The result was a REPAYE plan with all of the Final Rule's changes (including the change in name to SAVE), except the shortened-repayment-period provision. Accordingly, when presented with plaintiffs' request to extend the preliminary injunction to preexisting forgiveness provisions, the court did not express any concerns about the effectiveness of its order or suggest that the Department had acted improperly. Instead, it declined the request because plaintiffs had "only sought injunctive relief from implementation of the Final Rule," and that is what the court had provided. App 432; R. Doc. 54.

### B.   The balance of equities and public interest weigh against injunctive relief.

Finally, the preliminary injunction is improper because the balance of the equities and the public interest strongly favor the government. *See Morehouse Enters.*, 78 F.4th at 1018 ("The third and fourth factors for a preliminary injunction . . . merge when the Government is the party opposing the preliminary injunction."). Given the mismatch between plaintiffs' speculative injuries and the government's strong interests in implementing the Final Rule, "consideration of these factors alone requires denial of the requested injunctive relief." *Winter*, 555 U.S. at 23.

The government is irreparably injured when it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers) ("[A]n improper intrusion by a federal court into the workings of a coordinate branch of the Government" weighs against equitable relief). Congress directed the Department to offer borrowers an ICR plan on terms set by the Secretary, but the district court's injunction

prevents the Department from offering the full SAVE plan to millions of borrowers already enrolled. In turn, that will exacerbate the serious harms the Rule was designed to ameliorate, including student-loan defaults, 88 Fed. Reg. at 43,881, delinquency, *id.* at 43,882, adverse effects on credit scores, *id.*, decreased liquidity for important purchases, *id.* at 43,883, decreased enrollment in higher education, *id.*, drags on national economic growth, *id.* at 43,884, and increased reliance on federal welfare programs, *id.* Moreover, as the district court recognized, enjoining the shortened-repayment-period provision will upset expectations of borrowers who switched to the SAVE plan, have made payments under the program, and anticipate early forgiveness. App. 382; R. Doc. 35, at 57. "These borrowers and the public," the court observed, "have an interest in ensuring consistency in loan repayment programs, and any preliminary injunction would harm their expectations of such consistency." *Id.*

Implicit in this observation is a recognition that the preliminary injunction modified the status quo. At the time of the district court's ruling, the shortened timeline to forgiveness had been in effect for five months. Thus, enjoining the operation of that provision would "disrupt, not preserve, the status quo." *Adventist Health*, 17 F.4th at 806; *see also Louisiana ex*

*rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022) (per curiam) (staying an injunction directed at a challenged action that was already in place).  "[T]he public interest weighs in favor of denying" a preliminary injunction where allowing an adopted regulation to remain in force "maintains the status quo for every other interested party that has prepared for it." *Adventist Health*, 17 F.4th at 806.  These considerations apply with special force with respect to forgiveness on preexisting timelines, which have been the status quo for years, and even decades for some plans.

The district court ultimately found "serious public interest concerns" on both sides and concluded that the public interest factor favored neither party.  App. 382-83; R. Doc. 35, at 57-58.  In calling a tie, the district court erred.  The countervailing public interests hypothesized by the district court either rest on policy objections to income contingent repayment culminating in forgiveness, *see* App. 382; R. Doc. 35, at 57 (citing "effects on taxpayers" who do not benefit from the program), or attempt to double-count the court's prediction on the merits, *see* App. 383; R. Doc. 35, at 58 (citing the interest in "ensuring that those repayment programs are lawful").  Both are improper.  Further, even if the public interests were in equipoise, that would counsel against injunctive relief.  To obtain a preliminary injunction, the moving

party "must establish . . . that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *accord Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("The party seeking injunctive relief bears the burden of proving all the . . . factors."). The district court's recognition that the public interest would be disserved by the entry of such relief means that plaintiffs failed to carry their burden.

## III. At a minimum, the preliminary injunction should be narrowly tailored.

Assuming that some relief were proper, this Court should at least narrow the injunction to match any injury established by plaintiffs. Consistent with Article III, a court must tailor its remedy "to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *id.* at 72 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Principles of equity reinforce those limitations. Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) ("A preliminary injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law."

