# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

―――――――――――

STATE OF MISSOURI, et al.,

>>>> Plaintiffs-Appellees/Cross-Appellants,

v.

JOSEPH R. BIDEN, JR., et al.,

>>>> Defendants-Appellants/Cross-Appellees.

―――――――――――

On Appeal from the United States District Court
for the Eastern District of Missouri

―――――――――――

## ADDENDUM

―――――――――――

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7533*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue, NW*
   *Washington, DC 20530*
   *(202) 305-0173*

# TABLE OF CONTENTS

Memorandum and Order (June 24, 2024), R. Doc. 35.....................................................A1

Preliminary Injunction (June 24, 2024), R. Doc. 36.....................................................A62

Exhibit 2 to Defendants' Memorandum in Support of Motion to Dismiss Case
and Opposition to Plaintiffs' Motion for a Preliminary Injunction (Kvaal
Declaration) (May 7, 2024), R. Doc. 22-2.........................................................A63

Order Denying Plaintiffs' Motion for Clarification of the Preliminary
Injunction (July 10, 2024), R. Doc. 54.............................................................A74

20 U.S.C. § 1087e (excerpts) ..........................................................................A75

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:24-cv-00520-JAR |
| | ) | |
| JOSEPH R. BIDEN, Jr., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

The State of Missouri and six other states[1] bring this suit against President Joseph R. Biden, Jr., Secretary of Education Miguel Cardona,[2] and the United States Department of Education challenging the Secretary's rule, "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program," (the "Final Rule"). The Final Rule creates a new income-driven repayment ("IDR") plan—referred to as the Savings on Valuable Education ("SAVE") plan—to replace the Revised Pay-As-You-Earn ("REPAYE") plan. Compared to the REPAYE plan, the SAVE plan: (1) increases the amount of a borrower's income that is exempt from payment calculations from 150% to 225% of the federal poverty line ("FPL"); (2) decreases the maximum percentage of discretionary income that can be used to calculate monthly payments on undergraduate loans from 10% to 5%; (3) decreases the maximum time in repayment for borrowers with low initial principal balances to qualify for loan forgiveness from 20 years for undergraduate loans to as

---

[1]    These are Arkansas, Florida, Georgia, North Dakota, Ohio, and Oklahoma.

[2]    Plaintiffs' claims against the Secretary and the President are brought against them in their respective official capacities.

little as 10 years[3]; and (4) provides that any accrued interest not covered by a borrower's calculated monthly payment is not charged to the borrower.  The Final Rule is to take full effect on July 1, 2024, though the Secretary has designated some provisions for early implementation, including the early loan forgiveness provisions.  Thus, the Secretary has already forgiven hundreds of thousands of loan balances for borrowers in the SAVE plan.[4]  Plaintiffs argue that Defendants lack congressional authority to implement these changes or otherwise have violated the law in promulgating the Final Rule.  Plaintiffs seek prospective injunctive and declaratory relief to halt any further implementation of the Final Rule.

This matter is now before the Court on several motions.  On April 16, 2024, Plaintiffs filed their Motion to Stay or, in the alternative, for a Temporary Restraining Order.  ECF No. 6.  On the same day, Plaintiffs filed a Motion to Stay or, in the alternative, for Preliminary Injunction.  ECF No. 7.  On May 7, 2024, Defendants filed a Motion to Dismiss and a Response to Plaintiff's Motions.  ECF Nos. 21 and 22.  On May 17, 2024, Plaintiffs filed their combined Reply and Response to Defendants' Motion.  ECF No. 26.  On May 27, 2024, Defendants filed

---

[3]     Under the SAVE plan, borrowers with original principal balances of $12,000 or less become eligible for forgiveness of any remaining account balance after making at least 120 months (or 10 years) of eligible payments.  For each additional $1,000 in a borrower's initial principal balance, the Final Rule permits full discharge of the unpaid balance after the borrower makes an additional 12 months of eligible payments.  For example, a borrower with an original principal balance between $13,001 and $14,000 can have any remaining balance forgiven after making 144 months (or 12 years) of eligible payments.  The Final Rule sets a maximum repayment period of 20 years for undergraduate loans or 25 years for graduate loans for borrowers choosing the SAVE plan and permits the Secretary to fully cancel any remaining balances after borrowers have been in repayment for the maximum repayment period.

[4]     *Biden-Harris Administration Announces Additional $7.7 Billion in Approved Student Debt Relief for 160,000 Borrowers*, U.S. Dep't of Educ. (May 21, 2024), https://perma.cc/94CJ-ZU8B ("Today's announcement brings total relief approved under the SAVE Plan to $5.5 billion for 414,000 borrowers.").

their Reply.  ECF No. 29.  On June 3, 2024, the Court heard oral argument on the parties' various motions.  ECF No. 31.  All Motions are now ripe for disposition.

The Court has thoroughly reviewed the parties' briefing and exhibits and has carefully considered the parties' arguments.  Because the Court finds that at least one Plaintiff has standing and that venue is proper in this district, it will deny Defendants' Motion to Dismiss.  The Court also finds that Plaintiffs are likely to succeed on the merits of their argument that the early loan forgiveness provisions of the Final Rule were promulgated in a manner exceeding the Secretary's statutory authority.  And because Plaintiffs have shown that Missouri faces impending harm from any additional loan forgiveness under the Final Rule, the Court finds it necessary to enjoin Defendants from any further implementation of the Final Rule's loan forgiveness provisions until this matter can be fully litigated.  All other aspects of the Final Rule were promulgated properly. For these reasons and others set forth below, the Court will grant in part and deny in part Plaintiffs' Motion for Stay or, in the alternative, for Preliminary Injunction.

## Background

A.    The Higher Education Act and Accompanying Regulations

In 1965, Congress passed the Higher Education Act ("HEA") "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965).  The HEA authorized the Department to provide financial assistance to students seeking a post-secondary education in the form of "Educational Opportunity Grants" and by creating a federal loan insurance program administered by the Department to support student loans issued by qualifying private lenders.

In 1993, Congress passed the Student Loan Reform Act, which created the Federal Direct Student Loan Program,[5] which for the first time allowed the federal government to issue loans for post-secondary education.  Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993).  As amended, the HEA provided borrowers with several options of repayment plans, one of which was an income contingent repayment ("ICR") plan "with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years . . . ."  20 U.S.C. § 1087e(d)(1)(D) (1993).  The 1993 amendments also provided that "[i]ncome contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary."  *Id.* 1087e(e)(4).  The language of section 1087e(e)(4) remains the same today as it was when first passed in 1993.

In 1994, the Secretary promulgated the first regulations regarding the standards, criteria, and procedures governing ICR plans, and these regulations became effective on July 1, 1995.  59 Fed. Reg. 61664-01.  Under the authority provided by 20 U.S.C. § 1087e(e)(4), these regulations capped the repayment amount for ICR plans at 20% of discretionary income[6] (34 C.F.R. § 685.209(a)(2) (1994)) and provided that "[i]f a borrower has not repaid a loan in full at the end of the 25-year repayment period under the [ICR] plan, the Secretary cancels the unpaid portion of the loan."  *Id.* § 685.209(c)(2)(iv) (1994).

---

[5]     Now known as the William D. Ford Federal Direct Loan Program.  20 U.S.C. § 1087a(b)(1).

[6]     "Discretionary income" was defined as "a borrower's [adjusted gross income] minus the amount of the 'HHS Poverty Guidelines for all States (except Alaska and Hawaii) and the District of Columbia' as published by the United States Department of Health and Human Services on an annual basis."  34 C.F.R. § 685.209(a)(3) (1994).

A4

In 2007, Congress again amended the HEA.  College Cost Reduction and Access Act, Pub. L. 110-84, 121 Stat. 784.  These amendments for the first time instructed the Secretary on how the Department was to calculate the maximum repayment period under an ICR plan, but it provided no specific definition of an "extended period of time" under 20 U.S.C. § 1087e(d)(1)(D).  Nor did it prevent the Secretary from forgiving loans at the end of the maximum repayment period.  Instead, the amendments generally outline when payments under various repayment plans qualify towards the maximum repayment period, including months in which the borrowers are not in default or are in deferment due to an economic hardship.  The statutory limits in section 1087e(e)(7) regarding the calculation of the maximum repayment period for an ICR plan remain the same today as they were when first passed in 2007.

The 2007 amendments also created a specific plan of loan forgiveness for public service employees—the Public Service Loan Forgiveness ("PSLF") program.  Under 20 U.S.C. § 1087e(m), the Secretary "shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default for a borrower" who has made 120 qualifying monthly payments and has been employed in a public service job throughout the entirety of those 120 months.  The statute further specifies that "the Secretary shall cancel the obligation to repay the balance of principal and interest due as of the time of such cancellation . . . ."  *Id.* § 1087e(m)(2).  Outside of some amendments to the definition of a "public service job," section 1087e(m) remains the same today as it was when first passed in 2007.

The 2007 amendments created yet another repayment plan—the income-based repayment ("IBR") plan.  College Cost Reduction and Access Act, Pub. L. 110-84, 121 Stat. 784 (codified at 20 U.S.C. § 1098e).  The IBR program permits borrowers experiencing "partial financial hardship" to elect repayment under the IBR plan.  A "partial financial hardship" is when a

borrower's annual loan payments as calculated under the standard repayment plan[7] are greater than 15% of the borrower's (and the borrower's spouse if filing jointly) adjusted gross income ("AGI") less 150% of the FPL.  *Id.*  It also directed the Secretary to repay or cancel a qualified IBR plan borrower's outstanding loan balance after a maximum repayment period of 25 years.  *Id.*

In 2010, Congress amended the terms of the IBR program.  Congress lowered the "financial hardship" threshold to qualify for IBR from 15% of AGI less 150% of the FPL to 10% of AGI less 150% of the FPL.  And "with respect to any loan made to a new borrower on or after July 1, 2014[,]" Congress decreased the maximum repayment period under the IBR plan from 25 years to 20 years.  Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029.  Section 1098e(e) remains the same today as it was when first passed in 2010.

Congress has made no significant amendments to the HEA since 2010, but the Secretary has promulgated regulations controlling ICR plans.  In 2012, the Secretary implemented a new ICR plan known as Pay As You Earn ("PAYE") and incorporated some of the 2010 statutory changes to the IBR plan into the Direct Loan and Federal Family Education Loan ("FFEL") program.  77 Fed. Reg. 66,088-01.  Under the 2012 regulations, which became effective on July 1, 2013, borrowers of loans disbursed after October 1, 2011,[8] who could establish a partial financial hardship could elect to repay their loan through the PAYE program.  *Id.* at 66,137; 34

---

[7]    The standard repayment plan offers borrowers a "fixed annual repayment amount paid over a fixed period of time, not to exceed 10 years[.]"  20 U.S.C. § 1078(b)(9)(A)(i).

[8]    An "eligible new borrower" under the PAYE plan was one who "[h]as no outstanding balance on a Direct Loan Program loan or a FFEL Program loan as of October 1, 2007, or who has no outstanding balance on such a loan on the date he or she received a new loan after October 1, 2007; and . . . [r]eceives a disbursement of a [qualifying loan] after October 1, 2011 . . . ." making the PAYE plan available to borrowers who took out loans as far back as 2007.  34 C.F.R. § 685.209(a)(iii).

C.F.R. § 685.209(a)(2) (2013).   A "partial financial hardship" under the PAYE program is when a borrower's annual amount due under the 10-year standard repayment plan is greater than 10% of the borrower's AGI less 150% of the FPL, the same as it is under the IBR plan.  *Id.* at 66,137; 34 C.F.R. §§ 685.209(a)(1)(v)(A) and (B).   Monthly payments under the PAYE plan "are limited to no more than 10 percent of the amount by which the borrower's AGI exceeds 150 percent of the [FPL] applicable to the borrower's family size, divided by 12," which is the same as the limit under the IBR plan.  *Id.*; 34 C.F.R. § 685.209(a)(2).   And, as with the IBR plan, qualifying borrowers who opted into the PAYE plan were eligible for loan forgiveness after making 20 years of qualifying payments.  *Id.* at 66,139–40; 34 C.F.R. § 685.209(a)(6).

In 2015, the Secretary issued additional regulations creating a new ICR plan called the Revised Pay As You Earn ("REPAYE") repayment plan.  80 Fed. Reg. 67,204.  These regulations became effective on July 1, 2016.  34 C.F.R. § 685.209(c) (2016).  Some terms of the REPAYE plan mirror those of the PAYE plan: borrowers' monthly payments under the plan are again limited to no more than 10% of the borrower's AGI less 150% percent of the FPL and borrowers under the plan qualify for loan forgiveness after 20 years of qualifying payment for undergraduate loans and 25 years of qualifying payments for graduate loans.  80 Fed. Reg. at 67,239, 67,241; 34 C.F.R. §§ 685.209(c)(2)(i) and (c)(5) (2016).  Importantly, unlike the PAYE plan, which requires borrowers to show financial hardship and to have received loans after October 1, 2011, the REPAYE plan is available to all borrowers.[9]  80 Fed. Reg. at 67,239; 34 C.F.R. § 685.209(c)(ii) (2016).  The REPAYE plan thus has many of the same repayment provisions as the PAYE and IBR plans but is available to more borrowers.  The terms of both the

---

[9]      Except those borrowers who are in default and "parent borrowers" who obtained loans to help pay for their child's education.

PAYE plan and the REPAYE plan remain in effect without significant alteration.  34 C.F.R.

§§ 685.209(a) and (c).

      B.    <u>The Final Rule</u>

On May 26, 2021, the Secretary published in the Federal Register his intent to establish

negotiated rulemaking committees "to prepare proposed regulations for programs authorized

under title IV[10] of the [HEA]."  86 Fed. Reg. 28,299-01.  It published the dates, times, and

locations of public hearings on the matter and permitted public comments on or before July 1,

2021.  Among the issues the Department intended to address were "[l]oan repayment plans under

34 C.F.R. . . . [§§] 685.208, and 685.209" and "[t]he Public Service Loan Forgiveness program

under 34 C.F.R. [§] 685.219."  *Id.* at 28,300.  Virtual public hearings were held on June 21, 23,

and 24, 2021.  *Id.*; *see also* 88 Fed. Reg. 1,894-01.  After these public hearings, the Secretary

published in the Federal Register notice of his intent to establish a committee to propose

modifications to the HEA loan repayment programs and requested "nominations for individual

negotiators who represent key stakeholder constituencies for the issues to be negotiated to serve

on the committee."  *See* 86 Fed. Reg. 43,609.  Individual negotiators were nominated and

selected, and the committee met several times to negotiate the subsequent rulemaking.

