Iɴ ᴛʜᴇ

# United States Court of Appeals for the Eighth Circuit

State of Missouri; State of Arkansas; State of Florida; State of Georgia;
State of North Dakota; State of Ohio; State of Oklahoma
Plaintiffs - Appellees

v.

Joseph Robinette Biden, Jr., in his official capacity as President of the United
States; Miguel Cardona, in his official capacity as Secretary, United States
Department of Education; United States Department of Education
Defendants - Appellants

On Appeal From a Preliminary Injunction from the United States District Court for
the Eastern District of Missouri

**BRIEF OF NATIONAL CONSUMER LAW CENTER
AS AMICUS CURIAE IN SUPPORT OF APPELLANTS**

Abigail E. Shafroth
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
ashafroth@nclc.org

*Counsel for Amicus Curiae*

Dated: August 26, 2024

# DISCLOSURE STATEMENT

Amicus National Consumer Law Center is a nonprofit and has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

i

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................................i

TABLE OF AUTHORITIES ...............................................................iv

INTEREST AND CONTRIBUTION OF AMICUS CURIAE ...............................1

SUMMARY OF ARGUMENT ...........................................................2

ARGUMENT .................................................................................4

    I.    The Higher Education Act Authorizes the Secretary to Cancel
    Remaining Balances at the End of the ICR Repayment Term..............4

        A.    The Legislative History of Income Contingent
             Repayment Demonstrates that Congress Authorized
             Cancellation of Any Remaining Balance at the End of the
             Repayment Term.......................................................4

             (i)    1993 Legislation ...............................................4

             (ii)    1994 Regulations ..............................................9

             (iii)    2007 Statutory Amendments .........................12

        B.    The Plain Language of the Higher Education Act
             Requires Cancellation of Remaining Balances After a
             Borrower Has Completed the Income Contingent
             Repayment Plan's Terms. .......................................16

             (i)    The Statutory Text Makes Repayment Contingent
                   on Income and Limits the Duration of the
                   Repayment Obligation ....................................17

             (ii)    A Borrower's Satisfaction of the Terms of a
                   Federal Student Loan Payment Plan Satisfies their
                   Repayment Obligation ....................................19

Appellate Case: 24-2332    Page: 3    Date Filed: 08/27/2024 Entry ID: 5428685

(iii)   The Alternative Interpretations Suggested by the District Court Are Inconsistent with the Higher Education Act. ...............................................21

(iv)   A Negative Inference Based on Use of Term "Cancel" in IBR and PSLF is Unsupported. ..................24

CONCLUSION ......................................................................27

CERTIFICATE OF COMPLIANCE .....................................28

CERTIFICATE OF SERVICE .............................................29

Appellate Case: 24-2332   Page: 4   Date Filed: 08/27/2024 Entry ID: 5428685

# TABLE OF AUTHORITIES

**STATUTES:**

20 U.S.C. § 1078 ........................................................................................22, 24
20 U.S.C. § 1085 ...............................................................................................23
20 U.S.C. § 1087e .......................................................................................*passim*
20 U.S.C. § 1092 ...............................................................................................23
20 U.S.C. § 1098 ...............................................................................................24
20 U.S.C. § 1098e .......................................................................................16, 26

**REGULATIONS:**

34 C.F.R. § 685.102 ..........................................................................................23
34 C.F.R. § 685.208 ....................................................................................10, 22
34 C.F.R. § 685.209 (1994) .......................................................................10, 11
34 C.F.R. § 685.211 .............................................................................................3

**OTHER AUTHORITIES:**

59 Fed. Reg., FR Doc. No. 94-19733 (Aug. 18, 1994),
    https://www.govinfo.gov/content/pkg/FR-1994-08-18/html/94-
    19733.htm ...................................................................................10, 22

59 Fed. Reg., FR Doc No: 94-29260 (Dec. 1, 1994),
    https://www.govinfo.gov/content/pkg/FR-1994-12-01/html/94-
    29260.htm ............................................................................10, 11, 13

73 Fed. Reg. 63,232, 63,239 (Oct. 23, 2008).............................................24

103 Cong. Rec. S9495 (daily ed. May 6, 1993)............................................8

Black's Law Dictionary (12th ed. 2024) .................................................2, 17

John R. Brooks & Adam J. Levitin, *Redesigning Education Finance: How
    Student Loans Outgrew the "Debt" Paradigm*, 109 Georgetown L. J.
    5 (2020).........................................................................................20

College Cost Reduction and Access Act, Pub. L. No. 110-84, § 205, 121
    Stat. 784 (2007) .......................................................................4, 12

iv

Direct Loan Master Promissory Note, Borrower's Rights and
    Responsibilities Statement, 16. Repaying Your Loan, *available at*
    https://studentaid.gov/sites/default/files/Sub_Unsub_MPN_508-en-
    us.pdf.................................................................................................3, 20

H.R. Rep. No. 103-213 (1993)...................................................9

H.R. Rep. No.110-210, at 71 (2007),
    https://www.congress.gov/congressional-report/110th-congress/house-
    report/210/1?outputFormat=pdf ............................................16, 26

