# In the United States Court of Appeals for the Eighth Circuit

STATE OF MISSOURI, ET AL.,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

JOSEPH R. BIDEN, JR., ET AL.,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Missouri

## BRIEF FOR THE STATES OF TEXAS, ALASKA, AND SOUTH CAROLINA AS AMICUS CURIAE IN SUPPORT OF THE PLAINTIFF STATES

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE
    ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Aaron.Nielson@oag.texas.gov

AARON L. NIELSON
Solicitor General
    *Counsel of Record*

LANORA C. PETTIT
Principal Deputy Solicitor General

*Counsel for Amici States*

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................. ii

Interest of Amici Curiae ......................................................... 1

Summary of the Argument ...................................................... 1

Argument ....................................................................... 4

    I.   The SAVE Plan's Final Rule is Unlawful Many Times Over. .................... 4

        A.  Congress has not authorized the Final Rule ......................... 4

        B.  The SAVE Plan also violates the APA .............................. 11

    II.  The Federal Government's Remaining Arguments are Unpersuasive. ........................................................... 16

        A.  The States have standing .......................................... 16

        B.  The federal government's equitable arguments fail. .................. 18

        C.  The entire Final Rule is unlawful and should be enjoined. ............ 19

Conclusion ..................................................................... 22

Certificate of Compliance ....................................................... 24

Certificate of Service ........................................................... 25

**Cases:**

*Alabama Association of Realtors v. HHS*,
594 U.S. 758 (2021) ......................................................... 8

*Alaska v. U.S. Dep't of Educ.*,
2024 WL 3104578 (D. Kan. June 24, 2024)..................... 1, 6, 7, 9, 10, 17

*Am. Fuel & Petrochemical Mnfrs. v. EPA*,
937 F.3d 559 (D.C. Cir. 2019) ....................................... 13

*Am. Inst. of Certified Pub. Accts. v. IRS*,
804 F.3d 1193 (D.C. Cir. 2015)...................................... 17

*Biden v. Nebraska*,
600 U.S. 482 (2023)........................1-6, 8-9, 12, 14, 16, 18-19, 22

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
144 S.Ct. 2440 (2024) .................................................... 20

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*,
187 F.2d 789 (3d Cir. 1951)........................................... 20

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ....................................................... 21

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ......................................................... 6

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..................................................... 13, 15

*Duarte v. Mayorkas*,
27 F.4th 1044 (5th Cir. 2022)........................................ 20

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................................................... 12

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ................................................... 6, 18

*FEC v. Akins*,
524 U.S. 11 (1988) ......................................................... 21

*Loper Bright Enters. v. Raimondo*,
144 S.Ct. 2244 (2024) ............................................... 8, 10

*In re Louisiana Pub. Serv. Comm'n*,
  58 F.4th 191 (5th Cir. 2023) ............................................................20

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ...................................................................... 21

*In re MCP No. 185*,
  No. 24-7000, 2024 WL 3650468 (6th Cir. Aug. 1, 2024) ........................... 18

*Michigan v. EPA*,
  576 U.S. 743 (2015) ..................................................................... 13

*Mistretta v. United States*,
  488 U.S. 361 (1989) ...................................................................... 11

*Missouri v. Biden*,
  112 F.4th 531 (8th Cir. 2024) .................................................. 2- 7, 16

*Missouri v. U.S. Dep't of Educ.*,
  2024 WL 4069224 (S.D. Ga. Sept. 5, 2024) ........................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................13, 21

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022) ..................................................................... 18

*Nat'l Lifeline Ass'n v. FCC*,
  921 F.3d 1103 (D.C. Cir. 2019) .......................................................... 15

*NRDC, Inc. v. Perry*, ............................................................... 18
  940 F.3d 1072 (9th Cir. 2019) ......................................................... 14

*Ohio v. EPA*,
  144 S.Ct. 2040 (2024)........................................................ 3, 12, 21

*Prometheus Radio Project v. FCC*,
  652 F.3d 431 (3d Cir. 2011) ......................................................... 15

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)...................................................................... 14

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. 2002) ................................................................ 16

*United States v. X-Citement Video, Inc.*,
  513 U.S. 64 (1994) .................................................................. 11

*UARG v. EPA*,
  573 U.S. 302 (2014)..................................................................5-6, 8

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ...................................................... 2, 4-5, 7-8
*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ...................................................... 11

**Constitutional Provision and Statutes:**

U.S. Const., art. I, §9 ...................................................... 11

5 U.S.C.:
  §703 ...................................................................... 20
  §705 ...................................................................... 20
  §706 .................................................................. 19-20

20 U.S.C.:
  §1087e(d)(1) ............................................................... 9
  §1087e(d)(1)(D) ......................................................... 9, 11
  §1087e(e)(4) ............................................................... 9
  §1098e(a)(3) ............................................................... 9
  §1098e(b)(1) ............................................................... 9

