## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF MISSOURI, ET AL.,
*Plaintiffs-Appellees / Cross-Appellants*,
v.
JOSEPH R. BIDEN, ET AL.,
*Defendants-Appellants / Cross-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Missouri
No. 6:24-CV-01057-DDC-ADM

*Amici Curiae* Brief of the New Civil Liberties Alliance, the Cato Institute, and the Mackinac Center for Public Policy in Support Plaintiffs-Appellees

Sheng Li
    *Counsel of Record*
Russell G. Ryan
Markham S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
sheng.li@ncla.legal

Patrick J Wright
MACKINAC CENTER FOR PUBLIC POLICY
140 West Main Street
Midland, MI 48640
(989) 631-0900
wright@Mackinac.org

Clark M. Neily III
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 218-4631
cneily@cato.org

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 26.1(a), the undersigned counsel states that each of the *amici curiae* is a nonprofit organization that has no parent corporations, and no publicly held corporation owns 10 percent or more of its stock.

*/s/Sheng Li*
Sheng Li

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS .......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iii

INTERESTS OF THE AMICI CURIAE .................................................................. 1

STATEMENT OF THE CASE .................................................................................. 2

ARGUMENT ........................................................................................................... 4

   I.   STATES HAVE STANDING IN THEIR CAPACITY AS PSLF-QUALIFYING
       EMPLOYERS ................................................................................................. 4

   II.  THE 1993 ICR STATUTE DOES NOT AUTHORIZE SAVE ................................. 9

      A.   The 1993 ICR Statute Requires Repayment Rather than
          Cancellation of Student-Loan Debt ....................................................... 9

      B.   The Department's Contrary Interpretation of the ICR Statute Would
          Result in an Unconstitutional Delegation of Legislative Power ............. 16

CONCLUSION ...................................................................................................... 20

CERTIFICATE OF COMPLIANCE ...................................................................... 21

CERTIFICATE OF SERVICE ............................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABA v. Dep't of Educ.,*
370 F. Supp.3d 1 (D.D.C. 2019) ............................................................6

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946) .................................................................................17

*Biden v. Nebraska,*
143 S.Ct. 2355 (2023) .......................................................................2, 10

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
601 U.S. 416 (2024) ..............................................................................10

*Dep't of Transp. v. Ass'n of Am. RRs,*
575 U.S. 43 (2015) .................................................................................17

*Gundy v. United States,*
588 U.S. 128 (2019) ...............................................................................17

*Hall v. Hall,*
138 S. Ct. 1118 (2018) ...........................................................................11

*Int'l Union v. OSHA,*
938 F.2d 1310 (D.C. Cir. 1991) .............................................................18

*J.W. Hampton, Jr., & Co. v. United States,*
276 U.S. 394 (1928) ...............................................................................17

*Jarkesy v. SEC,*
34 F.4th 446 (5th Cir. 2022) ..................................................................18

*Missouri v. Biden,*
112 F.4th 531 (8th Cir. 2024) ..................................................................4

*Missouri v. Biden,*
No. 4:24-CV-00520-JAR, 2024 WL 3104514 (E.D. Mo. June 24, 2024) ............5

*Mistretta v. United States,*
488 U.S. 361 (1989) ...............................................................................17

*SEC v. Jarkesy,*
144 S. Ct. 2117 (2024) ...........................................................................18

*Sherley v. Sebelius*,
 610 F.3d 69 (D.C. Cir. 2010) ................................................................................8

*Taggart v. Lorenzen*,
 587 U.S. 554 (2019) ................................................................................11

*Wayman v. Southard*,
 23 U.S. (10 Wheat.) 1 (1825) ................................................................................17

*Whitman v. Am. Trucking Ass'ns.*,
 531 U.S. 457 (2001) ................................................................................ 13, 17

*Yakus v. United States*,
 321 U.S. 414 (1944) ................................................................................17

**STATUTES**

20 U.S.C. § 1078 ................................................................................ 11, 14

20 U.S.C. § 1078-10 ................................................................................10

20 U.S.C. § 1087e ................................................................................ passim

20 U.S.C. § 1098e ................................................................................ 10, 15, 16

31 U.S.C. § 1301 ................................................................................ 10, 11

College Cost Reduction and Access Act of 2007,
 Pub. L. 110-84, 121 Stat. 784 (2007) ................................................................................15

