**Nos. 24-2332, 24-2351**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

———————————

STATE OF MISSOURI, et al.,

> Plaintiffs-Appellees/Cross-Appellants,

v.

JOSEPH R. BIDEN, JR., et al.,

> Defendants-Appellants/Cross-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Missouri

———————————

**RESPONSE AND REPLY BRIEF
FOR APPELLANTS / CROSS-APPELLEES**

———————————

BRIAN M. BOYNTON
 *Principal Deputy Assistant
 Attorney General*

CATHERINE M.A. CARROLL
 *Deputy Assistant Attorney
 General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
 *Civil Division, Appellate Staff
 U.S. Department of Justice
 950 Pennsylvania Avenue, NW
 Washington, DC 20530*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

The Department of Education adopted a rule that makes various improvements to statutorily required plans that allow millions of Americans to make student-loan payments based on their income. One of the improvements shortened the timeline to loan forgiveness for certain borrowers from what was available under prior regulations. The district court held this part of the rule—alone—likely exceeds the Department's statutory authority and preliminarily enjoined any further loan forgiveness under this provision. A panel of this Court subsequently granted in part and denied in part plaintiffs' motion for injunction pending appeal, prohibiting the Department from "any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing [the rule's] payment-threshold provisions" for "any borrower whose loans are governed in whole or in part by the terms" of the rule.

This case has been set for oral argument on October 24, 2024. The government respectfully renews its request for a decision by November 25, 2024, which would allow the Supreme Court to hear oral argument this Term should a petition for a writ of certiorari be filed and granted.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT..........................................................i

INTRODUCTION...........................................................................1

STATEMENT OF THE ISSUE .........................................................2

STATEMENT OF THE CASE ..........................................................3

SUMMARY OF ARGUMENT .........................................................6

ARGUMENT.................................................................................11

I.    An administrative panel ruling on a request for interim relief
does not create law of the case....................................................11

II.   The government is likely to prevail on the merits....................13

      A.    Plaintiffs lack standing. ....................................................13

            1.    Plaintiffs fail to show financial harm to MOHELA
from forgone administrative fees...........................13

            2.    Plaintiffs' alternative standing theories fail........................20

      B.    Plaintiffs' statutory challenges lack merit. ....................28

            1.    The HEA clearly authorizes forgiveness.............................28

            2.    The HEA clearly authorizes the Final Rule's other
changes to the SAVE plan..........................................33

            3.    The major-questions doctrine does not alter this
analysis. ................................................................38

            4.    The Final Rule is not arbitrary or capricious. ....................44

ii

III.    The remaining equitable factors favor the government...........................50

    A.    Plaintiffs have not shown a likelihood of irreparable harm absent injunctive relief. .......................................................50

    B.    The balance of the equities and the public interest favor the government. ...........................................................55

IV.    At a minimum, the preliminary injunction should be narrowed, not expanded. ...................................................60

    A.    The injunction is overbroad. .............................................60

    B.    The injunction should not be broadened. ........................63

CONCLUSION ..............................................................................65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Appellate Case: 24-2332      Page: 4      Date Filed: 10/07/2024 Entry ID: 5443500

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Adventist Health Sys./SunBelt, Inc. v. HHS,*
  17 F.4th 793 (8th Cir. 2021) ..................................................................53, 56

*Air Excursion LLC v. Yellen,*
  66 F.4th 272 (D.C. Cir. 2023) ...........................................................25

*Air Transp. Ass'n of Am. v. FAA,*
  169 F.3d 1 (D.C. Cir. 1999).................................................................45

*Allen v. Milligan,*
  599 U.S. 1 (2023) ......................................................................11-12

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) .........................................................................27

*American Textile Mfrs. Inst., Inc. v. Donovan,*
  452 U.S. 490 (1981) ...................................................................47-48

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ...............................3, 4, 13, 14, 15, 17, 39, 40, 43

*Blakley v. Schlumberger Tech. Corp.,*
  648 F.3d 921 (8th Cir. 2011) ............................................................28

*Bradford v. U.S. Dep't of Labor,*
  101 F.4th 707 (10th Cir. 2024) .........................................................40

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ........................................................................61

*California v. Texas,*
  593 U.S. 659 (2021) ........................................................................26

iv

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................ 26

*Colorado v. U.S. EPA,*
989 F.3d 874 (10th Cir. 2021) ....................................................... 62

*Combat Veterans for Cong. Political Action Comm. v. FEC,*
795 F.3d 151 (D.C. Cir. 2015) ........................................................ 49

*Conkright v. Frommert,*
559 U.S. 506 (2010) ........................................................................ 22

*Council Tree Commc'ns, Inc. v. FCC,*
503 F.3d 284 (3d Cir. 2007) ........................................................... 11

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ........................................................................ 49

*Dakotans for Health v. Noem,*
52 F.4th 381 (8th Cir. 2022) ............................................ 50, 51, 63

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.,*
108 F.4th 194 (3d Cir. 2024) .......................................................... 55

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
601 U.S. 42 (2024) .................................................................... 32, 44

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ............................................................................ 46

*East Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) .......................................................... 11

*Entergy Corp. v. Riverkeeper Inc.,*
556 U.S. 208 (2009) ........................................................................ 47

Appellate Case: 24-2332     Page: 6     Date Filed: 10/07/2024 Entry ID: 5443500

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ..............................................................22, 27

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ......................................................................62

*Gill v. Whitford*,
    585 U.S. 48 (2018) ........................................................................60

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017) ......................................................62

*Homans v. City of Albuquerque*,
    366 F.3d 900 (10th Cir. 2004) ....................................................11

*Lewis v. GEICO*,
    98 F.4th 452 (3d Cir. 2024) ........................................................17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ................................................................48-49

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ...........................................................32, 33

*Louisiana Energy & Power Auth. v. FERC*,
    141 F.3d 364 (D.C. Cir. 1998) ....................................................25

*Louisiana ex rel. Louisiana Dep't of Wildlife & Fisheries v.*
    *National Oceanic & Atmospheric Admin.*,
    70 F.4th 872 (5th Cir. 2023) ......................................................18

*Mackinac Ctr. for Pub. Policy v. Cardona*,
    102 F.4th 343 (6th Cir. 2024) ....................................................16

*Maxfield v. Cintas Corp., No. 2*,
    487 F.3d 1132 (8th Cir. 2007) ....................................................13

Appellate Case: 24-2332    Page: 7    Date Filed: 10/07/2024 Entry ID: 5443500

*Michigan v. EPA*,
    576 U.S. 743 (2015) ............................................................ 47, 48

*Mobile Relay Assocs. v. FCC*,
    457 F.3d 1 (D.C. Cir. 2006) ....................................................... 26

*Morehouse Enters., LLC v. ATF*,
    78 F.4th 1011 (8th Cir. 2023) ................................................ 50, 52

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ............................................ 3, 16, 22, 23-24

*National Truck Equip. Ass'n v. NHTSA*,
    711 F.3d 662 (6th Cir. 2013) ...................................................... 45

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ................................................... 62

*Ng v. Board of Regents of the Univ. of Minn.*,
    64 F.4th 992 (8th Cir. 2023) ................................................. 53, 54

*Nyffler Constr., Inc v. Secretary of Labor*,
    760 F.3d 837 (8th Cir. 2014) ...................................................... 12

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ............................................................ 46

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*,
    831 F.3d 961 (8th Cir. 2016) ...................................................... 24

*Pinder v. WellPath, LLC*,
    112 F.4th 495 (8th Cir. 2024) ..................................................... 12

*Premachandra v. Mitts*,
    727 F.2d 717 (8th Cir. 1984) ...................................................... 12

*Safeway Transit LLC v. Discount Party Bus, Inc.*,
    954 F.3d 1171 (8th Cir. 2020) .................................................. 57-58

vii

*Shinseki v. Sanders,*
   556 U.S. 396 (2009) ........................................................ 49

*Simon v. Eastern Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) .......................................................... 23

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ........................................................ 17

*St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.,*
   309 F.3d 680 (10th Cir. 2002) ........................................ 49

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.,*
   908 F.3d 313 (8th Cir. 2018) .......................................... 28

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .......................................... 18

*Thompson v. United States,*
   872 F.3d 560 (8th Cir. 2017) .......................................... 13

*Topp, In re,*
   75 F.4th 959 (8th Cir. 2023) .......................................... 21

*United States v. Texas,*
   599 U.S. 670 (2023) .................................................. 27, 60

*Watkins Inc. v. Lewis,*
   346 F.3d 841 (8th Cir. 2003) .......................................... 50

*West Virginia v. EPA,*
   597 U.S. 697 (2022) .................................................. 39, 43

*Whitman v. American Trucking Ass'ns,*
   531 U.S. 457 (2001) ........................................................ 47

*Whole Woman's Health v. Jackson,*
   141 S. Ct. 2494 (2021) .................................................... 61

Appellate Case: 24-2332     Page: 9     Date Filed: 10/07/2024 Entry ID: 5443500

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................... 3, 55

**Statutes:**

Higher Education Act of 1965:
   20 U.S.C. § 1078(b)(1)(D)(i) ................................................. 20
   20 U.S.C. § 1078(b)(9)(A) ..................................................... 31
   20 U.S.C. § 1078-3(b)(1)(D) .................................................. 21
   20 U.S.C. § 1082(a)(6) ........................................................ 4, 5
   20 U.S.C. § 1087a(a) ............................................................ 24
   20 U.S.C. § 1087e(d)(1)(D) ................................ 3, 28, 29, 30, 31, 35, 42
   20 U.S.C. § 1087e(e) ........................................................ 30, 48
   20 U.S.C. § 1087e(e)(4) .............................. 3, 34, 35, 36, 37, 48
   20 U.S.C. § 1087e(e)(5) ............................................. 30, 36, 37
   20 U.S.C. § 1087e(m)(1) ..................................................... 23
   20 U.S.C. § 1087i ................................................................ 48

Pub. L. No. 110-84, 121 Stat. 784 (2007) ...................................... 33

5 U.S.C. § 705 ............................................................... 61-62, 62

5 U.S.C. § 706 .................................................................... 48

5 U.S.C. § 805 .................................................................... 58

10 U.S.C. § 7442(j) ............................................................... 27

16 U.S.C. § 6802(a) ............................................................... 27

20 U.S.C. § 1098bb .................................................................. 4

42 U.S.C. § 7412(n)(1)(A) ........................................................ 48

N.D. Cent. Code ch. 15-62.1 ...................................................... 25

