## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF MISSOURI, *et al.*,

*Plaintiffs-Appellees, Cross-Appellants*,

v.

JOSEPH R. BIDEN, JR., in his official capacity as the President of the United States of America, *et al.*,

*Defendants-Appellants, Cross-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Missouri
The Honorable District Court Judge John A. Ross
Case No. 4:24-cv-520-JAR

# REPLY BRIEF OF MISSOURI AND
# ALL OTHER PLAINTIFFS-APPELLEES

ANDREW BAILEY
  *Attorney General of Missouri*
JOSHUA M. DIVINE
  *Solicitor General*
REED C. DEMPSEY
  *Deputy Solicitor General*
SAMUEL FREEDLUND
  *Deputy Solicitor General*
ATTORNEY GENERAL'S OFFICE
Post Office Box 899
Jefferson City, MO 65102
(573) 751-1800
josh.divine@ago.mo.gov

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................iii

**INTRODUCTION & SUMMARY OF THE ARGUMENT** ..................1

**ARGUMENT** ........................................................................3

I. Several of the Administrative Panel's Conclusions Are Law of the Case. ..................................................................3

II. The States Easily Have Standing. ...........................................4

    A. The States have standing under the exact theory the Supreme Court accepted last year. .........................4

        a. Defendants' "offsetting" benefits theory is factually wrong and legally irrelevant. ...............5

        b. Defendants' new argument that the Final Rule does not affect the lifespan of accounts fails. .......................................................7

        c. Defendants cannot insulate the rule simply because some forgiveness timelines existed in previous rules. ................................10

    B. The Final Rule deprives MOHELA of interest revenue. .......................................................12

    C. The Final Rule harms North Dakota. .........................15

III. The States Are Likely to Succeed on the Merits. .................17

    A. The Final Rule violates the major questions doctrine. .......................................................17

        a. The Final Rule is of vast economic and political significance. ...........................................17

        b. The Final Rule is transformative. .......................19

Appellate Case: 24-2332    Page: 2    Date Filed: 10/17/2024 Entry ID: 5447418

  c.  Defendants cannot identify "exceedingly clear language" authorizing forgiveness. ...........21

 B. The Final Rule exceeds statutory authority................22

 C. The Final Rule is arbitrary and capricious because it deliberately underestimates cost by $300 billion. ...................................................................25

IV. Plaintiffs Face Irreparable Harm, and the Equities Strongly Favor the States. ...................................................28

V. The Scope of the Injunction Pending Appeal Is Appropriate. ........................................................................33

**CONCLUSION**................................................................................**34**

**CERTIFICATE OF COMPLIANCE**....................................................**37**

**CERTIFICATE OF SERVICE** .............................................................**38**

Appellate Case: 24-2332  Page: 3  Date Filed: 10/17/2024 Entry ID: 5447418

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Alabama Ass'n of Realtors v. Dep't of Health and Hum. Servs.*,
   594 U.S. 758 (2021) ................................................................. 18

*Biden v. Nebraska*,
   143 S. Ct. 477 (Dec. 1, 2022) ............................................... 26

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) .................................... 2, 5, 6, 7, 17, 18, 23, 25, 26

*California v. Texas*,
   593 U.S. 659 (2021) ................................................................. 13

*Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024) ................................................. 11

*Citizens State Bank of Marshfield, Mo. v. Fed. Deposit Ins. Corp.*,
   718 F.2d 1440 (8th Cir. 1983) ............................................... 26

*City of Chicago v. Atchison, T. & S. F. Ry. Co.*,
   357 U.S. 77 (1958) ................................................................... 17

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ................................................. 29

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................. 13

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................. 27

*Kansas v. Biden*,
   No. 24-1057-DDC-ADM, 2024 WL 2880404 (D. Kan., June 7, 2024)
   ...................................................................................... 12, 13, 16

*Kuduk v. BNSF Ry. Co.*,
   768 F.3d 786 (8th Cir. 2014) ................................................. 23

iii

*Louisiana ex rel. Louisiana Dep't of Wildlife and Fisheries v. Nat'l
    Oceanic & Atmospheric Admin.*,
    70 F.4th 872 (5th Cir. 2023) ................................................................7

*Maxfield v. Cintas Corp., No. 2*,
    487 F.3d 1132 (8th Cir. 2007) ...........................................................4

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024) .............................................. 2, 10, 19

*Missouri v. U.S. Dep't. of Educ.*,
    No. 4:24-CV-01316-MTS, 2024 WL 4426370 (E.D. Mo. Oct. 3, 2024) ..4

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ...................................................................5, 14

*Nat. Res. Def. Council v. Perry*,
    940 F.3d 1072 (9th Cir. 2018) .........................................................26

*NCAA v. Gov. of N.J.*,
    730 F.3d 208 (3d Cir. 2013) ............................................................12

*Ng v. Bd. of Regents of Univ. of Minnesota*,
    64 F.4th 992 (8th Cir. 2023) ...........................................................30

*Nyffeler Constr., Inc. v. Sec'y of Lab.*,
    760 F.3d 837 (8th Cir. 2014) .............................................................3

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) .....................................................................31

*P.A.M. News Corp. v. Hardin*,
    440 F.2d 255 (D.C. Cir. 1971) .........................................................15

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ..........................................................................26

*Sierra Club v. U.S. Army Corps of Eng's*,
    645 F.3d 978 (8th Cir. 2011) ...........................................................31

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................9

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015)............................................................7

*United States v. Pirani,*
    406 F.3d 543 (8th Cir. 2005)..........................................................28

*United States* v. *United Foods, Inc.,*
    533 U.S. 405 (2001)....................................................................21

*Van Buren v. United States,*
    593 U.S. 374 (2021)....................................................................22