(quotation marks omitted)). In line with these principles, the Supreme Court recently "remind[ed] lower courts of th[at] foundational rule" by staying a "universal injunction" that swept more broadly than necessary to prevent harm to the plaintiffs. *Poe*, 144 S. Ct. at 927 (2024) (Gorsuch, J., concurring); *id.* at 921 (order of the Court); *id.* at 933 n.4 (Kavanaugh, J., concurring).

Any injunctive relief in this case thus should have been tailored to prevent harm to Missouri—the only State the district court found to have standing. App. 361; R. Doc. 35, at 36. Instead, the district court entered a universal injunction barring the application of the Final Rule's shortened timeline to forgiveness to millions of borrowers throughout the country— most of whom have no connection whatsoever to MOHELA. *See* App. 231; R. Doc. 22-2 at 2. That injunction imposes all of the now-familiar harms associated with universal relief. *See Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring). Here, those harms are particularly acute because the district court's injunction severely undermines the Tenth Circuit's order in *Alaska* and grants the plaintiffs in that case relief they were denied in their own suit.

Worse still, the injunction's overbroad scope provides no conceivable benefit to plaintiffs. Even accepting the district court's theories of standing and irreparable harm, plaintiffs are not affected by the discharge of loans

serviced by *other* federal loan servicers—none of which are instrumentalities of plaintiff States.

The universal injunction is particularly improper because the district court offered no reasoning for its scope. That fact alone justifies a narrowing of the preliminary injunction. *See Louisiana v. Becerra*, 20 F.4th 260, 263-64 (per curiam) (5th Cir. 2021) (staying a district court's injunction insofar as it applied beyond the plaintiff States where the district court "gave little justification" for issuing a universal injunction).

Although this Court found nationwide relief appropriate in *Nebraska*, that decision does not control here for two reasons. First, the Court reasoned there that an "injunction limited to the plaintiff States, or even more broadly to student loans affecting the States," would be "impractical" and would not provide plaintiffs full relief, considering that MOHELA services loans held by borrowers throughout the country. 52 F.4th at 1048. The government here asks the Court to modify the injunction to target only loans serviced by MOHELA, a limit that is workable and that would redress the only injury the district court accepted. Second, central to this Court's reasoning in *Nebraska* was the fact that, under a different agency action that no one had challenged, student-loan payments were then paused and interest

on student loans was not accruing; in the Court's view, temporarily enjoining the Secretary's forgiveness plan would not harm borrowers under those circumstances. *Id.* at 1047. The Court reasoned that the suspension of student loan payments and interest accrual "weigh[ed] against delving" into the complexities inherent in fashioning narrower relief, though it expressly noted that such "complexities may not counsel against limiting the scope of an injunction in other contexts." *Id.* at 1048. The context is materially different now: those pandemic-era measures pausing payments and interest accrual have ended, and as explained above, enjoining the SAVE plan's forgiveness provision imposes irreparable harms on borrowers, the Department, and the public. *See supra* pp. 52-54.

Finally, the district court erred by preliminarily enjoining the President. *See* App. 365; R. Doc. 35, at 40 (declining to dismiss the President as a defendant); App. 387; R. Doc. 36 (enjoining "[d]efendants"). Federal courts "in general . . . ha[ve] no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)). Assuming some relief were proper, a preliminary injunction directed at the Department and Secretary would plainly suffice, given that the

Department implements the Final Rule. An injunction running against the President is therefore improper. *See id.*; *see also id.* at 828-29 (Scalia, J., concurring).

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
  *s/ Sarah N. Smith*
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7533*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue, NW*
   *Washington, DC 20530*
   *(202) 305-0173*
   *Sarah.N.Smith@usdoj.gov*

August 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because it contains 12,224 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Sarah N. Smith*
Sarah N. Smith

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sarah N. Smith*
Sarah N. Smith