After concluding the negotiated rulemaking process, on January 11, 2023, the Secretary

published a notice of proposed rulemaking ("NPRM") outlining the proposed changes to the

HEA loan repayment programs.  88 Fed. Reg. 1,894-01.  The NPRM explains that:

> The Secretary proposes to amend the regulations governing [ICR] plans by
> amending the [REPAYE] repayment plan, and to restructure and rename the
> repayment plan regulations under the William D. Ford Federal Direct Loan (Direct

---

[10]    Title IV refers to the "Student Assistance" section of the HEA, which includes all
sections relating to the relevant student loans plans discussed herein.  *See* 20 U.S.C. §§ 1070–
1099d.

Loan) Program, including combining the [ICR] and [IBR] plans under the umbrella term of "Income-Driven Repayment (IDR) plans."

*Id.*  The NPRM further explained the Secretary's intent to amend the regulations on IDR plans, specifically to "expand the benefits of the REPAYE plan" by (1) increasing the amount of protected income used to calculate borrowers' monthly payments, (2) decreasing the share of unprotected income used to calculate borrowers' monthly payments, (3) reducing the time for some low initial balance borrowers to receive loan forgiveness, and (4) no longer charging borrowers accrued interest each month after borrowers make a qualifying payment.  Borrowers would also receive credit toward loan forgiveness for certain periods of deferment or forbearance that were not previously credited.  The NPRM set the date to receive public comments on the proposed rule for February 10, 2023—30 days after the NPRM's publication.  *Id.*

After receiving public comments, on July 10, 2023, the Final Rule was published in the Federal Register.  88 Fed. Reg. 43,820.  In relevant part, the Final Rule's outlines its major provisions as follows:

The final regulations—

- Expand access to affordable monthly Direct Loan payments through changes to the [REPAYE] repayment plan, which may also be referred to as the Saving on a Valuable Education (SAVE) plan;[11]

. . .

- Increase the amount of income exempted from the calculation of the borrower's payment amount from 150 percent of the [FPL] to 225 percent of FPL for borrowers on the REPAYE plan;

- Lower the share of discretionary income used to calculate the borrower's monthly payment for outstanding loans under REPAYE to 5 percent of discretionary income for loans for the borrower's undergraduate study and 10 percent of discretionary income for other outstanding loans; and an amount between 5 and 10 percent of discretionary income based upon the

---

[11]    Throughout the Final Rule, REPAYE and SAVE are used interchangeably and both are meant to refer to the changes to the REPAYE plan promulgated by the Final Rule.

weighted average of the original principal balances for those with outstanding loans in both categories;

- Provide a shorter maximum repayment period for borrowers with low original loan principal balances;

. . .

- Provide that the borrower will not be charged any remaining accrued interest each month after the borrower's payment is applied under the REPAYE plan;

- Credit certain periods of deferment or forbearance toward time needed to receive loan forgiveness; [and]

- Permit borrowers to receive credit toward forgiveness for payments made prior to consolidating their [FFEL] loans[.]

*Id.*

The HEA provides procedural rules for when rules published by the Secretary may become effective.  Under 20 U.S.C. § 1089(c)(1), the Secretary must publish the final form of any rule by "November 1 prior to the start of the award year" for the Secretary's rules to become effective during the next award year.[12]  The Final Rule was published on July 10, 2023, and the Secretary plans to fully implement the Final Rule by July 1, 2024.  88 Fed. Reg. at 43,821.

Despite the Final Rule's July 1, 2024, onset date, the Secretary designated several portions of the Final Rule for early implementation under the procedural requirements provided by the HEA.  Under § 1089(c)(2), "[t]he Secretary may designate any regulatory provision that affects the programs under [Title IV of the HEA] and is published in final form after November 1 as one that an entity subject to the provision may, in the entity's discretion, choose to implement prior to the effective date described in [§ 1089(c)(1)]."  This designation of provisions for early

---

[12]    The "award year" is defined as "the period beginning July 1 and ending June 30 of the following year[,]" which generally aligns the rule's implementation date with the beginning of a school year.  20 U.S.C. § 1088.

implementation is accomplished by publication in the Federal Register and "shall be effective

with respect to that entity in accordance with the terms of the Secretary's designation." *Id.*

§ 1089(c)(2)(B). Under this authority, the Secretary designated several provisions of the Final

Rule for early implementation on July 30, 2023:

- Adjusting the treatment of spousal income in the REPAYE plan for married borrowers who file separately as described in § 685.209(e)(1)(i)(A) and (B);

- Increasing the income exemption to 225 percent of the applicable poverty guideline in the REPAYE plan as described in § 685.209(f);

- Not charging accrued interest to the borrower after the borrower's payment on REPAYE is applied as described in § 685.209(h); . . .

- Designating in § 685.209(a)(1) that REPAYE may also be referred to as the Saving on Valuable Education (SAVE) plan[; and]

. . . the changes to the definition of family size for Direct Loan borrowers in IBR, ICR, PAYE, and REPAYE in § 685.209(a) to exclude the spouse when a borrower is married and files a separate tax return . . . .

88 Fed. Reg. at 43,820–21. The Final Rule also designated for early implementation the

provision for awarding credit toward loan forgiveness to certain periods of deferment and

provided that the Secretary "will publish a separate notice announcing the timing of the

implementation." *Id.* at 43,821.

On October 23, 2023, the Department designated for early implementation a provision

that eliminated "the requirement for borrowers returning to SAVE after having previously been

on REPAYE to provide prior years' income." 88 Fed. Reg. 72,685-01. This effectively

eliminated the obligations of borrowers under the SAVE plan to recertify their previous year's

income to remain on the plan.

On January 16, 2024, the Department designated for early implementation the provision

of the Final Rule permitting early forgiveness for certain borrowers with low initial principal

balances. 89 Fed. Reg. 2,489-01. Since early implementation of the forgiveness provision, the

Secretary has forgiven hundreds of thousands of loan balances for borrowers opting for the SAVE plan.

     C.    *Biden v. Nebraska*

The Supreme Court's recent ruling regarding the Secretary's previous student loan forgiveness plan is instructive.  Though the Secretary in that case claimed the authority to forgive loans under a different statute not at issue here, there remains some overlap between the Supreme Court's analysis in that case and the issues presented here.

In 2001, following the September 11 terrorist attacks, Congress passed the Higher Education Relief Opportunities to Students Act of 2001, which authorized the Secretary to modify or waive provisions of the HEA student loan programs "in connection with *the* national emergency."  Pub. L. 107-122, 115 Stat. 2386 (emphasis added).  This statute specifically authorized full tuition refunds "to students who are members of the Armed Forced serving on active duty during the national emergency."  *Id.*  In both instances, "the national emergency" refers to the September 11 terrorist attacks.

Rather than let the Act terminate on September 20, 2003, Congress passed the Higher Education Relief Opportunities for Students Act of 2003 (the "HEROES Act"), which again granted the Secretary the authority to modify or waive "any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act as the Secretary deems necessary in connection with a war or other military operation or national emergency . . . ."  Pub. L. 108-76, 117 Stat. 904.

The Secretary invoked this authority in the wake of the President's declaration of a national emergency for the COVID-19 pandemic[13] to promulgate modifications and waivers to

---

[13]    Presidential Proclamation No. 9994, 85 Fed. Reg. 15,337.

the student loan repayment program.  One such set of modifications and waivers was published

in the Federal Register on October 12, 2022.  87 Fed. Reg. 61,512-01.  There, the Secretary

announced his intention "to discharge up to a total of $20,000 in covered loans for affected

individuals who received Pell Grants and up to a total of $10,000 in covered loans for affected

individuals who did not receive a Pell Grant" for individual borrowers making less than

$125,000 per year or married couples filing jointly making less than $250,000.  *Id.*

Several states, including Plaintiffs Missouri and Arkansas, subsequently sought to enjoin

the implementation of the Secretary's forgiveness plan.  *Nebraska v. Biden*, 636 F. Supp. 3d 991

(E.D. Mo. 2022).  On October 20, 2022, the district court dismissed the case for lack of standing.

*Id.*  But on November 14, 2022, the Eighth Circuit granted the plaintiff States' Emergency

Motion for an injunction pending appeal to the Supreme Court.  *Nebraska v. Biden*, 52 F.4th

1044, 1048 (8th Cir. 2022).

On June 30, 2023, the Supreme Court sided with the States and held the Secretary's loan

forgiveness plan under the HEROES Act was unlawful.  The Supreme Court in a six-to-three

majority opinion authored by the Chief Justice found that the plaintiff States had standing

because the Higher Education Loan Authority of the State of Missouri ("MOHELA") is an

instrumentality of the State of Missouri, and therefore Missouri suffered direct harm when

MOHELA suffered harm from the loan forgiveness program.  *Biden v. Nebraska*, 143 S. Ct.

2355, 2366–68 (2023)[14] ("The Secretary's plan harms MOHELA in the performance of its public

function and so directly harms the State that created and controls MOHELA.  Missouri thus has

suffered an injury in fact sufficient to give it standing to challenge the Secretary's plan.").  The

_____

[14]    Unless otherwise noted, additional references to *Biden v. Nebraska* refer to the Supreme
Court's Opinion at 143 S. Ct. 2355.

Supreme Court further held that the Secretary's forgiveness plan was unlawful under the major questions doctrine, holding that the HEROES Act language that granted the Secretary authority to "modify or waive" provisions of the student loan repayment plans was not "clear congressional authorization" for the mass debt cancellation program. *Id.* at 2375.  The decision never directly spoke to the Secretary's authority to implement repayment procedures under the HEA that are at issue in this case.

      D.     <u>The Parties' Motions</u>

Plaintiffs filed two motions, though their requested relief for each is essentially the same. Recognizing that their requested forms of relief significantly overlap, Plaintiffs filed a combined Memorandum in Support of both Motions.  ECF No. 10.  Plaintiffs ask this Court to stay the Final Rule under the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 705.  In the alternative, Plaintiffs ask the Court to issue a temporary restraining order ("TRO") or a preliminary injunction to prevent Defendants from fully implementing the Final Rule.

Anticipating a challenge from Defendants regarding their standing to sue, Plaintiffs present several arguments to support their standing.  Plaintiffs then argue that they will likely be successful on the merits.  In particular, Plaintiffs contend that the Final Rule violates separation of powers principles requiring invocation of the major questions doctrine and otherwise runs afoul of the APA.  Plaintiffs argue that these violations necessitate vacatur of the Final Rule in its entirety.  Finally, Plaintiffs argue that they face impending injury if the Final Rule is allowed to continue and that the public interest favors a stay or other injunctive relief to prevent its further implementation.

In their Motion to Dismiss, Defendants ask the Court to dismiss this case for two reasons. First, Defendants argue that the Court should not reach the merits of this case because Plaintiffs

have not established standing, and therefore the case should be dismissed under Fed. R. Civ. P.

12(b)(1).  Second, Defendants argue that even if Plaintiffs have standing, this Court is not the

appropriate venue for this case and therefore it should be dismissed under Fed. R. Civ. P.

12(b)(3).  Defendants also argue that President Biden should be dismissed from the case.

Because the issues briefed by the parties overlap considerably, the Court will discuss the

parties' arguments by topic rather than in the order they were presented for the sake of clarity.

1.    <u>Standing</u>

Plaintiffs allege several theories of standing, though they emphasize that if the Court

finds standing for any one of them on any theory, the case should proceed as to all Plaintiffs.

Defendants vigorously oppose all of Plaintiffs' standing theories and insist that each Plaintiff

must separately establish standing under each alleged theory before the Court can consider

granting Plaintiffs' requested relief.

a.    <u>Missouri's Standing Via Harm to Its State Instrumentality</u>

Plaintiff Missouri asserts that it has standing based on alleged past and future harms to

MOHELA from the implementation of the Final Rule.  Under this theory, Missouri is harmed

because its public instrumentality, MOHELA, will lose revenue in two ways.  First, Missouri

argues that when the Direct Loans serviced by MOHELA are forgiven under the SAVE plan,

those loan accounts will be closed and MOHELA will no longer collect administrative servicing

fees for those accounts.  Second, Missouri argues that the Final Rule encourages borrowers to

consolidate FFEL loans into Direct Loans and therefore will (1) deprive MOHELA of interest

revenue from consolidated FFEL loans, (2) decrease the value of FFEL loans on the tradable

market, and (3) harm MOHELA's ability to issue bonds.  Plaintiffs emphasize that Missouri's

theory regarding the loss of income from loan servicing fees when loans are forgiven, was

accepted by the Supreme Court in *Biden v. Nebraska* and should have the same force here.

Defendants argue that the Supreme Court's determination in *Biden v. Nebraska* that Missouri had standing in that case does not mean that Missouri has standing here. Defendants specifically attack the theory that Missouri has established that MOHELA is facing actual and imminent financial harm from ongoing loan forgiveness under the Final Rule. Defendants point to MOHELA's recent request that the Department reallocate 1.5 million of its Direct Loan accounts to other federal servicers.[15] *See* ECF No. 22-3. At the same time, Defendants admit that, as of the date of its Motion to Dismiss, MOHELA had "discharged approximately 28,000 borrowers' accounts under SAVE, and an estimated further 53,000 have been identified for forgiveness and are being processed." ECF No. 22 at 11; ECF No. 11-2 at ¶ 33. Defendants argue that, because MOHELA has voluntarily requested that 1.5 million accounts be transferred to other servicers, Missouri cannot simultaneously claim harm from the closing of fewer accounts via loan forgiveness.

Defendants also argue that MOHELA will actually benefit from the SAVE plan. First, Defendants argue that with fewer loans to service because of loan forgiveness, MOHELA will be less likely to incur financial penalties, like a recent $7.2 million penalty imposed for servicing errors. Second, the Department has already distributed to MOHELA $1.6 million in transition costs as part of the switch to SAVE. Third, Defendants contend that the Final Rule will reduce borrower delinquency, decreasing servicing costs and permitting MOHELA to collect additional servicing fees on accounts that will otherwise fall into delinquency and default under previous loan repayment programs.