*Hearing of S. Comm. on Labor & Human Res. on S. 920 to Amend the*
    *Higher Education Act of 1965*, 103d Cong. 48 (May 26, 1993),
    https://files.eric.ed.gov/fulltext/ED363187.pdf...........................8, 9

Higher Education Amendments of 1992, Pub. L. No. 102-325, § 416, 106
    STAT. 529 ..........................................................................6

Income-Dependent Education Assistance Act of 1993, H.R. 2073, 103 Cong.
    § 201(c)(2) (1993).............................................................5-6

Omnibus Budget Reconciliation Act of 1993, Public Law No. 103-66 (1993) ........7

S. 2255, 102 Cong. § 454(b)(4) (1992)...................................................5

Student Loan Reform Act of 1993, S. 920 ...........................................6, 7

The Heritage Foundation, *Mandate for Leadership: The Conservative*
    *Promise Project 2025* 337-38 (2023),
    https://static.project2025.org/2025_MandateForLeadership_FULL.pdf......18

Steven Waldman, *The Bill: How Legislation Really Becomes Law: A Case*
    *Study of the National Service Bill* 157-158 (New York: Penguin
    Books, 1995)....................................................................9

v

# INTEREST OF AMICUS CURIAE[1]

Since its founding as a nonprofit in 1969, the National Consumer Law Center (NCLC) has been the leading consumer law resource center to which attorneys, officials, and policymakers across the nation have turned for consumer law answers, analysis, and support. NCLC has long-standing expertise in student loan law. NCLC publishes a 21-volume consumer law treatise series, including National Consumer Law Center, *Student Loan Law* (7th ed. 2023), *updated at* www.nclc.org/library, which is an 888-page treatise providing in-depth explanations of the laws and regulations governing the federal student loan program, with a chapter devoted to student loan repayment plans. NCLC attorneys have served on numerous Department of Education rulemaking committees, including committees that developed income contingent repayment regulations.

In this brief, NCLC offers its student loan law expertise to shed light on the question of whether the Higher Education Act authorizes cancellation of any remaining balance on a federal Direct Loan upon completion of an income contingent repayment term. The brief lays out the legislative and regulatory history of income contingent repayment and situates the statutory text within the context of the laws and regulations governing student loan repayment and default.

---

[1] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part and no person other than amicus curiae contributed money intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a).

1

# SUMMARY OF ARGUMENT

contingent (kən-tin-jənt) *adj.* (14c) 1. Possible; uncertain; unpredictable <the trust was contingent, and the contingency never occurred>. 2. Dependent on something that might or might not happen in the future; conditional <her acceptance of the position was contingent upon the firm's agreeing to guarantee her husband a position as well>.
CONTINGENT, Black's Law Dictionary (12th ed. 2024).

This case concerns the question of whether Congress authorized the Secretary of Education to offer borrowers an income contingent repayment plan wherein the borrower's payments are set based on a percentage of income each year and the obligation to repay is satisfied by making the required payments for the full term of the payment plan, even if doing so does not result in the borrower repaying the loan in full.

The answer is yes. Congress authorized the Secretary of Education to offer to borrowers a payment plan whereby repayment would be "contingent," i.e., *dependent,* on whether the borrower earns income sufficient to repay in full using income-based payments within "an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. 1087e(d)(1)(D). Through its name, the "income contingent repayment plan" expressly anticipates that not all borrowers who satisfy the terms of the plan will repay in full: because future income is uncertain, and payments are set as a portion of annual income, repayment in full is not guaranteed but rather is contingent on sufficient future

2

income. A borrower with consistently low or even no income is unlikely to repay in full, and, because payments are applied to interest first,[2] they may not even be able to do more than pay some of the interest they are charged without ever reducing principal after a decade or more of making payments.  But at the end of the repayment term (which is extended during periods of missed payments), once the borrower has made all of the payments required under the plan, the obligation to repay is satisfied and the student loan borrower can finally move forward debt free. This is how all federal student loan repayment plans operate—the repayment plan specifies the borrower's repayment obligations, which are set forth in the terms and conditions of the loan agreement signed by the borrower (called a "Master Promissory Note" or "MPN"), and once the borrower meets those obligations, the repayment obligation is satisfied.[3]

As detailed below, the legislative history, plain language, and broader statutory scheme all reflect and reinforce this longstanding interpretation of the Higher Education Act (HEA). Indeed, every administration for the past 30 years has consistently interpreted and applied the statutory language in this way, including in promulgation of ICR regulations in 1994, 2010, 2015, and 2023—all

---

[2] 34 C.F.R. § 685.211(a)(1)(i).

[3] Direct Loan Master Promissory Note, Borrower's Rights and Responsibilities Statement, 16. Repaying Your Loan.

Appellate Case: 24-2332     Page: 9     Date Filed: 08/27/2024 Entry ID: 5428685

of which specified that any remaining balance is canceled upon completion of the repayment term.