31 U.S.C. §3711(a) ......................................................... 10

**Other Authorities:**

Black's Law Dictionary 1612 (3d ed. 1933) ................................. 20

Dep't of Education, *Secretary Cardona Statement on Supreme Court
  Ruling on Biden Administration's One Time Student Debt Relief Plan*
  (June 30, 2023) ........................................................... 14

Improving Income Driven Repayment for the William D. Ford
  Federal Direct Loan Program and the Federal Family Education
  Loan (FFEL) Program/ SAVE Plan, 88 Fed. Reg. 1894 (Jan. 11,
  2023) .................................................................. 11-12

Improving Income Driven Repayment for the William D. Ford
  Federal Direct Loan Program and the Federal Family Education
  Loan (FFEL) Program/ SAVE Plan, 88 Fed. Reg. 43,820
  (July 10, 2023) ..................................................... 3, 7, 9, 12, 13

Ingrid Jacques, *Courts Keep Telling Biden His Student Loan Scam Is Illegal.
  Will It Stop Him? Nah!*, USA TODAY (July 1, 2024, 4:04 A.M. ET) ........... 1

Michael Brickman, *Democrats are Plotting a Brazen $147B Student-
  Loan Debt 'October Surprise,'* N.Y. POST (Aug. 14, 2024) .................... 2

Monroe Harless, *Education Department Attacks Republicans, Touts Biden's Agenda in Official Letter*, THE FEDERALIST (July 15, 2024)........... 2, 7, 18

Jon Miltimore, *The Biggest Winners of Biden's Student Debt 'Cancellation'*, WASH. EXAMINER (Apr. 26, 2024) ..................................................................2

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933 (2018).............................................................................20

NCLA Amicus Br. at 15, *Alaska v. Dep't of Educ.*, No. 24A11 (U.S. July 16, 2024) ...................................................................................... 10

Russ VerSteeg, *Early Mesopotamian Commercial Law*, 30 U. TOL. L. REV. 183 (1999) ...................................................................... 17

White House, *President Joe Biden Outlines New Plans to Deliver Student Debt Relief to Over 30 Million Americans Under the Biden-Harris Administration* (Apr. 8, 2024) ...........................................................................7

## INTEREST OF AMICI CURIAE

Amici curiae are the States of Texas, Alaska, and South Carolina, who are Plaintiffs-Appellees/Cross-Appellants in *Alaska v. Department of Education*, Nos. 24-3089, 24-3094 (10th Cir). The District of Kansas found, based on uncontroverted evidence, that the SAVE Plan and its associated Final Rule will irreparably harm the Amici States. *See, e.g.*, *Alaska v. U.S. Dep't of Educ.*, No. 24-1057-DDC-ADM, 2024 WL 3104578, at *15 (D. Kan. June 24, 2024). Because the U.S. Court of Appeals for the Tenth Circuit has abated its proceedings in light of this Court's nationwide injunction pending appeal, *see* Order, *Alaska*, *supra* (10th Cir. Aug. 22, 2024), the Amici States have a significant interest in the outcome of this litigation. The Amici States also have additional arguments in favor of injunctive relief that fully support those of Missouri and the other Plaintiff States here.[*]

## SUMMARY OF THE ARGUMENT

The federal government's briefing to the Court is most remarkable for what it lacks: any **(i)** defense of President Biden's boasting that the Supreme Court's decision in *Biden v. Nebraska*, 600 U.S. 482 (2023), "didn't stop" him from mass student-loan cancellation[1]; **(ii)** mention of Secretary Cardona's use of official government channels—in advance of a presidential election—to proclaim that "the Biden-Harris team" is battling "Republican elected officials" through this

---

[*] No counsel for any party authored this brief, in whole or in part. No person or entity other than amici contributed monetarily to its preparation or submission.

[1] Ingrid Jacques, *Courts Keep Telling Biden His Student Loan Scam Is Illegal. Will It Stop Him? Nah!*, USA TODAY (July 1, 2024, 4:04 A.M. ET), https://bit.ly/46fPThb.

litigation[2]; **(iii)** reason why its reading of the Higher Education Act (HEA) would not allow the Department of Education (Department) to cancel every penny of the $1.6 trillion in student loans it holds; or **(iv)** discussion of the Department's jaw-dropping choice to ignore *Nebraska* when promulgating the SAVE Plan.

After *Nebraska*, it is now black-letter law that "'[t]he basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are [questions] that Congress would likely have intended for itself.'" *Id.* at 506 (quoting *West Virginia v. EPA*, 597 U.S. 697, 730 (2022)). Applying that rule, the Supreme Court barred the Department from giving away $430 billion without approval from Congress, *id.* at 504, and left in place this Court's injunction preventing that from happening. Because agencies—under core separation-of-powers principles—can neither act without congressional authorization nor ignore court decisions, the Department's efforts at mass-debt cancellation should have ended with *Nebraska*.