Health Care and Education Reconciliation Act of 2010,
 Pub. L. No. 111-152, 124 Stat. 1029 (2010) ................................................................................16

Omnibus Budget Reconciliation Act of 1993,
 Pub. L. 103-66, 107 Stat. 312 (1993) ................................................................................3

**REGULATIONS**

34 C.F.R. § 685.219 ................................................................................5, 6

*Improving Income Driven Repayment for the William D. Ford Federal Direct
 Loan Program and the Federal Family Education Loan (FFEL) Program*,
 88 Fed. Reg. 43,820 (July 10, 2023) ................................................................................ passim

**OTHER AUTHORITIES**

Adam Looney,
 *Biden's Income-Driven Repayment plan would turn student loans into*

*untargeted grants*,
Brookings, September 15, 2022...........................................................13

Barack Obama,
*Remarks by the President in State of the Union Address*, Speech given before
Congress, January 27, 2010 ...............................................................15

Cong. Rsch Serv.,
*The Federal Direct Student Loan Program* (1995) .............................................14

Department of Education,
Secretary Cardona Statement on Supreme Court Ruling on Biden
Administration's One Time Student Debt Relief Plan (June 30, 2023) ................2

*Hearing of the Senate Committee on Labor and Human Resources to Amend the
Higher Education Act of 1965*,
103rd Cong. (1993)................................................................... 12, 13, 18

Matthew Chingos, et al.,
*Few College Students Will Repay Student Loans under the Biden
Administration's Proposal*,
Urban Institute, January 19, 2023 .......................................................13

**INTERESTS OF THE AMICI CURIAE**[1]

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization devoted to defending constitutional freedoms from the administrative state's depredations. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government). NCLA was one of many commenters that objected to the proposed Department of Education ("Department") rule that ultimately established the unauthorized Saving on a Valuable Education ("SAVE") student-loan plan, which is the central focus of this case.

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files

---

[1] Counsel for *amici* states that all parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel made a monetary contribution to its preparation or submission.

*amicus* briefs in federal courts across the country, including in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

The Mackinac Center for Public Policy is a Michigan-based, nonpartisan research and educational institute advancing policies fostering free markets, limited government, personal responsibility, and respect for private property. The Center is a § 501(c)(3) organization founded in 1987.

All three *amici* are keenly interested in this case because it involves a profoundly troubling assertion of administrative power and raises critically important issues of constitutional and administrative law.

## STATEMENT OF THE CASE

On June 30, 2023, before the ink dried on the Supreme Court's decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), which invalidated the Department's plan to cancel $430 billion in federal student loans by unlawfully rewriting the HEROES Act of 2003, the Secretary of Education announced a new and equally unlawful debt-cancellation scheme.[2] Ten days later, the Department published a final rule establishing the so-called "SAVE" repayment plan, entitled *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820 (July 10,

---

[2] *See* Department of Education, Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan (June 30, 2023).

2023). SAVE rewrites the income-contingent repayment provisions of the 1993 amendments to the Higher Education Act, Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 312, 348-49 (1993) ("ICR Statute"), to transform loan-*repayment* plans that Congress authorized into loan-*cancellation* plans that Congress did not authorize and that would wipe out $475 billion of debt owed to the U.S. Treasury.

The Court should affirm its earlier injunction to halt SAVE in its entirety because the ICR Statute does not authorize SAVE. The 1993 ICR Statute merely allows the Department to establish repayment plans over a longer period—up to 25 years instead of the standard 10-year plan—so individual monthly payments can be smaller for lower-income borrowers. *See* 107 Stat. at 348. Nothing in the ICR Statute's text or legislative history suggests Congress granted the Department discretion to design plans like SAVE that prioritize the *cancellation* of loans instead of their repayment. Indeed, if the 1993 law granted such power, it would be unconstitutional because it contains no intelligible principle to guide the Department's discretion regarding how generous it can make repayment plans. Otherwise, the Department could design a plan that resulted in virtually all federal student loans being cancelled, none at all, or anything in between. Such unfettered discretion would violate the Constitution's vesting of all legislative powers in

Congress—or at the very least the major questions doctrine, as the Supreme Court articulated in the *Biden v. Nebraska* case.