Appellate Case: 24-2332   Page: 10   Date Filed: 10/07/2024 Entry ID: 5443500

**Regulations:**

34 C.F.R. § 682.209(b)(2)................................................................20

34 C.F.R. § 685.209(k)(1)-(2) .........................................................58

34 C.F.R. § 685.219(b) ....................................................................23

34 C.F.R. § 685.220(f)(1)-(2) ..........................................................21

Exec. Order No. 12,866,
    58 Fed. Reg. 51,735 (Oct. 4, 1993).........................................44

**Legislative Material:**

H.R. Rep. No. 110-210 (2007)..........................................................33

**Other Authorities:**

BND, *Apply for a Student Loan*,
    https://perma.cc/82VU-GQPX...............................................25

*Contingent*, Black's Law Dictionary (12th ed. 2024) .........................30

Creditkarma, *One-in-five Borrowers have Made Zero Payments Toward
    Their Student Loans, as Many Hold Out for Loan Forgiveness*
    (Sept. 5, 2024), https://perma.cc/GX2K-MF7Q ................................57

Dep't of Educ., *Student Loans Overview: Fiscal Year 2025 Budget Proposal*,
    https://www.ed.gov/sites/ed/files/about/overview/budget/
    budget25/justifications/t-sloverview.pdf ..........................................57

59 Fed. Reg. 61,664 (Dec. 1, 1994).............................................36, 52

77 Fed. Reg. 66,088 (Nov. 1, 2012) .............................................36, 52

80 Fed. Reg. 67,204 (Oct. 30, 2015) ............................................36, 52

x

87 Fed. Reg. 52,943 (Aug. 30, 2022) ........................................................ 4

88 Fed. Reg. 43,069 (July 6, 2023) ................................................... 5, 55

88 Fed. Reg. 43,820 (July 10, 2023) ........................................ 2, 17, 34-35, 36, 37, 38, 40, 41, 42, 44-45, 47

89 Fed. Reg. 27,564 (Apr. 17, 2024) ........................................................ 5

Fed. Student Aid, *Consolidating Student Loans*,
https://studentaid.gov/manage-loans/consolidation
(last visited Oct. 4, 2024) ........................................................ 22

Fed. Student Aid, *SAVE Plan Court Actions: Impact on Borrowers*,
https://studentaid.gov/announcements-events/save-court-
actions (last visited Oct. 4, 2024) ........................................................ 56

*Student Loan Principal Balance Cancellation, Compromise, Discharge,
and Forgiveness Authority*, https://perma.cc/M3AJ-L37R .................. 3-4, 4

18B Charles Alan Wright & Arthur R. Miller,
*Federal Practice & Procedure* § 4478.5 (3d ed.),
Westlaw (database updated June 2024) ........................................................ 11

Appellate Case: 24-2332    Page: 12    Date Filed: 10/07/2024 Entry ID: 5443500

# INTRODUCTION

Since 1993, when Congress required the Department of Education (Department) to offer an income contingent repayment (ICR) plan, every such plan has set borrowers' monthly payments based on their income rather than the size of their loan, as required by statute. Under those plans, some borrowers whose incomes have been insufficient to fully repay their loans have had their outstanding balances forgiven at the conclusion of their repayment term. That outcome follows from Congress's express instruction that ICR payments must vary in relation to the borrower's income and terminate after a set period of time.

Plaintiffs' suit now seeks to upend how millions of borrowers have paid their student loans pursuant to ICR plans for over three decades. Plaintiffs' argument seeks to impose atextual limitations on ICR plans, insisting that Congress all along meant to require that borrowers' payments cover their loans in full—even though such a reading contravenes the statutory text actually employed. This Court should reject plaintiffs' effort to invalidate decades of consensus on the proper function of these plans.

Worse yet, plaintiffs seek that result based on meager theories of injury unsupported by the factual record. Their principal standing theory

fails to even apply to most of the provisions they challenge. It also ignores how Missouri (the only plaintiff held to have standing) will in fact benefit from the challenged Final Rule, 88 Fed. Reg. 43,820 (July 10, 2023). And the district court rightly declined to rely on plaintiffs' "tenuous" other theories. Without any demonstrated injury, plaintiffs lack standing to seek any injunction at all.

Further, the injunction plaintiffs seek would be profoundly inequitable, upending settled expectations of borrowers who have been making payments toward forgiveness for decades. Millions of borrowers have already been thrust into prolonged uncertainty as their loans have been put into forbearance. Meanwhile, plaintiffs' dilatory filing of this suit precludes their assertions of irreparable harm, even assuming they experience any injury at all.

This Court should reverse the district court's preliminary injunction and dissolve the injunction pending appeal.

## STATEMENT OF THE ISSUE

The issue on plaintiffs' cross-appeal is whether the district court abused its discretion in declining to enjoin any features of the Final Rule

2

other than the Saving on a Valuable Education (SAVE) plan's shortened timeline to forgiveness.

The most apposite authorities are *Murthy v. Missouri*, 144 S. Ct. 1972 (2024); *Biden v. Nebraska*, 600 U.S. 477 (2023); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); and 20 U.S.C. § 1087e(d)(1)(D), (e)(4).

## STATEMENT OF THE CASE

Plaintiffs' brief (Resp. 9-10, 20-24) mischaracterizes the Department's actions with regard to a 2021 memorandum and a separate rulemaking targeting student loans. Neither is relevant to this appeal. But to ensure that the Court is informed on these issues, the government provides the following supplementary background.

**A.** In January 2021, then-Principal Deputy General Counsel Reed D. Rubinstein signed a memorandum addressed to the then-former Secretary of Education (Secretary) regarding "blanket or mass" student-loan cancellation. *See Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority*, https://perma.cc/M3AJ-L37R (2021 Memo). The 2021 Memo does not cite or discuss the ICR statute, nor does it suggest any then-existing ICR plans

3

were unlawful.  Instead, it concluded that the Secretary lacks authority to "forgive, on a blanket or mass basis, principal balances of student loans, and/or to materially modify the repayment amounts or terms thereof," under two discrete statutory authorities.  *Id.* (discussing 20 U.S.C. §§ 1082(a)(6), 1098bb).

In August 2022, the Department's General Counsel determined that the 2021 Memo was "substantively incorrect" and "not properly promulgated" because it had been "issued in contravention of then-effective Department processes for issuing significant guidance."  87 Fed. Reg. 52,943, 52,944-453 & n.5 (Aug. 30, 2022).  The Office of General Counsel therefore "'formally rescinded' its earlier legal memorandum."  *Biden v. Nebraska*, 600 U.S. 477, 487 (2023).

**B.**  In July 2023, the Department began a negotiated rulemaking process—also unrelated to the ICR statute—to explore whether to promulgate regulations "relate[d] to the modification, waiver, or compromise of Federal student loans" pursuant to 20 U.S.C. § 1082(a)(6).  88 Fed. Reg. 43,069, 43,069 (July 6, 2023).

In April 2024, the Department published a notice of proposed rulemaking (NPRM) outlining regulations that would, if promulgated,

4

explain how the Secretary intended to exercise his authority to waive debts held by the Department in certain situations.  The NPRM solicited further public comments, *see generally* 89 Fed. Reg. 27,564 (Apr. 17, 2024), which the Department will consider in shaping the contours of any final rule.

Shortly after the NPRM's publication, the Department began a "change-request" process, which the Department follows when it seeks to alter how servicers administer loans.[1]  Such changes require extensive coordination between the Department and servicers to test feasibility and ensure a smooth transition to operations under new rules.  Change requests often identify anticipated implementation dates.  These dates are always tentative, subject to the promulgation of a final rule and subsequent instructions to servicers to act under that rule.  Throughout the change-request process, the Department remains free to alter its proposals.  As part of the change-request process discussed here, servicer contracts have been modified, but no rule has been finalized to date, and servicers have not been instructed to discharge any debt under the NPRM.

---

[1] This process and the facts relating to the litigation discussed in this section are further described in the Declaration of James Kvaal, *Missouri v. U.S. Dep't of Educ.*, No. 24-cv-103 (S.D. Ga. Sept. 10, 2024), Dkt. No. 35-1.

5

Mistaking documents relating to the change request and contract modification process as evidence of final agency action, a group of States (including several plaintiffs here) challenged the proposed regulations. The district court issued (and later extended) a temporary restraining order prohibiting the Department from "implementing the Third Mass Cancellation Rule," a term used by the plaintiffs there to describe the NPRM. Order at 5, *Missouri v. U.S. Dep't of Educ.*, No. 24-cv-103 (S.D. Ga. Sept. 5, 2024), Dkt. No. 17. The order also restrains the Department "from mass canceling student loans, forgiving any principal or interest, not charging borrowers accrued interest, or further implementing any other actions under the [Third Mass Cancellation] Rule or instructing federal contractors to take such actions." *Id.* On October 2, the case was transferred to the Eastern District of Missouri, which entered a preliminary injunction with the same prohibitions the following day. *See Missouri v. U.S. Dep't of Educ.*, No. 24-cv-1316 (E.D. Mo.).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's preliminary injunction and deny plaintiffs' request for expanded injunctive relief.

I.     The administrative panel's ruling on plaintiffs' motion for an emergency injunction pending appeal is not law of the case.  Plaintiffs cite no authority establishing that orders granting or denying such interim relief are binding on a merits panel.

II.     The government is likely to succeed on the merits.

First, plaintiffs lack standing, as they have not shown that MOHELA is likely to suffer any financial injury on account of the Final Rule. MOHELA's monthly fees depend on the number of loans MOHELA services—not on borrowers' payment amounts or loan balances.  The many provisions of the Rule that do not affect how long borrowers' accounts stay open—such as those used to calculate borrowers' payment amounts— therefore will not reduce MOHELA's servicing fees.  Nor is MOHELA harmed when the Department forgives loans under the 20- and 25- year timelines that long predate the Final Rule.  To the extent that the Rule's shortened-repayment-period provision would cause some borrower accounts to close earlier than they otherwise would, MOHELA has not established that such closures would result in financial harm, both because of the financial benefits the Rule offers MOHELA and because MOHELA itself has sought to shrink its portfolio.

7

Plaintiffs' other standing theories were properly rejected by the district court. Plaintiffs do not suffer an injury traceable to the Final Rule when borrowers consolidate Federal Family Education Loans (FFELs) held by MOHELA. Consolidation results in full repayment of the FFEL, and the decision to consolidate is made by independent third-party borrowers, not the Department. Nor is North Dakota harmed if the Final Rule makes federal loans more attractive than the loans offered by its instrumentality. The doctrine of competitor standing does not apply when sovereigns pursue overlapping policy objectives but do not engage in market-based competition.