*West Virginia v. EPA,*
    597 U.S. 697 (2022)....................................................................21

## Statutes

5 U.S.C. § 706....................................................................................34

20 U.S.C. § 1078(b)(9)(A)...................................................................6

20 U.S.C. § 1087e.......................................................................16, 23

20 U.S.C. § 1089(c)(1).....................................................................29

20 U.S.C. § 1098e.......................................................................19, 23

## Other Authorities

Executive Order 12,866.....................................................................27

Wright & Miller, 13A Federal Practice & Procedure § 3531.4 (3d ed.)
........................................................................................6, 13

Appellate Case: 24-2332    Page: 6    Date Filed: 10/17/2024    Entry ID: 5447418

## INTRODUCTION & SUMMARY OF THE ARGUMENT

Two weeks ago, on October 3, the Eastern District of Missouri entered *another* injunction against Defendants—for their *third* unlawful attempt to mass cancel loans. This newest injunction highlights the Federal Government's relentless attempt to initiate a wealth transfer of over $1 trillion without any statutory basis. So weak is the President's newest statutory argument that *he himself* disclaimed it three years ago—as did the Department of Education. Indeed, in their opposition to the preliminary injunction motion, Defendants raised only procedural defenses; they did not even press substantive statutory arguments.

While Defendants here do offer a statutory defense of their Second Mass Cancellation attempt, it is no stronger. Start first with their inability to identify a limiting principle. In the district court, Defendants did not deny that their boundless assertion of authority would enable them to forgive every penny of every federal loan. Now, they at least deny it in a single sentence, but do not explain why.

They do not because they cannot. Defendants assert unbounded discretion to set payment thresholds and to forgive loans after as few as 10 years of (often $0) "payments." And they have elected to exercise that

1

power to forgive all balances for 57% of borrowers and partial balances for up to 98% of borrowers. They have identified no reason they could not do the same for 100% of borrowers. That boundless assertion of authority is as "staggering" as it was the first time. *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

That difficulty on the merits explains Defendants' insistence on pressing a standing argument repeatedly rejected. Despite *Biden v. Nebraska*, Defendants insist Missouri experiences no harm from forgiveness on a 20- or 25-year timeline. But as both the Supreme Court and this Court have held, *any* forgiveness harms Missouri because accounts would continue (as would MOHELA's revenue) if balances were not forgiven. True, the States did not previously challenge earlier ICR plans (which purported to authorize 20/25-year forgiveness), but the Final Rule guts the previous limitations on eligibility. Missouri was *always* harmed by unlawful forgiveness in earlier rules, but did not sue because the harm was comparatively minor. When Defendants greatly expanded eligibility for forgiveness, that worsened harm by "an order of magnitude broader than anything that has come before." *Missouri v. Biden*, 112 F.4th 531, 534 (8th Cir. 2024). So the States sued.

Appellate Case: 24-2332    Page: 8    Date Filed: 10/17/2024 Entry ID: 5447418

On the merits, Defendants abandon their original argument that the "not to exceed 25 years" language is enough to infer authority to forgive. Their new defense is no better, however, because they still rely on an inference—this time from two provisions, not one. The major questions doctrine requires that authority be express, not implicit. And the combination of those provisions is still insufficient, which is why even though the IBR program contains those same provisions, it also includes express forgiveness authority.

## ARGUMENT

### I. Several of the Administrative Panel's Conclusions Are Law of the Case.

While Defendants cite (at 23)[1] the "general rule" that administrative panel rulings "do not establish law of the case," they do not dispute that this Court's precedents recognize an exception where an administrative panel issued its decision with "sufficient directness and clarity" to show that the panel "actually decided the specific" issue. *Nyffeler Constr., Inc. v. Sec'y of Lab.*, 760 F.3d 837, 842 (8th Cir. 2014). Defendants instead try to evade this doctrine by noting that the issue

---

[1] All page numbers refer to the numbers in the docket stamp.

Appellate Case: 24-2332     Page: 9     Date Filed: 10/17/2024 Entry ID: 5447418

often arises for motions to dismiss. But Defendants identify no case limiting the rule to that context. So for the reasons the States already explained (at 39–41), many of the administrative panel's determinations are law of the case.

Recognizing this problem, Defendants invoke the exception to the law-of-the-case doctrine, noting that a decision from a panel is not binding if it was "clearly erroneous and works manifest injustice.'" Resp./Reply Br. 25 (quoting *Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1135 (8th Cir. 2007)). But as explained below, none of the panel's conclusions was "erroneous," much less "clearly" so.

## II. The States Easily Have Standing.

### A. The States have standing under the exact theory the Supreme Court accepted last year.

Every court to hear the question—including the Eastern District of Missouri two weeks ago—has rejected Defendants' argument that MOHELA's losing servicing fees is insufficient for standing. *E.g.*, *Missouri v. U.S. Dep't. of Educ.*, No. 4:24-CV-01316-MTS, 2024 WL 4426370 (E.D. Mo. Oct. 3, 2024). Indeed, while Defendants press that argument here, the U.S. Solicitor General last year "concede[d]" the issue

4

and focused instead on whether Missouri could sue on behalf of MOHELA. *Biden v. Nebraska*, 143 S. Ct. at 2366.

The U.S. Solicitor General was right to concede that issue. Defendants' assertion that MOHELA somehow *benefits* from the rule is legally irrelevant and factually incorrect (as the district court already found). So too is Defendants' newfound argument that the Final Rule's provisions do not affect the lifespan of accounts.