---

[15]     The Department has indicated that it began transferring a portion of MOHELA's accounts to other servicers at MOHELA's specific request. *Update for MOHELA student loan borrowers*, U.S. Dep't of Educ. (April 29, 2024), https://perma.cc/NTZ6-BVK6.

Defendants are also highly critical of Plaintiffs' theory that the Final Rule encourages borrowers of FFELs to seek consolidation. Defendants argue that any harm under such a theory is contingent on the action of independent third parties and is far from certain. Defendants also argue that, even if FFEL consolidation were to increase because of the Final Rule, Plaintiffs have not established with sufficient certainty that such consolidation would actually harm MOHELA.

Plaintiffs in their Reply ask that the Court to reject Defendants' preferred balancing approach when assessing potential harms to MOHELA. According to Plaintiffs, if MOHELA can show that it will lose a single dollar because of the Final Rule, that is enough.

   b. <u>North Dakota's Standing Via Harm to Its State Instrumentality</u>

Plaintiff North Dakota argues it has a separate basis for standing through alleged harms to the Bank of North Dakota (the "Bank"). The Bank provides loans to students enrolled in North Dakota institutions of higher education. According to Plaintiffs, the Final Rule will "unlawfully impose[] a direct competitive harm" on the Bank because the loan terms offered by the SAVE plan are better than those offered by the Bank. Under this theory, the Bank will lose potential revenue because fewer borrowers will choose to take out loans from the Bank and will instead chose to take out Direct Loans to take advantage of the SAVE plan.

Defendants contest the bases of this theory. Defendants first note that North Dakota has not clearly established that the Bank is an instrumentality of the state. Defendants further assert that this kind of competitor standing has never been extended to situations where the government itself was considered a competitor, but instead has been limited to cases in which government action increased the competitive advantage of one non-governmental actor over another non-governmental actor. Defendants also argue that North Dakota's standing argument improperly relies on the actions of independent third parties that are not certain to occur.

c.      Plaintiffs' Recruitment Theory

Plaintiffs also contend that each of them has standing because the Final Rule harms their ability to recruit and retain talent.  According to Plaintiffs, they rely on the PSLF program's 10-year loan forgiveness timeline to recruit and retain talent for state and local government employment.  Plaintiffs allege that without the PSLF program's comparatively strong benefits over traditional student loan repayment plans, recruits will be lured away from government work by the promise of higher pay in the private sector and a 10-year loan forgiveness timeline under the SAVE plan.  Plaintiffs support these contentions with sworn affidavits from State employees who attest to the importance of the PSLF program in the recruitment and retention of government employees.  ECF Nos. 1-4, 1-5, and 1-6.

Defendants argue that Plaintiffs' theory improperly relies on the actions of independent third parties and is speculative.  Defendants contend that the SAVE plan will continue to provide significant benefits to borrowers seeking PSLF forgiveness in the form of lower payments and limited interest accrual and may even increase participation in the PSLF program.  Defendants assert that any injunction preventing the additional benefits provided by SAVE plan will actually exacerbate Plaintiffs' concerns about recruitment.

d.      Georgia, Missouri, North Dakota, Oklahoma, and Ohio's Lost Tax Revenue Theory

Plaintiffs Georgia, Missouri, North Dakota, Oklahoma, and Ohio separately argue that they have standing because the Final Rule will decrease their tax revenues.  Generally, forgiven student loan balances (besides those forgiven via PSLF) are considered taxable income under the federal definition of AGI.  26 U.S.C. § 108(f).  These Plaintiffs allege that, for the purposes of assessing state income tax, their tax codes tie their definition of AGI to the federal government's definition.  *See*, *e.g.*, Mo. Rev. Stat. § 143.121 ("The Missouri [AGI] of a resident individual

A18

shall be the taxpayer's federal [AGI] subject to the modifications in this section."). Thus, in these States, forgiven loan balances are generally considered taxable income. But the American Rescue Plan Act of 2021 at 26 U.S.C. § 108(f)(5)—passed by Congress in response to the economic hardships caused by the COVID-19 pandemic—specifically excludes discharged student loan debt from consideration of federal AGI through the end of 2025. Therefore, these Plaintiffs argue that the SAVE plan, by permitting accelerated loan forgiveness, will decrease their expected tax revenues in 2026 and beyond when loans are forgiven on the SAVE plan before 2025.

Defendants argue that such a theory of standing is self-inflicted and precluded by binding Supreme Court precedent. Defendants assert that the alleged loss of potential tax revenue is of the Plaintiff States' own making and is unduly speculative. Defendants contend that these Plaintiffs have the ultimate power over their tax codes and can, if they so desire, change those tax codes to avoid losing tax revenue.

2.    Venue

Defendants argue that the case should also be dismissed for the independent reason that venue is improper in the Eastern District of Missouri. Defendants argue that under 28 U.S.C. § 1391(e)(1)(C), Missouri is an "entity" who "maintains its principal place of business" in Missouri's capital, Jefferson City, which is located in the Western District of Missouri. Under this theory, Plaintiffs' Complaint, which alleges that venue is proper in this Court because "Plaintiff Missouri is a resident of this judicial district," ECF No. 1 at ¶ 35, is insufficient to establish venue. Defendants argue that, per the venue statute, the State of Missouri resides only in the Western District of Missouri.

Defendants also state that the allegation in Plaintiffs' Complaint that "a substantial part of the events or omissions giving rise to the Complaint occurred within this district," *id.*, is not supported by any other factual allegations.  According to Defendants, the Complaint merely describes actions taken by the federal government in the District of Columbia and lists no specific actions taken by any party in the Eastern District of Missouri.  For these reasons, Defendants request dismissal of this case for improper venue or, in the alternative, transfer to the Western District of Missouri or the District of D.C.

Plaintiffs disagree.  They point to caselaw indicating that courts have unanimously found that venue is proper when a State brings a case in any district court within that State.  Plaintiffs also contend that venue is proper in this Court because they are bringing this suit on behalf of MOHELA, whose principal place of business is in the Eastern District.

Defendants assert in their Reply that the Ninth Circuit and other district courts were mistaken in finding that a State can bring a suit in any judicial district within that State.  Defendants ask the Court to reject the rationale used in the cases cited by Plaintiffs.  Defendants similarly discount Plaintiffs' argument that Missouri's residence has any connection to the location of MOHELA's principal place of business.

### 3.    Dismissal of President Biden

Defendants briefly argue that Defendant Joseph R. Biden, Jr., should be dismissed because President Biden is not subject to Plaintiffs' requested relief.  According to Defendants, the Court lacks jurisdiction to enjoin the president.

Plaintiffs argue that the Court has the authority to issue declaratory relief and to issue injunctive relief against the President when injunctive relief against the remaining Defendants will not fully redress Plaintiffs' alleged injuries.  They argue that the Court can, and should, enter

injunctive relief against the President to prevent him from pursuing loan cancellation by executive order.

### 4.    Statutory Authority and the Major Questions Doctrine

Plaintiffs assert that the Final Rule was promulgated in excess of statutory authority, violates separation of powers principles, and implicates the major questions doctrine. Under the major questions doctrine, when an agency takes an action touching on issues of important economic and political significance, the agency must find clear congressional authority delegating such action to the agency. Plaintiffs contend that the Final Rule is of such economic and political significance that it requires clear congressional authorization and that Defendants have no clear statutory authority to promulgate a rule with the provisions found in the Final Rule.

Plaintiffs further allege that the HEA does not permit the Secretary to forgive any loans under any ICR program. Plaintiffs also argue that the general terms of the Final Rule unlawfully change the ICR program from a loan repayment program into a grant program "for the typical borrower." Plaintiffs insist that the use of "repayment" in the statutory creation of the ICR program requires full repayment of any student loan.

Plaintiffs also contend that the SAVE program under the Final Rule will make the IBR program irrelevant, indicating that the Final Rule is not statutorily authorized. According to Plaintiffs, the Secretary cannot make an ICR program more generous than the IBR program because the IBR program was created by Congress. Plaintiffs argue that any specific conditions set by Congress in the IBR program, like the percent of a borrower's income considered when calculating payments, cannot be more generous under an ICR program because Congress would have set those conditions by statute as they did with the IBR plan. Plaintiffs use this same theory to attack the provisions of the Final Rule providing for limits on the interest accrual as long as a

borrower participates in the SAVE plan because the IBR plan only permits the Secretary to subsidize a borrower's interest for a maximum of three years.

Additionally, Plaintiffs argue that the Secretary's interpretation of his power under the HEA is simply too broad. Plaintiffs assert that repayment "over an extended period of time prescribed by the Secretary, not to exceed 25 years" does not mean, as Defendants suggest, that there is no lower limit to the length of time a borrower must remain in repayment. Plaintiffs contend that "an extended period of time" must be at least 20 years as that is the minimum repayment timeline to qualify for forgiveness under the IBR plan as set by Congress.

Defendants argue that the Court need not rely on the major questions doctrine to decide this case because the issues presented can be resolved using typical tools of statutory interpretation. And even though Defendants dispute the applicability of the major questions doctrine, they still assert that Congress has provided clear authority for the Final Rule's provisions via the HEA.

Additionally, Defendants reject the applicability of the *Biden v. Nebraska* decision to this case. According to Defendants, the *Biden v. Nebraska* decision invoked the major questions doctrine in relation to the Secretary's reliance on the HEROES Act to create that loan forgiveness program but said nothing about the Secretary's authority under the HEA. Defendants emphasize that this plan does not rely on emergency powers like those implicated by the HEROES Act, and that any concerns the Supreme Court may have had about executive overreach in times of crisis are not applicable to the Final Rule.

Defendants contend that Congress has granted them statutory authority to create ICR plans in 20 U.S.C. § 1087e(d)(1)(D). According to Defendants, the Final Rule is just another example of the Secretary exercising that authority. Defendants point out that, despite the

Secretary creating several ICR plans over the past three decades—including plans that allow for forgiveness for borrowers who make 20 years of qualifying payments—Congress has never specifically prevented the Secretary from offering loan forgiveness under ICR plans.

Defendants also question Plaintiffs' position that the statutory provisions of the IBR plan are implicit limitations on the Secretary's authority to promulgate ICR plans.  In Defendants' view, if Congress wished to restrict the IBR plan's provisions to borrowers experiencing a partial financial hardship, Congress would have explicitly limited the ICR plan in the way Plaintiffs suggest.  And because Congress has not done so, the Court should not find the Secretary's authority contains this implicit limitation.

Plaintiffs argue in their Reply that Defendants' alleged admission that the Secretary has implied authority to forgive loans under the ICR plan is sufficient to show that there is no clear statutory authority for the Secretary to do so.  Plaintiffs further argue that, despite the Secretary previously creating ICR plans that provided loan forgiveness, the Final Rule is of such economic and political significance that it invokes the major questions doctrine and requires the Secretary to established clear congressional authority for the Final Rule.

     5.    <u>The Administrative Procedure Act and Arbitrary and Capricious Agency Action</u>

Plaintiffs contend that, regardless of whether the Final Rule implicates the major questions doctrine, it is also unlawful because it is arbitrary and capricious agency action or otherwise violates the APA.

     a.    <u>The Final Rule's Cost Estimate</u>

Plaintiffs contend the Final Rule's cost estimate is so inaccurate that its inclusion in the Final Rule indicates that the Final Rule is arbitrary and capricious.  According to Plaintiffs, the cost estimate is flawed because it underestimates the cost of implementation and ignores that the

Department's previous plan for loan forgiveness was struck down as unlawful by *Biden v. Nebraska*.  Much of Plaintiffs' argument on this point is based on the timing of the publication of the Final Rule, which was 10 days after the Supreme Court issued its decision in *Biden v. Nebraska*.  According to Plaintiffs, because the Secretary knew that the cost estimates as published in the Final Rule were inaccurate at the time of publication, the Secretary's promulgation of the Final Rule was arbitrary and capricious agency action.

Defendants dispute that the Final Rule is arbitrary and capricious despite its seemingly inaccurate cost estimate.  Defendants argue the HEA does not require any cost-benefit analysis with respect to ICR plans.  Defendants assert that the only reason the Secretary conducted a cost-benefit analysis was to conform to Executive Order 12,866[16] requiring an "Impact Analysis" by the Office of Management and Budget to determine whether any regulatory action is "significant."  88 Fed. Reg. 43,867.  Defendants contend that Executive Order 12,866 creates "no rights enforceable by litigation plaintiffs outside the executive branch," and is therefore not appropriately enforceable by these Plaintiffs.  Defendants further emphasize that the Secretary had finalized the Final Rule prior to the *Biden v. Nebraska* decision, so the fact that the Final Rule was published after that decision does not undermine the Secretary's analysis.  Defendants also cite to the Secretary's response to a comment in the Final Rule whereby the Secretary considered and ultimately declined the commenter's invitation to conduct an alternative cost-benefit analysis to account for the possibility that the Supreme Court would ultimately find the loan forgiveness plan under the HEROES Act unlawful.

Additionally, Defendants argue that, regardless of whether the Court agrees that the Secretary should have conducted an alternative cost-benefit analysis, such an error by the

---

[16]    58 Fed. Reg. 51,735.

Secretary is not prejudicial.  Defendants take the position that reducing the burdens of student debt via the Final Rule was a priority of the President and the Secretary and—despite the Supreme Court's decision to strike down the previous loan forgiveness plan in *Biden v. Nebraska* —the costs associated with that plan were known to the Secretary and were acceptable because of its purported benefits.  Defendants argue that whether the costs of the HEROES Act loan forgiveness plan were incurred under that plan or will be incurred under the Final Rule, such costs would not have discouraged the Secretary from promulgating the Final Rule given the administration's emphasis on providing borrowers with relief.

    b. <u>Defendants' Alleged Failure to Consider Important Aspects of the Final Rule</u>

  Plaintiffs assert that the Final Rule is arbitrary and capricious agency action because Defendants allegedly did not consider Plaintiffs' reliance on state tax revenues and the PSLF program as part of the Final Rule.  Plaintiffs also argue that Defendants did not adequately consider the inflationary effects of the Final Rule.