And over this lengthy period, Congress has not only never repudiated this interpretation, it has reinforced it: In 2007, Congress codified portions of the ICR regulations promulgated in 1994 to ensure that borrowers get credit toward completing their repayment term and having their balances canceled for periods in which they make higher payments in other plans, and added new language providing such credit for periods that the borrower is excused from making payments as a result of economic hardship. College Cost Reduction and Access Act, Pub. L. No. 110-84, § 205, 121 Stat. 784 (2007). These changes only make sense if the statute provides for satisfaction of the repayment obligation—and thus cancellation of any remaining balance—at the end of the repayment period, rather than a balloon payment or default.

## ARGUMENT

### I. The Higher Education Act Authorizes the Secretary to Cancel Remaining Balances at the End of the ICR Repayment Term.

#### A. The Legislative History of Income Contingent Repayment Demonstrates that Congress Authorized Cancellation of Any Remaining Balance at the End of the Repayment Term.

##### (i) 1993 Legislation

In the early 1990s, policymakers in the United States, concerned about default rates and the pressure student loan payments were placing on borrowers'

4

finances and career choices, became interested in offering student loan borrowers a new type of repayment plan, where payments would be based on the borrower's income rather than on the amortization schedules used in existing plans dictated by the amount borrowed, interest rate, and length of repayment term. A number of bills providing for income contingent repayment were introduced, and a bill providing for a small pilot program passed, but was quickly supplanted by the permanent income contingent repayment law before the pilot could begin. These bills differed in how much detail they prescribed versus how much they left to the Secretary to flesh out, but shared a common approach of allowing borrowers to satisfy their repayment obligation by making payments based on income.

While using varying language to do so—and never using the term "cancel" or "forgive"—the bills consistently established that in income contingent repayment, the obligation to repay is satisfied either by full repayment of principal and interest or by completion of an extended repayment period of up to 25 years, whichever comes first. *See, e.g.*, A bill to amend part D of title IV of the Higher Education Act of 1965 to provide for income dependent education assistance, S. 2255, 102 Cong. § 454(b)(4) (1992), ("LENGTH OF REPAYMENT - Repayment . . . shall continue until such loan has been repaid or for 25 years after the borrower ceases to be enrolled in an institution of higher education on at least a half-time basis, whichever occurs first.); Income-Dependent Education Assistance Act of

1993, H.R. 2073, 103 Cong. § 201(c)(2) (1993) ("Termination of Borrower's Repayment Obligation. – (2) No repayment required after 25 years in repayment status. – No amount shall be required to be repaid under this section with respect to any loan for any taxable year after the 25th year for which the borrower is in repayment status with respect to such loan."); Higher Education Amendments of 1992, Pub. L. No. 102-325, § 416, 106 STAT. 529 (authorizing the Secretary to establish a pilot income contingent repayment program and to set terms and conditions specifying the payment schedules and permitting "the discharge of remaining obligation on the loan not later than 25 years after the commencement of income contingent repayment").

In 1993, President Clinton embraced the income contingent repayment approach, and proposed amendments to the HEA that were adapted and introduced to the Senate by Senator Kennedy as the Student Loan Reform Act of 1993, S. 920, and subsequently incorporated into the Omnibus Budget Reconciliation Act of 1993, Public Law No. 103-66 (1993). In addition to reducing default, the purpose of offering borrowers an income contingent repayment option was to give borrowers "flexibility in managing their student loan repayment obligations, and so that those obligations do not foreclose community service-oriented career choices." Student Loan Reform Act of 1993, S. 920 (statement of purpose). Unlike some of the more detailed versions of income contingent repayment bills, the Act left most

6

of the details of income contingent repayment to the discretion of the Secretary of Education. But, like the other bills, the Act specified that payments would be based on a portion of annual income and would not go on forever, but rather the payments would only be due for "an extended period of time prescribed by the Secretary, not to exceed 25 years." Omnibus Budget Reconciliation Act of 1993, Pub. Law No. 103-66 § 455, codified at 20 U.S.C. § 1087e(d)(1)(D).

The legislative history reflects that Congress was initially uncertain as to whether to leave the decision as to how long the borrower should be required to make payments entirely to the Secretary, or to limit the Secretary's discretion by setting a maximum length—and if so, what that length should be—but that there was no question that the Secretary would set a time limit and cancel any remaining balancing once borrowers hit that limit. The initial language left the term entirely to the Secretary's discretion, stating that payments were "not to exceed a maximum length of time determined by the Secretary." Student Loan Reform Act of 1993, S. 920. Then-Deputy Secretary of Education Madeleine Kunin discussed this language when presenting on the bill in a Senate committee hearing. She explained that the income contingent repayment plan would help borrowers who could not afford the standard or extended repayment plans "to avoid default" by making payments instead based on a portion of their income. But because payments that are set as a portion of income do not ensure that the loan will be repaid in full,

7

Kunin explained that so you do not "go to your grave owing your student loan after 40 years . . . there is a provision in the bill that says the Secretary will make some designation as to when you call it quits and you are forgiven. One possibility is around 25 years or so." *Hearing of S. Comm. on Labor & Human Res. on S. 920 to Amend the Higher Education Act of 1965*, 103d Cong. 48 (May 26, 1993), https://files.eric.ed.gov/fulltext/ED363187.pdf.