Instead, the Department plowed ahead with the SAVE Plan—which costs $45 billion *more* than the HEROES Act Plan at issue in *Nebraska*. *See, e.g.*, *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024). Yet the Supreme Court applied the major-

---

[2] *See, e.g.*, Monroe Harless, *Education Department Attacks Republicans, Touts Biden's Agenda in Official Letter*, THE FEDERALIST (July 15, 2024), https://perma.cc/4T26-A3X5; *see also* Michael Brickman, *Democrats are Plotting a Brazen $147B Student-Loan Debt 'October Surprise,'* N.Y. POST (Aug. 14, 2024), https://bit.ly/4dNwCqb (similar); Jon Miltimore, *The Biggest Winners of Biden's Student Debt 'Cancellation'*, WASH. EXAMINER (Apr. 26, 2024), https://perma.cc/WD8F-NWGY (notice stating: "Congratulations! The Biden-Harris Administration has forgiven your federal student loan(s).").

questions doctrine in *Nebraska* because "[t]he economic and political significance of the Secretary's action is staggering," the "Secretary's assertion of administrative authority has conveniently enabled him to enact a program that Congress has chosen not to enact," and "it would seem more accurate to describe the program as being in the wheelhouse of the House and Senate Committees on Appropriations." 600 U.S. at 502-04 (cleaned up). Nothing in that analysis remotely suggests that *Nebraska* would have come out differently had the Department used its second-choice statute to effectuate a "mass debt cancellation program." *Id.* at 506.

But that is just the beginning of the SAVE Plan's flaws. Indeed, the Court will be hard pressed to find a clearer example of *un*reasoned decisionmaking. The Department finalized the SAVE Plan on July 10, 2023—ten days *after* the Supreme Court decided *Nebraska*. Yet despite the Supreme Court's rejection of mass-debt cancellation, the Final Rule expresses confidence that the Department may give away hundreds of billions of dollars under the HEROES Act Plan. *See Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program/ SAVE Plan*, 88 Fed. Reg. 43,820, 43,875 (July 10, 2023) (*Final Rule*). Such a black-and-white misstatement of the law—and such black-and-white disregard of the Supreme Court—cannot stand under *Ohio v. EPA*, 144 S.Ct. 2040 (2024). Nor has the Department identified any case (from any court) upholding any rule (from any agency) in history of comparable scope, complexity, or cost with just 30 days of comments. To put that comment period in perspective, the Department provided the public roughly one day per $15

billion—or roughly $660 million per hour and $11 million per minute.

Nonetheless, the federal government urges this Court to ignore these flaws. It does so by offering misguided arguments about standing, the equities and balances of harms, and the scope of relief. Nothing in its brief, however, changes reality. Because the SAVE Plan is effectively and in material respects the HEROES Act Plan 2.0, the Court again should put a stop to the Department's unlawful effort to give away hundreds of billions of taxpayer dollars in the lead-up to an election.

## ARGUMENT

## I.    The SAVE Plan's Final Rule is Unlawful Many Times Over.

Just last month, the Court granted an injunction pending appeal because the Plaintiff States demonstrated a likelihood of success on the merits and the remaining factors support such relief. As the Court explained, with a price tag of $475 billion, "[t]he SAVE plan is even larger in scope than the loan-cancellation program" in *Nebraska*. *Missouri*, 112 F.4th at 536. Yet the federal government again relies on "wafer-thin reed[s]" to justify "such sweeping power." *Id.* at 538 (alteration in original) (quoting *Nebraska*, 600 U.S. at 499). The Court was right to reject the federal government's statutory arguments. The Court, however, did not identify all the ways that the SAVE Plan and its associated Final Rule is unlawful. The Amici States thus offer additional reasons the Plaintiff States here should prevail.

### A. Congress has not authorized the Final Rule.

**1.**    In *Nebraska*, the Supreme Court held that "'[t]he basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are ones that Congress

would likely have intended for itself.'" 600 U.S. at 506 (quoting *West Virginia*, 597 U.S. at 730). Because the SAVE Plan is also a "mass debt cancellation program," that precedent controls here. The federal government asks the Court to limit *Nebraska*'s holding to the HEROES Act, but that is not a plausible reading of the Supreme Court's analysis, which is plain that—for purposes of the first prong of the major-questions doctrine (that is, whether the agency action is major)—*any* "mass debt cancellation program" triggers the major-questions doctrine. *Nebraska*, 600 U.S. at 506.

Even putting aside *Nebraska*, the SAVE Plan is a major question by any measure.