Additionally, the States indisputably suffer concrete and irreparable injuries because of the Department's unlawful conduct. In addition to causing Missouri to lose revenue from its loan-servicing activities, SAVE injures the States by undermining the competitive advantages Congress bestowed on them as qualified "public service" employers through the Public Service Loan Forgiveness ("PSLF") program, which incentivized student-loan borrowers to seek and maintain employment with state government agencies and other public-service employers. *See* 20 U.S.C. § 1087e(m) (creating PSLF incentives for workers in "public service" jobs). Loss of that competitive advantage inflicts a concrete injury against the States in their capacity as employers needing to recruit and retain college-educated employees. This irreparable competitive injury, which the States raised below, confers subject-matter jurisdiction and allows the Court to halt the Department's unconstitutional attempt to rewrite laws and cancel debt owed to the Treasury.

## ARGUMENT

### I. States Have Standing in Their Capacity as PSLF-Qualifying Employers

*Amici* agree with this Court's earlier panel that at least one State has standing because SAVE injures Missouri's instrumentality that services federal loans. *See Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024). The remaining States also

have standing in their capacity as public-service employers: SAVE injures the States as employers by undermining recruitment, shrinking the PSLF-subsidized labor pool, and thus increasing labor and recruiting costs. The States presented this theory of standing to the district court, which did not address it. *Missouri v. Biden*, No. 4:24-CV-00520-JAR, 2024 WL 3104514, at *9–10, 19. (E.D. Mo. June 24, 2024). The States raise the same unaddressed PSLF-based argument here. *See* States' Br. 45–46. This Court should hold that, in addition to Missouri, other States also have standing based on economic injury in their capacity as PSLF-qualifying employers.

Congress established PSLF in 2007 to encourage workers with outstanding student-loan debt to seek and maintain employment with public-service employers, including with state-government agencies. 20 U.S.C. § 1087e(m)(3)(B)(i). PSLF does this by promising borrowers that their outstanding loan balances will be completely cancelled after 120 monthly payments (10 years) while working at qualifying employers. *Id*. (m)(1)(B); *see also* 34 C.F.R. § 685.219. Because of PSLF, all else being equal, working for a qualifying employer is more financially advantageous to student-loan debtors than working for the same pay (or in many cases even higher pay) at a nonqualifying employer.

By offering these incentives to student-loan debtors in the job market, Congress purposefully gave qualifying public-service employers (and only them) a valuable advantage over nonqualifying employers in competing to recruit and retain

college-educated talent. PSLF thereby benefits public-service employers "by providing significant financial subsidies to the borrowers they hire," thereby "increasing recruitment and lowering labor costs." *ABA v. Dep't of Educ.*, 370 F. Supp.3d 1, 19 (D.D.C. 2019). The Department's own regulations acknowledge that PSLF was expressly created for the benefit of public-service employers. 34 C.F.R. § 685.219(a). So, agency action that eliminates or reduces state employers' statutory competitive advantage inflicts an economic injury that confers standing. The Department may not undermine a debt-cancellation program Congress created by fashioning its own broader *unauthorized* program. If the Department thinks the programs Congress created (like PSLF) do not go far enough, then it must go to Congress and ask for broader legislation, not legislate for itself.

States are PSLF-qualifying employers and thus are among the employers that Congress benefitted through PSLF incentives. *See* 20 U.S.C. § 1087e(m)(3)(B)(i). State agencies rely on the ability to enable loan forgiveness to attract and retain college-educated employees who would otherwise be enticed to take higher-paying private-sector jobs. SAVE undermines PSLF employers' statutory recruiting advantage by cancelling debt for all participating borrowers who borrow $12,000 or less after they make 10 years of monthly payments—regardless of whether they work for public-service employers or not. 88 Fed. Reg. at 43,903. Because these borrowers get their entire loan balance forgiven after 10 years, regardless of where

they work (or whether they work at all), PSLF no longer gives them any economic incentive to seek or continue employment with public-service employers like state agencies. It thereby undermines the incentive structure Congress put in place.