Second, even if plaintiffs had standing, the Higher Education Act (HEA) provides clear authorization for the Final Rule. The plain text of the statute authorizes forgiveness of any balance remaining after a borrower makes income-based payments for an extended repayment term. Plaintiffs' alternative reading would set payments based on the balance of the loan, not on the borrowers' income, as Congress provided. And the Rule's other provisions are valid exercises of the Secretary's authority to determine the appropriate amount of income on which borrowers' payments are based and to set repayment schedules.

Appellate Case: 24-2332    Page: 20    Date Filed: 10/07/2024 Entry ID: 5443500

The major questions doctrine does not apply here, where the challenged program is longstanding and the agency has simply adjusted the program's specifications. But even if the doctrine did apply, the HEA provides clear authority for the Final Rule.

Finally, plaintiffs' arbitrary-and-capricious challenge is unreviewable and without merit. The cost estimate published alongside the Final Rule was created to comply with internal Executive Branch requirements and was not relied upon as a basis for the Department's action. Even if it were reviewable, though, events that transpire after an agency finalizes a regulation cannot render that regulation arbitrary and capricious, and plaintiffs fail to demonstrate any prejudice from the alleged error.

**III.** Assuming plaintiffs could show a likelihood of success on the merits, the equitable factors clearly favor the government. Plaintiffs have not shown any injury, let alone irreparable injury, traceable to the Final Rule. And on the other side of the ledger, enjoining the Rule would impose certain and serious harms on the Department, borrowers, and the public. Indeed, to comply with the injunction pending appeal issued by this Court, the Department has already had to place millions of borrowers into forbearance, which has caused confusion and upended borrowers' settled

9

expectations, and which will extend timelines to forgiveness, even if the government prevails in this litigation.

**IV.** At a minimum, the Court should narrow the district court's preliminary injunction, which is overbroad both because it is universal in scope and because it enjoins the President. Assuming some relief were proper, it must be tailored to target only loans serviced by MOHELA, which would provide full relief to the only plaintiff held to have standing.

Plaintiffs have not shown that the district court abused its discretion by declining to enjoin the entire Rule. The court correctly held that plaintiffs had not stated a cognizable injury attributable to provisions of the Final Rule that do not shorten a borrower's time to forgiveness, such as those affecting monthly payment amounts. Plaintiffs argue that the entire Rule must be enjoined to prevent the Department from forgiving loans on preexisting timelines, but they do not explain how they could have challenged those long-standing provisions or why such an injunction would be equitable. The Court should deny their request for expanded relief.

10

# ARGUMENT

## I. An administrative panel ruling on a request for interim relief does not create law of the case.

Plaintiffs contend (Resp. 29-31) that the administrative panel's ruling on an emergency motion for an injunction pending appeal constitutes law of the case that binds the merits panel. The general rule is the contrary: "[p]reliminary or tentative rulings," such as "an appellate injunction pending appeal," "do not establish law of the case." 18B Wright & Miller, *Federal Practice & Procedure* § 4478.5 (3d ed.), Westlaw (database updated June 2024). Rather, such rulings by a "motions panel are tentative and subject to re-examination by the merits panel." *Id.* (quotation marks omitted); *see, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021) (published stay denial does not control the "decision on the merits of the preliminary injunction appeal"); *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 291 (3d Cir. 2007) (law of the case is "inapplicable" to a motions panel ruling on an "emergency motion for stay"); *Homans v. City of Albuquerque*, 366 F.3d 900, 904-05 (10th Cir. 2004) (motions panel order "grant[ing] an injunction pending appeal" "does not establish the law of the case"); *see also Allen v. Milligan*, 599 U.S. 1, 10 (2023) (affirming on plenary review an order that the Court had previously stayed); *cf. Premachandra v.*

11

*Mitts*, 727 F.2d 717, 723 (8th Cir. 1984) (rejecting the idea that "the Eighth Circuit's and Supreme Court's denials of an injunction pending appeal" reflected "a final judicial determination on the merits").

This rule makes good sense. Review by administrative panels often takes place on an abbreviated time frame, especially for motions seeking emergency relief, which are decided on shorter briefs with less developed arguments and without submission of the full record. *See Nyffler Constr., Inc v. Secretary of Labor*, 760 F.3d 837, 841 (8th Cir. 2014).

Plaintiffs cite no case in which any court of appeals has treated an administrative panel's ruling on a motion for stay or injunction pending appeal as law of the case. Instead, they cite cases involving motions to dismiss, which, unlike motions for preliminary relief, are potentially dispositive of an appeal.[2] But even in that context they acknowledge that the law-of-the-case doctrine applies only if the administrative panel "actually decided the specific jurisdictional issue" to be resolved on the merits. Resp. 30 (quoting *Thompson v. United States*, 872 F.3d 560, 565 (8th Cir. 2017)).

---

[2] One case involved a motion to proceed *in forma pauperis*, but the opinion that would have recognized the administrative panel's ruling as law of the case was, in relevant part, a dissent. *See Pinder v. WellPath, LLC*, 112 F.4th 495, 505-06 (8th Cir. 2024) (Kelly, J., concurring in part and dissenting in part).

12

Here, the issue for the merits panel is whether the district court abused its discretion in fashioning its preliminary injunction. *See* Resp. 1. The administrative panel did not purport to answer that question. In any event, for the reasons provided below, the administrative panel's ruling was "clearly erroneous and works manifest injustice." Resp. 31 (quoting *Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1135 (8th Cir. 2007)).

## II. The government is likely to prevail on the merits.

### A. Plaintiffs lack standing.

#### 1. Plaintiffs fail to show financial harm to MOHELA from lost administrative fees.

The government's opening brief (at 23-31) demonstrated that Missouri lacks standing under the only theory accepted by the district court and the administrative panel of this Court: that MOHELA will lose future administrative fees when loans it services are forgiven. App. 363; R. Doc. 35, at 38; Inj. Op. 6. Plaintiffs purport (Resp. 31) to invoke "the same theory of standing that prevailed in the Supreme Court" in *Biden v. Nebraska*, 600 U.S. 477 (2023), but the different context here makes that theory unavailable.

**a.** The Supreme Court's jurisdictional holding in *Nebraska* does not help plaintiffs here. The injury the Court recognized there arose not from forgiveness itself, but from the early closure of student-loan accounts. As the

13

Court explained, "MOHELA receives an administrative fee" for each federal loan account it services. *Nebraska*, 600 U.S. at 489-90. That fee is a monthly per-borrower fee, not one based on the borrower's balance or payment amount. App. 232; R. Doc. 22-2, at 4. The action challenged in *Nebraska* would have resulted in millions of borrowers "hav[ing] their loans completely discharged," injuring MOHELA because it "could no longer service *those closed accounts*." 600 U.S. at 490 (emphasis added). The Court did not hold that "any decrease in balances" or "[a]ny forgiveness" would injure MOHELA by reducing its administrative fees, Resp. 32, 39—nor could it, because MOHELA's fees do not depend on balances or payment amounts.

*Nebraska* accordingly does not support plaintiffs' assertion (Resp. 39) that MOHELA is harmed by the preexisting timelines for forgiveness established in the original ICR, PAYE, and REPAYE plans. Since MOHELA became a federal loan servicer, those plans have always resulted in account terminations after 20 or 25 years of payments. *See* Opening Br. 30. Even under plaintiffs' theory that the ICR statute requires full repayment, borrowers' accounts would be closed after the same period of time. *See, e.g.*, Resp. 55. And because MOHELA's servicing fees do not depend on the balance of the loan at the time of the final payment, MOHELA

14

would cease earning fees at that point regardless of whether those accounts terminate in full repayment or forgiveness. Thus, forgiveness on the preexisting timelines does not cost MOHELA "fees that it otherwise would have earned under its contract." *Nebraska*, 600 U.S. at 490. Missouri therefore lacks standing to challenge those timelines.

Similarly, plaintiffs fail to show financial harm arising from what they call (Resp. 40) "new eligibility provisions that increase the amount of borrowers who receive forgiveness." Plaintiffs do not contend that the SAVE plan's protected-income or payment-calculation provisions, or even the family-size definition (which they did not challenge previously), change how long MOHELA services an account; plaintiffs assert only that these provisions increase the amount of forgiveness. Resp. 40-41. But MOHELA's fees do not depend on how much loan forgiveness a borrower receives. *See* App. 232; R. Doc. 22-2, at 4. Missouri therefore fails to show any cognizable injury from these provisions. As for provisions crediting deferment for bankruptcy and unemployment, these might in some circumstances affect the number of months that MOHELA services an account, but they will not result in the closure of any account before 20 or 25 years. *Cf. Mackinac Ctr. for Pub. Policy v. Cardona*, 102 F.4th 343, 355 (6th Cir. 2024) (explaining that

15

public service employers lacked standing to challenge a credit toward forgiveness under Public Service Loan Forgiveness (PSLF) that did not affect the minimum employment requirement). Most significantly, though, plaintiffs have not specifically challenged these credit provisions, and because "standing is not dispensed in gross," *Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024), they cannot rely on any harm caused by these provisions to support standing for the claims they actually brought.

**b.** Even as to the injury the Supreme Court deemed sufficient in *Nebraska*—*i.e.*, the loss of future administrative fees due to early closure of student-loan accounts—plaintiffs have not established that injury here. Plaintiffs assert (Resp. 33) that "MOHELA stands to lose . . . up to \$285 million" annually under the Final Rule. They derive that figure by assuming that every MOHELA-serviced account would be closed immediately. *See* Resp. 32-33. But the Final Rule does no such thing. Only borrowers enrolled in the SAVE plan are eligible for forgiveness on a shortened timeline, and roughly three-quarters of MOHELA's borrowers are on other plans. App. 231; R. Doc. 22-2, at 2. Further, of the borrowers enrolled in the SAVE plan, only those with low original principal balances would benefit from the shortened-repayment-period provision. 88 Fed. Reg. at 43,880. Plaintiffs

16

offer no evidence of how many accounts might be closed sooner than they would otherwise have been, which was the essential prerequisite in *Nebraska*. *See* 600 U.S. at 490.

Moreover, as the government previously explained (Opening Br. 25-26), Missouri stands to benefit from other effects of the Final Rule that will reduce MOHELA's servicing costs and avoid penalties. For example, the lower payments that would result from the challenged protected-income and payment-calculation provisions will reduce delinquencies and defaults, which in turn will increase MOHELA's servicing fees. Ignoring those benefits when assessing standing "would impermissibly divorce [Missouri's] standing to sue from any real-world financial injury." *Lewis v. GEICO*, 98 F.4th 452, 460 (3d Cir. 2024) (holding that the plaintiffs lacked standing because "countervailing adjustments" offset any financial injury); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (an injury "must actually exist"). Plaintiffs needed to show that the Final Rule's cumulative effects would actually harm MOHELA.