### a. Defendants' "offsetting" benefits theory is factually wrong and legally irrelevant.

Defendants re-raise their offsetting-benefits theory (at 29–30)—which the district court factually rejected, App.363, R.Doc.35 at 38. But they do not come close to identifying benefits that offset. They assert that the $285 million harm the States identify (each year) is an overestimate, but they do not dispute that they have identified purported "benefits" that amount to just 3% of that figure. So even if the States' estimate were way off, the benefits still would not offset. The States have easily satisfied their lighter burden at the preliminary-injunction stage of showing they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).

5

That is especially true because Defendants refuse to provide their own estimate of harm. Last year when Defendants failed to identify an estimate, the Supreme Court relied on "Missouri's estimate." *Biden v. Nebraska*, 143 S. Ct. at 2366. Defendants cannot, faced with an estimate up to $285 million per year, defeat standing simply by speculating that the actual harm is lower. A prima facie case cannot be defeated by rank speculation.

Similarly, Defendants (at 29) fault the States for not identifying "how many accounts might be closed." But Defendants themselves admitted that *every* borrower holding only undergraduate loans would receive forgiveness between 10 and 20 years—5 years shorter than the 25-year length of the ICR plan, the extended repayment plan, and the extended graduated repayment plan. *E.g.*, 20 U.S.C. § 1078(b)(9)(A). Borrowers with only undergraduate debt are 79% of all borrowers. 88 Fed. Reg. 43,869.

In any event, Defendants' argument is legally irrelevant. Defendants make little effort to contend with the settled rule that "no attempt is made to ask whether the injury is outweighed by benefits." Wright & Miller, 13A Federal Practice & Procedure § 3531.4 (3d ed.).

6

Defendants argue (at 30) that "costs and benefits are appropriately considered jointly." But the case on which they rely involved an agency that agreed to "provide commensurate funding to" the plaintiff to offset costs. *Louisiana ex rel. Louisiana Dep't of Wildlife and Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882–84 (5th Cir. 2023). Here, in contrast, Defendants have not agreed to fully compensate Missouri for its losses. As Fifth Circuit case law, affirmed by the Supreme Court, dictates: offsetting benefits may be considered only when they are a "direct result" of the agency action. *E.g.*, *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015), *aff'd by an equally divided court,* 579 U.S. 547 (2016); *see id.* ("The one case in which we concluded that the costs of a challenged program were offset by the benefits involved a much tighter nexus."). There is no direct offset here.

### b. Defendants' new argument that the Final Rule does not affect the lifespan of accounts fails.

Defendants raise a new argument (at 25) that the Final Rule will not affect the lifespan of accounts. Nonsense. Every account forgiven under the Final Rule *necessarily* is closed early and deprives MOHELA of monthly per-borrower fees. *Biden v. Nebraska*, 143 S. Ct. at 2366. Indeed, in the same breath that they assert this argument, Defendants

7

concede it is wrong.  Resp./Reply Br. 27 (certain provisions in the Final Rule "might in some circumstances affect the number of months that MOHELA services an account").  Defendants' argument fails for many reasons.

**1.** Start first with the 79% of borrowers who have only undergraduate loans.  88 Fed. Reg. 43,869.  Defendants admit that *every* one of these borrowers could receive forgiveness 10 to 20 years under the Final Rule.  *Id.* at 43,891.  But the ICR plan length is 25 years.  MOHELA will lose at least 60 months of servicing fees for each account.

**2.** Defendants are likewise wrong for accounts the Final Rule would forgive at 25 years.  Defendants' fundamental error here is assuming (at 27) that only two things occur at 25 years—"full repayment or forgiveness."  In fact, several other circumstances are possible that would extend the time MOHELA services an account.

First, MOHELA may continue receiving servicing fees when a borrower is late on payments.  Defendants' own declarant acknowledges that although servicing fees decrease, MOHELA continues receiving fees throughout any period of delinquency.  App.232–33, R.Doc.22-2 at 3–4.

8

An account that is neither forgiven nor fully repaid at 25 years is delinquent, and MOHELA continues receiving fees.

Second, as Defendants expressly advertise, a borrower who fails to repay after 25 years can get out of delinquency or default by refinancing. *Don't Get Discouraged If You're in Default on Your Federal Student Loan*, Federal Student Aid (last accessed Oct. 14, 2024).[2] Because consolidating or refinancing an account creates a new account, this choice can extend the length of a MOHELA account by many years.

**3.** These facts help illustrate why provisions that might not *immediately* close accounts still hasten their end. For example, the interest-accrual provision in the Final Rule unlawfully subsidizes and forgives interest each month, slashing the balance of each loan. Smaller balances lead to borrowers paying off loans earlier. Defendants are thus wrong to say that forgiveness confers standing only if it immediately closes accounts. Rather, any provision that creates a "substantial risk" of reduced administrative fees confers standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). That includes unlawful actions that reduce (without eliminating) balances.

---

[2] https://studentaid.gov/manage-loans/default/get-out#loan-consolidation

### c. Defendants cannot insulate the rule simply because some forgiveness timelines existed in previous rules.

In a further attempt to insulate the Final Rule from review, Defendants assert (at 19, 26–27) that forgiveness would be no quicker than before, so MOHELA is not "harmed when the Department forgives loans under the 20- and 25- year timelines." This is wrong twice over: the rule increases eligibility for forgiveness on those timelines, and those timelines always harmed MOHELA.

First, the Final Rule expands eligibility by "an order of magnitude broader than anything that has come before." *Missouri v. Biden*, 112 F.4th at 534. Defendants have acknowledged that "[i]t is true" that "they are trying to forgive loans between 20 and 25 years for borrowers who were never in any previous ICR program." App.422, R.Doc.52 at 12. They cannot rely on the "preexisting" timelines when they elsewhere admit that millions of borrowers eligible for forgiveness under the Final Rule were never eligible on so-called "preexisting" timelines.