  Defendants dispute Plaintiffs' contention that the Secretary did not adequately consider the reliance interests of the States or the inflationary effects of the Final Rule.  Defendants point to the Secretary's responses to comments in the Final Rule showing that he indeed did consider the effect the Final Rule may have on state tax revenues, the PSLF program, and inflation.  Defendants contend that these responses definitively show that the Secretary did not act arbitrarily and capriciously by failing to consider these effects.

    c. <u>Alleged Procedural Violations</u>

  Plaintiffs argue that the Final Rule violates the APA because it was promulgated in violation of statutory procedures.  Specifically, Plaintiffs take issue with the Secretary's decision to limit the notice and comment period to 30 days.  Plaintiffs insist that a 30-day public comment

period was too short.  Plaintiffs assert that a 60-day comment period is the minimum time for comment for a rule of this importance.

Defendants argue that there is no specific requirement under the APA for a 60-day comment period.  In fact, Defendants argue that the APA does not include any requirement beyond giving interested parties the opportunity to participate in the rulemaking process.  Defendants cite to *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) for the contention that a reviewing court has no ability to impose additional requirements on agency rulemaking not found in the APA.  In the alternative, Defendants argue that if the Court does find that the Secretary erred by providing only 30 days for public comments, such error was harmless as the Secretary received over 13,600 written comments, some of which cover the issues Plaintiffs now raise in this case and were addressed in the Final Rule.

### d.    Plaintiffs' Other Arguments

Plaintiffs make several other arguments as to why the Final Rule is arbitrary and capricious, including that Defendants have: (1) allegedly "departed from 30 years of regulatory practice"; (2) improperly stated the SAVE plan is a "loan" program when it is allegedly a grant program; (3) implausibly assumed that borrowers at 100% of the FPL are statistically indistinguishable from those at 225% of the FPL; and (4) provided for early implementation of portions of the Final Rule without proper explanation.  Plaintiffs assert that, for each of these reasons, they are likely to succeed on the merits.

Defendants dispute Plaintiffs' contentions on each of these issues.  On each account, Defendants refer to the Secretary's explanations in the Final Rule itself or challenge the adequacy of Plaintiffs' explanations.

6.    Irreparable Harm

Plaintiffs argue that if they are not granted immediate relief, they will suffer irreparable harm.  They argue that MOHELA will suffer financial harm when (1) loans are forgiven under the SAVE plan sooner than they would have been under previous ICR plans, or (2) borrowers consolidate FFEL loans to take advantage of the SAVE program.  North Dakota argues that, without a TRO or preliminary injunction, the Bank—and thus North Dakota—will experience competitive injury by having to compete with the federal government for student loan business.  Similarly, Plaintiffs assert that they will experience irreparable harm by the loss of competitive advantage in the job market because of the alleged decreased appeal of the PSLF program and the loss of tax revenue in those States that tie their State definition of AGI to the federal definition.

Defendants' arguments regarding Plaintiffs' failure to establish irreparable harm mirror those used to support their arguments against Plaintiffs' standing.  But Defendants additionally argue that the timing of Plaintiffs' Motions exhibits a lack of irreparable harm and weighs against granting a TRO or preliminary injunction.  Defendants assert that Plaintiffs' nine-month's delay between the publication of the Final Rule and the filing of this lawsuit suggest that Plaintiffs were not reasonably diligent in pursuing their case.  Defendants believe this delay undermines Plaintiffs' claims of impending irreparable harm and alone is sufficient to deny Plaintiffs' Motions.

Plaintiffs deny that they delayed bringing this suit and that such delay undermines their assertion of impending irreparable harm.  Plaintiffs argue that unreasonable delay can undermine an argument for irreparable harm only when (1) the harms have already occurred, and (2) the parties cannot be returned to the status quo.  For Plaintiffs, neither is true in this case because a

vast majority of the harms they complain of will occur in the future and can therefore be rectified by the injunctive relief they seek.[17] Plaintiffs also state that there was no unreasonable delay here because the first time they were made aware of early implementation of the Final Rule was in February 2024, and they filed suit 48 days later.

Plaintiffs further argue that unnecessary delay cannot be a valid argument here because Plaintiffs, specifically the Missouri Attorney General's Office, pursued non-litigation avenues before bringing this case. Plaintiffs allege that in December 2023, the Missouri Attorney General's Office participated in the negotiated rule-making process for a different student loan rule. According to Plaintiffs, that participation was Missouri's attempt to pursue non-litigation avenues to resolve this dispute. Plaintiffs admit that the Missouri Attorney General's Office failed to make any progress during the negotiations and eventually withdrew from the process.

### 7.    The Public Interest

Plaintiffs argue that the public interest heavily favors their position because they face irreparable harm while Defendants merely face a delay in implementation. According to Plaintiffs, "[a]n injunction will re-establish the status quo as it existed before the publication of the Final Rule and the Department's early implementation of various provisions." ECF No. 10 at 49. However, Plaintiffs are asking only for a stay or injunctive relief to prevent any further loan forgiveness and full implementation of the Final Rule. Plaintiffs also argue that borrowers receiving loan forgiveness under the Final Rule will receive a huge windfall while the American public will have to pay for it. Plaintiffs then state that the public interest cannot lie in keeping

---

[17]    Plaintiffs conceded at oral argument that they are seeking prospective relief and therefore are not requesting that the Court turn back the clock to reverse any loan forgiveness that has already occurred.

the allegedly unlawful Final Rule in place because the public has an interest in ensuring lawful agency rulemaking.

Defendants argue that the public interest favors keeping the Final Rule in place. Defendants assert that the public will experience several impending harms if the Final Rule were to be put on hold, including loan defaults, delinquency, adverse effects on borrowers' credit scores, decreased borrower liquidity to make important purchases, decreased enrollment in higher education, slowed national economic growth, and increased reliance on federal welfare programs. In Defendants' view, these harms are certain to occur if the Final Rule is put on hold, while Plaintiffs have only presented speculative injuries. Defendants also contend that the status quo is that portions of the Final Rule have already gone into effect and that injunctive relief at this time would "result in chaos and uncertainty . . . ." ECF No. 22 at 55.

8.      Scope of Relief

Defendants assert that Plaintiffs' requested relief is overbroad. Defendants suggest that, if the Court finds that the Final Rule is unlawful, it should grant limited relief only to those Plaintiffs that can establish standing and only as to provisions of the Final Rule that are found to be harmful. Defendants also suggest that the provisions of the Final Rule are severable such that the Court in its discretion can grant injunctive relief only as to the specific provisions of the rule found to be unlawful.

Plaintiffs argue that their ultimate requested relief, i.e., vacatur of the entire rule, is required under the APA. Plaintiffs argue that if the Court finds that Missouri has standing under *Biden v. Nebraska*, then all Plaintiffs have standing and that vacatur of the final rule is the only statutorily appropriate remedy. Plaintiffs further argue that, under the APA, if the Court finds

that the Final Rule is unlawful agency action, then it must vacate the rule in its entirety or postpone the Final Rule's effective date until the conclusion of this litigation.

Similarly, while Plaintiffs agree with Defendants that regulations can sometimes be severed, Plaintiffs contend that severability is the exception and not the rule.  According to Plaintiffs, the limited severability exception is not applicable here because Defendants have failed to show that the Secretary would have adopted the Final Rule if only the unchallenged portions remained.  Plaintiffs also contend that the remaining portions of the regulation would not function sensibly without the provisions Plaintiffs seek to strike.

## Legal Standard

A.    <u>Motion to Dismiss</u>

When a party challenges the Court's subject matter jurisdiction, at issue is the Court's "very power to hear the case."  *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) (citation omitted).  The Court has substantial discretion and is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Little Otters of Love, LLC v. Rosenberg*, 724 F. App'x 498, 501 (8th Cir. 2018) (per curium) (citation omitted).

In deciding a motion under Rule 12(b)(1) regarding its jurisdiction to the hear the case, the Court "must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings."  *Croyle ex rel. Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (citing *Osborn*, 918 F.2d at 729 n.6).  In either case, Plaintiffs bear the burden of proving that subject matter jurisdiction exists. *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019).

Defendants have not made clear whether they are lodging a facial or factual attack to Plaintiffs' standing.  *See* ECF No. 21 and 22.  But in reviewing Defendants' arguments, and

despite the Defendants' submission of additional exhibits for the Court's consideration, the Court

interprets Defendants' arguments as raising a facial challenge to Plaintiffs' standing. Thus, the

Court must accept as true all facts alleged in Plaintiffs' Complaint as it would on any motion to

dismiss raised under Rule 12(b)(6). *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir.

2016).

Defendants moving to dismiss under Rule 12(b)(3) generally must demonstrate that the

plaintiff's choice of venue is improper through affidavits or other evidence. *Gross & Janes Co.*

*v. Jeff Neill Timberland Mgmt., Inc.*, No. 4:15-cv-1058-JAR, 2016 WL 4665954, at *2 (E.D. Mo.

Sept. 7, 2016) (citations omitted). Plaintiffs allege that venue is proper in this Court under 28

U.S.C. §§ 1391(b)(2) and (e)(1). ECF No. 1 at ¶ 35. The general federal venue statute, in

relevant part, provides that:

> (b) . . . A civil action may be brought in—
>
> . . .
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;
>
> . . .
>
> (e)(1) . . . A civil action in which a defendant is an officer or employee of the United States or an agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. §§ 1391(b)(2) and (e)(1).

Plaintiffs allege that Defendants are agencies or officers of the United States sued in their

official capacities. Plaintiffs further allege that Plaintiff Missouri is a resident of the Eastern

District of Missouri and a substantial part of the events or omissions giving rise to the Complaint occurred within this district.  ECF No. 1 at ¶ 35.  In analyzing Defendants' Motion to Dismiss, the Court must determine whether Plaintiff Missouri resides within this district or whether a substantial part of the events giving rise to this case occurred within this district.  If venue is improper, the Court may either dismiss the action or transfer it to the proper district.  28 U.S.C. § 1406(a).

      B.    <u>Motions for Stay or, in the alternative, for TRO or Preliminary Injunction</u>

      Plaintiffs seek a stay of the Final Rule, or, in the alternative, a TRO or a preliminary injunction enjoining Defendants from any further implementation of the Final Rule.  At this stage in the litigation, the Court will determine whether a stay or a preliminary injunction is appropriate.

      As to the Court's authority to issue a stay of the Final Rule, Section 705 of the APA provides that when a plaintiff shows that a stay or preliminary injunction would be necessary to prevent irreparable injury, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  The Court's power under section 705 to issue a stay on agency action is limited "to the extent necessary to prevent irreparable injury . . . ."  *Id.*; *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016).

      The Court has the discretion to issue a stay and considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).  The mere possibility

of irreparable injury is not sufficient. *Id.* at 434–35 (citation omitted). When the government opposes the stay, the final two factors merge into an assessment of the public interest. *Id.* at 435.

Besides its authority to issue a stay under the APA, the Court may alternatively issue a preliminary injunction under traditional equitable principles. This Court has broad discretion when ruling on preliminary injunctions. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) (citation omitted). "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Ng. v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021)). Its "primary function . . . is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984). "[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Winter v. NRDC*, 555 U.S. 7, 24 (2008). These factors are essentially identical to those the Court must analyze when considering issuing a stay. No single factor is dispositive, but the Court should afford substantial weight to the movant's likelihood of success on the merits. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

"A movant shows a likelihood of success on the merits when it demonstrates a 'fair chance,' not necessarily 'greater than fifty percent,' that it will ultimately prevail under applicable law." *Cigna Corp. v. Bricker*, ___ F.4th ___, 2024 WL 2839930, at *3 (8th Cir. June 5, 2024) (citing *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)).

A33

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Plaintiffs "must show more than the mere possibility that irreparable harm will occur." *Ng*, 64 F.4th at 997 (quoting *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021)). Rather, "[t]o demonstrate irreparable harm, [the movant] must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023) (internal quotation marks omitted).

### Discussion

A.  <u>Standing</u>

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted). Article III of the Constitution limits the jurisdiction of federal court to "Cases" and "Controversies." U.S. CONST. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case . . . ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish this personal stake, plaintiffs must show: (1) they have suffered an "injury in fact" that is concrete, particularized, and actual or imminent, (2) that there is a causal connection between the alleged injury and the defendant's conduct, and (3) that judicial relief will likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. Plaintiffs, therefore, "must support each element in the same way as any other matter on which they bear the burden of proof." *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021) (citing

*Lujan*, 504 U.S. at 561) (internal quotation marks omitted). Therefore, on a motion to dismiss, "plaintiffs must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan,* 504 U.S. at 560). "A concrete injury must be *de facto*; that is, it must actually exist" in reality rather than in the abstract. *Id.* at 340 (cleaned up). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* at 339 (cleaned up).

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original and citations omitted). "[A]llegations of *possible* future injury are not sufficient." *Id.* (emphasis in original).

"For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021) (citation omitted). This "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm. That connection cannot be overly attenuated." *Id.* (citation omitted).

"[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish."

*Lujan*, 504 U.S. at 562 (citation and internal quotation marks omitted). "To satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted).

Redressability requires the plaintiff to show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up). In assessing redressability, the court must "consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. at 671 (citation and internal quotation marks omitted).

"If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Here, Plaintiffs have established standing through the alleged injuries to MOHELA and thus to Missouri. The allegations in the Complaint are substantially similar to, if not identical to, those the Supreme Court held were sufficient to establish Missouri's standing just last year in *Biden v. Nebraska*. The Court finds no reason to reach a different result here.