The congressional record reflects that members of Congress echoed this understanding of the law: that it would require borrowers to make payments based on income for no longer than the repayment term set by the Secretary, with the obligation to pay then extinguished. *See, e.g.*, *Hearing of S. Comm. on Labor & Human Res. on S. 920 to Amend the Higher Education Act of 1965*, 103d Cong. 141-42 (May 26, 1993) (statement of Sen. Kassenbaum) (explaining that while carrying student loan debt in ICR for a long time while interest accrues worries some students, "it is assumed now, I think, that maybe after 25 years, that loan would be forgiven. So I suppose he could look at it in that it would relieve some of the burden that he feels he might have now in getting it repaid."); *see also* 103 Cong. Rec. S9495 (daily ed. May 6, 1993) (statement of Sen. Paul Simon) (Sen. Simon, stating that under S. 920, "if you become a nun, you may pay back nothing or a small amount. But if you become a famous Chicago lawyer, or a Wall Street

Appellate Case: 24-2332    Page: 14    Date Filed: 08/27/2024 Entry ID: 5428685

investor, you may be able to pay back quite a bit. It takes away what is happening right now in distorting what students do.").

Though the initial version of S. 920 left the maximum period a borrower could be required to keep making payments entirely to the discretion of the Secretary, and the Deputy Secretary suggested 25 years, the Senate amended the bill to limit the repayment period to 20 years—which was criticized by some as too "progressive." Steven Waldman, *The Bill: How Legislation Really Becomes Law: A Case Study of the National Service Bill* 157-158 (New York: Penguin Books, 1995). As reflected in the conference report, the House and Senate agreed to compromise with an amendment continuing to give the Secretary discretion to set the maximum repayment period, but providing that such period may "not exceed 25 years." H.R. Rep. No. 103-213, at 447 (1993) (Conf. Rep.). The compromise language was enacted and remains in effect today, offering borrowers "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).

### (ii)    1994 Regulations

In 1994, promptly after the bill's enactment, the Secretary proposed the first income contingent repayment (ICR) regulations. As the Secretary, "The borrower is not required to repay any amount that remains outstanding at the end of the

9

repayment period." 59 Fed. Reg., FR Doc. No. 94-19733 (Aug. 18, 1994),

https://www.govinfo.gov/content/pkg/FR-1994-08-18/html/94-19733.htm.

Therefore, both the proposed regulations and the final regulations promulgated

later that same year required payments "until the loan is repaid in full or until the

loan has been in repayment through the end of the income contingent repayment

period," *id.* at proposed 34 C.F.R. § 685.208(f); 59 Fed. Reg., FR Doc No: 94-

29260 (Dec. 1, 1994) at final 34 C.F.R. § 685.208(f)(1994),

https://www.govinfo.gov/content/pkg/FR-1994-12-01/html/94-29260.htm.

Accordingly, "[i]f a borrower has not repaid a loan in full at the end of the 25-year

repayment period under the income contingent repayment plan, the Secretary

cancels the unpaid portion of the loan." 59 Fed. Reg., FR Doc No: 94-29260, final

34 C.F.R. § 685.209(d)(2)(iv) (1994) (same language also in proposed regulations),

https://www.govinfo.gov/content/pkg/FR-1994-12-01/html/94-29260.htm.

 Additionally, the final regulations established what time is included in the

ICR repayment period, and thus what time earns the borrower credit toward having

any outstanding balance canceled after 25 years of qualifying time in repayment.

The regulations provided that in addition to time in which the borrower makes their

required payments under ICR, the repayment period includes "periods in which the

borrower makes payments under the standard repayment plan" and under fixed

"plans in which payments are based on a repayment period that is up to 12 years."

10

However, "[the repayment period does not include periods in which the borrower makes payments under the graduated and alternative repayment plans or periods of authorized deferment or forbearance" or "periods in which the borrower makes payments under an extended repayment plan in which payments are based on a repayment period that is longer than 12 years." 59 Fed. Reg., FR Doc No: 94-29260, § 685.209(d)(2)(ii) (1994). As is made clear in the preamble, the purpose of including periods when the borrower makes payments on a standard, 10-year fixed payment plan within the ICR repayment period is to ensure that borrowers get credit toward satisfying their repayment obligations, and ultimately being relieved of the obligation to continue making payments, not only for periods in which they made ICR payments, but also for periods in which they made higher payments than they would have been required to make under ICR:

> Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period. In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years. The Secretary is including years in repayment under both the 10-year standard plan and the 12-year extended plan as years eligible to count toward the 25 years for ICR loan forgiveness, because payments in these plans are at least equal to, and very often larger than, those required under ICR.

59 Fed. Reg., FR Doc No: 94-29260. And conversely, the purpose of excluding periods in which borrowers failed to make required payments or made payments on a graduated plan or an extended plan with a term of more than 12 years is to preclude the borrower from getting credit toward satisfaction of their obligation in

11

ICR for periods in which they fail to make payments or make payments that may be lower than would be required in ICR.