*First*, the SAVE Plan has extraordinary economic significance. *See, e.g.*, *West Virginia*, 597 U.S. at 721. Even if the SAVE Plan cost $156 billion (the Department's initial estimate), that would still be three times more than the program in *Alabama Association of Realtors v. HHS*, 594 U.S. 758 (2021) (per curiam). At $475 billion (the true cost, *see, e.g.*, *Missouri*, 112 F.4th at 536), the SAVE Plan's costs are even more than the astronomical sum in *Nebraska*. Given such an extraordinary price tag, "[t]here is no serious dispute that the Secretary claims the authority to exercise control over 'a significant portion of the American economy.'" *Nebraska*, 600 U.S. at 503 (quoting *UARG v. EPA*, 573 U.S. 302, 324 (2014)).

*Second*, the SAVE Plan also has extraordinary political significance. *See, e.g.*, *West Virginia*, 597 U.S. at 721. As in *Nebraska*, "the Secretary's assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself." 600 U.S. at 503 (quoting *West Virginia*, 597

U.S. at 731). That is not for lack of opportunity. As the Supreme Court explained in *Nebraska*, Congress has considered this issues scores of times: "More than 80 student loan forgiveness bills and other student loan legislation were considered by Congress during its 116th session alone." *Id.* (quotation omitted).

Furthermore, that the highest levels of the Executive Branch are using the SAVE Plan as a thinly disguised campaign tool shows that the SAVE Plan is, if anything, *more* politically significant than the HEROES Act Plan. *See supra* pp. 1-2, nn. 1-2. That political significance, moreover, is especially apparent now given the extraordinary lengths the federal government has gone to avoid or defeat the Eastern District of Missouri's injunction, *see, e.g.*, *Missouri*, 112 F.4th at 535, including an unsuccessful emergency application to the U.S. Supreme Court, and the fact that the Department is preparing a third round of massive debt forgiveness—again, notably, in the run-up to a presidential election, *see, e.g.*, *Missouri v. U.S. Dep't of Educ.*, No. CV 224-103, 2024 WL 4069224, at *2 (S.D. Ga. Sept. 5, 2024) (granting temporary restraining order with respect to third round of debt cancellation). Judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up).

*Third*, the SAVE Plan "represent[s] the first time the Secretary has gone beyond the number set by Congress" in the HEA. *Alaska*, 2024 WL 3104578, at *11. Where, as here, "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" courts "typically greet its announcement with a measure of skepticism." *UARG*, 573 U.S. at 324 (quoting

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123 (2000)). The Department cannot overcome that skepticism by claiming that this plan merely incrementally extends prior practice when the SAVE Plan costs *30 times* more than the previous highwater mark. No wonder the Secretary has claimed that the SAVE Plan is "the most affordable student loan repayment plan *in history*." Harless, *supra* (emphasis added). This plan "'is an order of magnitude broader than anything that has come before" and "expands agency authority to such an extent that it alters it.'" *Missouri*, 112 F.4th at 534, 537 (quoting *Alaska*, 2024 WL 3104578, at *11).

The SAVE Plan also turns "loans" into partial grants in an unlawful—and highly transformative—way. For undergraduate debt, "expected payments per $10,000 borrowed drop from $11,844 … to $6,121," while those "who have lifetime income in the bottom quintile are projected to repay $873 per $10,000." *Final Rule*, 88 Fed. Reg. at 43,880. And if that were not enough, the President has announced that millions of borrowers will pay nothing and another million will pay almost nothing. *See, e.g.*, White House, *President Joe Biden Outlines New Plans to Deliver Student Debt Relief to Over 30 Million Americans Under the Biden-Harris Administration* (Apr. 8, 2024), https://bit.ly/4cvvkzE ("Nearly 8 million borrowers have enrolled in the SAVE plan, 4.5 million borrowers have a monthly payment of $0 under the plan, and an additional 1 million borrowers have a monthly payment of less than $100."). Unilaterally imposing hundreds of billions of dollars' worth of costs on taxpayers under a statute requiring repayment is transformative under any accounting.

*Fourth*, "the breadth of the authority … asserted" is also extraordinary. *West Virginia*, 597 U.S. at 721. The federal government offers no reason why, under its new reading of the HEA, it could not abolish *all* $1.6 trillion of student debt that it holds—to say nothing of future debt that has not yet been incurred. Yet that is essentially *all* "the Government's $1.7 trillion in annual discretionary spending." *Nebraska*, 600 U.S. at 503. It takes major power to fundamentally change how an entire sector of the economy works; more so still to spend astronomical sums to do it.

*Fifth*, although this factor is less relevant after *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024), the Department has no relevant expertise here. The Department's most analogous experience is the HEROES Act Plan, which not only was almost $50 billion smaller than the SAVE Plan (a difference that by itself could trigger the major-questions doctrine under *Alabama Association of Realtors*), but also was not implemented precisely because it is unlawful for the Department to give away hundreds of billions of dollars without clear congressional authorization. When a program's price tag runs into the billions of dollars—let alone nearly half a trillion dollars—"the program" falls within "the 'wheelhouse' of the House and Senate Committees on Appropriations." *Id.* at 504.