Consider a recent graduate who stands to earn $10,000 in PSLF forgiveness on top of his normal salary if he chooses to work at a state agency for 10 years, which works out to extra effective compensation of $1,000 per year. This PSLF-deferred compensation means it costs the state agency, for example, only $59,000 annually in salary and benefits to offer $60,000 in effective annual compensation, as compared to for-profit employers that are not PSLF-eligible. However, SAVE now cancels the same graduate's $10,000 loan balance after the same 10 years, even if he never works in a public-service job. The state agency thus no longer benefits from PSLF's $1,000 per year wage subsidy in its competition against for-profit employers to recruit or retain that graduate. To remain equally competitive as an employer, the agency would have to increase its offer by $1,000 per year to match the effective compensation it could offer the employee before SAVE. While the magnitude of this increase is different—and more complex to calculate—if present value, tax effects, inflation, and the like are considered, the direction of the effect remains the same: state agencies' recruitment and labor costs rise. Being forced by the Department's unlawful action to "invest more time and resources" to successfully recruit

employees "is an actual, here-and-now injury." *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010).

This injury also extends to the retention of employees. Consider next a current state employee who had an original loan balance of $10,000 and has been making monthly payments while working in public service for the past eight years. Without SAVE, she would have a strong financial incentive to stay in public service for two more years so she could get the entire remaining balance of her loans forgiven under PSLF. However, because of SAVE, she would get her debt canceled after two more years of monthly payments regardless of where she works. She can thus switch to a higher-paying, for-profit job immediately without any negative repercussions on her eligibility for debt cancellation. Any financial incentive to stay in her public service job evaporates under SAVE, forcing state agencies to incur additional marginal costs to offer offsetting incentives to stay.

SAVE thus completely negates, through unlawful agency action, statutory recruitment and retention benefits that Congress deliberately conferred on state employers through PSLF. This loss of competitive advantage in the labor market inflicts direct and immediate competitive harm on the States as employers, which satisfies the injury-in-fact requirement for Article III standing.

## II. THE 1993 ICR STATUTE DOES NOT AUTHORIZE SAVE

### A. The 1993 ICR Statute Requires Repayment Rather than Cancellation of Student-Loan Debt

The Department claims SAVE is authorized by the 1993 ICR Statute, which provides in relevant part that "income contingent repayment shall be based on the [borrower's] adjusted gross income" for "an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(e)(2) , (d)(1)(D) 1087e(e)(2). According to the Department, the statute requires "only that payments must be set based upon the borrower's annual adjusted gross income," 88 Fed. Reg. at 43,827, and then the Department may forgive any outstanding balance at the end of the prescribed repayment period. Department's Br. 32.

The Department admits no limiting principle to govern how low monthly payments can be or how short the repayment period can be. If this obtuse interpretation were accepted, the Department could later set the monthly payment cap at one percent of income over $1 million, so that nearly all loans would be cancelled rather than repaid at the end of the repayment term. It could also shorten the repayment period to just one year or even one day, so loans would be cancelled almost immediately.

Such a boundless interpretation runs afoul of the 1993 law's plain text, which calls for "repayment" of debt with no mention of any authorization to *cancel* debt owed to the Treasury. *See* 20 U.S.C. § 1087e. The Department responds that the

statute's "not to exceed 25 years" language exists to ensure that "no borrower will be required to make payments indefinitely" and thus impliedly requires loan cancellation at the end of the term. Department's Br. 32. That is wrong.

To start, Congress does not impliedly grant agencies with authority to cancel debt owed to the Treasury. *Biden v. Nebraska*, 143 S. Ct. at 2369 (citation omitted) ("It is 'highly unlikely that Congress' authorized such a sweeping loan cancellation program 'through such a subtle device[.]'"). Any cancellation of federal student-loan debt gives away "money otherwise destined for the general fund of the Treasury" and thus involves an appropriation of funds. *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024). Congress has made clear that a "law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made[.]" 31 U.S.C. § 1301(d). Hence, when Congress authorizes debt forgiveness, it must use explicit language. *See, e.g.*, 20 U.S.C. § 1078-10(b) ("The Secretary shall … assume[] the obligation to repay a qualified loan" for qualifying teachers); § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due …" for borrowers who satisfy PSLF); § 1098e(b)(7) ("the Secretary shall repay or cancel any outstanding balance …" of eligible borrowers). The lack of similarly explicit language in the 1993 ICR Statute

confirms that Congress did not authorize the Department to establish repayment plans that are designed to *cancel* debt owed to the Treasury.[3]