They failed to do so, and their efforts to correct that deficiency now are unsuccessful. First, they briefly disclaim (Resp. 33-34) the need to demonstrate a net loss before recognizing that "offsetting benefits may be

17

considered when they 'are of the same type and arise from the same transaction as the costs.'" Resp. 34 (quoting *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015)). That is the circumstance here, where the same Final Rule confers economic benefits on the same entity by virtue of its servicing contract. Therefore, costs and benefits are appropriately considered jointly. *See, e.g.*, *Louisiana ex rel. Louisiana Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882-84 (5th Cir. 2023). But plaintiffs have not shown that any costs exceed the benefits to MOHELA. Their brief fails to mention the reduction in labor costs when servicing SAVE accounts, App. 233-234; R. Doc. 22-2, at 5-6, and its discussion of the savings attributable to reductions in delinquencies (Resp. 35-36) is devoid of record citations. Plaintiffs' gross overestimate of MOHELA's potential losses (*supra* p. 16) compounds the error. In short, plaintiffs fail to meet their burden of demonstrating a real-world financial injury.[3]

---

[3] Plaintiffs err in asserting (Resp. 33) that the district court made a factual finding that any losses exceed the potential benefits. Rather, the district court rejected the government's standing argument on legal grounds, App. 363; R. Doc. 35, at 38, and that conclusion is reviewed de novo.

18

**c.**  Finally, the government previously demonstrated that MOHELA's request to reallocate accounts to other servicers precludes Missouri's claim of injury.  Opening Br. 29-30.  Missouri fails to rebut that showing and instead misstates the nature of MOHELA's request.  This request was not for "early" implementation of a transfer "already contractually scheduled," and it was not a request to transfer only accounts that were not governed by the Final Rule. *Contra* Resp. 37.  Plaintiffs conflate two actions: MOHELA was scheduled to move the accounts it services to a new platform in spring 2024; separately, MOHELA voluntarily requested that up to 1.5 million accounts be transferred from MOHELA to a different servicer. *See* App. 235; R. Doc. 22-2, at 7.  They are also factually incorrect in asserting (Resp. 37) that most of the accounts transferred to a different servicer pursuant to MOHELA's request were PSLF accounts.

In any event, the salient point is that MOHELA has recognized that a reduction in accounts improves MOHELA's ability to perform its contract successfully.  Even taken at face value, plaintiffs' various quibbles (Resp. 36-39) about which accounts would be transferred do not address the heart of the matter.  MOHELA stands to benefit from having a smaller, more manageable loan-servicing portfolio.

19

## 2. Plaintiffs' alternative standing theories fail.

Plaintiffs also urge various alternative standing theories that the district court described as "tenuous at best" and declined to adopt. App. 363-364; R. Doc. 35, at 38-39. None establishes jurisdiction.

**a.** Plaintiffs first theorize (Resp. 42-43) that the Final Rule will cause MOHELA to lose future interest payments on FFELs, a type of loan issued under a program that ceased new originations in 2010, *see* Opening Br. 8-9. The theory assumes that third-party borrowers will consolidate (*i.e.*, convert) FFELs held by MOHELA into Federal Direct Loans held by the Department, resulting in the cessation of interest payments to MOHELA. This theory establishes neither a cognizable injury-in-fact nor traceability.

*Injury.* Consolidation of FFELs does not entail any financial injury to MOHELA. FFEL borrowers have the right to "accelerate" their loans at any time (and without penalty) by prepaying them in whole or in part. *See* 20 U.S.C. § 1078(b)(1)(D)(i); 34 C.F.R. § 682.209(b)(2). A FFEL holder has no legally cognizable interest in future payments from a borrower after a loan has been prepaid in full. And one way in which a borrower may prepay is by consolidating a FFEL into a Federal Direct Loan. When a borrower consolidates, the proceeds of their new Direct Loan are paid "to the holder or

20

holders of the loans so selected to discharge the liability on such loans." 20 U.S.C. § 1078-3(b)(1)(D); *accord* 34 C.F.R. § 685.220(f)(1)-(2). MOHELA thus receives full compensation—including the entire outstanding principal and accrued interest—on its FFEL holdings if borrowers consolidate.

MOHELA does not suffer financial injury simply because it will not collect a stream of future interest payments from the borrower. Early repayment in full provides the economic equivalent of those future payments by permitting the FFEL holder to recoup the time value of the principal and avoid the risk of loss from a borrower's default. *See In re Topp*, 75 F.4th 959, 961 (8th Cir. 2023) ("Generally, money now is worth more than money later. Accordingly, future payments must be discounted before adding them up to see whether the total equals the present value of a claim." (citation omitted)). And under the terms of the program, the holder has no legal right to interest payments following repayment. MOHELA thus experiences no pocketbook or other injury when a borrower consolidates their loans and repays the outstanding FFEL principal and interest in full.

Missouri makes no effort to account for those principles, instead merely asserting that the inability to collect future interest payments is itself a financial injury. Resp. 42. That is wrong as a matter of economics, so

21

Missouri fails to make any showing of a genuine financial injury. *See Conkright v. Frommert*, 559 U.S. 506, 519 (2010) (explaining that, "[i]n the actuarial world," failing to "account for the time value of money" is "heresy").

*Traceability.* Even if Missouri could demonstrate an injury, however, it would still fail to establish traceability. "[P]laintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quotation marks omitted). Instead, plaintiffs must adduce "evidence" demonstrating that "the asserted injury was the consequence of the defendants' actions." *Murthy*, 144 S. Ct. at 1992 n.8 (quotation marks omitted).

Here, independent third parties—borrowers—decide whether to consolidate their loans after considering the various advantages and disadvantages of consolidation. *See* Fed. Student Aid, *Consolidating Student Loans*, https://studentaid.gov/manage-loans/consolidation (last visited Oct. 4, 2024) (listing possible benefits and disadvantages). Enrolling in the SAVE plan to obtain ICR-based loan forgiveness is not the only reason why a FFEL borrower might consolidate. She must do so, for example, to become eligible for PSLF. *See* 20 U.S.C. § 1087e(m)(1); 34 C.F.R. § 685.219(b).

22

Given the various incentives, it is "purely speculative" whether borrowers'
consolidation decisions are driven by a desire to obtain benefits offered under
the Final Rule or are instead "made by the [borrowers] without regard to"
those benefits. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43
(1976).

In attempting to make the necessary showing, plaintiffs exclusively
rely on a spreadsheet including monthly totals for finalized consolidations of
MOHELA-held FFELs. *See* Resp. 43 (citing App. 312-313; R. Doc. 26-1, at
19-20). But that spreadsheet shows wide variation in consolidations over
time, dating back well before the promulgation of the Final Rule. Plaintiffs
make no effort to account for when the consolidations were originally
requested and offer no proof that consolidating borrowers ended up on the
SAVE plan; indeed, consolidations appear to have doubled from one month to
the next at times without any apparent connection to the Final Rule. *See*
App. 312-313; R. Doc. 26-1, at 19-20 (*e.g.*, February 2022 to March 2022).
Such fluctuations confirm that borrowers had "independent incentives" to
consolidate long before the Final Rule "entered the picture." *Murthy*, 144
S. Ct. at 1992 n.8. And even if, as plaintiffs contend, an increase in
consolidations could be attributed to the Department's announcement in

23

January 2024 that it was designating the shortened-repayment-period provision for early implementation, as plaintiffs contend, that does nothing to establish injury from the other provisions plaintiffs challenge, which took effect at other times.

**b.** North Dakota suggests (Resp. 43-45) that it suffers an injury because the Final Rule makes Federal Direct Loans more attractive than loans offered by the Bank of North Dakota (BND), a state instrumentality. The State seeks to invoke "the doctrine of competitor standing." *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 831 F.3d 961, 967 (8th Cir. 2016). That doctrine is inapplicable here.

As an initial matter, plaintiffs have not clearly established that BND is the Department's "competitor" in any relevant sense. The Department offers Federal Direct Loans "to enable [eligible] students to pursue their courses of study at [higher-education] institutions." 20 U.S.C. § 1087a(a). The terms of those loans are not driven by market forces, but rather are governed by statute and regulation in a manner designed to effectuate Congress's chosen policy. That North Dakota also has a policy of making student loans available through a government entity, *see* N.D. Cent. Code ch. 15-62.1, shows only that the federal and state governments both play a role in

24

making higher education affordable.  It does not show market-based competition.

Consequently, this case differs significantly from the only competitor-standing case cited by plaintiffs, *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998).  There, a market participant had standing to challenge a federal agency's decision to lift regulations on another participant's prices.  *See id.* at 366-67.  Plaintiffs cite no case for the proposition that a government agency's policy decisions can support standing for a state instrumentality that carries out a corresponding state policy.

That problem aside, plaintiffs have not adequately shown that BND is "is in fact a *direct* and *current* competitor" of the Department.  *Air Excursion LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023) (quotation marks omitted).  On the contrary, BND itself encourages students to exhaust their options for Federal Direct Loans before applying for BND loans.  BND, *Apply for a Student Loan*, https://perma.cc/82VU-GQPX, *cited at* Resp. 44 ("BND recommends you take federal Direct Subsidized and/or Unsubsidized Student Loans before any others.  If those aren't enough, our student loan program offers preferred rates[.]").  Despite acknowledging such statements, the BND President's declaration never explains under what circumstances

25

he believes a borrower would choose between Federal Direct and BND loans. App. 319-321; R. Doc. 26-2, at 2-4. Nor does he explain specifically "who" would select a Direct loan over a BND loan and "why," *California v. Texas*, 593 U.S. 659, 677-78 (2021) (emphasis omitted), instead relying on speculation about possible future changes to student-loan programs. *See* App. 320-321; R. Doc. 26-2, at 3-4 (asserting that BND will be disadvantaged "if it becomes established as precedent that the federal government can unilaterally change the terms of federal student loans").[4] A "bare assertion of competition" is insufficient to establish competitor standing, *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 14 (D.C. Cir. 2006) (quotation marks omitted), and "allegations of *possible* future injury" never suffice to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration omitted).

The implications of plaintiffs' argument are startling. On their theory, California could challenge the National Park Service's decision to lower entrance fees at Yosemite, *see* 16 U.S.C. § 6802(a), citing increased

---

[4] Relatedly, the declaration provides no methodology supporting the "estimate[]" of decreased revenue supposedly attributable to the Final Rule. App. 321; R. Doc. 26-2, at 4. In any event, this statement relates only to "forgive[ness]" and therefore is irrelevant to North Dakota's standing to challenge any other feature of the Final Rule, including the payment-threshold and accrued-interest provisions.