Second, the previous timelines are the wrong reference point because forgiveness under those timelines always harmed MOHELA; Missouri simply did not sue because those "plans were relatively uncontroversial as they were limited in scope." *Missouri v. Biden*, 112

10

F.4th at 534. Missouri's decision not to challenge now-defunct ICR rules years ago does not "greenlight the aggregation of Executive power 'through adverse possession.'" *Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024) (citation omitted). In determining whether MOHELA is "likely" harmed by the Final Rule, the correct reference point is not previous rulemakings, but borrowers on an ICR plan that complies with the law (meaning no forgiveness). As explained above, those accounts last up to 25 years plus any period of delinquency or consolidation.

In a final effort, Defendants several times suggest that the States challenged only certain portions of the Final Rule. But as already explained (at 25–26), the States challenged the entire Final Rule. *E.g.*, App.69, R.Doc.1 at 60 (requesting a "judgment declaring that the Final Rule violates the APA" and requesting an order to "vacate and set aside the Final Rule"). The States' briefing mostly focuses on unlawful forgiveness, but that is unsurprising because that is the cornerstone of the Final Rule. Without authority *to* forgive, all eligibility provisions *for* forgiveness—*e.g.*, payment provisions, "family size" provisions, bankruptcy and unemployment forgiveness deferments—must fall.

## B. The Final Rule deprives MOHELA of interest revenue.

The district court in the Kansas case found that States had standing because the Final Rule leads to borrowers consolidating their State-owned (but federally backed) FFEL loans into federal-owned loans, depriving the States of future interest revenue: "(1) borrowers are likely to consolidate their FFEL loans into direct loans because of the SAVE Plan and (2) when borrowers consolidate, it will cause the public instrumentality to lose interest revenue." *Kansas v. Biden*, No. 24-1057-DDC-ADM, 2024 WL 2880404, at *11 (D. Kan., June 7, 2024). So too here. Neither of Defendants' arguments carries water.

First, Defendants again commit the "offsetting benefits" fallacy. Citing a bankruptcy case that affirmed setting an interest rate over a 20-year repayment plan, Defendants assume (at 33) that the present value of money will exceed the loss of future interest revenue because MOHELA might invest in other vehicles with higher returns. But a court's "standing analysis is not an accounting exercise." *NCAA v. Gov. of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013), *abrogated on other grounds*, 584 U.S. 453 (2018). Analysis appropriate for calculating damages or bankruptcy credits is inappropriate for standing, where "no attempt is

12

made to ask whether the injury is outweighed by benefits." Wright & Miller, § 3531.4.

Defendants also commit the same flaw as in *Kansas*. After the States proffered evidence that Alaska would lose future interest revenue, the district court faulted Defendants for having "proffered no evidence of their own." *Kansas v. Biden*, 2024 WL 2880404, at *11. Here, the States have explained to Defendants why MOHELA's indentures of trust prohibit MOHELA from accessing investment opportunities that could offset loss of future interest revenue. Supp.App.096–097; R.Doc.26 at 23–24 n.11. As in *Kansas*, Defendants have "proffered no evidence of their own" to dispute that.

Second, Defendants assert that the States cannot sue because consolidations depend on the actions of third parties. Binding precedent rejects that argument. States may sue where government action has a "predictable effect . . . on the decisions of third parties," *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019), such as where a rule will lead FFEL borrowers "to enroll in valuable benefits programs that they would otherwise forgo," *California v. Texas*, 593 U.S. 659, 678 (2021).

13

Here, the record establishes that each time Defendants offer a mass forgiveness scheme and encourage FFEL borrowers to consolidate, consolidations spike. App.312–14; R.Doc.26-1 at 19–21. Borrowers predictably consolidate in response to the Final Rule. That is sufficient for standing. Indeed, Defendants admit (at 34) that enrolling in SAVE "to obtain ICR-based loan forgiveness" is a reason FFEL borrowers consolidate.

True, borrowers may repay their accounts early. But that was true also in *Biden v. Nebraska*, where the Supreme Court found standing even though borrowers could take independent action to eliminate their own accounts through prepayment. Defendants would have this Court hold that a government can destroy an entire lending industry by forcing taxpayers to bail out every borrower, and nobody in the industry would have standing to sue. That cannot be right.

In a last-ditch effort, Defendants try (at 35) to raise the standard to require States to provide definitive proof. That is much more than required. Just this year, the Supreme Court held that at the preliminary-injunction stage a plaintiff need only show they are "'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986.

14

### C. The Final Rule harms North Dakota.

As explained in the opening brief (at 53–55), North Dakota has established through an affidavit from the President of the Bank of North Dakota that it will lose at least $19 million over the next 15 years because of the Final Rule. And because the Bank is an instrumentality of the State, that harm to the Bank is a harm to the State. North Dakota thus has standing.

On this point, Defendants abandon nearly all arguments they pressed in the district court: that the competitor-standing doctrine does not apply to the government at all, *see P.A.M. News Corp. v. Hardin*, 440 F.2d 255, 256–57 (D.C. Cir. 1971) (rejecting that argument); and that the Bank is not an instrumentality of the State. Their new arguments are no better.

First, they argue (at 38) that "a 'bare assertion of competition' is insufficient." The States do not offer a "bare assertion," but an affidavit from the President/CEO of the Bank attesting that "approximately 16,000 student loan borrowers have consolidated federal student loans with the Bank of North Dakota." App.320; R.Doc.26-2 ¶ 8. The Final Rule will "strongly disincentivize[ ]" borrowers from refinancing. *Id.* ¶ 9.

As in *Kansas*, the States offered specific evidence while Defendants "proffered no evidence of their own." *Kansas*, 2024 WL 2880404, at *11.