The Final Rule calls for accelerated loan forgiveness for a set of borrowers with low initial principal balances who elect repayment through the SAVE plan and make a set number of qualifying payments. To the extent MOHELA services accounts subject to this early forgiveness—and there is no dispute that MOHELA does service such accounts—MOHELA will lose revenues from administrative servicing fee when those accounts are forgiven. For forgiveness to occur, borrowers must first opt into the SAVE program and make the necessary number of qualifying payments. There is some question of whether such a theory of harm relies

too heavily on the actions of third-party borrowers who may decide to not choose the SAVE program or who may otherwise not qualify for early forgiveness because they have failed to make the necessary payments.  But in reality, thousands of loans once serviced by MOHELA have already been forgiven by the Secretary under the early implementation of the Final Rule. Thousands more are primed for forgiveness in the coming weeks and months, making the alleged harm to MOHELA from early loan forgiveness certain to occur.  "This financial harm is an injury in fact directly traceable to the Secretary's plan . . . ."  *Biden v. Nebraska*, 143 S. Ct. at 2366. And "[t]he [Final Rule's] harm to MOHELA is a harm to Missouri" because "MOHELA is a 'public instrumentality' of the State."  *Id.* (citing Mo. Rev. Stat. § 173.360).  Granting Plaintiffs' requested injunctive relief would redress this impending harm by stopping any additional forgiveness.

To the extent Defendants ask this Court to assess the alleged harms to Missouri by conducting a balancing test by weighing the Final Rule's potential benefits to MOHELA against the loss of administrative fees, the Court declines to do so.  Defendants have cited no case law from this Circuit indicating that any court has dismissed a case for lack of standing because a plaintiff could potentially benefit from the alleged injurious actions of a defendant even though those alleged harms appear certain to occur.

Defendants cite to *Bueno v. Experian Information Sols., Inc.*, 664 F. Supp. 3d 800, 806 (N.D. Ill. 2023) for the contention that a plaintiff's windfall is not an injury.  But the plaintiff in *Bueno* alleged harm from a false—but ultimately beneficial—statement on her credit report.  The district court found that because the false statement actually provided the plaintiff with a benefit, the plaintiff failed to establish an injury sufficient to establish standing.  Defendants argue that the same can be said for MOHELA here because MOHELA has requested that the Secretary

reallocate 1.5 million of its Direct Loan accounts to other loan servicers and MOHELA may receive additional benefits under the Final Rule. The Court does not agree, and again rejects the invitation to conduct a balancing test. Under *Biden v. Nebraska*, it is enough that MOHELA has shown that it has been and will be harmed by the Final Rule's loan forgiveness provisions. Any potential "benefits" MOHELA receives are incidental and do not affect the Court's standing analysis.

Defendants next cite to *Texas v. United States* for the contention that some courts recognize an exception where a court considers "offsetting benefits that are of the same type and arise from the same transaction as the costs." 809 F.3d 134, 155 (5th Cir. 2015). But directly thereafter, the Fifth Circuit recognized that:

> [o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise.

*Id.* at 155–56 (citations, footnotes, and internal quotation marks omitted).

MOHELA's loss of administrative fees when loans it services are forgiven by the Secretary is not of the same type nor does it arise from the same transaction as the loss of administrative fees when the Secretary reallocates Direct Loans held by MOHELA to other servicers. Similarly, the other purported benefits of the Final Rule to MOHELA do not offset the alleged and actual harms experienced by MOHELA. Taking Plaintiffs' allegations as true, Missouri has adequately alleged that the Final Rule has and will harm Missouri via early forgiveness of loans serviced by MOHELA.

Because the Court finds that Plaintiff Missouri has standing, it need not address Plaintiffs' other theories of standing. This suit may proceed "[i]f at least one plaintiff has standing." *Biden v. Nebraska*, 143 S. Ct. at 2365. Even so, the Court notes that Plaintiffs' other theories of

standing are tenuous at best.  But because it finds that at least Missouri has standing, the Court will deny Defendants' Motion to Dismiss on the grounds that Plaintiffs lack standing.

      B.    <u>Venue</u>

In what appears to be an issue of first impression in this Circuit, Defendants argue that this case should be dismissed for improper venue, or, in the alternative, this case should be transferred to the Western District of Missouri or the District of D.C.  Defendants argue that the rules of venue require Missouri to file cases as a plaintiff only in the Western District of Missouri because Missouri's capital, and thus its principal place of business, is located in that district.  In support, Defendants cite instances where courts have dismissed cases for improper venue when plaintiffs sued State officials in the federal judicial district that does not include the State's capital.  The Court agrees that when a plaintiff seeks to sue Missouri officials for official actions, the Western District is the proper venue for such a case generally.  But that is not the case here, where  Missouri, and not a Missouri state official, is a plaintiff.  Defendants cite to no cases where a court found venue improper when a plaintiff State sued in a district within that State where the State's capital does not sit.

On the contrary, Defendants' argument has been rejected by every court where it has been raised.  *See Utah v. Walsh*, No. 2:23-cv-016, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023) ("[Plaintiff] Texas resides everywhere in Texas."); *see also California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) ("A state is ubiquitous throughout its sovereign borders.").  In line with other courts considering this argument, the Court finds that the State of Missouri resides everywhere in Missouri and thus resides in this district.  Cases where "a defendant is an officer or employee of the United States or an agency thereof . . . or an agency of the United States . . . may . . . be brought in any judicial district in which . . . the plaintiff resides . . . ."  28 U.S.C. § 1391(e)(1).

The State of Missouri resides in the Eastern District of Missouri, and therefore venue is proper in this Court.  The Court will therefore deny Defendants' Motion to Dismiss for improper venue.

C.    <u>President Biden</u>

Defendants argue that President Biden should be dismissed as a Defendant because the Court lacks the authority to issue injunctive relief against the President.  Plaintiffs agree that the Court lacks the authority "in general" to issue an injunction against the President.  But Plaintiffs also argue that the Court has such authority in limited circumstances when an injury "cannot be 'redressed fully by injunctive relief against the remaining Defendants.'"  ECF No. 26 at 54 (quoting *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated on other grounds*, 583 U.S. 941 (2017)).  Plaintiffs specifically point to statements made by President Biden indicating his intent to, in Plaintiffs' words, "evade the Supreme Court." *Id.*  Plaintiffs contend that without entering declarative relief against President Biden, he will simply attempt to enforce the same student loan forgiveness via executive action.  Therefore, Plaintiffs say declaratory and injunctive relief against President Biden are both proper and necessary.

At this early stage in the litigation, the Court cannot conclude that Plaintiffs will not prevail against President Biden.  In so deciding, the Court makes no determination of whether such relief will be appropriate once Plaintiffs' claims have been fully litigated.  But, at this time, the Court will deny Defendants' request to dismiss President Biden as a Defendant.

D.    <u>Likelihood of Success on the Merits</u>

Satisfied that it has jurisdiction over this case, the Court will next discuss the likelihood that Plaintiffs will be successful on the merits.  The Court will first discuss whether Plaintiffs are likely to succeed on their argument that the HEA does not provide the Secretary with the authority to promulgate the Final Rule, and what effect, if any, the major questions doctrine may

play in this analysis.  The Court will then discuss whether Plaintiffs are likely to succeed on their arguments that Defendants' actions in promulgating the Final Rule were arbitrary and capricious agency action or otherwise violate the APA.

1.    The Secretary's Authority Under the HEA

On its face, the HEA provides the Secretary with significant authority to promulgate regulations related to ICR repayment plans.  Under the HEA, the Secretary has significant discretion to determine the amount of time that borrowers can participate in repayment under ICR plans.  The only express limitation of that authority is that repayment under ICR plans cannot exceed 25 years.  20 U.S.C. § 1087e(d)(1)(D).  Similarly, the Secretary has significant authority to determine repayment schedules for ICR programs through promulgated regulations.  *Id.* § 1087e(e)(4) ("Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary.").  The Secretary also enjoys broad discretion regarding how and when interest can be capitalized on loans in repayment under ICR plans.  *Id.* § 1087(e)(5) ("The Secretary may promulgate regulations limiting the amount of interest that may be capitalized on such loan, and the timing of any such capitalization.").

Faced with these statutory provisions, Plaintiffs argue that the Secretary's authority to promulgate rules for ICR plans under the HEA is implicitly limited by the terms of the congressionally created IBR plan.  Plaintiffs rely on this reasoning to question (1) the Secretary's ability to consider as exempt from payment calculations any AGI below 225% of the FPL under the SAVE plan as opposed to 150% of the FPL in the IBR program; (2) the Secretary's ability to cap payments under the SAVE plan at 5% of discretionary income rather than the 10% cap

A41

provided by the IBR program; (3) the Secretary's ability to prevent borrowers from being charged additional interest after making payments under the SAVE program as opposed to the 3 year limit on interest subsidization in the IBR program;[18] and (4) the Secretary's ability to forgive loans under the SAVE program in as little as 10 years instead of the 20 year forgiveness timeline provided for under the IBR program.  On that final point, it is Plaintiffs' contention that the Secretary has absolutely no authority to forgive loans under the ICR plan, let alone the authority to forgive loans in as little as 10 years.

The Court finds that Plaintiffs' arguments regarding the Secretary's authority to set payment schedules and interest accrual limitations are unlikely to succeed on the merits.  A reading of the plain language of the statute supports the Secretary's promulgation of the Final Rule as to the modified ICR repayment schedules and interest accrual under the SAVE program. Student loan repayment programs are well within the wheelhouse of the Secretary and the Department.  Congress, in passing the HEA and its many amendments, has consistently tasked the Secretary and the Department with promulgating regulations regarding ICR plans that are "necessary to implement effectively income contingent repayment."  20 U.S.C. § 1087e(e)(1). Under this authority, the Secretary has significant discretion to promulgate rules to effectively implement ICR plans, including the ability to (1) determine what constitutes discretionary income, (2) set the cap on the amount of discretionary income that can qualify for payment calculations, and (3) limit interest accrual and capitalization.  As more thoroughly outlined

---

[18]     Plaintiffs contend that "[t]he ICR program expressly *forbids* subsidizing interest payments" and cites to 20 U.S.C. § 1098e(b)(3) and § 1087e(b)(9) for support.  ECF No. 10 at 35.  But § 1098e(b)(3) only controls the IBR plan and on its face does not appear to forbid interest subsidization under the ICR plan.  Similarly, § 1087e(b)(9) deals with the Secretary's authority regarding reducing interest rates for loans disbursed before July 1, 2012.  But as pointed out by Defendants, the Final Rule does not make any attempt to reduce interest rates, so § 1087e(b)(9) is not relevant to the Secretary's claimed authority here.

above, the Secretary has promulgated such regulations for decades.  Though the SAVE plan is the first time that payments under an ICR plan are likely lower than payments under the IBR plan for most borrowers, Congress does not appear to have either explicitly or implicitly limited the Secretary's ability to create such a comparatively generous plan.  The same is true for interest accrual and capitalization, which again fall within the express discretion of the Secretary.

Further, the Secretary's discretionary changes to the ICR program here appear reasonably tailored to accomplish the Secretary's stated goal.  The Secretary explains that the Final Rule was promulgated in an attempt to curb the tremendous rise in student loan balances and to ease the burdens borrowers face in paying off loans under existing repayment plans.  The Secretary also states that the Final Rule's goal is ensuring that fewer borrowers fall into delinquency and default.  Having the SAVE plan offer low-income borrowers a repayment plan that permits low payment amounts—as low $0 per month—and limits additional interest accrual and capitalization appear as two reasonable ways of accomplishing these goals.  To find that the terms of the IBR plan somehow limit the Secretary's broad discretion to shape rules that reasonably address these matters is not supported by the history and plain language of the HEA.  Plaintiffs have failed to establish that they are likely to succeed on the merits of their challenges to these specific provisions of the Final Rule.

The Final Rule's loan forgiveness provisions present a more difficult issue.  According to Defendants, Congress intended to grant the Secretary authority under the HEA to forgive balances on loans in the ICR program by creating a maximum repayment period of 25 years or "an extended period of time prescribed by the Secretary."  20 U.S.C. § 1087e(d)(1)(D).  The Secretary's claimed authority here is not new.  Under this alleged authority, the Secretary has

been providing loan cancellation for loans in the ICR plan since the first ICR regulations became

effective in 1995.

Despite this history, the plain text of the statute does not support Defendants' position.

The Court is not free to replace the language of the statute with unenacted legislative intent.

*Thigulla v. Jaddou*, 94 F.4th 770, 777 (8th Cir. 2024) (citation omitted); *see also Iverson v.*

*United States*, 973 F.3d 843, 849 (8th Cir. 2020) ("The case must be a strong one indeed, which

would justify a court in departing from the plain meaning of words in search of an intention

which the words themselves did not suggest.") (quoting *Bouie v. City of Columbia*, 378 U.S. 347,

362–63 (1964)) (cleaned up); *Argus Leader Media v. U.S. Dep't of Agric.*, 740 F.3d 1172, 1176

(8th Cir. 2014) ("Congress expresses its purpose by words.  It is for [courts] to ascertain—neither

to add nor to subtract, neither to delete nor to distort.") (citation and internal quotation marks

omitted).  It is true that offering forgiveness of loan balances after 25, or even 10, years of

repayments to borrowers under the SAVE plan will ensure that fewer borrowers will default or

become delinquent.  These loan forgiveness provisions thus comport with the Secretary's

expressed purpose for creating the Final Rule.  But because the statute is silent on loan

forgiveness under the ICR program, it is at least equally as likely that the HEA's time limitations

in the ICR program refer to the maximum period that borrowers can be in repayment before the

entire loan amount must be repaid or borrowers must default.

Plaintiffs' alternative reading—that § 1087e(d)(1)(D)'s language does not permit loan

forgiveness under the ICR program—finds support in other portions of the HEA that explicitly

permit loan forgiveness.  Congress has made it clear under what circumstances loan forgiveness

is permitted, and the ICR plan is not one of those circumstances.  *See Biden v. Nebraska*, 143 S.

Ct. at 2363 ("[The HEA] authorizes the Secretary to cancel or reduce loans, but only in certain

limited circumstances and to a particular extent.").[19]  Defendants counter that Congress required

forgiveness under programs like IBR and PSLF but left forgiveness under ICR up to the

discretion of the Secretary.  But considering the loan repayment scheme under the HEA in its

entirety, the Court finds Defendants' interpretation is questionable.  Plaintiffs, therefore, have a

"fair chance" of success on the merits on their claim that the Secretary has overstepped its

authority by promulgating a loan forgiveness provision as part of the SAVE program.  *Cigna*

*Corp v. Bricker*, ___ F.4th ___, 2024 WL 2839930, at *3 (8th Cir. 2024 June 5, 2024).