Additionally, while the Secretary decided to set the repayment term at 25 years for all borrowers for this initial ICR plan in 1994, and declined to adopt a suggestion to shorten the term for low-income borrowers or borrowers in public service jobs, the Secretary made clear that this was a policy choice and "the statute permits contracting the 25-year forgiveness period." *Id.*

### (iii) 2007 Statutory Amendments

Since the Secretary promulgated regulations clearly interpreting the HEA to provide for cancellation of any remaining balance upon completion of the ICR repayment period more than 30 years ago, Congress has never repudiated that interpretation. To the contrary, the only significant amendment to the ICR provisions of the HEA reaffirmed that interpretation.

In 2007, Congress amended the ICR provision to define what time must and must not be counted toward a borrower's "maximum repayment period." College Cost Reduction and Access Act, Pub. L. 110-84, 121 Stat. 784 (2007), relevant amendment codified at 20 U.S.C. § 1087e(d)(1)(D)(7). In doing so, it codified the regulatory provision that the Secretary promulgated in 1994 to ensure that time in which borrowers made payments under the standard plan, in addition to time they made payments in ICR, would count toward satisfying their repayment obligation

12

in ICR and having their remaining loan balance canceled at the completion of the repayment period. *See* 20 U.S.C. § 1087e(d)(1)(D)(7)(B)(ii), (iv), (v) (counting time in which borrowers made payments under the standard, 10-year repayment plan as well as time in which borrowers made payments of "not less than the payments required under a standard repayment plan").

Additionally, Congress went farther than the regulations, adding a provision specifying that periods in which borrowers are "in deferment due to an economic hardship" also count toward satisfying the ICR repayment term. 20 U.S.C. § 1087e(d)(1)(D)(7)(B)(i). This was something that an advocate for borrowers had recommended during the 1994 rulemaking, arguing that just as a borrower whose low income qualifies them for $0 payments in ICR gets credit toward fulfilling their 25-year payment obligation, so should a borrower similarly excused from making payments due to an economic hardship. 59 Fed. Reg., FR Doc No: 94-29260 (discussion of comments on Section 685.204(b)(3) (1994)), https://www.govinfo.gov/content/pkg/FR-1994-12-01/html/94-29260.htm. The Secretary declined to adopt that recommendation in 1994, citing statutory constraints. *Id.* (explaining that under the HEA, "the maximum years in repayment . . . exclude periods of deferment and forbearance.")

Congress, unlike the Secretary of Education, did not explain that the purpose of including such periods of time within the definition of the "maximum

Appellate Case: 24-2332     Page: 19     Date Filed: 08/27/2024 Entry ID: 5428685

repayment period" for ICR is to ensure that they count toward the borrower's requirement to make payments for a set number of years before the repayment obligation will be satisfied and the remaining balance canceled. However, these amendments only make sense if ICR provides for satisfaction of the repayment obligation and cancellation of any remaining loan balance at the end of the repayment period. If, as Missouri suggests, the borrower must instead repay the loan in full by the end of the ICR maximum repayment period or default, then counting time in which the borrower was relieved of the obligation to repay due to economic hardship toward the repayment period would have perverse results: It would give the financially distressed borrower *less* time to repay the remaining loan balance than they would have if they had simply skipped payments without seeking permission (in the form of a hardship deferment), meaning the borrower would have to make higher payments.

This would not only increase financial hardship, it would also increase the likelihood of default. Imagine, for example, a low-income borrower who consistently makes income contingent repayments for 24 years, then loses his job and receives an economic hardship deferment for the final year of the ICR repayment plan. It would make no sense for Congress to insist that the Secretary count that deferment year toward the maximum repayment period for ICR if the

14

effect were simply to result in an impossible balloon payment at the end of the year or unavoidable default.

Counting payments that are likely higher than a low-income borrower would be required to pay in ICR (such as payments in the standard plan) toward the maximum ICR repayment period, but not counting payments likely to be lower, would be similarly perverse under Missouri's theory. If a borrower is required to repay the balance in full or to default at the end of the maximum ICR repayment period, then this approach would punish borrowers who paid more than they would be required to under ICR by giving them less time to fully pay off their loans or face default. Thus, the only plausible reading of Congress's 2007 amendments to the ICR provisions (which are still in effect today) is that Congress shared the Secretary's understanding that the maximum repayment period in ICR defines the maximum period during which a borrower can be required to make payments before the repayment obligation is deemed satisfied, and borrowers get credit toward satisfying that payment obligation through making ICR payments or payments that are likely to be higher than what they would owe in ICR, but not for payments that are lower than what they would owe in ICR.