**2.** The key question before the Court, therefore, is whether Congress provided "'clear congressional authorization'" in the HEA. *West Virginia*, 597 U.S. at 723 (quoting *UARG*, 573 U.S. at 324). Congress, however, has not authorized anything like the SAVE Plan, much less provided "clear … authorization." *Id.*

On its face, the HEA does not authorize loan forgiveness but instead allows the Secretary to create "an income contingent *repayment* plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. §1087e(d)(1)(D) (emphasis added); *see also id.* §1087e(e)(4) ("[Such plans] shall require *payments* that vary in relation to the appropriate portion of the annual income of the borrower … as determined by the Secretary." (emphasis added)).

Despite that statutory language, the Secretary's theory is that he has "discretion as to how much a borrower must pay," so long as the repayment period does not "exceed 25 years" and that the amount due is "based upon the borrower's annual adjusted gross income …." *Final Rule* at 43,826-27. But that reading of the HEA not only disregards other limits set by Congress, *see Alaska*, 2024 WL 3104578, at *11, it also ignores the crucial word "repayment." Although the HEA allows for loan forgiveness in certain circumstances, *see Nebraska*, 600 U.S. at 484, §1087e(d)(1)(D) is not one of them. To the contrary, Congress insisted that "repayment" "includ[e] *principal and interest* on the loan." 20 U.S.C. §1087e(d)(1) (emphasis added).

When the HEA is read as a whole, moreover, the flaw in the Department's arguments become even clearer. Exercising its legislative authority over the nation's finances, Congress has limited when borrowers can receive lower monthly payments followed by loan forgiveness. To qualify for such plans, Congress requires borrowers to show financial hardship, such that the "annual amount due" on the loan exceeds "15 percent" of income exceeding "150 percent of the poverty line." *Id.*

§§1098e(a)(3)(A)-(B), (b)(1). Here, by contrast, the Department seeks to make forgiveness easier for essentially every borrower than Congress did for those suffering financial hardship—which turns the HEA upside down.

The federal government's theory also makes two statutes superfluous: Congress's amendments to the HEA in 2007 and 2010. *See, e.g.*, NCLA Amicus Br. at 15, *Alaska v. Dep't of Educ.*, No. 24A11 (U.S. July 16, 2024) ("The 2007 CCRA and the 2010 HCERA make no sense if the 1993 HEA Amendments already authorized the Department to unilaterally design a more generous repayment plan like SAVE."). And the SAVE Plan nullifies the many limits Congress has put on grant programs, to say nothing of the requirement that agencies must "try to collect a claim of the United States Government for money ... arising out of the activities of, or referred to, the agency." 31 U.S.C. §3711(a). Given the language Congress enacted, the Department's theory would not be a plausible way to read the HEA even if the SAVE Plan cost taxpayers only $475.00, not $475,000,000,000.00.

Against all of this, the federal government argues that past policies have assumed that loan cancellation is permissible following 20 or 25 years of payments. Yet assumptions about what claimed ambiguities in a statute might allow are the opposite of clear statements, even more so after *Loper Bright*. Regardless, as the District of Kansas explained, what the Department attempts to do here goes far beyond what any administration has done before. *See Alaska*, 2024 WL 3104578, at *11.

**3.** The federal government's unprecedented theory also has no limiting principle. Under its view, the Department could forgive 100% of every loan at the

stroke of a pen merely by setting payments at 0.1% of discretionary income, defined as income above 3000% of the federal poverty line, for two months. Courts, however, should construe statutes to avoid constitutional doubts, not invite them. *See, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994).

Here, the federal government's argument runs headlong into Article I's allocation of spending power to Congress—not the White House. *See* U.S. Const., art. I, §9. And if Congress in §1087e(d)(1)(D) truly granted a federal agency discretion to give away hundreds of billions of dollars (or more) whenever the Secretary believes it would be "appropriate," then Congress has not provided the required intelligible principle to satisfy the nondelegation doctrine. After all, "application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989). It is hard to imagine when that interpretative rule would be more warranted than here. As the Supreme Court has explained, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," and Congress must "must provide substantial guidance" for "standards that affect the entire national economy." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001).

## B. The Final Rule also violates the Administrative Procedure Act.

Beyond lacking statutory authorization, the Final Rule here also cannot satisfy the APA, which provides an additional and alternative basis for injunctive relief.

**1.** In its proposed rule, the Department estimated that the SAVE Plan would cost $137.9 billion (rather $475 billion). *See Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program*, 88 Fed. Reg. 1894, 1895 (Jan. 11, 2023). That is because the Department excluded the costs of the HEROES Act Plan from its accounting. That exclusion unsurprisingly prompted a commenter to ask for the SAVE Plan's true costs if the Supreme Court were to reject the HEROES Act Plan. *See Final Rule*, at 43,875. That question was hardly speculative, given that the Supreme Court had already granted certiorari before judgment while leaving this Court's nationwide injunction in place—an extraordinary development.