The ICR Statute's "not to exceed" language certainly does not provide loan cancellation authority. The same text appears in other prior statutory provisions governing the repayment of student loans. Importantly, standard repayment plans that predate the 1993 law must be "paid over a fixed period of time, *not to exceed 10 years*." 20 U.S.C. § 1078(b)(9)(A) (emphasis added). When Congress "transplanted" the identical "[not to exceed]" language into the ICR Statute, it brought "the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (internal quotation marks omitted) (quoting *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018)). The "not to exceed" language in the ICR Statute fulfills the same function as it does in the standard-repayment-plan statute. Far from impliedly authorizing debt cancellation, it sets parameters on how much a borrower must repay each month to ensure eventual full repayment within the prescribed time period.

A loan-repayment plan contains two essential variables: the monthly payment amount and the repayment period. If the period is short, then monthly payments must

---

[3] The States relied on the major questions doctrine to make a similar argument that a clear statement is needed to authorize the mass cancellation of student loans. States' Br. 46-51. *Amici* agree but note that it is not necessary to invoke the major questions doctrine because 31 U.S.C. § 1301(d) already provides that a clear statutory statement is needed to authorize the expenditure of funds from the Treasury to pay for student-loan debt cancellation. No such statement exists here.

be higher to ensure eventual repayment in full. Conversely, if the period is long, then monthly payments may be lowered. For example, monthly payments under a 15-year mortgage must be higher than for a 30-year mortgage because full repayment must occur within a shorter timeframe. The same principle applies to student-loan repayment plans. Under the standard repayment plan, monthly payments must be high enough to ensure full repayment within a "10 year" repayment period. 20 U.S.C. § 1087e(e)(7)(iv). The only way to lower monthly payments for borrowers is to lengthen the repayment period past the 10-year limit. Hence, Congress enacted the 1993 ICR Statute to allow for a longer time horizon, "not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D), so that monthly payments can be lowered for borrowers with limited income.

There was no doubt that full repayment within the prescribed repayment period was the goal. Then-Deputy Secretary of Education Madeline Kunin explained to Congress in 1993 that income-contingent repayment would be cost-neutral in the long run: "As to what the cost of [these plans] would be, we see it as a wash" because the government "would eventually get paid" and "[t]here would be interest charged on that, so it isn't like [borrowers] are getting a free ride." *Hearing of the Senate Committee on Labor and Human Resources to Amend the Higher Education Act of 1965*, 103rd Cong. 48 (1993).[4] Cost neutrality and being "eventually" paid is

---

[4] *Available at* https://files.eric.ed.gov/fulltext/ED363187.pdf.

obviously incompatible with granting the Department authority to design a repayment plan that ends up forgiving most loans.[5] To be sure, Deputy Secretary Kunin acknowledged that some small portion of loans might become uncollectable at the end of the payment period and "the Secretary will make some designation as to when you call it quits and [borrowers] are forgiven." *Id.* As any participant in the loan industry knows, writing off *some* bad loans is an unavoidable part of the business. But such write-offs are not the goal—repayment is.

Under the Department's contrary interpretation, Congress authorized the Department to cancel outstanding loans after a certain repayment period set by the Department but somehow failed to specify a minimum term. That means the Department could shorten the repayment term as much as it likes—to one year or even one day—so that all student loans would be immediately cancelled. Such an interpretation is wrong because Congress does not hide such elephantine powers in miniscule mouseholes. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

---

[5] An analyst at the Brookings Institution and the Urban Institute estimate that SAVE would cancel 50 percent or more of participants' student-loan debt. Adam Looney, *Biden's Income-Driven Repayment plan would turn student loans into untargeted grants*, Brookings, September 15, 2022, *available at* https://www.brookings.edu/articles/bidens-income-driven-repayment-plan-would-turn-student-loans-into-untargeted-grants/ . Matthew Chingos, *et al.*, *Few College Students Will Repay Student Loans under the Biden Administration's Proposal*, Urban Institute, January 19, 2023, *available at* https://www.urban.org/research/publication/few-college-students-will-repay-student-loans-under-biden-administrations .