26

competition with its own parks. Or South Carolina could challenge the Secretary of the Army's decision to increase the number of cadets at West Point, *see* 10 U.S.C. § 7442(j), citing increased competition with The Citadel. The Supreme Court has never approved such "an unprecedented and limitless approach" to standing that would allow States "to sue in federal court to challenge almost any policy." *Alliance for Hippocratic Med.*, 602 U.S. at 392; *see also United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) (reaffirming "bedrock Article III constraints in cases brought by States"). Competitor standing provides no exception. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) (rejecting the "boundless" theory that "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful").

Even if North Dakota's standing theory had merit, it would not justify relief that extends beyond the harm alleged to BND. *See* Opening Br. 55-58; *infra* pp. 60-61. Plaintiffs indicate (Resp. 43) that BND offers loans "for borrowers attending institutions of higher education in North Dakota." Thus, any preliminary injunction based on this theory should do no more than prevent the Department from offering the SAVE plan to such borrowers.

27

**c.** Finally, plaintiffs vaguely gesture (Resp. 45) to "additional theories of standing" without describing them or explaining why they could succeed. Such skeletal arguments are forfeited. *See, e.g.*, *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 324 (8th Cir. 2018) ("[A] litigant may not advert perfunctorily to an argument[.]"); *see also Blakley v. Schlumberger Tech. Corp.*, 648 F.3d 921, 931 (8th Cir. 2011) (deeming "waived" on appeal arguments that might have supported subject-matter jurisdiction).

## B.    Plaintiffs' statutory challenges lack merit.

### 1.    The HEA clearly authorizes forgiveness.

Congress instructed the Department to offer "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Plaintiffs' primary argument (Resp. 52) is that this provision does not authorize forgiveness—and thus that every Secretary of Education since 1994 has administered the statute unlawfully.[5]

---

[5] Plaintiffs attempt to minimize their position by pointing out (Resp. 60-61) that, before the Final Rule, "just *two* Secretaries out of nine" had created ICR plans that provided for forgiveness. But they cannot deny that all nine

*Continued on next page.*

But as the government previously explained (Opening Br. 32), the plain text of the ICR statute establishes two principles: first, the amount a borrower repays each year will be "based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D). And second, no borrower will be required to make payments indefinitely; rather, each borrower will be required to make payments for a period "not to exceed 25 years." *Id.* The only type of plan that complies with both principles is one that allows the borrower to make income contingent payments for a prescribed period and then forgives any outstanding balance.

Plaintiffs fail to show otherwise. They assert (Resp. 55) that "[t]he Secretary could promulgate a plan stating that a borrower each year shall pay X% of annual income or 4% of the principal balance, whichever is higher." But such a plan would violate the first principle: if the borrower must pay at least "4% of the principal balance every year," that payment would be based on her "principal balance," not on her income. So, too, would a plan that "permit[s] lower payments for four years but require[s] catch-up

---

Secretaries administered such a plan, and they cite no evidence that any Secretary attempted to eliminate ICR forgiveness on the ground that it exceeded statutory authority.

payments in the fifth."  Resp. 55.  Any such "catch-up payments" would be based on the amount of the loan, not on the borrower's income.

Plaintiffs assert that because § 1087e(d)(1)(D) refers to "repayment," it must mean full repayment—*i.e.*, repayment of the entire "balance due." Resp. 53 (quoting 20 U.S.C. § 1087e(d)(1)(D), (e)(5)).  But the text does not refer to "full" repayment.  To the contrary, it refers to repayment that is "contingent"—that is conditioned—on a borrower's "income."  20 U.S.C. § 1087e(d)(1)(D), (e); *see also Contingent*, Black's Law Dictionary (12th ed. 2024) (defined as "[p]ossible; uncertain; unpredictable," and "[d]ependent on something that might or might not happen in the future").  Plaintiffs err in reading a statute that expressly conditions repayment on a borrower's income as though it imposed an absolute obligation of repayment in full no matter how much—or how little—the borrower earns.[6]  Further, requiring ICR payments to fully repay a loan would make an alternative option, the extended repayment plan, redundant.  Opening Br. 36-37.  Plaintiffs attempt to resist this conclusion (Resp. 59) by asserting that, under an extended

---

[6] It makes no difference whether "repayment" serves as an adjective modifying the "plan" in § 1087e(d)(1)(D) rather than "a noun in its own right" modified by "income contingent."  Resp. 54.  An "income contingent repayment plan" is a plan for "income contingent repayment."

Appellate Case: 24-2332     Page: 42     Date Filed: 10/07/2024 Entry ID: 5443500

repayment plan, "a person's current income is irrelevant to monthly payments." But the same can be said for plaintiffs' hypothetical plans, which ultimately require payments based on loan amount, whatever the borrower's income happens to be.

Plaintiffs assert (Resp. 55) that use of the phrase "not to exceed" in § 1087e(d)(1)(D) cannot "authorize forgiveness" because similar language is used in provisions governing repayment plans that do not provide for forgiveness. But the ICR statute's maximum repayment period reflects only the second of the two principles identified above. The first principle is that the amount a borrower repays each year must be "based on [her] income." 20 U.S.C. § 1087e(d)(1)(D). None of the other repayment plans plaintiffs cite includes similar language. *See id.* § 1078(b)(9)(A), *cited at* Resp. 55.

Next, plaintiffs attempt to "contrast" § 1087e(d)(1)(D) with other provisions that "expressly authorize forgiveness." Resp. 56. But here, as elsewhere, "no magic words are required" to achieve Congress's objective, and "the clarity of each statute must be evaluated on its own terms." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 52 (2024) (quotation marks omitted). As the government previously explained (Opening Br. 32-33), both the text of § 1087e(d)(1)(D) and the text of the 2007

31

amendments to § 1087e(e) make clear that Congress provided for forgiveness here.

Plaintiffs make no meaningful attempt to reconcile their interpretation with those 2007 amendments. Resp. 57 n.21. They acknowledge (Resp. 63) that it would create "absurdity" to read the statute to "push borrowers into *default*." Yet under plaintiffs' interpretation, that is exactly what the 2007 amendments to § 1087e(e) would do: by requiring that periods of nonpayment count toward a borrower's fixed repayment period, the amendments would perversely accelerate a borrower's obligation to pay her loan in full. Opening Br. 34.

Moreover, as the government explained (Opening Br. 33-34), Congress enacted the 2007 amendment against the backdrop of the Department's consistent practice of granting forgiveness under ICR plans. Plaintiffs dismiss (Resp. 60) that consistent practice as "atmospherics." But the Department's interpretation was "issued contemporaneously with the statute at issue," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024); it has "remained consistent over time," *id.*; and Congress has enacted subsequent amendments presupposing that it is correct.

Appellate Case: 24-2332    Page: 44    Date Filed: 10/07/2024 Entry ID: 5443500

Plaintiffs' reliance (Resp. 57-58) on the provisions governing income-based repayment (IBR) plans is also misplaced. IBR was enacted alongside the 2007 amendments and was premised on the understanding that ICR plans provide for forgiveness. Pub L. No. 110-84, § 203, 121 Stat. 784, 792-95 (2007). Congress viewed IBR as "build[ing] on the existing [ICR plans] and extend[ing] this option to individuals participating in the FFEL loan program." H.R. Rep. No. 110-210, at 44 (2007). Congress's decision to legislate the particular terms of one income-driven repayment plan did not implicitly repeal the Secretary's longstanding authority to provide more generous options under separate statutory authority.

### 2. The HEA clearly authorizes the Final Rule's other changes to the SAVE plan.

**a.** The text of § 1087e(e) also clearly authorizes the Final Rule's protected-income and payment-calculation provisions. When Congress amended the HEA to require the Department to offer ICR, it established the two basic principles identified above. But Congress expressly delegated to the Secretary the authority "to prescribe rules to 'fill up the details.'" *Loper*, 144 S. Ct. at 2263. In particular, Congress instructed: "Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the *appropriate*

33

portion of the annual income of the borrower . . . *as determined by the Secretary*." 20 U.S.C. § 1087e(e)(4) (emphases added).

That provision unambiguously authorizes the Secretary to "determin[e]" the "appropriate portion of the [borrower's] annual income" for calculating payments. 20 U.S.C. § 1087e(e)(4). In every ICR plan, the Secretary has exercised that authority in the following way: first, by determining the amount of a borrower's adjusted gross income that should be protected from loan payments; and second, by determining the percentage of a borrower's remaining income (*i.e.*, her discretionary income) that should go toward monthly payments. *See* Opening Br. 6.

In the preexisting REPAYE plan, which plaintiffs describe as "limited in scope" and "uncontroversial," Resp. 8, 61 (quoting Inj. Op. 3), the Secretary determined a borrower's protected income to be 150% of the federal poverty line and the percentage of a borrower's discretionary income that should go toward monthly payments to be no more than 10%. The Final Rule's protected-income and payment-calculation provisions simply adjust those figures to 225% and 5% or 10% (depending on the type of loan). *See* 88 Fed. Reg. at 43,881, 43,901-02. Those changes fit squarely within the Secretary's authority.

34

Plaintiffs "do not dispute that the Secretary has a fair amount of discretion in setting payment amounts based on income," but they contend that the Department must "require payment amounts large enough for borrowers to repay fully within 25 years." Resp. 62-63. That contention repeats the same error above by assuming that § 1087e(d)(1)(D) requires "full" repayment rather than "income contingent repayment."

The Secretary's authority has limits, but they are the limits that Congress enacted into statute, not the limits that advance plaintiffs' policy preferences. Congress specified that the repayment period be an "extended period," "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Congress also required that payments "vary in relation to the appropriate portion of the annual income of the borrower." *Id.* § 1087e(e)(4). A plan that forgave "every penny of every federal student loan" (*e.g.*, Resp. 2) would exceed those limits.

Plaintiffs do not contend, however, that the Final Rule's protected-income and payment-calculation provisions exceed those textual limits. In fact, plaintiffs' statutory authorization argument never discusses, or even cites, the text of § 1087e(e)(4). Beyond arguing that the statute requires "full[]" repayment, plaintiffs merely observe (Resp. 62-63) that many

35

borrowers will owe monthly payments of $0. But that is also true of borrowers under each of the preexisting "uncontroversial" ICR plans. Resp. 61; *see, e.g.*, 80 Fed. Reg. 67,204, 67,229 (Oct. 30, 2015); 77 Fed. Reg. 66,088, 66,117 (Nov. 1, 2012); 59 Fed. Reg. 61,664, 61,676 (Dec. 1, 1994). Indeed, that is an inherent feature of protected-income provisions: Borrowers whose incomes fall below the threshold pay $0 so long as their incomes remain that low. And that feature effectuates Congress's instruction that repayment be contingent on a borrower's income.