Second, having dropped their argument that the competitor-standing doctrine never applies to the government, Defendants now assert (at 36) that the Federal Government is not engaged in competition at all because "[t]he terms of those loans are not driven by market forces." Not so. Federal loans are statutorily indexed to market prices, specifically "the high yield of the 10-year Treasury note auctioned at the final auction held prior to such June 1" each year. 20 U.S.C. § 1087e(b)(8). They also say there is no competition because the Bank encourages individuals to take out federal loans. That ignores that the Bank competes with the Federal Government on the *back* end, offering to refinance loans at rates cheaper than what the Federal Government offers. App.320; R.Doc.26-2 ¶¶ 7–9.[3]

Moreover, Defendants' parade of horribles (at 38–39) about National Parks and the Army does not march because it "confuses the

---

[3] Defendants' statement (at 39) that an injunction should be limited to the Bank's harm makes no difference to the scope of the injunction. Because the Bank provides consolidation services to individuals who have federal loans, *every* federal loan holder is a potential customer of the Bank. The injunction cannot be narrowed more than it currently is.

16

merits of the controversy with the standing of [parties] to litigate them." *City of Chicago v. Atchison, T. & S. F. Ry. Co.*, 357 U.S. 77, 83 (1958). Even *if* individuals had standing in the circumstances Defendants cite, frivolous claims would simply be rejected under Rule 12(b)(6) on the merits (perhaps with sanctions) rather than under Rule 12(b)(1). For example, because loan forgiveness always harms MOHELA, Missouri certainly has *standing* to challenge forgiveness under the Public Service Loan Forgiveness program, but that challenge would readily fail on the merits.

## III. The States Are Likely to Succeed on the Merits.

### A. The Final Rule violates the major questions doctrine.

The Final Rule violates the major questions doctrine because the rule is of vast economic and political significance and Defendants rely on inference and implication to forgive, not express authority.

#### a. The Final Rule is of vast economic and political significance.

Contrary to Defendants' assertion (at 51), the States do not rely on "cost alone" to trigger the major questions doctrine. The States note that any rule of "vast economic *and* political significance" triggers the doctrine. In *Biden v. Nebraska,* the Supreme Court found the question

17

of mass student loan cancellations of "staggering" "political significance." *Biden v. Nebraska*, 143 S. Ct. at 2373. Defendants offer no explanation why this Plan B, which seeks *greater* loan cancellation, is less politically significant.

Nor can they dispute the astronomical cost. Even their deliberately false estimate is three times as high as the $50 billion that triggered the doctrine in *Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758, 764 (2021). And Penn Wharton's model—which the Supreme Court credited last year—found the plan would cost nearly $500 billion every ten years. Defendants dispute this number for the first time but do not dispute that their own cost estimate is false, and they offer no updated analysis. For example, Defendants argue that the States cannot support their estimate that the cost of the 10-to-19-year provision is "likely 20 to 30 times" above the $4 billion that the Final Rule estimates, but they also do not reject the number as false. In fact, the cost of forgiveness under the 10-to-19-year provision surpassed $4.8 billion between just February 23 and April 12, 2024—in less than two months, not ten years—before the Final Rule even went into full effect, when only a fraction of eligible borrowers had already signed up for the

18

plan.[4]  Even at that rate, the cost of that provision exceeds $300 billion across ten years.

### b. The Final Rule is transformative.

A rule need not also be transformative to trigger the doctrine; that is simply a plus factor.  In any event, Defendants are wrong (at 52–55) to dispute this Court's determination that the Final Rule "is an order of magnitude broader than anything that has come before." *Missouri v. Biden*, 112 F.4th at 534.

**1.** Contrary to Defendants' insistence (at 53), the income threshold and payment percentage provisions are not "similar in proportion" to former plans.  As explained in the opening brief (at 17), a median-income borrower on the original ICR plan paid back $9,000 each year.  While the next two ICR plans lowered repayment amounts, those changes were tethered to the IBR program, which applied only to persons with "partial financial hardship."  20 U.S.C. § 1098e(a)(3).  The Final Rule is *untethered* and creates forgiveness eligibility for nearly all borrowers,

---

[4] https://www.ed.gov/about/news/press-release/biden-harris-administration-releases-state-state-breakdown-of-12-billion; https://www.ed.gov/about/news/press-release/biden-harris-administration-announces-additional-74-billion-approved

Appellate Case: 24-2332     Page: 25     Date Filed: 10/17/2024 Entry ID: 5447418

making the ICR program more generous for *rich* borrowers than the IBR program is for borrowers who are poor.

**2**. Defendants cannot run from the estimates they published in the Rule, which show that the "average" undergraduate borrower will pay back only 61 cents on the dollar. 88 Fed. Reg. 43,823, −80. Under the earlier REPAYE plan, the average undergraduate borrower repaid $1.09 for every dollar borrowed, slightly less than borrowers on the standard 10-year plan. 88 Fed. Reg. 43,881–82. Moreover, the average graduate borrower under REPAYE paid back *more* than under the standard plan. *Id.*

By making nearly every borrower eligible for forgiveness, the Final Rule converts a loan program into a grant program, offering an average $.39 rebate for every dollar borrowed. That benefit is staggering when compared to the centerpiece Pell Grant program, which costs $27 billion each year,[5] *half* of what SAVE costs. The States do not dispute that other programs like IBR and PSLF also in effect convert loans into grants, but that is through express statutory forgiveness authority.

---

[5] https://crsreports.congress.gov/product/pdf/R/R45418 at 26.