        2.     The Major Questions Doctrine

Plaintiffs assert that the Final Rule violates separation of powers principles.  As part of

this argument, Plaintiffs state that this case requires the Court to invoke the major questions

doctrine.

The major questions doctrine has been recently invoked by the Supreme Court in several

decisions relating to actions taken by various executive agencies.  In these cases, the Supreme

Court explains that when the agency action complained of involves a matter of "vast economic

and political significance," the agency must find clear congressional authority approving of such

action.  *Alab. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 764 (2021)

(finding no clear congressional authority for the CDC to issue a nationwide eviction

moratorium); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 114 (2022) (per

---

[19]      Earlier this year, the Fifth Circuit came to a similar conclusion.  "Congress, after all, unambiguously authorized the Department to 'cancel' or 'discharge' student debt obligations in limited circumstances. *See, e.g.*, 20 U.S.C. § 1078-11(a)(2)(B) (authorizing the Department to '*cancel* a qualified loan amount' for individuals employed full time 'in an area of national need') (emphasis added); *id.* § 1087e(m)(1) (stating that the Department 'shall *cancel* the balance of interest and principal due' for borrowers employed in a public service job) (emphasis added); *id.* § 1087j(b) (directing the Department to '*cancel*[] the obligation to repay a qualified loan amount' for teachers) (emphasis added)."  *Career Colls. & Schs. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024) (emphasis in original).

curium) (finding that OSHA had no clear congressional authority to issue a vaccine mandate during the COVID-19 pandemic and stating that "[a]dministrative agencies are creatures of statute [that] accordingly possess only the authority that Congress has provided."); *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (finding that the EPA had no clear statutory authority to implement regulations that would have brought more sources of greenhouse gas emissions under the EPA's authority and stating that "in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there.  To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to 'clear congressional authorization' for the power it claims.") (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *Biden v. Nebraska*, 143 S. Ct. at 2374 (finding that the Secretary did not have clear authority under the HEROES Act to promulgate its previous loan forgiveness program and stating that "[a] decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation from that representative body.") (cleaned up).

Here, there is no real dispute that the Secretary's Final Rule touches on issues of vast economic and political significance and therefore may implicate the major questions doctrine. But to the extent it is necessary to invoke the major questions doctrine here at this stage of litigation, it merely confirms what the Court has found using the typical tools of statutory interpretation.  Under the express terms of the HEA, the Secretary has clear congressional authority to promulgate the vast majority of the provisions of the Final Rule.  The HEA is not ambiguous regarding its grant of discretion to the Secretary as to setting ICR repayment

schedules and determining the extent of interest capitalization as to loans in an ICR repayment plan like SAVE.  But Defendants have failed to point to a clear congressional authorization for the loan forgiveness provisions of the Final Rule, and the Court has found none.  While the Secretary does not appear to be expressly precluded from forgiving loans under his ICR authority, it is far from clear that Congress has expressly granted the Secretary such authority. Thus, Plaintiffs have a "fair chance" of success on the merits on their claim that the Final Rule violates separation of powers principles.  *Cigna Corp*, 2024 WL 2839930, at *3.

### 3.    Alleged Arbitrary and Capricious Agency Action

"Under the APA, review of an agency decision is limited[, and the Court] gives 'agency decisions a high degree of deference.'"  *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 579 (8th Cir. 2024) (quoting *Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001)).  "If an agency's determination is supportable on any rational basis, then a reviewing court must uphold it."  *Id.* (quoting *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018)) (internal quotation marks omitted).  "Arbitrary and capricious review, at its core, measures if an agency action was irrational."  *Id.* (citation omitted).  "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted).  Agency action must rely on its consideration of relevant factors, which are set by Congress.  *Mandan*, 95 F.4th at 579 (citation omitted).

Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise.

*Id.* at 580 (quoting *Missouri ex rel. Bailey v. U.S. Dep't of Interior*, 73 F.4th 570, 576–77 (8th Cir. 2023)).  The court must also consider if an agency is acting within its sphere of expertise.  *Id.* (citations omitted).

Plaintiffs allege that the Final Rule is arbitrary and capricious agency action under the APA for several reasons, some of which are more developed and relevant than others.  The Court finds that none of these arguments are likely to be successful on the merits and will discuss the most salient of them below.

a.     <u>The Final Rule's Cost Estimate</u>

First, Plaintiffs argue that the Final Rule's cost estimate is arbitrary because it failed to account for the potential that the Supreme Court would strike down its previous loan forgiveness program in *Biden v. Nebraska*.  The Final Rule estimates the costs of its implementation to be $156 billion over the first ten years.  88 Fed. Reg. 43,820.  This cost estimate does not consider the potential effect of the Supreme Court finding that the previous loan forgiveness program under the HEROES Act was unlawful even though the Final Rule was not published until after the Supreme Court decided *Biden v. Nebraska*.  *Id.* at 43,875.

Plaintiffs contend that the cost of the Final Rule is much higher.  Plaintiffs cite to the Congressional Budget Office's estimate that the program would cost $230 billion over the first ten years.[20]  Plaintiffs also cite an independent cost analysis conducted by the Penn Wharton Budget Model estimating the 10-year cost of the Final Rule at $475 billion.[21]  Finally, Plaintiffs

---

[20]     *Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans*, Congressional Budget Office (March 13, 2023), https://perma.cc/CTJ5-XBSV.

[21]     *Biden's New Income-Drive Repayment ("SAVE") Plan: Budgetary Cost Estimate*, University of Pennsylvania, Penn Wharton Budget Model (July 17, 2023), https://perma.cc/GSC2-WP3F.

A48

cite to a promotional blog post from an independent student loan planning organization that estimates the ten year cost to be over $1 trillion.[22]

Plaintiffs claim that the Secretary's decision to promulgate the Final Rule under such an inaccurate estimate means that the Secretary did not act reasonably.  In this view, the Secretary's decision to publish the Final Rule without conducting an additional analysis was arbitrary and capricious and requires vacatur.  For support, Plaintiffs cite to two cases from outside this district in which an executive agency action was found to be arbitrary and capricious because it relied on outdated environmental data.  ECF No. 10 at 39 (citing *Dow AgroSciences LLC v. Nat'l Marine Fisheries Servs.*, 707 F.3d 462, 473 (4th Cir. 2013) (finding that reliance on outdated water monitoring data that was not representative of current environmental conditions indicated arbitrary and capricious decision-making because the agency "chose to continue relying on the outdated data without explaining why."); and *Sierra Club v. EPA*, 671 F.3d 955, 966–68 (9th Cir. 2012) (finding that the EPA's use of outdated emissions data when promulgating a rule was arbitrary and capricious because it "did not analyze this new data or explain why it chose not to analyze the data . . . .").  Neither case is particularly relevant to the question of whether the Secretary's cost estimate, which Plaintiffs conceded at oral argument that the Secretary is under no obligation to conduct, means that the Final Rule is arbitrary and capricious.

Defendants contend that, despite the inaccuracy of the cost estimate and failure to conduct an additional cost estimate after *Biden v. Nebraska*, there is no basis to find that the Final Rule was arbitrary and capricious.  Defendants contend that that the Secretary's cost estimate is unreviewable because it is under no obligation to conduct one, let alone an accurate one.  They

---

[22]    Travis Hornsby, *New REPAYE Plan Could Save Borrowers Over $1 Trillion Over 10 Years*, Student Loan Planner (last updated on December 30, 2023), https://perma.cc/B5DU-W5S2.

also argue that the Secretary finalized the Final Rule before the publication of *Biden v. Nebraska* and support this contention with an affidavit of an employee who attests to have knowledge of the Final Rule being signed by the Secretary and submitted for publication on June 24, 2023. ECF No. 22 at 43; ECF No. 22-1 at ¶ 3.  Defendants also contend that the Secretary acted reasonably by not considering the effects of a negative decision in *Biden v. Nebraska* because, when the Final Rule was finalized, the Secretary believed the Supreme Court would uphold its authority to promulgate the loan forgiveness plan under the HEROES Act.  Finally, Defendants argue that Plaintiffs have failed to establish that, if there was an error, that such an error was prejudicial.  Defendants state that because the Secretary knew of the estimated costs of the HEROES Act forgiveness plan and approved that plan, he would just as easily have approved the Final Rule if those costs were associated with the Final Rule instead of the previous plan.

The Court finds that Plaintiffs are not likely to succeed on the merits of this argument. Despite the allegedly inaccurate cost estimate, the Secretary's reliance on that cost estimate in promulgating the Final Rule was not unreasonable.  Congress has never required the Secretary to consider costs when promulgating rules for the ICR plans, and the Secretary cannot be said to have entirely failed to consider the cost of the Final Rule.

There is also no indication that the Secretary's reasoning for creating the Final Rule is somehow invalidated by Plaintiffs' preferred cost estimates.  Defendants have explained that their priority in promulgating the Final Rule was to "reduc[e] the crushing burdens of student-loan debt." ECF No. 22 at 45.  Plaintiffs seemingly have shown that the cost of such actions are high but have not established that a high cost somehow would fail to reduce the burdens of student loan debt.  As Defendants have explained, whether costs were to occur under the Final Rule or would be spread between the Final Rule and the HEROES Act forgiveness plan, the

Secretary found that the need to provide relief to borrowers outweighs the estimated costs. And though the Secretary knew there was a risk that the Supreme Court would find its HEROES Act forgiveness plan unlawful when the Final Rule was finalized, it was reasonable for the Secretary to rely on his belief that he had the authority to promulgate the stricken rule. On this record, the Court has not found a sufficient basis to conclude that the Secretary's cost estimate in the Final Rule makes the entire Final Rule arbitrary and capricious agency action.

Plaintiffs urge the Court to find that Defendants' harmless error arguments evince an "unalterably closed mind," indicating that the Secretary's action was not "rationally considered." Under this theory, because the Secretary would have promulgated the Final Rule despite its increased cost, the Secretary's actions were not reasonable. Plaintiffs cite to a completely inapposite case from the D.C. Circuit in support of this standard. ECF No. 26 at 40 (citing *Air Trans. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011)). Plaintiffs have cited no cases endorsing this "unalterably closed mind" approach. In fact, the Supreme Court appears to have recently rejected a substantially similar test. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) ("We decline to evaluate the final rules under the open-mindedness test."). The Court finds no authority or reasoned basis to use such a test here.

The Court therefore finds that Plaintiffs have failed to show that they are likely to succeed on the merits of their claim that the Final Rule's cost estimate constitutes arbitrary and capricious agency action.

   b. <u>The Secretary's Alleged Failure to Consider Certain Issues</u>

Plaintiffs assert that the Secretary failed to consider the Final Rule's implications on State tax revenues, the State's reliance on the PSLF program as a recruiting tool, and the Final Rule's

alleged inflationary effects.  But the Final Rule in fact does consider and respond to comments

that dealt with these issues.  *See* 88 Fed. Reg. 43,877 (responding to comments about the Final

Rule's effect on State tax revenues); *Id.* at 43,879–80 (responding to comments about the effect

of the Final Rule on the appeal of the PSLF program); *Id.* at 43,879 (responding to comments

about the Final Rule's potentially inflationary effects).  Therefore, the Final Rule is not arbitrary

and capricious for failing to consider these issues, and the Court finds that such an argument has

little chance of success on the merits.

c.    <u>The Secretary's Findings Regarding Income-Exemption</u>

Plaintiffs argue that the Final Rule's explanation for an increase in income-exemption

under the SAVE plan from 150% of the FPL to 225% is based on unlikely and implausible

conclusions.  Plaintiffs take issue with the Final Rule's statement that, in the Secretary's analysis,

people with incomes at 100% of the FPL and those with incomes at 225% of the FPL are

"statistically indistinguishable."  The Final Rule states that:

> [t]he Department chose the 225 percent threshold based on an analysis of data from
> the U.S. Census Bureau's Survey of Income and program Participation (SIPP) for
> individuals aged 18–65 who attended postsecondary institutions and who have
> outstanding student loan debt.  The Department looked for the point at which the
> share of those who report material hardship—either being food insecure or behind
> on their utility bills—is statistically different from those whose family incomes are
> at or below the FPL.

88 Fed. Reg. 43,832.

Plaintiffs decry this conclusion as implausible.  According to Plaintiffs, a person or

family with an income at 100% of the FPL cannot experience the same financial difficulties of a

person or family making 225% of the FPL.  But this is not the reasoning the Secretary used.

Instead, the Secretary conducted an analysis of SIPP data to determine at what income level

Americans who previously attended college begin to experience material economic hardships

like food instability and inability to pay utility bills.  According to this analysis, Americans at

A52

225% of the FPL report these economic hardships to a similar degree as those at 100% of the FPL.  This is a reasonable explanation of the statistical analysis the Secretary relied on as its basis to set the income expectation under the SAVE plan at 225% of the FPL.

Plaintiffs offer no reasonable basis to question the Secretary's analysis.  Plaintiffs' do not present an alternative analysis of SIPP data that undermines the Secretary's conclusions.  Nor do Plaintiffs offer a cogent critique of the Secretary's statistical methodology.  Plaintiffs do not even cite a single point in the SIPP data that may call the Secretary's use of this data into question.  Having failed to contend with the Secretary's analysis on its terms, Plaintiffs' argument falls flat.  Accordingly, Plaintiffs' point here is not well taken, and the Court finds that Plaintiffs are unlikely to succeed on the merits under this theory.

### d.  The Secretary's Alleged Failure to Explain Early Implementation

Plaintiffs argue that the Secretary has failed to adequately explain the reasons why certain portions of the Final Rule were designated for early implementation.  Plaintiffs primarily dispute the Secretary's publication in the Federal Register of his intention to implement the early forgiveness provision in January 2024 rather than waiting until July 1, 2024, for full implementation.  Defendants dispute Plaintiffs' position and point to an explanation published on the Department's website five days before the publication in the Federal Register.[23]  More importantly, Plaintiffs have cited to no case, statute, or regulation that would require the Secretary to provide a more robust explanation.  In fact, under the HEA, publication in the Federal Register appears to be the only requirement for early implementation.  20 U.S.C. §

---

[23]    *Biden-Harris Administration to Shorten Path to Debt Cancellation for Some SAVE Borrowers*, U.S. Dep't of Educ. (Jan. 11, 2024), https://perma.cc/M5ND-VFEM.