Finally, the same 2007 law that amended the ICR provisions also created the income-based repayment (IBR) program. In creating IBR, Congress demonstrated its approval of the ICR plan as implemented by the Secretary and its desire to

15

extend it to reach borrowers in the FFEL program and to ensure lower payments than the Secretary had previously set in ICR. As explained in the House report, the law sought to "establish a new income-based repayment plan available to all student loan borrowers similar to the current income-contingent repayment (ICR) plan in the direct student loan program." H.R. Rep. No.110-210, at 71 (2007), https://www.congress.gov/congressional-report/110th-congress/house-report/210/1?outputFormat=pdf. Like the ICR plan as defined in the Secretary's 1994 regulations, the income-based repayment (IBR) plan enacted in 2007 also capped payments at a fixed percentage of borrowers' discretionary income and canceled any remaining balance after 25 years of payments.[4]

**B.** **The Plain Language of the Higher Education Act Requires Cancellation of Remaining Balances After a Borrower Has Completed the Income Contingent Repayment Plan's Terms.**

The district court concluded that while it is plausible that the ICR statutory language allows cancellation of remaining balances at the end of the repayment term, "because the statute is silent on loan forgiveness under the ICR program, it is at least equally as likely that the HEA's time limitations in the ICR program refer to the maximum period that borrowers can be in repayment before the entire loan

---

[4] The 2007 law capped IBR payments at 15% of discretionary income with cancellation after 25 years; in 2010, Congress amended IBR for new borrowers to provide lower payments (10%) and a shorter period until cancellation (20 years), which remain in place today. 20 U.S.C. § 1098e.

Appellate Case: 24-2332    Page: 22    Date Filed: 08/27/2024 Entry ID: 5428685

amount must be repaid or borrowers must default." However, as detailed below, the statute is not silent and its plain language can only be squared with cancellation of any remaining balance upon completion of the repayment plan terms and conditions; the alternatives suggested by the district court are inconsistent with the HEA.

### (i) The Statutory Text Makes Repayment Contingent on Income and Limits the Duration of the Repayment Obligation

The statute is not in fact silent as to whether a borrower who enrolls in an income contingent repayment plan must repay in full or may instead satisfy their repayment obligation with a lesser payment. Rather, in offering an "income *contingent* repayment" plan, Congress clearly authorized the Secretary to create a payment plan in which repayment is *contingent*, i.e., "uncertain," and "dependent on" the borrower's income over the extended term of repayment. Contingent, Black's Law Dictionary (12th ed. 2024). The plan thus expressly contemplates that some borrowers may complete the repayment plan, and thus their repayment obligation, without repayment in full. Further, the statute requires the Secretary to set ICR payments that "vary in relation to the appropriate portion of the annual income of the borrower" and are "paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D), (e)(4). This

17

establishes a limit both on how much borrowers may be required to pay and on how long borrowers enrolled in an ICR plan may be required to make payments.

At the end of the repayment term—which is extended during periods when the borrower does not make payments required under the plan—the obligation to repay is satisfied. While in hindsight, Congress could have made this *even more* clear by adding that any remaining balances would be canceled at the end of the term, such language was unnecessary to make clear that repayment was contingent on income and that, just as in all other federal student loan repayment plans, the obligation to repay would be satisfied by fulfilling the terms of the plan. Indeed, every administration for the past 30 years has consistently interpreted and applied the statutory language this way, including during the creation of ICR plans in 1994, 2010, 2015, and 2023. Further, outside of the present litigation, it is widely recognized even among opponents of student debt cancellation that the ICR provisions of the HEA require cancellation of remaining balances at the end of the repayment period.[5] And as discussed above, the 2007 statutory amendments defining what time is included that maximum repayment period are only consistent

---

[5] *See, e.g.,* The Heritage Foundation, *Mandate for Leadership: The Conservative Promise Project 2025* 337-38 (2023) (recommending that the Secretary phase out old ICR plans and create a new plan with payments set at 10% of income above 100% of the poverty line, and stating "If new legislation is possible, there should be no loan forgiveness, but if not, *existing law would require forgiving any remaining balance after 25 years*." (emphasis added)).

Appellate Case: 24-2332    Page: 24    Date Filed: 08/27/2024 Entry ID: 5428685

with the Secretary's understanding of the repayment period as defining the maximum amount of time a borrower can be required to make payments before the obligation to repay is satisfied.

> **(ii)** **A Borrower's Satisfaction of the Terms of a Federal Student Loan Payment Plan Satisfies their Repayment Obligation**

The HEA allows the repayment obligation on Direct Loans to be met through payment according to the terms of one of the several repayment plans that it requires the Secretary to offer. 20 U.S.C. § 1087e(d) ("the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of loan"). There is no provision in the HEA for continued payments or default after the repayment plan has ended because the obligation to repay is satisfied by making all payments required in the plan for the required term, or repaying in full early.

In the "traditional" repayment plans (the standard, graduated, and extended plans), the borrower necessarily repays the loan in full by the end of the plan because payments are set based on an amortization schedule determined by the principal, interest rate, and repayment term. Unless the borrower has pre-paid, the final monthly payment of their loan term pays off their loan in full, completing the repayment obligation. In the ICR and IBR plans, payments are based not on an amortization schedule designed to pay off the loan in a certain amount of time, but instead as a percentage of borrowers' varying and unpredictable income, with a

19

maximum repayment period defining the upper limit for how long the borrower must continue making payments if the payments do not first pay off the loan. As Professors Brooks and Levitin have described it, the ICR and IBR plans are "more aptly described as giving the borrower a right to satisfy the debt by paying X percent of income for Y years," instead of providing for "forgiveness" at the end of the repayment term. John R. Brooks & Adam J. Levitin, *Redesigning Education Finance: How Student Loans Outgrew the "Debt" Paradigm*, 109 Georgetown L. J. 5, 37 (2020).