The Department, however, refused to address the HEROES Act Plan's true costs in the Final Rule and instead said that it was "confident" that the Supreme Court would allow the agency to "pursue debt relief" under the HEROES Act. *Final Rule*, at 43,875. The Supreme Court, however, had decided *Nebraska* a full ten days *before* the Final Rule was published. *Compare Nebraska*, 600 U.S. 477 (published on June 30, 2023), *with Final Rule* at 44,875 (issued on July 10, 2023). An agency's decision to blind itself to Supreme Court precedent is the opposite of reasoned decisionmaking. By definition, "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio*, 144 S.Ct. at 2053 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Here, the Department never tried to explain how the Final Rule could be reconciled with the Supreme Court's decision in *Nebraska*, which in one fell swoop made this already astronomically expensive program three times more expensive.

The federal government advanced various arguments to the Tenth Circuit in an effort to salvage the SAVE Plan. None is availing, for at least five reasons.

*First*, the federal government's argument that the Department was not required to consider costs is an impermissible post-hoc rationalization. It is a "'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The Final Rule recites a single reason for refusing to update the cost estimates: the Department was "confident in [its] authority to pursue debt relief" under the HEROES Act and expected to prevail in the forthcoming "Supreme Court's ruling on the issue." *Final Rule* at 44,875. Nowhere did the Department argue that it did not need consider costs in the first place.

*Second*, the federal government is wrong that the Department can ignore costs. Even if the HEA did not require it directly, the APA does by requiring "reasoned decision-making." *Michigan*, 576 U.S. at 750. Absent some statutory exception, costs are always an "'important aspect of the problem'" for agencies to consider. *Id.* at 752 (citation omitted). Ignoring how much a program costs necessarily means the Department failed to account for all "important aspect[s] of the problem before it." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). At a minimum, considering costs was certainly within the Department's discretion. *See, e.g., Am. Fuel & Petrochemical Mnfrs. v. EPA*, 937 F.3d 559, 577 (D.C. Cir. 2019) (unless barred by statute, discretion includes power to consider costs). Accordingly,

13

the Department's refusal to explain in the Final Rule its use (or nonuse) of that discretion was a violation of the APA, and one it cannot solve with post hoc arguments. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943).

*Third*, the federal government erroneously treats costs as an abstract issue divorced from the Final Rule's purposes. But the amount of debt cancelled—the point of the SAVE Plan—effectively *is* the Final Rule's cost. The Department can hardly claim that the SAVE Plan cancels the "right" amount of debt when it has no idea how much debt is at issue.

*Fourth*, the federal government has defended the Department's disregard of *Nebraska* on the ground that the Secretary (supposedly) sent the SAVE Plan to the General Printing Office before *Nebraska* was decided—as if rushing an almost half-trillion-dollar program out the door to avoid a Supreme Court decision isn't itself an indictment. But that is not what the Secretary said the day the Supreme Court decided *Nebraska*. *See, e.g.*, Dep't of Educ., *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan* (June 30, 2023) (the Department finalized Final Rule "today"), https://tinyurl.com/2jeyaap. And even putting the Secretary's words aside, "agencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval." *NRDC, Inc. v. Perry*, 940 F.3d 1072, 1077 (9th Cir. 2019). The federal government has not cited contrary authority.

*Fifth*, the federal government's theory that this error was harmless—*i.e.*, that the Department would have plowed ahead despite *Nebraska* and would not have

updated *any* of its analysis to account for a Supreme Court decision—does not pass the straight-face test. In fact, the federal government's position that it would have proceeded no matter what the Final Rule costs, no matter how much debt cancellation it achieves, and no matter what the Supreme Court says, underscores the lack of "reasoned decision-making" here. *Michigan*, 576 U.S. at 752.

**2.** The Department's defense of its decision to provide only 30 days for comment also cannot be squared with its duty to provide commenters a "*meaningful opportunity*" to comment. *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011) (emphasis added). Courts have not hesitated to invalidate agency actions with comment periods too short to provide such an opportunity. *See id.* (invalidating 28-day comment period); *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1103, 1117 (D.C. Cir. 2019) (14 days). The purpose of notice-and-comment rulemaking is to allow the public to provide critical information to an agency and to explain the pitfalls of a proposal in time for the agency to avoid errors. Notice-and-comment rulemaking thus is not a mere formality, much less a box-checking exercise. Instead, it is how "federal agencies are accountable to the public and their actions subject to review by the courts." *Regents*, 591 U.S. at 16.