Nor could it delegate such unfettered power and discretion to an agency. *See infra*, Argument II.B.

Rather, the lack of a minimum repayment period makes sense only if Congress authorized income-contingent plans as loan-*repayment* plans, not loan-cancellation plans. If the term is short, then monthly payments must be relatively high to ensure repayment. Only by lengthening the term can the Department lower the monthly payment for lower-income borrowers while ensuring eventual repayment. The standard repayment plan already called for full repayment within 10 years with relatively high monthly payments. *See* 20 U.S.C. § 1078(b)(9). Income-contingent repayment plans could offer lower monthly payments only if the repayment period exceeds 10 years. Hence, Congress needed only to prescribe a maximum length, not a minimum, for income-contingent repayment plans.

By limiting the maximum term to 25 years, Congress was also limiting the extent to which the Department could lower monthly payments—they cannot be so low that repayment is not feasible within a 25-year term. Consistent with this understanding, the Department's original income-contingent plan allowed a borrower's monthly payment to be capped at 20 percent of income above the federal poverty line. Cong. Rsch. Serv., *The Federal Direct Student Loan Program* 10 (1995).[6] A lower monthly payment, like the one offered under SAVE, would result

---

[6] *Available at* https://files.eric.ed.gov/fulltext/ED378875.pdf.

in a plan that is not designed to achieve repayment within the maximum 25-year term. It would impermissibly prioritize debt cancellation over the statutory text requiring the Department to ensure debt "repayment."

Subsequent legislation reinforces this conclusion. Because the original income-contingent repayment plan based on the 1993 statute was seen as insufficiently generous, Congress enacted the College Cost Reduction and Access Act of 2007 ("CCRA"), Pub. L. 110-84, 121 Stat. 784 (2007), which authorized income-based repayment plans that reduce monthly payments to 15 percent of income above 150 percent of the poverty line. 20 U.S.C. § 1098e(a)(3)(B)(ii). Unlike the 1993 law, CCRA contained explicit language authorizing loan cancellation after 25 years of payments. *Id.* at § 1098e(b)(7). Believing even more generosity was needed, President Obama urged Congress in his 2010 State of the Union address to lower the payment cap to "only 10 percent of their income [above 150 percent of the poverty line]" and to shorten the payment period so "all of their debt will be forgiven after 20 years." Barack Obama, *Remarks by the President in State of the Union Address*, Speech given before Congress, at 5, January 27, 2010.[7] Congress obliged and enacted these 10-percent and 20-year proposals in the Health Care and

---

[7] *Available at* https://www.govinfo.gov/content/pkg/DCPD-201000055/pdf/DCPD-201000055.pdf.

Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, 1081 §

2213 (2010) ("HCERA"), codified at 20 U.S.C. § 1098e(e).

The 2007 CCRA and the 2010 HCERA make no sense if the 1993 ICR Statute

already authorized the Department to unilaterally design even *more* generous

repayment plans like SAVE. SAVE reduces monthly payments to only five percent

of income in excess of 225 percent of the poverty line, 88 Fed. Reg. at 43,820,

resulting in far more debt being cancelled instead of being repaid at the end of the

20-year repayment period as compared to HCERA. It also reduces the payment

period to only 10 years for certain borrowers, *id.*, at 43,903., which further increases

the amount of debt cancelled rather than repaid. If the Department already had

unfettered discretion since 1993 to lower monthly payments and to shorten the

repayment term of income-contingent repayment plans, as it now claims, then why

did Congress and President Obama previously consider it necessary to enact and

push legislation to authorize far *less* generous income-based repayment relief? The

obvious answer is that the 1993 law was never before understood to allow the

Department to establish repayment plans more generous than what Congress

explicitly authorized by HCERA, because the 1993 law, in fact did not do that.

**B.    The Department's Contrary Interpretation of the ICR Statute
Would Result in an Unconstitutional Delegation of Legislative Power**

The Department's contrary interpretation of the 1993 ICR Statute to authorize

SAVE must be rejected as an unconstitutional delegation of legislative power.