**b.** The Final Rule's accrued-interest provision likewise falls comfortably within the Department's statutory authority. Section 1087e(e)(4) directs the Secretary to establish "[i]ncome contingent repayment schedules" by regulation. 20 U.S.C. § 1087e(e)(4). The authority to establish "[i]ncome contingent repayment schedules" encompasses the authority to determine the amount of accrued interest to be charged, and the Department exercised that authority in the preexisting REPAYE and PAYE plans as well. 20 U.S.C. § 1087e(e)(4); *see id.* § 1087e(e)(5); *see also* 88 Fed. Reg. at 43,827; 77 Fed. Reg. 66,108, 66,137.

Again, plaintiffs do not engage with the text of § 1087e(e)(4). Instead, they quote (Resp. 60) a different provision, which states that "[t]he balance

36

due on a loan" shall include "any accrued interest."  20 U.S.C. § 1087e(e)(5).

But that sentence merely identifies the components of the balance due.  *See*

88 Fed. Reg. at 43,827.  It does not preclude the Department from exercising

its authority under § 1087e(e)(4) to determine, based on a borrower's income,

how much a borrower must pay.

    **c.**  Finally, plaintiffs contend (Resp. 64) that "all other provisions" of

the Final Rule "must fall" because they "increase forgiveness eligibility" and

therefore "necessarily depend on the Secretary having the authority to

forgive."  They point as an example to the Final Rule's change to the

regulatory definition of "family size" (which, again, they have not previously

challenged) to exclude the income of spouses who file separate returns.  *See*

88 Fed. Reg. at 43,856.  But this provision, like the protected-income and

payment-calculation provisions, is an exercise of the Secretary's express

authority to "determin[e]" the "appropriate portion of the [borrower's]

annual income" on which payments should be based.  20 U.S.C. § 1087e(e)(4).

Plaintiffs do not contend that the Secretary exceeded this authority.

Further, many other provisions of the Final Rule are even further removed

from the Secretary's authority to forgive loans.  These include a provision

that eliminates "burdensome and confusing" requirements relating to annual

37

income recertification, and another that makes certain consolidated loans ineligible for any income-driven repayment plan except original ICR. 88 Fed. Reg. at 43,836, 43,865.

Plaintiffs have never specifically challenged the legality of these other provisions in this litigation. As the district court explained, plaintiffs challenged the Final Rule's protected-income provision, the payment-calculation provision, the shortened-repayment-period provision, and the accrued-interest provision. App. 366-367; R. Doc. 35, at 41-42. Plaintiffs' forfeiture is not excused by their assertion (Resp. 64) that vacatur would be the appropriate remedy if they were ultimately to prevail on the merits. Given the district court's severability analysis (which plaintiffs do not challenge), plaintiffs would not be entitled to vacatur of the entire Final Rule. And regardless, any preliminary injunctive relief must be limited to the provisions causing irreparable harm and for which Plaintiffs have standing. *See infra* pp. 50-55. It is too late now for plaintiffs to expand the scope of their litigation.

### 3. The major-questions doctrine does not alter this analysis.

As the government previously explained (Opening Br. 41), the major-questions doctrine is not implicated where the challenged program is

38

longstanding and the agency has exercised its statutory authority to adjust some of the policy's parameters.[7]  The Department has included loan forgiveness, without controversy, as an element of ICR repayment plans for over 30 years, ever since the statute was enacted.  This is fatal to plaintiffs' suggestion (Resp. 46) that loan forgiveness *simpliciter* triggers the major-questions doctrine.  *See, e.g.*, *Nebraska*, 600 U.S. at 501, 504 (looking to "past practice" to determine whether an action is "unprecedented").  Their contention (Resp. 46-47) that the Final Rule's cost alone (at least according to plaintiffs' preferred estimate) "triggers the major questions doctrine" is wrong for reasons previously identified.  Opening Br. 44.  Plaintiffs make no effort to engage with the cases the government cited.  *Id.* (citing *West Virginia v. EPA*, 597 U.S. 697, 721, 729 (2022); *id.* at 747-48 (Gorsuch, J., concurring); *Nebraska*, 600 U.S. at 501, 504; *id.* at 519 (Barrett, J., concurring)); *see also Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 725-28 (10th Cir. 2024) (articulating a four-factor test to determine whether the

---

[7] Plaintiffs incorrectly suggest (Resp. 48) that the Department previously concluded that it lacks the authority to forgive loans under the ICR statute.  The 2021 Memo did not address that provision, and in any event, it was rescinded because it was procedurally invalid and substantively incorrect.  *See supra* pp. 3-4.

Appellate Case: 24-2332     Page: 51     Date Filed: 10/07/2024 Entry ID: 5443500

doctrine applies and rejecting a sole "focus on the economic effects" of the challenged agency action).

Plaintiffs contend (Resp. 50) that the Final Rule is "transformative" rather than "incremental" because it permits more borrowers to obtain a larger amount of loan forgiveness. Invoking the unverified calculations of one commenter, plaintiffs assert (Resp. 50) that the Final Rule "would provide forgiveness for participants up until the 98th income percentile." *See* 88 Fed. Reg. at 43,831 (noting a commenter's speculation that "the 98th percentile [of income] would be the point at which it does not make sense to choose [the SAVE] plan"). This argument is woefully underdeveloped but appears to rest on a misunderstanding of the relevance of income in ICR plans. The extent to which a borrower receives forgiveness is determined by the amount borrowed and the borrower's income over the entire repayment period, not at the moment that period ends. Few, if any, borrowers have a constant income over the course of 20-25 years. The Final Rule explains that, under certain conditions, the average borrower in the top quintile of lifetime income would be projected to pay over $11,000 per $10,000 borrowed if she had only undergraduate debt and more than $12,000 if she had any graduate debt. 88 Fed. Reg. at 43,881 (tbl. 4.2). Regardless, the

40

consequence plaintiffs complain of is primarily driven by the protected-income and payment-calculation provisions, which were similar in proportion to changes effected by previous plans.[8]

Plaintiffs also suggest that the changes to REPAYE made by the Final Rule "turn[] a loan repayment program . . . into a grant program" because "the average undergraduate borrower" under SAVE "pays only 61% of their principal before the remainder is forgiven" while the same borrower under the original REPAYE "paid back [her] principal[]." Resp. 50-51. Plaintiffs misunderstand the data upon which they base this argument, which did not describe the actual operation of REPAYE before the Final Rule (or the expected operation of SAVE afterwards), but rather compared each version under very specific assumptions in order to demonstrate "the types of borrower who could benefit most under different payment plans." *See* 88 Fed. Reg. at 43,880. The actual benefits to real-world borrowers will depend on who signs up for SAVE, how long they remain on the plan, and what their incomes are over the course of their payment periods. Further, even under

---

[8] For example, compared to original ICR, PAYE increased by half the amount of income that was protected from payment (100% of the poverty line to 150%) and decreased by half the amount of discretionary income that must be devoted to loan repayment (20% to 10%). The Final Rule employed the exact same ratios.

41

the specific assumptions used in the Rule, while the "average" borrower on REPAYE might have "paid back [her] principal[]," a substantial portion of borrowers would not. The difference between original REPAYE and SAVE was therefore one of degree, not of kind.

Moreover, this argument rests upon the incorrect assertion that a financial transaction is not a loan if any principal is forgiven. Plaintiffs do not contend, however, that IBR and PSLF are grant programs. By authorizing ICR repayment plans with "varying annual repayment amounts based on the income of the borrower," 20 U.S.C. § 1087e(d)(1)(D), Congress allowed some borrowers to make payments that would not cover the entire principal and interest on the loan. "[M]any" other borrowers "will repay their balances with interest" under the SAVE plan. 88 Fed. Reg. at 43,826. That stands in stark contrast to grants, where repayment is not required *regardless* of the recipient's income. *See generally* 20 U.S.C. § 1070a (authorizing Pell Grants).

While most of plaintiffs' arguments focus almost exclusively on the availability of loan forgiveness under the Final Rule, they would have this Court ignore that the only available estimate of the Rule's shortened-repayment-period provision ($4 billion) falls well below the cost of other

42

administrative actions the Supreme Court has found to have "vast economic" significance. They provide no evidence at all to support their assertion (Resp. 51) that the cost of this provision is "likely 20 or 30 times" higher. Plaintiffs' request (Resp. 52) that this Court consider instead the cost of forgiving "every penny of every loan" is equally without foundation. The Final Rule does not abolish the Department's entire portfolio of student loans; rather, it makes a number of discrete and severable changes to one particular class of repayment plans for one particular class of loans. Each provision must therefore be analyzed separately.

Even if the major-questions doctrine did apply, it would be satisfied here. The Supreme Court has held that the doctrine requires "clear congressional authorization" for a challenged administrative action. *West Virginia*, 597 U.S. at 723. Plaintiffs claim (Resp. 47) that this standard is not satisfied because the ICR statute "lack[s] express forgiveness authority." But statutory authorization need not be express to be clear. *See Nebraska*, 600 U.S. at 514 (Barrett, J., concurring) ("[C]larity may come from specific words in the statute, but context can also do the trick"). Waivers of sovereign authority must also be "clear" (indeed, "unmistakably clear"), but the Supreme Court has explained that Congress need not use "magic words"

43

or "state its intent in any particular way." *Kirtz*, 601 U.S. at 48-49. And even where Congress uses "certain language" to accomplish its goal in one part of a statute, it can "us[e] different language to accomplish th[e] same goal" in a different part of "the same law." *Id.* at 52 (second alteration in original). As explained above, § 1087e(d)(1)(D) and (e) provide clear authority for forgiveness (and for the other challenged provisions).

### 4.   The Final Rule is not arbitrary or capricious.

Plaintiffs contend that the Final Rule is arbitrary and capricious because the Department's cost estimate assumed the success of the loan-relief program held unlawful in *Nebraska*. This claim is unreviewable and lacks merit.

**a.** Executive Order 12,866 requires most federal agencies to assess costs and benefits before proposing "[s]ignificant" regulatory actions, as part of the Executive Branch's regulatory-review process. Exec. Order No. 12,866, §§ 1(a), 3(b), 3(f), 6(a)(3), 58 Fed. Reg. 51,735 (Oct. 4, 1993). In accordance with this requirement, the Department conducted a cost-benefit analysis of the Final Rule and published its results in the accompanying "Regulatory Impact Analysis." *See* 88 Fed. Reg. at 43,867. But a cost-benefit analysis that is performed solely to comply with the Executive Order

44

and is not relied upon to support a final agency action has no legal effect and cannot be the subject of an arbitrary-and-capricious claim under the Administrative Procedure Act (APA). *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (rejecting an attempt to invoke an allegedly erroneous cost-benefit analysis as "evidence of the arbitrary and capricious nature of the FAA's decision" as an "indirect—and impermissible—attempt to enforce private rights" under Executive Order 12,866); *see also National Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not create judicially enforceable rights, nor does it provide a basis for rejecting final agency action.").