Appellate Case: 24-2332     Page: 26     Date Filed: 10/17/2024 Entry ID: 5447418

**3**. No better is Defendants' attempt to evade the transformative nature of the rule by arguing (at 55) that each provision must be assessed separately. Binding precedent says otherwise. *West Virginia v. EPA* requires assessing the full "breadth of the authority that the agency has asserted," 597 U.S. 697, 721 (2022) (brackets omitted), which tracks what the Supreme Court has "stressed" for decades: "the entire regulatory program must be considered in resolving the case," *United States* v. *United Foods, Inc.*, 533 U.S. 405, 412 (2001). Where, as here, Defendants assert an interpretation permitting them to cancel every penny of every loan, it is that interpretation that must be assessed.

### c. Defendants cannot identify "exceedingly clear language" authorizing forgiveness.

Defendants change the argument they pressed to the district court, but their new argument suffers the same flaws. They argued below that they can infer forgiveness authority from the language stating that ICR plans are "not to exceed 25 years" in length. Supp.App.43; R.Doc.22 at 43. Now, they draw this inference from the combination of that language plus language stating that payments may vary based on income. The problem remains: Defendants are still relying on an inference, but the major questions doctrine requires that forgiveness authority be express.

Appellate Case: 24-2332     Page: 27     Date Filed: 10/17/2024 Entry ID: 5447418

Defendants' argument also runs into an obvious surplusage problem. They note (at 41) that the ICR program "establishes two principles": a cap on length of repayment plans, and a statement that repayment amounts may be based on income. But the same two principles apply to the IBR program, yet Congress included express forgiveness authority there. Defendants cannot rely on implication when Congress expressly rejected implied forgiveness authority in the parallel IBR program.

## B. The Final Rule exceeds statutory authority.

As the States already explained (at 62–70), Defendants' insistence that they can give forgiveness to nearly every borrower conflicts with the text of the Higher Education Act. Their arguments to the contrary are rife with problems.

**1.** Most fundamentally, Defendants identify no limiting principle. They have no way of defending the Final Rule while precluding authority to forgive every penny of every loan. As the States explained (at 72–73), the Final Rule provides a full grant to 57% of borrowers, and a partial grant to 98% of borrowers. Defendants cannot explain why they can forgive all loans for 57% of borrowers but not 100%. Their inability to

22

identify a limiting principle "underscores the implausibility of the Government's interpretation." *Van Buren v. United States*, 593 U.S. 374, 394 (2021).

**2.** On the text, Defendants' newest theory fails. They now assert (at 41) that the ICR statute rests on "two principles": 1) repayment "based on the income of the borrower"; and 2) a payment period "not to exceed 25 years." But they neglect the third principle: 3) "repayment" is required, including "principal and interest," and the "balance due" from ICR borrowers "shall equal the unpaid principal amount of the loan, any accrued interest, and any fees." § 1087e(d)(1)(D), (e)(5). Defendants insist otherwise, stating (at 20) that payment amounts should be based *only* on income, not also on debt level. But it is hardly unusual in the law for something to be based on multiple factors. *E.g.*, *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (employment decision unlawful if improper motive was a "contributing factor" of the decision even if not the only factor). And Defendants' interpretation makes no sense of the text, which the Supreme Court held permits forgiveness "only in a few particular exigent circumstances." *Biden v. Nebraska*, 143 S. Ct. at 2369.

23

**3**. Defendants rely (at 43–44) on the 2007 amendments to the Act but those amendments created *express* forgiveness authority in the IBR program and said borrowers on ICR can obtain forgiveness by *switching* to IBR. 20 U.S.C. § 1098e(b)(7)(A), (b)(7)(B)(iv) (forgiveness for borrowers who switch to IBR after having "made payments under an income-contingent repayment plan"). There is no rationale for an explicit pathway to switch from ICR to IBR for forgiveness if ICR already authorizes forgiveness.

**4.** Finally, Defendants (at 50) accuse the States of trying "to expand the scope of their litigation" by challenging provisions that increase forgiveness eligibility. But the States have continuously challenged the entire rule. *E.g.*, App.69, R.Doc.1 at 60 (asking court to "vacate and set aside the Final Rule"). And contrary to Defendants' assertion (at 50), Plaintiffs do challenge the district court's severability analysis. The district court erred because the Final Rule never says that its provisions are severable if the underlying cornerstone of the plan—forgiveness—is removed from the edifice.

24

\*     \*     \*

At the very least, the canon of constitutional avoidance favors Plaintiffs. An interpretation giving Defendants unbounded authority to cancel every penny of every loan would violate the nondelegation doctrine by giving the Secretary unbounded authority without an intelligible principle and would violate the Appropriations Clause by giving the Secretary perpetual authority to appropriate hundreds of billions of dollars.

### C. The Final Rule is arbitrary and capricious because it deliberately underestimates cost by $300 billion.

Defendants cannot justify their knowingly false cost estimate, so they try to deflect by offering a self-serving timeline, insisting their actions are unreviewable, and arguing their deliberate falsehood was harmless. Each argument fails.

**1**. To evade the point that the rule was published with knowingly false cost estimates, Defendants argue (at 57) that the rule was in fact sent to the Federal Register on June 14, 2023, two weeks before *Biden v. Nebraska*. This argument has three glaring weaknesses.

One, Defendants offer no explanation why the Secretary said he was finalizing the Final Rule on June 30, minutes *after* the Supreme

25

Court's ruling. That contemporaneous agency assertion binds Defendants. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). This Court must reject "appellate counsel's post hoc rationalizations for agency action." *Citizens State Bank of Marshfield, Mo. v. Fed. Deposit Ins. Corp.*, 718 F.2d 1440, 1445–46 (8th Cir. 1983). Moreover, regardless of when Defendants transmitted the rule to the Federal Register, the only reasonable action after *Biden v. Nebraska* was to amend the estimates because the rule was not yet published. Defendants admit (at 58) they could have done so. Not doing so was unreasonable. *See Nat. Res. Def. Council v. Perry*, 940 F.3d 1072, 1077 (9th Cir. 2018) ("[O]rdinarily, agencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval.").