1089(c)(2).  That is exactly what the Secretary did here.  This argument is not likely to succeed on the merits.

4.    <u>Alleged Procedural Violations</u>

Plaintiffs allege that the Final Rule was promulgated in violation of the APA's procedural requirements because it did not provide for sufficient time for public comments.  Under this theory, Plaintiffs argue that a 30-day comment period "was patently insufficient in light of the complexity and staggering significance of the Final Rule."  ECF No. 10 at 50.

The Supreme Court has "repeatedly stated that the text of the APA provides the maximum procedural requirements than an agency must follow in order to promulgate a rule" and has "repeatedly rejected courts' attempts to impose judge-made procedures in addition to the APA's mandates."  *Little Sisters of the Poor*, 591 U.S. at 685 (cleaned up) (collecting cases).  Thus, this Court is in no position to impose a greater procedural requirement on the Secretary than those included in the APA.

Under the APA, executive agencies are required to give general notice of proposed rulemaking (5 U.S.C. § 553(b)) and "[a]fter notice . . . , the agency shall give interested persons an opportunity to participate in rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  *Id.* § 553(c).  Plaintiffs insist that this "requires the opportunity to be meaningful," but the Court finds no reason to read this requirement into the statute.  Plaintiffs have simply not pointed to any provision of the APA requiring a comment period be longer than 30 days.  And without an APA provision requiring something more, the Court has no authority to require the Secretary to follow Plaintiffs' preferred timeline.  Accordingly, the Court finds that Plaintiffs' argument for a procedural violation of the APA is not likely to succeed on the merits.

E.    Irreparable Harm

The Court's analysis of irreparable harm largely overlaps with its analysis of injury in fact for Plaintiffs' standing.  The Court finds that Plaintiff Missouri has adequately pled an injury in fact to grant it standing to sue.  The question now is whether Plaintiffs face irreparable harm without the imposition of their requested injunctive relief.  The Court believes that Plaintiffs have shown impending irreparable harm to MOHELA via impending loan forgiveness under the Final Rule.[24]

"[T]he United States, as sovereign, is generally immune from suits seeking money damages."  *Dep't of Agric. Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 48 (2024) (citation omitted).  But 5 U.S.C. § 702 permits suits "seeking relief other than money damages" against federal agencies.

Here, Plaintiffs seek injunctive relief, not money damages.  As mentioned above, Plaintiffs clarified at oral argument that they specifically seek prospective relief to enjoin Defendants from putting the Final Rule into full effect on July 1, 2024, and to prevent Defendants from forgiving any additional loan balances under the early implementation of the Final Rule's loan forgiveness provisions.  By their own admissions, Defendants have already forgiven tens of thousands of loan balances under early implementation of these provisions.  Thousands of additional loans are primed for forgiveness in the coming months.  Defendants do

---

[24]    Missouri also alleges it is harmed when borrowers consolidate FFELs owned by MOHELA.  Missouri's allegations related to consolidation focus on the incentives created by the loan forgiveness provisions of the Final Rule and not on any other provisions.  Because an injunction preventing any further loan forgiveness will adequately address any alleged harm from loan consolidation, the Court need not separately address whether Missouri faces impending harm from such consolidation.

not dispute this.  Instead, Defendants assert that Plaintiffs' unexplained delay in bringing suit undermines their claims of imminent harm.

The Eighth Circuit has found that "delay is only significant if the harm has occurred and the parties cannot be returned to the status quo." *Ng. v. Bd. of Regents of Univ. of. Neb.*, 64 F.4th 992, 998 (8th Cir. 2023) (alterations accepted and internal quotation marks omitted) (quoting *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015)).  "[T]he reasonableness of delay is context dependent." *Id.*

Here, the Final Rule was published on July 10, 2023, and Plaintiffs filed this case nearly nine months later on April 9, 2024.  Plaintiffs then waited another week before filing their Motions for Stay, TRO, or Preliminary Injunction.  Plaintiffs explain that their delay was reasonable because had they brought the case earlier, it would have been dismissed as unripe.  According to Plaintiffs, it was only when the government announced in February 2024 that it had forgiven loans under the early implementation of the Final Rule that they believed they had a basis to sue.  The Court questions the bases of Plaintiffs' arguments.  Because of Plaintiffs' delay, some alleged harms have already occurred, which also weighs against Plaintiffs' position.

Even so, because Plaintiffs have explained that they seek only prospective relief, their delay does not undermine a finding that they are facing irreparable harm.  What Plaintiffs ultimately seek is an injunction preventing the full implementation of the Final Rule on July 1, 2024, and any additional loan forgiveness under the SAVE plan.  Plaintiffs' alleged harms are entirely focused on the Final Rule's early loan forgiveness provisions, and this is what they seek to stop.  The status quo is where we are now with borrowers already making payments under early implementation of the SAVE plan and expecting impending loan forgiveness.  Though their

delay in bringing this case diminishes Plaintiffs' claims of imminent harm, Plaintiff Missouri has adequately alleged a threat of irreparable harm in the form of this early loan forgiveness.

F.    <u>The Public Interest</u>

Plaintiffs argue that the public interest favors a stay or preliminary injunction because the costs of the Final Rule will fall on the shoulders of the American public and that it is fundamentally unfair to ask taxpayers to shoulder the burden of student loan debt owned by a relatively small portion of the population.  Plaintiffs also argue that there is no public interest in allowing the Defendants to promulgate an allegedly unlawful rule.

Defendants counter that the public at large faces several impending harms if Plaintiffs are granted injunctive relief, including increased default and delinquency on student loans, adverse effects on credit scores, decreased liquidity, decreased enrollment in higher education, drags on economic growth, and increased reliance on federal welfare programs.  According to Defendants, these harms would result if implementation of the Final Rule is enjoined, though Defendants presented very limited evidence that such harms would occur.

The Court must, of course, also consider the practical impacts of enjoining the Final Rule's implementation because, again, there are millions of borrowers who have already switched to the SAVE plan.  These borrowers have already made payments under the program, have already had those payments calculated under the early implementation of certain provisions of the Final Rule, and some borrowers anticipate imminent forgiveness.  These borrowers and the public have an interest in ensuring consistency in loan repayment programs, and any preliminary injunction would harm their expectations of such consistency.

Taking these factors under consideration, the Court finds that there are serious public interest concerns favoring both parties' arguments.  While there are clear effects on taxpayers

who have never received student loan benefits or have already repaid their loan balances in full, the benefits to the economy from the SAVE plan and increased educational opportunities it offers may outweigh these generalized public burdens.  Similarly, while the public has an interest in consistency in student loan repayment programs and borrowers have a vested interest in knowing how the provisions of those repayment programs will affect their repayment timelines and monthly bills, the public at large has an interest in ensuring that those repayment programs are lawful.  Given these competing, albeit speculative, public interests, the Court finds that the public interest factor does not particularly weigh in favor of either party.

G.    Appropriate Relief

Plaintiffs request a stay in implementation of the Final Rule, or in the alternative, a TRO or preliminary injunction.  Plaintiffs argue that eventual vacatur of the entire Final Rule is statutorily mandated under the APA.  But at this time, the Court finds that Plaintiffs' request to vacate the entire rule is not appropriate on the record before the Court.  Rather, at this stage, only a stay or preliminary injunction is appropriate.

The question then is: what is the appropriate scope of a preliminary injunction, if any, at this time?  Defendants argue that any relief should be limited to the redressing only the cognizable injuries of only those Plaintiffs who have established standing.  In Defendants' view, if the Court has found that only Missouri has standing, then any relief should be directed towards those harms that Missouri has been able to adequately connect to specific portions of the Final Rule.

In the Court's analysis, Plaintiffs have only alleged impending harm from the Final Rule's loan forgiveness provisions.  At this time, Plaintiffs have not stated a cognizable injury related to the other provisions of the SAVE program, and they conceded at oral argument that

A58

they are primarily seeking relief only from the Final Rule's loan forgiveness provisions. Plaintiffs' claims under the APA are unconvincing, and in any event vacatur of the entire Final Rule under the APA would be premature.  But Plaintiffs do appear to have a colorable argument that the Secretary lacks the statutory authority to forgive loans as part of the ICR plans and that continuing to permit such loan forgiveness would likely harm Missouri by decreasing the administrative fees collected by MOHELA for servicing Direct Loans.

This brings the Court to the issue of severability.  Defendants contend that, under the APA, the Court may sever and enjoin only those provisions of the rule that are found to be unlawful.  The D.C. Circuit has recognized that portions of regulations found unlawful may be severable under certain circumstances.  In making this determination, the D.C. Circuit has considered (1) whether the agency intended portions of the regulation to be severable, and (2) "whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)); *see also Carlson v. Postal Regul. Authority*, 938 F.3d 337, 351 (D.C. Cir. 2019) ("[T]he APA permits a court to sever a rule by setting aside only the offending parts of the rule.").

Severability makes sense in the context of the APA, which defines an "agency action" as "the whole or a part of an agency rule . . . ."  5 U.S.C. § 551(13).  Under 5 U.S.C. § 701, "agency action" has the definition given to it under 5 U.S.C. § 551.  Therefore, when looking at what relief is available pending review under 5 U.S.C. § 705, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action[,]" which suggests that the Court has the authority to enjoin only the potentially offending portions of the Final Rule.

Here, the Secretary made clear his intention that each portion of the Final Rule is severable.  "[E]ach of the components of this final rule can operate in a manner that is independent and severable of each other.  The analysis used to justify their inclusion are all different.  And while they help accomplish similar goals, they can contribute to those goals on their own."  88 Fed. Reg. 43,828.  The fact that Defendants now argue for the severability of the provisions of the Final Rule provide additional support for the proposition that the Department intended for portions of the Final Rule to be severable.  Thus, the first element of the severability test is satisfied.

The Court also finds that, on this record, the Final Rule can function sensibly if the Secretary is enjoined from enforcing only the offending portions of the Final Rule.  Here, the Court has found that the only argument for which Plaintiffs are likely to be successful on the merits is that the Secretary lacks the requisite congressional authority to forgive loans under the SAVE plan.  Without the provisions allowing for loan forgiveness under the SAVE plan, the Final Rule still provides a vast majority of borrowers with a plan that is likely to lower their payments and limit interest accrual.  At this stage of the litigation, Plaintiffs have not shown that these provisions harm them, and these pieces of the Final Rule still appear to function adequately even if participants in the SAVE plan cannot receive forgiveness under the plan.

Thus, the Court finds that it is appropriate to limit a preliminary injunction to only those provisions of the SAVE plan that permit loan forgiveness.  As litigation progresses, the Court can determine whether that preliminary injunction should become permanent or if any other portions of the Final Rule require additional injunctive relief**.**

**Conclusion**

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Stay or, in the alternative, a Preliminary Injunction (ECF No. 7) is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Stay or, in the alternative, Motion for Temporary Restraining Order (ECF No. 6) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that Defendants are preliminarily enjoined from any further loan forgiveness for borrowers under the Final Rule's SAVE plan until such time as this Court can decide the case on the merits.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (ECF No. 21) is **DENIED**.

Dated this 24th day of June, 2024.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:24-cv-00520-JAR |
| | ) | |
| JOSEPH R. BIDEN, Jr., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PRELIMINARY INJUNCTION

**IT IS HEREBY ORDERED** that Defendants are preliminarily enjoined from any further loan forgiveness for borrowers under the Final Rule's SAVE plan until such time as this Court can decide the case on the merits.

**IT IS FURTHER ORDERED** that the Court will issue a separate Scheduling Order.

Dated this 24th day of June, 2024.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

STATE OF MISSOURI, *et al.*,

        *Plaintiffs*,

    v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
*et al.*,

        *Defendants.*

Case No. 4:24-cv-520-JAR

# EXHIBIT 2

**Declaration of James Richard Kvaal (May 7, 2024)**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

STATE OF MISSOURI, *et al.*,

     *Plaintiffs*,

     v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
*et al.*,

     *Defendants*.

Case No. 4:24-cv-520-JAR

## DECLARATION OF JAMES RICHARD KVAAL

I, James Richard Kvaal, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate:

1. I am the Under Secretary of Education at the United States Department of Education (Department). My nomination for this position was confirmed by the United States Senate on September 14, 2021, and I was sworn in on September 15, 2021. As the Under Secretary of Education, my responsibilities include the coordination of major policies, programs, and activities related to Postsecondary Education and Federal Student Aid for the Department. This includes, but is not limited to, the development of policies, procedures, and directives related to the administration of the student loan programs, including the SAVE Plan. As such, I am familiar with the terms and conditions of the Department's contracts with servicers; servicers' loan portfolios and revenues; and the expected impacts of the SAVE Plan on those portfolios and revenues. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

1

**MOHELA's Servicing of Federal Loans**

2.   The Higher Education Loan Authority of the State of Missouri, or MOHELA, is one of five entities nationwide the Department has contracted to service federal student loans.

3.   As of April 2024, MOHELA services 8.02 million borrowers of federally-owned student loans, a figure that includes 3.43 million borrowers enrolled in an income-driven repayment (IDR) plan.   Of those 3.43 million IDR plan enrollees, 2.24 million have enrolled in the SAVE Plan.

4.   The Department is in the process of updating its contractual relationship with MOHELA.   The references herein to the "Legacy Contract" refer to a contractual framework that proceeds under a master contract that awarded in September of 2011, and the last of MOHELA's obligations under this framework are set to expire in December of 2024.   The Department and MOHELA are in the process of implementing a framework that proceeds under a master contract called "Unified Servicing and Data Solution (USDS) Contract," which will replace the framework under the Legacy Contract.   Although MOHELA continues to work under some aspects of the Legacy Contract framework, a significant portion of MOHELA's servicing work has shifted to the USDS Contract as of April 1, 2024.

5.   The revenue model under the Legacy Contract differs in several respects from that of the USDS Contract.   Unless otherwise specified, the statements made below pertain equally to the Legacy Contract and the USDS Contract.

6.   In its role as a federal student loan servicer, MOHELA is responsible for the administrative aspects of repayment of student loans held directly by the federal government.   Loan servicing includes corresponding with borrowers, collecting and processing payments, and tracking loan amounts paid and owed.