This is reflected in the Direct Loan Master Promissory Note ("MPN"), which is the contract between the borrower and the Department of Education as lender. The MPN sets forth the "borrowers' rights and responsibilities" and allows for payment obligation to be met through payment according to terms of any of the repayment plans, including the various ICR plans. The MPN specifically provides that for borrowers who choose to repay using an ICR plan (ICR, PAYE, or REPAYE/SAVE), "any remaining loan amount will be forgiven" if the borrower has made the required number of years of qualifying payments and the loan "is not repaid in full."[6] Borrowers' right to satisfy their repayment obligation in ICR by

---

[6] Direct Loan Master Promissory Note, Borrower's Rights and Responsibilities Statement, 16. Repaying Your Loan, https://studentaid.gov/sites/default/files/Sub_Unsub_MPN_508-en-us.pdf.

paying the required portion of their income to the Department for the required number of years is thus both statutory and contractual.

### (iii) The Alternative Interpretations Suggested by the District Court Are Inconsistent with the Higher Education Act

The alternative interpretations suggested for the meaning of the maximum repayment period for ICR—that it may mean the maximum time before the loan must be repaid in full of the borrower must default—are inconsistent with the HEA's text. It is not possible for the Secretary to set an income contingent repayment schedule that would both assure repayment in full within 25 years (or any shorter term) and also comply with Congress's mandate that such schedule "shall require payments that vary in relation to the appropriate portion of the annual income of the borrower." 20 U.S.C. § 1087e(e)(4). Because a borrower's annual income may vary from year to year over the course of the extended repayment term, can be as low as $0, and cannot be known in advance, the only way to ensure repayment in full within the loan term would be to either:

a. Set minimum monthly payments that must be paid *regardless of income* using an amortization schedule dictated by the borrower's principal and interest rate—i.e., establish that payments, at minimum, must be at least as high as payments under an extended plan; or

b. Set payments based on income until the final month of the repayment term, and then set a balloon payment based on the amount of the

21

remaining balance—which could be in the tens or even hundreds of thousands of dollars for a consistently low-income borrower. Each of these approaches, however, would violate the plain language of the HEA, which requires that the Secretary establish a schedule whereby payments "vary" annually based on a "portion of the borrower's income," with no allowance made to require higher payments that depart from such schedule.

Importantly, alternative (a) is essentially a different plan already provided by Congress, which Congress saw as inadequate to meet the needs of low-income borrowers: the "extended repayment plan," which extends fixed or graduated payments using an amortization schedule designed to fully pay off a loan within an extended term of 25 years for eligible new loans, and between 12 and 30 years for pre-2006 loans. 20 U.S.C. § 1078(b)(9)(A)(iv); 34 C.F.R. § 685.208(e), (i).[7] The extended plan requires borrowers to make minimum required payments calculated to fully repay a loan within an extended period and, like all repayment plans, also allows borrowers to pay more than those minimum required amounts without penalty, which borrowers could do if their income permitted and they wished to

---

[7] Congress provided the extended plan as one of four generally available repayment plan options for Direct Loan borrowers in 1993, alongside the standard, graduated, and income contingent repayment plans. Omnibus Budget Reconciliation Act of 1993, Public Law No. 103-66, at (d)(1) (1993). The extended plan mirrored a previously existing plan for FFEL borrowers. *See* 59 Fed. Reg., FR Doc No. 94-19733 (Aug. 18, 1994), *available at* https://www.govinfo.gov/content/pkg/FR-1994-08-18/html/94-19733.htm.

pay down their loans faster and as a result pay less interest. 20 U.S.C. § 1087e(d)(1); 20 U.S.C. § 1092(b)(iii). Thus if ICR required borrowers to make minimum payments designed based on an amortization schedule rather than income, and to make income-based payments only if and when their income made payments above those offered by the extend plan affordable, then ICR would not offer borrowers any additional benefit or ability to reduce payments beyond what was already offered by the extended plan. This would be inconsistent with Congress's expressed intent to create ICR to make repayment more manageable for low-income borrowers than it was under the existing payment plans.

Similarly, the suggestion that the maximum repayment period in ICR could mean that a borrower who does not repay in full within that time defaults is inconsistent with the text of the HEA. The HEA defines default to occur when a borrower is 270 days past due in making a required monthly payment. 20 U.S.C. § 1085(l); 34 C.F.R. § 685.102(b). As a result, a borrower cannot default under the HEA if they have made their required payments under the ICR plan and are meeting the terms of their Master Promissory Note (which provides for loan cancellation in ICR), even if making their required payments did not result in paying down their full balance.