No one is asking courts to graft new procedural requirements onto the APA— only to enforce Congress's mandate that agencies provide a "meaningful opportunity" to comment on proposed rule. *See, e.g.*, *Prometheus Radio Project*, 652 F.3d at 453. Essentially everyone in the United States will be affected by the SAVE Plan; per capita, the plan costs more than $1,000 for each person in the country. No

agency can impose such extraordinary costs on hundreds of millions of people without Congress's authorization, let alone with just 30 days for comments. Nor has the Department cited any case upholding a 30-day comment period for a gargantuan rule like this one. As the D.C. Circuit has explained, failure to comply with notice-and-comment requirements "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. 2002). Such structural error exists here.

## II.    The Federal Government's Remaining Arguments are Unpersuasive.

The federal government's merits arguments are flawed in multiple respects. Perhaps for that reason, it dedicates a significant portion of its briefing to standing, the equities and the balance of harms, and the scope of permissible injunctive relief. Its arguments with respect to these issues are also flawed.

### A. The Plaintiff States have standing.

Missouri and the other Plaintiff States have standing. The Supreme Court effectively held as much in *Nebraska* when it concluded that the HEROES Act Plan injured Missouri's Higher Education Loan Authority, one of the same entities before the Court. *See, e.g.*, *Missouri*, 112 F.4th at 536 ("[W]e agree with the district court that '[t]he allegations in the Complaint are substantially similar to, if not identical to, those the Supreme Court held were sufficient to establish Missouri's standing just last year in *Biden v. Nebraska*,' and thus that at least one of the States, Missouri, has standing to sue."). Any attempt to distinguish Missouri's standing to challenge *de jure* loan forgiveness and *de facto* loan forgiveness makes no sense under Article III

16

or basic economics because, either way, the States are injured.

Regardless, Missouri has standing for the same reason that the District of Kansas concluded that the Amici States have standing. As the District of Kansas explained, the States will lose interest income because of the SAVE Plan. *See, e.g.*, *Alaska*, 2024 WL 3104578, at *11 This is so because the SAVE Plan provides benefits—including through its unlawful payment thresholds—that categorically are not available to borrowers who deal with state-loan instrumentalities. Yet the Department allows those borrowers to consolidate their loans with new federal loans. *See id.* Thus, although state entities will receive their principal back, they will lose interest income—a classic pocketbook injury since at least Hammurabi's Code. *See, e.g.*, Russ VerSteeg, *Early Mesopotamian Commercial Law*, 30 U. TOL. L. REV. 183, 208 (1999) ("Hammurabi's Laws fixed the rate of interest for loans ranging from 20% (usually for a loan of money) to 33% (usually for a loan of grain).").

For similar reasons, the States have standing because they can "show an actual or imminent increase in competition," which "will almost certainly cause an injury in fact." *Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015). The rule that competitors have standing is premised on "basic economic logic." *Id.* at 1198 (quotation omitted). And that "basic economic logic" amply supports standing here because the States compete with the federal government in the market for student loans, yet the SAVE Plan unlawfully makes federal loans far more attractive—to the tune of hundreds of billions of dollars. Under any plausible understanding of competitor standing, a competitor has standing to challenge the

federal government's attempt to unlawfully harm it in the marketplace.

**B. The federal government's equitable arguments fail.**

Equity and the balance of harms also favor broad relief. The federal government's primary argument is an appeal to the supposed benefits of the SAVE Plan. As the Sixth Circuit explained last month, however, because it is never equitable for a federal agency to violate federal law, courts "do not evaluate that tradeoff [between a program's value and its harms] once [they] conclude that the Commission likely exceeded its legal authority," *In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *4 (6th Cir. Aug. 1, 2024) (citing *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 120 (2022)). Nor could it be otherwise under first principles, for "an administrative agency's power to regulate must always be grounded in a valid grant of authority from Congress." *Brown & Williamson*, 529 U.S. at 161.

Furthermore, even if the federal government's speculation regarding borrower confusion or expectations ever had merit (and it does not), such concerns carry no force now. This Court administratively stayed the entire Rule more than two months ago. *See* Order, *Missouri v. Biden*, No. 24-2332 (8th Cir. Jul. 18, 2024). Borrowers therefore have already been reminded (as if they needed it) that the SAVE Plan almost certainly violates federal law and that—as with *Nebraska*—borrowers should not expect to benefit from it for that reason. No one who watched the *Nebraska* litigation play out just last year can credibly claim reliance on any unlawful mass-debt cancellation plan. Additionally, that the Secretary can send emails to borrowers nationwide, *see* Harless, *supra*, defeats any appeal to confusion.

The federal government's arguments regarding the timing of this lawsuit also miss the mark for similar reasons. Here, everyone—the federal government, the States, and borrowers—have known since the Supreme Court left in place this Court's injunction in *Nebraska* that "mass debt cancellation" is legally barred absent congressional authorization. 600 U.S. at 506. As Congress has not seen fit to authorize "mass debt cancellation" in the intervening year, injunctive relief is thus required. The Plaintiff States' sensible decision to wait and see whether the Department itself would withdraw the SAVE Plan in light of *Nebraska* (as it should have) and to prepare for litigation before filing suit, while still seeking judicial relief months before the Final Rule was to go into effect, does not remotely allow the federal government to give away nearly half a trillion dollars of taxpayer money without authority, let alone for apparently partisan aims before an election.