"Article I, § 1, of the Constitution vests all legislative powers herein granted … in a Congress of the United States. This text permits no delegation of those powers." *Whitman*, 531 U.S. at 472 (cleaned up). Accordingly, "Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). The Supreme Court's more recent formulation of that longstanding rule states that Congress may grant regulatory power to an agency only if it provides an "intelligible principle" by which the agency must exercise it. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

While the intelligible-principle test has been criticized as too lax,[8] it still demands the articulation of objective principles that allow courts to test whether the agency has faithfully executed Congress's command. *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *Yakus v. United States*, 321 U.S. 414, 426 (1944) (delegation would be unconstitutional if "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed"). Thus, a statute that delegates to an agency "unfettered discretion" to make policy choices is

---

[8] *Dep't of Transp. v. Ass'n of Am. RRs*, 575 U.S. 43, 77 (2015) (Thomas, J., concurring in the judgment) (explaining that the intelligible-principle "test [that courts] have applied to distinguish legislative from executive power largely abdicates [the judiciary's] duty to enforce that prohibition [against legislative delegation].").

unconstitutional. *Jarkesy v. SEC*, 34 F.4th 446, 460–61 (5th Cir. 2022), *aff'd on other grounds sub nom.*, *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024); *see also Int'l Union v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991).

Here, the Department claims that the 1993 ICR Statute conferred unfettered discretion on the Secretary to invent whatever student-loan repayment plans he wishes. The Department says the explicit minimum-payment provisions that Congress enacted in 2007 and updated in 2010 do not bind it. Instead, the Department argues it can design a repayment plan with even lower monthly payments and a shorter repayment period such that very little debt will have been repaid by the end of the repayment period, at which point the substantial remaining balance is cancelled and the debt transferred to taxpayers.

In the Department's view, "[t]he statute … gives the Secretary discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income[.]" 88 Fed. Reg. at 43,827. The Department thus suggests that the same 1993 text authorizes both the original income-contingent plan that was expected to be cost-neutral in the long run[9] *and* the new $475 billion SAVE plan—and presumably anything in between.

SAVE's exorbitant price tag is not even the upper limit. If the only requirement is for payments to be based on income, as the Department claims, then

---

[9] *See supra* Kunin Testimony.

it could lower the payment cap to just one percent of income above $1 million, which would result in zero payments from the vast majority of borrowers. Nearly all student-loan debt would remain unpaid and then cancelled after 20 years. The Department's capacious view of its power would also allow it to shorten the payment period—as SAVE does for certain borrowers to 10 years—to further maximize debt cancellation. Of course, 10 years is not the lower limit. The 1993 ICR Statute's only boundary regarding the repayment period after which all loans are cancel is that such period "is not to exceed 25 years," with no minimum. 20 U.S.C. § 1087e(d)(1)(D). Thus, the Department could exercise unfettered discretion to shorten the repayment period to just one year or even one day, so loans would be cancelled almost immediately, which little or no repayment.

This nondelegation problem is readily avoided if the Court properly construes the 1993 ICR Statute not to authorize the cancellation of debt at the end of the repayment period—an easy task since the text contains no such authorization to expend taxpayer funds. Then, monthly payments are limited by being sufficient to allow the borrower to fully repay the debt within the repayment period set by the Secretary, which may not exceed 25 years. And there would be an intelligible limit regarding how short the repayment period can be: it cannot be so short that full repayment is not feasible based on the borrower's monthly payments.

# CONCLUSION

For the foregoing reasons, the States have standing to sue and are likely to succeed on the merits. The Court should therefore confirm the administrative panel's injunction and prevent the Department from implementing SAVE.

October 1, 2024

Respectfully submitted,

*/s/ Sheng Li*
Sheng Li
    *Counsel of Record*
Russell G. Ryan
Markham S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr. Suite 300
Arlington, VA 22203
(202) 869-5210
sheng.li@ncla.legal

Patrick J Wright
MACKINAC CENTER FOR PUBLIC POLICY
140 West Main Street
Midland, MI 48640
(989) 631-0900
wright@Mackinac.org

Clark M. Neily III
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 218-4631
cneily@cato.org

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,197 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type. Pursuant to Eighth Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*/s/Sheng Li*
Sheng Li

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on October 1, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/*Sheng Li*
Sheng Li

*Counsel for Amici Curiae*