Even if it were reviewable, plaintiffs' claim would fail. They contend (Resp. 65) that the Final Rule is arbitrary and capricious because the Department's cost estimate contained a "knowingly false" assumption that the government would prevail in *Nebraska*. But the Final Rule was adopted and sent to the Federal Register on June 14, 2023, App. 225; R. Doc. 22-1, at 1, two weeks *before* the Supreme Court's decision in *Nebraska*.[9] "It is a

---

[9] Plaintiffs note (Resp. 65) that a press statement imprecisely referred to the Rule as "finalized" on June 30, the day the *Nebraska* opinion was issued. But the undisputed fact remains that the Rule had been signed and transmitted previously.

45

'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). Subsequent factual developments cannot retroactively make a rule arbitrary and capricious, even if the agency possessed authority to amend the rule. After all, agencies can always amend regulations based on subsequent events, but plaintiffs cite no cases holding that agencies must do so.

Plaintiffs' reliance (Resp. 67) on *Ohio v. EPA*, 144 S. Ct. 2040 (2024), is misplaced. That case concerned the severability of a Federal Implementation Plan issued by the Environmental Protection Agency (EPA) that bound 23 States. *Id.* at 2050-51. The Supreme Court held that when commenters expressed concern about "an important aspect of the problem"—whether EPA's chosen methodology might require changes if fewer States remained in the Plan—"EPA offered no reasoned response." *Id.* at 2053-54. Here, in contrast, the Department did not rely on the cost estimate in establishing the contours of the Final Rule, so it was not an important aspect of the problem in the first place. And when a commenter suggested that an alternative cost estimate be prepared, the Department offered a reasoned response, explaining that its "cost estimate[] account[ed]

46

for [its] current and anticipated programs and policies." 88 Fed. Reg. at 43,875.

Plaintiffs further err in arguing that costs are always an "important aspect of the problem" absent a statutory exception. Resp. 66 (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). Administrative agencies often choose to weigh costs and benefits when deciding whether and how to regulate. *See, e.g.*, *Entergy Corp. v. Riverkeeper Inc.*, 556 U.S. 208, 226 (2009). But whether an agency must do so depends on the underlying statute that governs the agency's action. *Compare Michigan*, 576 U.S. at 760 (holding that a specific provision of the Clean Air Act—not the APA—required EPA to consider costs when taking one action), *with Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 486 (2001) (holding that a different provision of the Clean Air Act prevented EPA from "consider[ing] implementation costs" for a different action).

"When Congress has intended that an agency engage in cost-benefit analysis, it has [generally] clearly indicated such intent on the face of the statute." *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981). The HEA imposes no such requirement here, *see* 20 U.S.C. § 1087e(e), although it does elsewhere, *id.* § 1087i (permitting some actions

47

determined to be "in the best financial interests of the Federal Government"). Plaintiffs would find such a requirement in the ICR statute's use of the word "appropriate," the same word the Supreme Court held in *Michigan* "necessarily compel[s] 'attention to cost.'" Resp. 66 (quoting *Michigan*, 576 U.S. at 752). But their argument ignores crucial differences in statutory context. *Compare* 20 U.S.C. § 1087e(e)(4) (directing the Secretary to require "payments that vary in relation to the appropriate portion of the [borrower's] annual income"), *with* 42 U.S.C. § 7412(n)(1)(A) (requiring EPA to regulate power plants if the agency finds "regulation is appropriate and necessary"). And plaintiffs do not argue that the Final Rule's cost to the government far exceeds its benefits to borrowers, the key problem in *Michigan*. 576 U.S. at 752. As the district court recognized, "Congress has never required the Secretary to consider costs when promulgating rules for the ICR plans." App. 375; R. Doc. 35, at 50.

**b.** Most importantly, plaintiffs offer no argument that the Department's cost estimate caused them harm. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 684 (2020) ("[T]he rule of prejudicial error is treated as an 'administrative law harmless

48

error rule[.]'" (alteration omitted)). They speculate (Resp. 69) that a different cost estimate might have led a member of Congress to "vote differently" on whether the Final Rule should be permitted to take effect. But that would, at most, establish harm to a member of Congress. The APA requires the party challenging administrative action to "establish[] that the error prejudiced that party." *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 691 (10th Cir. 2002); *accord Shinseki v. Sanders*, 556 U.S. 396, 410 (2009). Further, any theory of harm that "depends on how legislators respond" to an administrative action (and then assumes that the President would not veto the resulting resolution) is beyond "'conjectural.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006). Plaintiffs' failure to carry their burden dooms their APA claim.

While "the agency need not prove [the] absence" of harm, *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015), here it is clear that any error was harmless. While using different statutory authorities to address different aspects of the problem, the Department found that the HEROES Act plan challenged in *Nebraska* and the Final Rule challenged here were each justified by the relief that borrowers would receive from reducing the crushing burdens of student-loan

49

debt. The subsequent invalidation of the HEROES Act plan caused a share of that plan's costs to be shifted to the Final Rule. But plaintiffs give no reason to believe that the Secretary's decision to sign the Final Rule turned on "whether costs were to occur under the Final Rule or would be spread between the Final Rule and the HEROES Act forgiveness plan." App. 375; R. Doc. 35, at 50.

## III. The remaining equitable factors favor the government.

Even if plaintiffs could demonstrate a likelihood of success on the merits, they have not shown that they will suffer irreparable harm in the absence of an injunction or that an injunction is in the public interest.

### A. Plaintiffs have not shown a likelihood of irreparable harm absent injunctive relief.

Plaintiffs do not come close to showing that any injury they face is so "great" and "imminen[t]" as to warrant preliminary relief. *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)). That is "an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

**1.** As an initial matter, plaintiffs' claim of irreparable harm focuses entirely on the loss of future servicing fees to MOHELA following loan

50

forgiveness. Resp. 70. And although they ask this Court to enjoin the Final Rule in its entirety, plaintiffs do not even attempt to argue that they are irreparably harmed by provisions of the Final Rule that do not provide loan forgiveness. For example, plaintiffs do not explain how MOHELA's revenues are reduced by operation of the SAVE plan's protected-income and payment-calculation provisions, which have no effect on how long an account remains open, but affect only how much (if any) balance remains at the end of the previously defined payment period (a point that does not alter MOHELA's per-borrower servicing fees). A preliminary injunction "must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs." *Dakotans for Health*, 52 F.4th at 392 (quotation marks omitted). There is accordingly no basis to enjoin those provisions.

**2.** Turning to loan forgiveness, plaintiffs offer no reasoned argument that they are irreparably harmed when the Department forgives loans on timelines that predate the Final Rule, *i.e.*, after 20 or 25 years of payment. As explained above, MOHELA loses servicing fees as a result of forgiveness only when that forgiveness causes accounts to be closed earlier than they otherwise would have been. An account that is closed on the 20- or 25-year timelines established when original ICR, PAYE, and REPAYE were

51

created, *see* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666, therefore has no adverse effect on MOHELA's finances, regardless of whether any balance is forgiven, because MOHELA could not have expected to continue servicing those accounts after 20 or 25 years. Plaintiffs cannot plausibly claim that MOHELA is harmed by such forgiveness when it has been a feature of ICR since long before MOHELA started servicing federal loans. They certainly cannot claim that continued application of this longstanding practice threatens the sort of "great" and imminent harm that merits interim relief. *Morehouse*, 78 F.4th at 1017.

**3.** Nor have plaintiffs shown that MOHELA is irreparably harmed by the Rule's shortened-repayment-period provision. As the government explained in its opening brief (at 46-47), MOHELA itself asked the Department to reduce its portfolio by 1.5 million borrowers—a number many times greater than the "thousands of MOHELA accounts" plaintiffs contend (Resp. 70) "will immediately close" absent an injunction.[10] MOHELA's own recognition that it required an immediate and drastic cut to its portfolio

---

[10] Plaintiffs attempt to inflate the number of accounts implicated by reprising their assertion that forgiveness is "available for borrowers into the 98th income percentile." Resp. 70. That unexplained opinion of a single commenter provides no support for plaintiffs' claim of irreparable harm.

forecloses plaintiffs' attempt to argue that a comparatively modest reduction spread over years (as borrowers gradually reach the new thresholds for forgiveness) would cause the servicer significant injury.

Plaintiffs' nine-month delay in seeking an injunction reinforces the conclusion that preliminary relief is not warranted. *See Ng v. Board of Regents of the Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) ("[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." (quotation marks omitted)). Plaintiffs claim (Resp. 74) that their delay was not unreasonable because they sought to enjoin future forgiveness. But by plaintiffs' logic, they could seek a preliminary injunction at any time—even years after the Final Rule went into effect—so long as the relief they seek is prospective. This Court has properly rejected that argument as an "implausible assertion of law." *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 805 (8th Cir. 2021). *Ng* is not to the contrary. In that case, the plaintiff also sought prospective relief (reinstating his college gymnastics team), and he did so before the beginning of the season in which he wanted to compete. 64 F.4th at 994, 998. This Court nevertheless held that the plaintiff unreasonably waited to seek a preliminary injunction after

53

the decision was made to disband the team. *Id.* at 998. Plaintiffs here waited nine months after the Final Rule was published to bring suit and then waited an additional week to seek a preliminary injunction. App. 381; R. Doc. 35, at 56.

Plaintiffs suggest that the "clock" for measuring delay did not start "ticking" until loan forgiveness under the shortened-repayment-period provision had already begun. *See, e.g.*, Resp. 75. The district court rightly rejected this argument. App. 381; R. Doc. 35, at 56. Plaintiffs learned of the shortened timeline to forgiveness when the Rule was promulgated in July 2023. Had that provision really posed a grave threat to MOHELA, Missouri would not have waited so long to bring suit.

Finally, plaintiffs argue that their delay is excused because for five months after the Rule was published, the "Missouri Attorney General's Office sought non-litigation remedies by participating in a negotiated rulemaking process to alter th[e] Final Rule." Resp. 75. The negotiated rulemaking to which plaintiffs refer, however, concerned an entirely different administrative action contemplating the exercise of a completely different statutory authority. *See* 88 Fed. Reg. at 43,069-70; *supra* p. 4. Participation

in such a rulemaking can hardly be characterized as a means "to alter" a rule that the Secretary had just signed.