Two, even before the Supreme Court issued its decision, it was unreasonable for Defendants to assume they would prevail. Indeed, they were on notice they were likely to lose. Even before Defendants proposed this rule, this Court had enjoined the First Mass Cancellation rule and the Supreme Court had rejected Defendants' request to vacate or narrow that injunction. *Biden v. Nebraska*, 143 S. Ct. 477 (Dec. 1, 2022). So

26

Defendants' assertion that they sent the rule to the Federal Register on June 14 simply suggests they were attempting to rush the rule so they would not have to update their false cost estimate. That itself is unreasonable.

Finally, Defendants are so focused on whether the Department had to offer a cost estimate that they ignore their *Prometheus* problem. To be clear, the States seek to enforce not Executive Order 12,866, but the APA. Once Defendants undertook an accounting of costs, they had to do so in a "reasonable and reasonably explained" way. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Deliberately false estimates are the opposite.

**2.** Defendants cannot avoid all this by asserting (at 58) that "the Department did not rely on the cost estimate in establishing the contours of the Final Rule." Nonsense. The Department explicitly relied on the estimate in promulgating the rule. *See* 88 Fed. Reg. 43,839 (determining income threshold); -846 (determining payment cap); -848 (same); -856–57 (determining forgiveness timelines). There was no way of knowing whether the Final Rule provided adequate debt relief unless Defendants knew the costs. And Defendants contend throughout the Final Rule that

27

the contours of various provisions were determined based on perceived costs and benefits. *Id.*

**3.** Nor were the false estimates harmless. "[T]he government has the burden of proving harmless error." *United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (en banc). Defendants have not done so here. The knowingly false estimate—by hundreds of billions of dollars— predictably misled the public about the costs and deprived Congress of information it needed to assess whether to use its authority under the Congressional Review Act to block the rule, relieving the States from the harm. The Congressional Review Act vote passed the House and failed in the Senate by a *single* vote.

## IV. Plaintiffs Face Irreparable Harm, and the Equities Strongly Favor the States.

Defendants have not established that the purported harms to the Department and public outweigh injuries to the States. Instead, Defendants present a theory that would require this Court to ignore irreparable harms in favor of Defendants' self-inflicted, alleged injuries.

Appellate Case: 24-2332     Page: 34     Date Filed: 10/17/2024 Entry ID: 5447418

### A. The States established irreparable harm.

On irreparable harm, Defendants largely repeat their standing arguments, which should be rejected for the reasons above. In particular, three errors stand out.

**1.** Defendants request that the Court assess each provision of the Final Rule separately. But where parts of the Rule are deemed unlawful, "[t]he default rule is that vacatur is the appropriate remedy." *E.g.*, *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Defendants elected to promulgate an umbrella rule; they are responsible for the litigation risk from that decision.

**2.** Defendants (at 64) falsely brand the 20/25-year forgiveness provisions as "continued application" of a "longstanding process." Not so. When Defendants blew open the doors on forgiveness eligibility, millions of accounts became newly eligible for forgiveness. Indeed, Defendants have admitted that millions of borrowers have enrolled in the SAVE plan who were never previously on an ICR plan. App.422, R.Doc.52 at 12.

**3.** The States did not unreasonably delay. A Final Rule published before November 1 cannot be implemented until July 1 the following year. 20 U.S.C. § 1089(c)(1). Here, the Final Rule could be implemented

29

only on July 1, 2024, or later. Yet in February 2024, Defendants violated that waiting provision, announcing they had already started forgiving loans. The States sued just over a month later—and just days after obtaining the MOHELA consolidation data needed for one of the theories of standing. The States' decision to seek only prospective relief falls squarely within this Court's holding that "delay is only significant if the harm has occurred and the parties cannot be returned to the status quo." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 998 (8th Cir. 2023).

**4.** Finally, Defendants try to discount Missouri's attempt to pursue non-litigation remedies by asserting (at 66) that the Third Mass Cancellation attempt is a different rule relying on a different part of the Higher Education Act. But Missouri participated in negotiations *before* that third rule was proposed, when it was still embryonic. And Defendants themselves describe the third rule as "part of a comprehensive effort to address the burden of Federal student loan debt." 89 Fed. Reg. 27,564–65. It was not unreasonable to believe that changes made by a "comprehensive" third rule might rectify problems with the second rule.

## B. The balance of equities strongly favors the States.

**1.** Defendants suggest (at 67) that the States' argument "wrongly collapses the equities into the merits." But just last term the Supreme Court declared that, when States challenge federal regulations, often "the harms and equities will be very weighty on both sides," meaning resolution of a preliminary injunction "ultimately turns on the merits." *Ohio v. EPA*, 144 S. Ct. 2040, 2052–53 (2024) (brackets adopted).

**2.** Defendants seek to impose the very disruption of which they complain. If the spigot is turned back on only for the Supreme Court to later side with the States (as it did in August without dissent), the loan system will experience more instability. The public interest is to maintain the status quo.

**3.** Defendants assert (at 67–68) that the injunction has forced the Department to place borrowers into forbearance. No. That is what Defendants chose to do in response to the injunction. That does not affect the balance of equities. *See Sierra Club v. U.S. Army Corps of Eng's*, 645 F.3d 978, 997 (8th Cir. 2011) (self-inflicted injuries militate against claims of harm). Similarly, nobody forced Defendants to promulgate a

31

rule without a backup plan in the likely event their second attempt to mass cancel loans was enjoined.