**MOHELA's Loan-Servicing Compensation and Penalties**

7. Under the Department's contracts with MOHELA, the servicer receives several forms of compensation for servicing loans.

8. Under the Legacy Contract, MOHELA receives a monthly base fee per borrower that varies according to the borrower's status. For borrowers in repayment, for example, that fee is $2.97 per borrower per month. In addition, the Legacy Contract entitles MOHELA to per-task, per-borrower fees associated with servicing, such as $0.52 per billing statement mailed to borrowers, and to one-time fees, such as $49.40 for a borrower defense discharge.

9. Under the USDS Contract, MOHELA charges the Department per-borrower fees on a tiered, line-item basis. The price tiers are progressive, with each tier applying to the next additional group of borrowers in MOHELA's servicing portfolio. The first tier covers the first 2.5 million borrowers in MOHELA's portfolio, for which it receives approximately $2.18 per borrower per month (largely irrespective of which tasks it performs for each borrower). The tier pricing decreases as the number of borrowers increases. For example, when its portfolio ranges between 5 and 7.5 million borrowers, it receives approximately $1.61 per borrower.

10. The Department's contracts with MOHELA provide for certain decreased payments and/or monetary penalties in the event of servicing errors, borrower delinquencies, and defaults.

11. Under the Legacy Contract, the base monthly fee MOHELA receives per delinquent borrower decreases commensurate with the length of the delinquency. The base monthly fee for current borrowers under the Legacy Contract, $2.97 per borrower, decreases to $2.34 per borrower for delinquencies between 6 and 30 days, and continues to decrease

in steps until it reaches $0.50 per borrower for borrowers 271 or more days in delinquency.

12. Under its USDS Contract, MOHELA is penalized quarterly for failing to meet pre-defined performance metrics that apply on a portfolio-wide basis. Those failures result in MOHELA's portfolio-wide payments being reduced by specific percentages, up to 5% per metric and up to 20% in aggregate, across metrics.

13. Servicing errors that fall outside the per-fee reductions and percentage-based, portfolio-wide reductions described above may result in additional penalties under both Legacy and USDS Contracts. For example, MOHELA once failed to send timely billing notices to more than half of its borrowers returning to repayment after the COVID-related freeze, resulting in a $7.2 million penalty.

14. When a borrower defaults, the borrower's loan account is removed from the servicer's portfolio. Fees to the servicer associated with servicing the defaulted account also cease at the point of default.

**Costs of Servicing**

15. The costs MOHELA incurs for servicing are primarily labor costs, incurred in corresponding with borrowers and updating borrowers' account information. For example, one category of account updates are annual recertifications of income.

16. Borrowers with delinquent accounts cost more for MOHELA to service than borrowers with current accounts. At least some of the increased costs are due to the additional labor required to reach out to borrowers and to solicit payment, as well as to educate borrowers about the need for payment.

17. A borrower with monthly payments of $0 is among the cheapest borrowers to service, maximizing profit to MOHELA, as minimal labor is required to service the borrower's

account and no payments can be missed, while the servicer continues to receive fees without any risk of suffering financial losses due to loan delinquencies or defaults.

18. MOHELA currently has approximately 1.15 million SAVE borrowers with a $0 payment that are always current.

## Servicer Performance Tracking and Portfolio Rebalancing

19. The Department regularly tracks its servicers' performance.  The tracking metrics the Department uses include overall performance of the servicer's loan portfolio (e.g., the number of borrowers with current and delinquent accounts and the number of defaults), overall customer satisfaction rates, contact center performance metrics and interaction quality (e.g., the accuracy of information provided to borrowers seeking assistance) and back office processing accuracy.

20. The Department's contracts with its servicers provide expressly for rebalancing of borrowers among servicers, from weak performers to strong performers.

21. MOHELA's Legacy Servicing Contract expressly gives the Department the right to reallocate existing borrowers and "waives and releases all current and future claims against the Department of Education, Office of Federal Student Aid regarding its account allocation decisions and methodology for existing borrower loans."

22. MOHELA's new USDS Contract states that the Department "reserves the right to unilaterally shift current borrower accounts among USDS Servicers at the [Department's] direction when it is in the best interest of [the Department] or its borrowers, at no additional cost to [the Department]. It is anticipated that the movement of borrower accounts will be done with reasonable and prudent cause…The allocation of new borrower account volume during Task Order performance will be determined based on the performance of each USDS Servicer in relation to the other USDS Servicers

awarded."

23. Strong performance results in the growth of a servicer's loan portfolio in several ways: Higher performing servicers are assigned more new borrowers than lower performing servicers each quarter; lower performing servicers may have borrowers reassigned to higher performing servicers; and decommissioning servicers (servicers withdrawing from their contracts with the Department) will generally have their loan portfolio reassigned to servicers that can handle the additional load.

24. In addition to the monetary penalties described above, weak performance can result in the reduction of a servicer's loan portfolio through rebalancing.

25. When servicer performance issues are identified, the Department pauses or reduces allocation of new borrowers to a particular servicer until those issues are resolved. During this time the remaining servicers will have their allocations increased.

26. In April 2024, MOHELA sent the Department a letter requesting that up to 1.5 million of MOHELA's borrowers be reassigned to another servicer.  MOHELA describes that request as being based on the existing contracts, but the Department disagrees with that explanation.  The Department's contracts with MOHELA do not contemplate reduction of loan servicing portfolio size, or reassignment of borrowers, under the circumstances MOHELA identifies.  Nonetheless, the Department agreed to transfer the borrowers to improve service to borrowers whose accounts are managed by MOHELA.

**SAVE's Impact on Borrowers and Servicers**

27. As part of the Department's transition to the SAVE Plan, MOHELA requested and has received more than $1.6 million in transition costs.

28. The SAVE Plan's shortened time to forgiveness will discharge the loans of borrowers otherwise at risk of default and delinquency at a disproportionately high rate.

29. The Department estimates that a substantially higher portion of MOHELA's borrowers will be eligible for $0 monthly payments under SAVE than have been eligible under prior IDR plans. A definite estimate is difficult to make because a borrower's income is a central determinant of her required monthly payment under SAVE, and the Department lacks current income information on every borrower.

30. SAVE eliminates a prior requirement that borrowers enrolling in SAVE after having been on another repayment plan provide income documentation for the years they were not on REPAYE/SAVE. Servicers, including MOHELA, can reasonably be expected to expend lesser costs on processing this paperwork as a result of this change.

31. SAVE will allow borrowers to opt into automatic annual recertification of income for IDR plans, which will reduce the costs required of MOHELA to maintain those borrowers' accounts.

32. By reducing monthly payment amounts for many borrowers, SAVE will result in some borrowers' accounts remaining outstanding longer than they otherwise would. While SAVE provides for a discharge after ten years of payments for borrowers with an original balance of $12,000 or less, there are up to 5.25 million borrowers serviced by MOHELA (approximately 65% of the borrowers MOHELA services for the Department) that could be eligible for SAVE and have original principal balances exceeding $12,000.

33. From the time early implementation of SAVE began until mid-April 2024, roughly 28,000 MOHELA borrowers have seen discharges as a result of SAVE's shortened forgiveness period and roughly 53,000 more MOHELA borrowers have been identified as eligible for SAVE forgiveness and are being processed.

**MOHELA's FFEL Portfolio**

34. Separately from its loan servicing portfolio, MOHELA derives revenue from Federal

Family Education (FFEL) loans.  FFEL loans are held by MOHELA but insured by guaranty agencies and reinsured by the federal government.  Interest rates on FFEL loans are set by statute.

35. The average age of a FFEL loan held by MOHELA is 21 years, with ages ranging from 14 to 44 years.

36. One subset of MOHELA's FFEL loans consists of "FFEL consolidation loans," a category distinct from direct consolidation loans described below.  MOHELA must pay to the Department monthly rebate fees on FFEL consolidation loans equivalent to 0.62% or 1.05% per annum of the unpaid principal balance and accrued interest on the loans, depending on the age of the loan.  MOHELA is not permitted to charge the borrower these fees.

**FFEL Consolidation**

37. FFEL loans owned by MOHELA are eligible for consolidation into a Direct Consolidation Loan from the federal government in certain circumstances.

38. When a FFEL loan owned by MOHELA is consolidated into a Direct Consolidation Loan, MOHELA receives a payment equal to the entire amount owed by the borrower, which includes outstanding principal and any accrued interest.

39. When a borrower consolidates one of MOHELA's FFEL consolidation loans into a Direct Consolidation Loan, MOHELA is no longer required to pay the rebate fees referred to in paragraph 36.  MOHELA saw rebate fee costs decrease by $1.2 million in Fiscal Year 2023, a large proportion of which was due to consolidation.

40. Independent of the SAVE plan, MOHELA has already seen a strong trend of borrowers consolidating FFEL loans into direct consolidation loans.  Starting in December 2021— long before the announcement of the SAVE Plan—through December 2023,

MOHELA's FFEL portfolio has decreased by approximately $400 million.  Over the same period, MOHELA saw roughly $250 million in direct consolidations, which reflects about 63% of the decrease in MOHELA's FFEL portfolio.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of May 2024.

James Richard Kraal

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:24-cv-00520-JAR |
| | ) | |
| JOSEPH R. BIDEN, Jr., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This matter is before the Court on Plaintiffs' Motion for Clarification of the Preliminary Injunction.  ECF No. 48.  Plaintiffs filed their Motion on June 29, 2024.  Defendants filed their response on July 8, 2024.  ECF No. 52.  Plaintiffs filed their reply on July 9, 2024.  ECF No. 53.

The Court has reviewed the parties' arguments and has found that no additional clarification is necessary.  The Court's preliminary injunction means what it says: that "Defendants are preliminarily enjoined from any further loan forgiveness for borrowers under the Final Rule's SAVE plan . . . ."  ECF No. 36.  The Court need not extend this injunction beyond the scope of the Final Rule as Plaintiffs only sought injunctive relief from implementation of the Final Rule, which the Court has granted in part.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Clarification of the Preliminary Injunction (ECF No. 48) is **DENIED**.

Dated this 10th day of July, 2024.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

**20 U.S.C. § 1087e (excerpts)**

**§ 1087e. Terms and conditions of loans**

. . .

**(d) Repayment plans**

    **(1) Design and selection**

        Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose—

        **(A)** a standard repayment plan, consistent with subsection (a)(1) of this section and with section 1078(b)(9)(A)(i) of this title;

        **(B)** a graduated repayment plan, consistent with section 1078(b)(9)(A)(ii) of this title;

        **(C)** an extended repayment plan, consistent with section 1078(b)(9)(A)(iv) of this title, except that the borrower shall annually repay a minimum amount determined by the Secretary in accordance with section 1078(b)(1)(L) of this title;

        **(D)** an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student; and

        **(E)** beginning on July 1, 2009, an income-based repayment plan that enables borrowers who have a partial financial hardship to make a lower monthly payment in accordance with section 1098e of this title, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS Loan made on behalf of a dependent student or a Federal Direct Consolidation Loan, if the proceeds of such loan were used to discharge the liability on such Federal Direct PLUS Loan or a loan under section 1078–2 of this title made on behalf of a dependent student.

. . .

**(e) Income contingent repayment**

**(1) Information and procedures**

The Secretary may obtain such information as is reasonably necessary regarding the income of a borrower (and the borrower's spouse, if applicable) of a loan made under this part that is, or may be, repaid pursuant to income contingent repayment, for the purpose of determining the annual repayment obligation of the borrower. Returns and return information (as defined in section 6103 of title 26) may be obtained under the preceding sentence only to the extent authorized by section 6103(l)(13) of title 26. The Secretary shall establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment.

**(2) Repayment based on adjusted gross income**

A repayment schedule for a loan made under this part and repaid pursuant to income contingent repayment shall be based on the adjusted gross income (as defined in section 62 of title 26) of the borrower or, if the borrower is married and files a Federal income tax return jointly with the borrower's spouse, on the adjusted gross income of the borrower and the borrower's spouse.

**(3) Additional documents**

A borrower who chooses, or is required, to repay a loan made under this part pursuant to income contingent repayment, and for whom adjusted gross income is unavailable or does not reasonably reflect the borrower's current income, shall provide to the Secretary other documentation of income satisfactory to the Secretary, which documentation the Secretary may use to determine an appropriate repayment schedule.

**(4) Repayment schedules**

Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary.

**(5) Calculation of balance due**

The balance due on a loan made under this part that is repaid pursuant to income contingent repayment shall equal the unpaid principal amount of the loan, any accrued interest, and any fees, such as late charges, assessed on such

loan. The Secretary may promulgate regulations limiting the amount of interest that may be capitalized on such loan, and the timing of any such capitalization.

**(6) Notification to borrowers**

The Secretary shall establish procedures under which a borrower of a loan made under this part who chooses or is required to repay such loan pursuant to income contingent repayment is notified of the terms and conditions of such plan, including notification of such borrower, that if a borrower considers that special circumstances, such as a loss of employment by the borrower or the borrower's spouse, warrant an adjustment in the borrower's loan repayment, the borrower may contact the Secretary, who shall determine whether such adjustment is appropriate, in accordance with criteria established by the Secretary.

**(7) Maximum repayment period**

In calculating the extended period of time for which an income contingent repayment plan under this subsection may be in effect for a borrower, the Secretary shall include all time periods during which a borrower of loans under part B, part D, or part E--

**(A)** is not in default on any loan that is included in the income contingent repayment plan; and

**(B)**

**(i)** is in deferment due to an economic hardship described in section 1085(o) of this title;

**(ii)** makes monthly payments under paragraph (1) or (6) of section 1098e(b) of this title;

**(iii)** makes monthly payments of not less than the monthly amount calculated under section 1078(b)(9)(A)(i) of this title or subsection (d)(1)(A), based on a 10-year repayment period, when the borrower first made the election described in section 1098e(b)(1) of this title;

**(iv)** makes payments of not less than the payments required under a standard repayment plan under section 1078(b)(9)(A)(i) of this title or subsection (d)(1)(A) with a repayment period of 10 years; or

**(v)** makes payments under an income contingent repayment plan under subsection (d)(1)(D).

. . .

. . .