Additionally, interpreting the maximum time period that a borrower must repay in ICR to mean that a borrower who does not pay down the full balance by

23

the end of that time defaults would render the ICR time limit required by Congress meaningless. This is because the HEA also provides that borrowers who default may be required by the Secretary to repay using the ICR plan. 20 U.S.C. § 1078(m)(1). If a borrower who does not repay in full in 25 years of ICR (or any shorter period the Secretary establishes) necessarily defaults and may then be required to continue paying in ICR, then there would effectively be no time limit on how long a borrower could be required to keep making payments in ICR—an incongruous way to make sense of language providing for a "maximum repayment period" for ICR.[8]

### (iv) A Negative Inference Based on Use of Term "Cancel" in IBR and PSLF is Unsupported

Missouri argues that because Congress did not use the term "cancel" when it created ICR in 1993, but did use the term in subsequently enacted laws that authorized plans requiring the Secretary to cancel balances after a certain amount of qualifying time in public service loan forgiveness ("PSLF") (20 U.S.C. § 1087e(m)) and income-based repayment ("IBR") (20 U.S.C. § 1098), the court

---

[8] Additionally, the "maximum repayment period" cannot mean the time a borrower may repay in ICR before being required to switch to one of the traditional payment plans, because borrowers must complete payment in the traditional plans within maximum terms (generally 10 to 25 years) that begin running the date the borrower first enters repayment in any plan–meaning most borrowers will no longer be eligible for those plans after completing the ICR repayment period. 73 Fed. Reg. 63,232, 63,239 (Oct. 23, 2008).

Appellate Case: 24-2332     Page: 30     Date Filed: 08/27/2024 Entry ID: 5428685

should make a negative inference that Congress did not intend to allow cancellation of outstanding balances in ICR.

But no such negative inference is appropriate here. First, for the reasons described above, including the term "cancel" was simply unnecessary to make clear that the obligation to pay ends once the borrower makes all required payments in the "income contingent repayment." Indeed, when the ICR statute was passed in 1993, it came on the heels of at least three other ICR bills that terminated the obligation to repay any remaining balance after making ICR payments for an extended number of years, each using different language and none using the word "cancel." *See supra* Section I.A.

Second, as a matter of logic, the income contingent repayment provisions preceded the PSLF and IBR provisions by 14 years, so Congress was not choosing to depart from the "cancellation" language when it drafted the ICR language.

Third, there are reasons for Congress to include the term "cancel" in the PSLF and IBR statutes that do not apply to ICR. PSLF terminates the obligation to repay early, *before* the repayment plan term is complete for borrowers who spend 10 years in qualifying employment while making payments in any of the income-driven repayment plans (ICR, PAYE, REPAYE/SAVE, IBR). Because the PSLF program terminates the obligation to repay before the borrower completes their

25

repayment plan's term, Congress had to specify that, and did so by stating that "the Secretary shall cancel the balance of interest and principal due."

There was likewise a distinct reason for Congress to specify that the Secretary "shall repay or cancel any outstanding balance" for borrowers that complete the IBR term that does not apply to ICR: Unlike ICR, which is only available to borrowers with federally-held Direct Loans, the IBR plan is also available to borrowers with privately held, federally guaranteed loans ("FFEL loans"). Congress decided that the government, rather than the private lender, would absorb the cost of FFEL loans that were not repaid in full through IBR, explaining in a House Report that at the end of the maximum IBR repayment term, "any unpaid principal, including any unpaid capitalized interest, would be paid by the government in case of a guaranteed loan." H.R. Rep. 110-210, at 71 (2007). Congress needed to add language beyond what was included in the ICR statute— which did not apply to the FFEL program—to specify this, and did so by stating that "the Secretary shall repay or cancel any outstanding balance of principal and interest due" for borrowers who complete the required years of repayment in IBR. 20 U.S.C. § 1098e(b)(7).

Appellate Case: 24-2332    Page: 32    Date Filed: 08/27/2024 Entry ID: 5428685

# CONCLUSION

As detailed above, the legislative history and plain language of the income contingent repayment provisions of the Higher Education Act, along with the broader statutory scheme governing repayment and default of federal student loans, demonstrate that Congress authorized the Secretary of Education create income contingent repayment plans in which repayment is contingent on income, a borrower's obligation to pay is satisfied by repayment according to the plan terms, and any remaining balance at the end of the repayment term is canceled.

Respectfully submitted,

/s/ *Abigail E. Shafroth*

Abigail E. Shafroth
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
ashafroth@nclc.org

*Counsel for Amicus Curiae*

Dated: August 26, 2024

27

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS AND VIRUS-FREE CERTIFICATION**

1.  This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7) because the brief contains 6,407 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface; footnotes appear in 14-point Times New Roman typeface.

3.  This brief is virus free.

/s/ *Abigail E. Shafroth*
Abigail E. Shafroth
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
ashafroth@nclc.org

*Counsel for Amicus Curiae*

Dated: August 26, 2024

Appellate Case: 24-2332   Page: 34   Date Filed: 08/27/2024 Entry ID: 5428685

**CERTIFICATE OF SERVICE**

I certify that on August 26, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Abigail E. Shafroth*

Abigail E. Shafroth
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
ashafroth@nclc.org

*Counsel for Amicus Curiae*

29