### C. The entire Final Rule is unlawful and should be enjoined.

Finally, the federal government argues for a narrow injunction. For the reasons explained by the Plaintiff States, the federal government's argument is incorrect. The federal government is also wrong under the APA. Because the Final Rule's violations of the APA infect every aspect of the unlawful SAVE Plan, they provide not only an alternative basis for affirmance, but also support broad relief.

Under the APA, courts "shall" "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," "contrary to constitutional right power, privilege or immunity," "in excess of statutory jurisdiction, authority,

or limitations, or short of statutory right." 5 U.S.C. §§706(2)(A)-(C).

A court "set[s] aside agency action" by vacating it. *Id.* § 706(2); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2460 (2024) (Kavanaugh, J., concurring). When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." Black's Law Dictionary 1612 (3d ed. 1933). Thus, "the [APA] establishes a unique form of judicial review that differs from judicial review of statutes." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 950 (2018). Indeed, just five years after the APA's enactment, the Third Circuit explained that Section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951). Congress has amended and recodified various portions of the APA since courts began to apply vacatur *without* abrogating this remedy. *See, e.g.*, *Duarte v. Mayorkas*, 27 F.4th 1044, 1059 (5th Cir. 2022).

As this Court's sister circuit has noted, "the All Writs Act and the APA to provide separate, but closely intertwined, grounds for … relief." *In re Louisiana Pub. Serv. Comm'n*, 58 F.4th 191, 193 (5th Cir. 2023). This is confirmed by other aspects of the APA. For example, Section 705 allows a court to "postpone the effective date of [such] an agency action" during litigation, 5 U.S.C. § 705, in a way very similar to a preliminary injunction. So too with Section 706(1), which allows courts to "compel" agency action. *Id.* § 706(1). Compelling agency action is plainly a remedy, which need not necessarily take the form of a "declaratory judgment[] or writ[] of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. §703.

And these principles support the broad relief that the States seek here. The Supreme Court long ago explained that agency action taken in violation of the APA "cannot be afforded the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (quotation marks omitted); *see also, e.g.*, *FEC v. Akins*, 524 U.S. 11, 25 (1988). For example, in *Lujan v. National Wildlife Federation*, an otherwise fractured Court agreed that agency action "can of course be challenged under the APA by a person adversely affected—and the entire [program] insofar as the content of that particular action is concerned, would thereby be affected." 497 U.S. 871, 890 & n.2 (1990). That is, "if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting).

True, this appeal currently arises in the posture of a preliminary injunction—not a final decision. Yet the fact that the federal government's APA violations require vacatur of the entire Final Rule cannot brushed aside. Where an aggrieved party is likely to succeed on such a claim, a court should not require that party to comply with the rule "during the pendency of this litigation," when doing so would impose injuries that are, by definition "irrecoverable." *Ohio*, 144 S.Ct. at 2053. Thus, where a rule "likely runs afoul of the[] long-settled standards" established in the APA—including by failing to "offer[] a satisfactory explanation for its action"—a court should pause that rule *in its entirety* to protect the party during the pendency of potentially years-long litigation. *Id.* at 2053 (quoting *State Farm,* 463 U.S. at 43).

Here, the federal government's APA errors require vacatur of the *entire* rule. After all, the Department did not offer different comment periods regarding different aspects of the rule, and its demonstrably false assumption that it would prevail in *Nebraska* taints the entire process. And anything short of nationwide relief would not prevent the States' irreparable injury in a nationwide marketplace. Broad injunctive relief is thus compelled by the APA, even apart from the Final Rule's lack of statutory authorization.

## CONCLUSION

The Court should hold that the SAVE Plan and its associated Final Rule is unlawful in its entirety and order the district court to permanently enjoin it.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Aaron.Nielson@oag.texas.gov

September 26, 2024

AARON L. NIELSON
Solicitor General
  *Counsel of Record*

LANORA C. PETTIT
Principal Deputy Solicitor General

*Counsel for Amici States*

Counsel for Additional Amici:

TREG TAYLOR
Alaska Attorney General

ALAN WILSON
South Carolina Attorney General

**CERTIFICATE OF COMPLIANCE**

This filing complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 5,890 words as determined by the word-counting feature of Microsoft Word 365, which is less than one-half the maximum length authorized for a party's principal brief.

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 365 in 14-point proportionally spaced Equity Text A font.

This filing complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

/s/ Aaron L. Nielson
Aaron L. Nielson

## CERTIFICATE OF SERVICE

On September 26, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Service will be accomplished by the appellate CM/ECF system.

/s/ Aaron L. Nielson
Aaron L. Nielson