## B. The balance of the equities and the public interest favor the government.

On the other side of the balance, the preliminary injunction imposes serious and irreparable harm on the Department and the public. The government's opening brief (at 52-53) laid out the extensive harms that an injunction would cause, particularly to borrowers enrolled in the SAVE plan. Plaintiffs fail to meaningfully address these serious harms and instead cast false aspersions on the Department. They thus fail to carry their burden of demonstrating "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs assert (Resp. 71) that the government suffers no harm from the enjoining of an "illegal agency action." But that wrongly collapses the equities into the merits. *See Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024); *see also Winter*, 555 U.S. at 32 (explaining that a preliminary injunction "does not follow from success on the merits as a matter of course").

Plaintiffs also incorrectly argue (Resp. 71) that an injunction will not "harm borrowers" because borrowers' "positions will remain the same." As

55

the government previously explained (Opening Br. 53-54), the district court's injunction operated to "disrupt, not preserve, the status quo." *Adventist Health*, 17 F.4th at 806. The interim relief ordered by the administrative panel exacerbated that problem. Prior to those orders, the Final Rule's protected-income, accrued-interest, and shortened-repayment-period provisions had taken effect, while forgiveness on various timelines determined by the Secretary has been an essential feature of ICR plans for decades. Nor are borrowers spared from harm because they were involuntarily placed into forbearance. Opening Br. 18. Use of this kind of forbearance causes widespread confusion and potential financial harm through the delay of forgiveness under both ICR and other authorities, such as PSLF. Resp. in Opp'n. to Mot. Inj. Pending Appeal 24-25; *see also* Fed. Student Aid, *SAVE Plan Court Actions: Impact on Borrowers,* https://studentaid.gov/announcements-events/save-court-actions (last visited Oct. 4, 2024). Thus, borrowers enrolled in SAVE now face a longer timeline to forgiveness, even if the Department prevails.

Plaintiffs' attempt (Resp. 71-72) to blame the Department for harm to the public interest falls flat. Their claim that one-third of borrowers "aren't making consistent payments in hopes [their] debt will be fully forgiven" is

56

based on an unscientific, online survey that is outside the record,[11] and makes little sense on its own terms. The SAVE plan requires, at minimum, a decade of payments before loans are forgiven. Non-payment leads to default. Equally off-base is plaintiffs' claim that the Final Rule "led to a $74 billion increase in the federal budget deficit." Resp. 72. The cited budget re-estimate relates to changed assumptions about other student-loan discharges, including PSLF.[12] And in any event, plaintiffs cite no authority for the startling proposition that a court properly considers the budgetary effects of a government action when deciding whether to enjoin its operation.

Plaintiffs accuse the Department of a rash of "inequitable conduct." Resp. 72-74. As an initial matter, "[t]he unclean hands doctrine bars a party that acted inequitably *from obtaining* equitable relief." *Safeway Transit LLC v. Discount Party Bus*, Inc., 954 F.3d 1171, 1181 (8th Cir. 2020) (emphases altered). Plaintiffs cite no authority for the very different

---

[11] Creditkarma, *One-in-five Borrowers have Made Zero Payments Toward Their Student Loans, as Many Hold Out for Loan Forgiveness* (Sept. 5, 2024), https://perma.cc/GX2K-MF7Q.

[12] Dep't of Educ., *Student Loans Overview: Fiscal Year 2025 Budget Proposal* 17, https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/t-sloverview.pdf.

proposition that a non-movant's inequitable conduct entitles the movant to an injunction.

In any event, as discussed above, *see supra* pp. 44-46, there is no merit to plaintiffs' assertion that the Department knowingly provided a false cost estimate. Any claim that the Department violated the Congressional Review Act by implementing parts of the Final Rule the same month that it was published was forfeited when plaintiffs failed to raise it in district court and would be unreviewable in any event. *See* 5 U.S.C. § 805 (providing that "[n]o determination, finding, action, or omission" under that Act "shall be subject to judicial review").

Nor are plaintiffs correct when they accuse the Department of "unlawfully . . . mixing and matching" old and new regulations to evade the district court's injunction. Resp. 73. As previously explained, after the district court enjoined the Department from applying the shortened-repayment-period provision, well-established severability principles dictated that the rest of the Final Rule was left undisturbed. The result was a REPAYE plan governed by the timeline in 34 C.F.R. § 685.209(k)(1)-(2), which carried forward from previous regulations the offer of forgiveness

58

after 20 or 25 years.[13]  When plaintiffs presented this same argument—that the injunction of the shortened-repayment-period provision prohibited any forgiveness under the SAVE plan on any timeline—to the district court in a motion for clarification, the court denied plaintiffs' motion.  App. 432; R. Doc. 54.  Plaintiffs cannot claim the government violated "the plain text of the injunction" when the district court that issued the injunction  concluded otherwise.  Resp. 73.

Finally, plaintiffs accuse the Department of inequitable conduct relating to a separate (and ongoing) rulemaking.  Plaintiffs' characterization of those events is inaccurate in many respects.  *See supra* pp. 4-6.  But more importantly, the validity of that rulemaking is being litigated in another action.  These accusations were not presented to the district court here and are therefore irrelevant to the question whether the district court properly granted preliminary relief.

---

[13] The shortened-repayment-period provision was codified at § 685.209(k)(3), which provided an exception to the general rule in (k)(1) and (2).

Appellate Case: 24-2332     Page: 71     Date Filed: 10/07/2024 Entry ID: 5443500

**IV. At a minimum, the preliminary injunction should be narrowed, not expanded.**

**A. The injunction is overbroad.**

**1.** The injunction entered by the district court is overbroad because it enjoined the shortened-repayment-period provision on a universal basis. Article III and traditional equitable principles, however, require a court to tailor its remedy "to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Accordingly, if any injunctive relief were warranted, the district court should have tailored relief to address harms to Missouri, the only plaintiff it held had standing. App. 361; R. Doc. 35, at 36. Instead, the district court entered a universal injunction prohibiting early forgiveness for millions of borrowers nationwide—the vast majority of whom have no connection to MOHELA. *See* App. 231; R. Doc. 22-2, at 2. That was error. *See Texas*, 599 U.S. at 703 (Gorsuch, J., concurring in the judgment) (if "party-specific relief can adequately protect the plaintiff's interests," then "an appellate court should not hesitate to hold that broader relief is an abuse of discretion").

Plaintiffs argue (Resp. 76) that universal relief is appropriate when necessary to provide complete relief to the plaintiff. But an injunction targeting only loans serviced by MOHELA would completely redress

60

Missouri's alleged injury. Plaintiffs' concern (Resp. 77) that the Department will attempt to evade a narrower injunction by "transferr[ing] accounts [to other servicers] before forgiving" loans is unfounded but could be adequately addressed by enjoining such transfers. Such an injunction would "provide complete relief to the plaintiffs," while being "no more burdensome to the defendant than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiffs are also wrong to assert (Resp. 77) that the Supreme Court has rejected the government's argument that relief should be tailored to Missouri. The Supreme Court denied emergency applications to vacate the nationwide injunctions in this case and in *Nebraska*. But it does not follow that the Supreme Court approved the challenged relief. *See, e.g., Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (in denying applicants' request for emergency relief, the Court "d[id] not purport to resolve definitively any jurisdictional or substantive claim in the applicants' lawsuit"). And it proves nothing that the Department stipulated that the rule at issue in *Nebraska* should be vacated *after* the Supreme Court's decision.

Finally, plaintiffs argue that preliminary relief need not be party-specific because "this is an APA case with available statutory remedies." Resp. 7. But as the district court here recognized, a court's "power under [5

61

U.S.C. § 705] to issue a stay on agency action is limited 'to the extent necessary to prevent irreparable injury'" to the parties before the court. App. 357; R. Doc. 35, at 32 (quoting 5 U.S.C. § 705); *see also Colorado v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (recognizing that the analysis for a § 705 stay mirrors that for a preliminary injunction). Plaintiffs have not come close to showing that a nationwide injunction—affecting millions of borrowers with no relationship whatsoever to MOHELA—is necessary to prevent irreparable harm to Missouri.

    **2.** The district court's injunction was also improper because it enjoined the President. As the government explained in its opening brief (at 58-59), federal courts generally lack jurisdiction "to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (courts "have never submitted the President to declaratory relief"). Plaintiffs' reliance on *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), is misplaced; the Ninth Circuit vacated the injunction in that case to the extent it ran against the President because, among other reasons, plaintiffs' injuries could be fully redressed by injunctive relief against the remaining defendants. The same is true here.

62

**B.    The injunction should not be broadened.**

Finally, plaintiffs' invitation to broaden the preliminary injunction should be declined.  The district court found that plaintiffs had "only alleged impending harm from the Final Rule's loan forgiveness provisions" and "ha[d] not stated a cognizable injury related to the other provisions of the SAVE program."  App. 383; R. Doc. 35, at 58.  After concluding that provisions of the Final Rule were severable, the district court limited its injunction "to only those provisions of the SAVE plan that permit loan forgiveness."  App. 385; R. Doc. 35, at 60.

The district court did not abuse its discretion when it declined to enjoin the other challenged provisions of the Final Rule.  As discussed, *see supra* pp. 13-16, plaintiffs have not shown that they are harmed at all by those provisions, much less irreparably so.  And a "preliminary injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs."  *Dakotans for Health*, 52 F.4th at 392 (quotation marks omitted).

Plaintiffs' only argument for enjoining the entire Final Rule is that it is necessary to prevent the Department from "exploit[ing] any partial injunction to continue unlawfully forgiving student loans" on preexisting timelines.  Resp. 78.  But plaintiffs have not explained how they could have

63

challenged regulatory provisions that have been in effect for years, or even decades. Nor have they addressed the profound inequity of disrupting the settled expectations of borrowers who have long been making payments toward forgiveness under those provisions. Plaintiffs note (Resp. 12) that the Final Rule includes provisions reflecting forgiveness under the original ICR and PAYE plans, as well as the prior version of REPAYE. But those provisions are not new; they simply recodify long-extant requirements. Even if the shortened timeline to forgiveness created by the Final Rule were properly enjoined, there would be no basis for enjoining forgiveness under these preexisting provisions.

64

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed, not expanded.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney*
    *General*

MICHAEL S. RAAB
THOMAS PULHAM

 *s/ Simon C. Brewer*
SIMON C. BREWER
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7529*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 616-5367*
  *Simon.C.Brewer@usdoj.gov*

October 2024

65

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(1)(A)(i) because it contains 12,978 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Simon C. Brewer*
Simon C. Brewer

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Simon C. Brewer*

Simon C. Brewer