Moreover, last week Defendants transmitted an interim final rule for review, entitled "Income-Contingent Repayment Plan Options." This action coincided with reports that President Biden would "unveil more student loan forgiveness in the coming days." Adam Minsky, *Biden Set to Unveil More Student Loan Forgiveness Relief as Key Programs Remain Blocked*, Forbes (Oct. 7, 2024).[6] While text has not yet been published, it appears from reporting that the Interim Final Rule may lift the forbearance, showing that the Department itself can rectify any harms it perceives.

**4.** Defendants' allegation of injury to PSLF borrowers (at 68) is also misplaced. For starters, Defendants informed the administrative panel that PSLF borrowers can receive credit for time in administrative forbearance. *Missouri v. Biden*, entry ID:5415510 at 51. Further, the Department separately offers PSLF participants a program that allows borrowers to "buy back certain [non-qualifying] months in [a borrowers']

---

[6] https://www.forbes.com/sites/adamminsky/2024/10/07/biden-set-to-unveil-more-student-loan-forgiveness-relief-as-key-programs-remain-blocked/

Appellate Case: 24-2332     Page: 38     Date Filed: 10/17/2024 Entry ID: 5447418

payment history to make them qualifying payments for PSLF." *Public Service Loan Forgiveness (PSLF) Buyback*, Federal Student Aid (last visited Oct. 14, 2024).[7] Any PSLF borrower currently in administrative forbearance can retroactively earn credits for any months in forbearance.

## V. The Scope of the Injunction Pending Appeal Is Appropriate.

Defendants' scope-of-injunction argument about MOHELA has now been rejected seven times: in the first and second attempts at mass cancellation, twice by the Supreme Court and twice by this Court; in the third mass cancellation attempt, twice by the Southern District of Georgia and once by the Eastern District of Missouri. Defendants identify nothing to depart sharply from this unbroken trend. As the States already explained (at 86), an injunction prohibiting Defendants from implementing the Final Rule—inclusive of the forgiveness provisions and provisions that increase forgiveness eligibility—is necessary to ensure complete relief.

Defendants further argue (at 73) that their stipulation to vacate the rule in *Biden v. Nebraska* "proves nothing." Not so. It shows the

---

[7] https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/public-service-loan-forgiveness-buyback

Appellate Case: 24-2332     Page: 39     Date Filed: 10/17/2024 Entry ID: 5447418

appropriate scope of relief here. Because vacatur is the default statutory remedy for a final decision under 5 U.S.C. § 706, a preliminary decision here should be parallel.

Continued relief against the President is also important. In this very case, Defendants unlawfully promulgated a new rule without notice and comment to render the district court's injunction "a nullity." Inj. Op. 4. And in the Third Mass Cancellation rule, Defendants have engaged in some of the most brazenly lawless federal actions seen in recent years. Defendants openly admitted, for example, that they planned to publish a rule and rush forgiveness within 72 hours of publication—even though federal law expressly requires a waiting period of at least 60 days. Second.Supp.App.40.[8] Continued relief is necessary to prevent further brazen, unlawful activity.

## CONCLUSION

The States request that the Court confirm the administrative panel's injunction and stay or preliminarily enjoin Defendants from implementing the Final Rule.

---

[8] In the opening brief, the States said they would provide the transcript of the argument in the Third Mass Cancellation Rule litigation. That is now attached as a second supplemental appendix.

Appellate Case: 24-2332    Page: 40    Date Filed: 10/17/2024 Entry ID: 5447418

Dated: October 17, 2024

Respectfully submitted,

*/s/ Joshua M. Divine*
Joshua M. Divine

TIM GRIFFIN
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI
  *Solicitor General*
DYLAN L. JACOBS
  *Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

ASHLEY MOODY
  *Attorney General of Florida*
JAMES H. PERCIVAL
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
james.percival@myfloridalegal.com

DREW H. WRIGLEY
  *Attorney General of North Dakota*
PHILIP AXT
  *Solicitor General*
Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

ANDREW BAILEY
  *Attorney General of Missouri*
JOSHUA M. DIVINE, #69875MO
  *Solicitor General*
REED C. DEMPSEY #1697941DC
  *Deputy Solicitor General*
SAMUEL FREEDLUND, #73707MO
  *Deputy Solicitor General*
MISSOURI ATTORNEY GENERAL'S
OFFICE
Post Office Box 899
Jefferson City, MO 65102
(573) 751-1800
josh.divine@ago.mo.gov
reed.dempsey@ago.mo.gov
samuel.freeland@ago.mo.gov

CHRISTOPHER M. CARR
  *Attorney General of Georgia*
STEPHEN J. PETRANY
  *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

35

DAVE YOST
  *Attorney General of Ohio*
T. ELLIOT GAISER
  *Solicitor General*
MATHURA J. SRIDHARAN
  *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

GENTNER DRUMMOND
  *Attorney General*
GARRY M. GASKINS, II
  *Solicitor General*
Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
gentner.drummond@oag.ok.gov
garry.gaskins@oag.ok.gov

# CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limit of Fed. R.P. 28.1(e) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 6,491 words as determined by the word-counting feature of Microsoft Word 2016, which is less than the 6,500 words permitted by Rule 28.1.

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point proportionally spaced Century Schoolbook font.

And this filing complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

*/s/ Joshua M. Divine*
Joshua M. Divine

Appellate Case: 24-2332    Page: 43    Date Filed: 10/17/2024 Entry ID: 5447418

## CERTIFICATE OF SERVICE

I certify that on October 17, 2024, I electronically filed the foregoing motion with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users. *See* Fed. R. App. P. 25(c)(2).

*/s/ Joshua M. Divine*
Joshua M. Divine

Appellate Case: 24-2332    Page: 44    Date Filed: 10/17/2024 Entry ID: 5447418