# United States Court of Appeals

## For the Eighth Circuit

_____

No. 24-2332

_____

State of Missouri; State of Arkansas; State of Florida; State of Georgia; State of North Dakota; State of Ohio; State of Oklahoma

*Plaintiffs - Appellees*

v.

Donald J. Trump, in his official capacity as President of the United States; Denise L. Carter, in her official capacity as Acting Secretary, United States Department of Education; United States Department of Education[1]

*Defendants - Appellants*

------------------------------

Student Borrower Protection Center; National Consumer Law Center

*Amici on Behalf of Appellants*

State of Alaska; State of South Carolina; State of Texas; New Civil Liberties Alliance; Mackinac Center for Public Policy; Cato Institute

*Amici on Behalf of Appellees*

_____

No. 24-2351

_____

_____

[1]President Donald J. Trump and Acting Secretary of Education Denise L. Carter are substituted as parties pursuant to Federal Rule of Appellate Procedure 43(c).

State of Missouri; State of Arkansas; State of Florida; State of Georgia; State of North Dakota; State of Ohio; State of Oklahoma

*Plaintiffs - Appellants*

v.

Donald J. Trump, in his official capacity as President of the United States; Denise L. Carter, in her official capacity as Acting Secretary, United States Department of Education; United States Department of Education

*Defendants - Appellees*

------------------------------

State of Alaska; State of South Carolina; State of Texas; New Civil Liberties Alliance; Mackinac Center for Public Policy; Cato Institute

*Amici on Behalf of Appellants*
_____

Appeal from United States District Court
for the Eastern District of Missouri
_____

Submitted: October 24, 2024
Filed: February 18, 2025
_____

Before GRUENDER, ERICKSON, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

This case, like *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), concerns the authority of the President and Secretary of Education, under existing law, to forgive hundreds of millions of dollars of loans made to borrowers to finance the cost of obtaining their post-secondary education. The origin of the dispute is a rule

-2-

promulgated by the Department of Education to modify a pre-existing income contingent repayment (ICR) plan for federal student loans. This ICR plan, called Saving on a Valuable Education (SAVE), altered payment thresholds, stopped interest accrual, and forgave loan balances after as little as ten years of repayment. Seven states challenged the SAVE Rule as exceeding statutory authority given to the Secretary of Education because they claim the Secretary cannot forgive loans through an ICR plan, among other things. The district court concluded they were likely to succeed on this claim and preliminarily enjoined the rule's early loan forgiveness provisions. The parties filed cross-appeals. The Secretary of Education, Department of Education, and the President (collectively, federal officials) seek vacatur of the preliminary injunction, while the states request we broaden the injunction.

Recognizing the important interests at stake, we carefully undertake the task of determining whether a preliminary injunction is warranted and, if so, the scope of that injunction. Like the district court, we conclude the states are likely to succeed in their claim that the Secretary's authority to promulgate ICR plans does not authorize loan forgiveness at the end of the payment period. The statute's text and structure require ICR plans to be designed for a borrower to pay his or her loan balance in full through payments that can fluctuate based on income during the payment term. The power Congress gave the Secretary in 20 U.S.C. § 1087e(d)(1) to create repayment plans means the Secretary must design ICR plans leading to actual repayment of the loans. The Secretary has gone well beyond this authority by designing a plan where loans are largely forgiven rather than repaid. We thus affirm the entry of the preliminary injunction, though we conclude the district court erred by not enjoining the entire rule and we remand with instructions to modify the injunction accordingly.

Appellate Case: 24-2332    Page: 3    Date Filed: 02/18/2025 Entry ID: 5486384

# I. Background

## A. Federal Student Loan Repayment

In 1993, Congress authorized the federal government to directly issue loans to students for post-secondary education through the William D. Ford Federal Direct Loan program. *See* Student Loan Reform Act of 1993, Pub. L. No. 103-66, §§ 4011, 4021, 107 Stat. 341, 341–42 (codified as amended at 20 U.S.C. §§ 1087a–1087h). Borrowers may choose to repay these loans through four generally applicable options: (1) a standard repayment plan with fixed payments over a period not exceeding ten years; (2) a graduated repayment plan with increasing payments over a period not exceeding ten years; (3) an extended repayment plan with fixed or graduated payments over a period not exceeding twenty-five years; or (4) an income contingent repayment plan with varying payments based on income over a period not exceeding twenty-five years. 20 U.S.C. §§ 1078(b)(9)(A), 1087e(d)(1)(A)–(D). These repayment plans have been largely consistent since the creation of the federal direct student loan program. *Compare* 20 U.S.C. § 1087e(d)(1) (1993), *with* 20 U.S.C. § 1087e(d)(1)(A)–(D) (2024).

A decade after the Student Loan Reform Act, Congress expanded repayment options for low-income borrowers by creating an income-based repayment (IBR) plan to limit monthly payments for borrowers experiencing a "partial financial hardship." *See* College Cost Reduction & Access Act, Pub. L. No. 110-84, § 203, 121 Stat. 784, 792–95 (2007) (codified as amended at 20 U.S.C. § 1098e). IBR plans have two central features: a ceiling on a borrower's loan payments and loan forgiveness after twenty or twenty-five years of payments. Under IBR, an eligible borrower's monthly payments are capped at a certain percentage of his or her adjusted gross income above 150% of the federal poverty line. 20 U.S.C. § 1098e(a)(3), (b)(1), (e). Specifically, borrowers with loans made before July 2014 have a "partial financial hardship" and are eligible for IBR if the annual amount due on their loans under the standard repayment plan exceeds 15% of their discretionary income, which is the total of their adjusted gross income minus 150% of the

-4-

applicable federal poverty line. *Id.* § 1098e(a)(3). If such borrowers select IBR, their monthly payments would be limited to one-twelfth of that 15%. *Id.* § 1098e(b)(1). Since these caps on payments meant a borrower might not pay enough toward the loans to fully repay them, Congress provided for loan forgiveness for borrowers using IBR once they made enough loan payments. *Id.* § 1098e(b)(7). For borrowers who qualify for and select the IBR plan, "the Secretary shall repay or cancel any outstanding balance of principal and interest due" on their loans after twenty-five years of qualifying payments. *Id.* Congress subsequently reduced these thresholds for new borrowers after July 2014, lowering the qualifying threshold and payment amount to 10% of the borrower's discretionary income and permitting forgiveness after twenty years. *Id.* § 1098e(e).

This appeal concerns the Secretary's recent promulgation of a revised ICR plan. Unlike IBR, the ICR statutory text does not provide a specific formula for calculating loan payments and does not explicitly state the Secretary can forgive loans. *See id.* § 1087e(e). Instead, when creating a borrower's ICR payment schedule, the Secretary must "require payments that vary in relation to the appropriate portion of the annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary." *Id.* § 1087e(e)(4). The balance owed on a federal loan repaid through ICR "equal[s] the unpaid principal amount of the loan, any accrued interest, and any fees, such as late charges, assessed on such loan." *Id.* § 1087e(e)(5). To effectively implement ICR, Congress empowered the Secretary to "establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary." *Id.* § 1087e(e)(1).

Since 1994, the Department of Education has established various ICR plans, known as ICR,[2] Pay As You Earn (PAYE), and Revised Pay As You Earn

---

[2]ICR is both the catch-all term for income contingent repayment plans generally and the name of the Department's first iteration of an ICR plan. For clarity, when referring to the specific ICR plan called ICR, we use ICR Rule or the original ICR plan.

Appellate Case: 24-2332     Page: 5     Date Filed: 02/18/2025 Entry ID: 5486384

(REPAYE), the last of which has been amended into the program challenged here. Every ICR plan has provided for loan forgiveness of any remaining debt at the end of the established payment period of twenty or twenty-five years, depending on the plan and the borrower's loans. *See* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61664, 61666, 61669 (Dec. 1, 1994) (to be codified at 34 C.F.R. pt. 685) [hereinafter ICR Rule]; Federal Perkins Loan Program, Federal Family Education Loan Program, & William D. Ford Federal Direct Loan Program, 77 Fed. Reg. 66088, 66139–40 (to be codified at 34 C.F.R. pts. 674, 682, 685) (Nov. 1, 2012) [hereinafter PAYE Rule]; Student Assistance General Provisions, Federal Family Education Loan Program, & William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67204, 67241–42 (to be codified at 34 C.F.R. pts. 668, 682, 685) (Oct. 30, 2015) [hereinafter REPAYE Rule]. Payment provisions under each ICR plan have differed. Under the original ICR plan, a borrower's payments were determined either by a formula multiplying the borrower's adjusted gross income by a payback rate, which ranged from 4% to 15% depending on the amount of the loans, or by a capped amount equal to what a borrower would repay monthly in a twelve-year repayment period. *See* ICR Rule, 59 Fed. Reg. at 61698–99. PAYE and REPAYE were promulgated after the statutory amendments creating IBR and essentially adopted the statutory payment structure available for IBR into ICR, though with looser eligibility requirements and shorter loan forgiveness timelines for some borrowers than IBR. *See* PAYE Rule, 77 Fed. Reg. at 66136–37, 66139–40; REPAYE Rule, 80 Fed. Reg. at 67239–42. As a result, the newer ICR plans resemble IBR, even though they are enacted under a separate repayment scheme.

### B. SAVE Rule

In 2021, citing rising student loan debt, the Department of Education convened a committee to consider changes to rules governing ICR and IBR plans. The Secretary announced the proposed rule in January 2023 and published the final rule with minimal changes ten days after the Supreme Court struck down the Secretary's HEROES Act forgiveness plan. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal

Appellate Case: 24-2332    Page: 6    Date Filed: 02/18/2025 Entry ID: 5486384

Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685) [hereinafter SAVE Rule]; *Nebraska*, 143 S. Ct. at 2355, 2362.

In comparison to earlier ICR and IBR plans, the SAVE plan protected more of a borrower's income by reducing the amount of income subject to loan payments, eliminated interest accrual, and expedited loan forgiveness for most borrowers. *See* SAVE Rule, 88 Fed. Reg. at 43901–03. Regarding payments and interest, SAVE offers more favorable terms than an eligible borrower would receive under IBR. It reduced the amount of income that was considered "discretionary" — a borrower's income up to 225% of the federal poverty line was excluded rather than 150% under IBR, PAYE, and the former REPAYE plans. *See* SAVE Rule, 88 Fed. Reg. at 43901–02. Then, it further lowered the portion of discretionary income a borrower with undergraduate loans would be required to pay monthly to one-twelfth of 5% of his discretionary income. *Id.* If the monthly payment amounts calculated under SAVE did not fully cover the accrued interest for that month, any remaining interest would not be charged to the borrower. *Id.* at 43902.

As to loan forgiveness, SAVE starts cancelling outstanding balances after 120 months of payments for any borrower whose "total original principal balance on all loans that are being paid under the [SAVE] plan was less than or equal to $12,000." *Id.* at 43903. For each $1,000 above $12,000 for the total original balance, an additional twelve months of payments would be necessary for forgiveness. *Id.* After twenty years of payments for borrowers with only undergraduate loans or twenty-five years of payments for those with graduate loans, any remaining balance would be forgiven, regardless of the amount borrowed. *Id.* at 43902–03.

The impacts of these changes for loan repayment are substantial. Under prior ICR plans, "borrowers would repay approximately $11,800 per $10,000 of debt," or $10,956 per $10,000 for borrowers with only undergraduate loans. *Id.* at 43880. But under SAVE, the same borrowers would pay only $7,000 per $10,000 borrowed, or $6,121 per $10,000 for a borrower with only undergraduate debt. *Id.*

Appellate Case: 24-2332    Page: 7    Date Filed: 02/18/2025 Entry ID: 5486384

Undergraduate-only borrowers with "lifetime income in the bottom quintile are projected to repay $873 per $10,000" if enrolled in SAVE. *Id.* at 43881. Only borrowers in the top two quintiles of lifetime income could expect to pay more than they initially borrowed under SAVE. *See id.* Of the 7.5 million borrowers enrolled in SAVE as of February 2024, 4.3 million pay $0 monthly towards their loans under SAVE. *Biden-Harris Administration Approves $1.2 Billion in Loan Forgiveness for Over 150,000 SAVE Plan Borrowers*, U.S. Dep't of Educ. (Feb. 21, 2024), https://www.ed.gov/about/news/press-release/biden-harris-administration-approves-12-billion-loan-forgiveness-over [hereinafter *Biden-Harris Administration Approves $1.2 Billion in Loan Forgiveness*].

Although the SAVE Rule was set to take full effect on July 1, 2024, the Secretary designated several portions for early implementation, including forgiveness for borrowers with low initial principal balances. *See* SAVE Rule, 88 Fed. Reg. at 43820–21; Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 89 Fed. Reg. 2489 (Jan. 16, 2024) [hereinafter Early Implementation of Forgiveness]. The Department started forgiving loans under SAVE in February 2024. *Biden-Harris Administration Approves $1.2 Billion in Loan Forgiveness*.

### C. Procedural History

A group of seven states brought this challenge to the SAVE Rule in April 2024, seeking declaratory and injunctive relief and vacatur of the rule. They assert various provisions of the SAVE Rule exceed the Secretary's authority and are arbitrary and capricious. The states sought a stay or preliminary injunction against implementation of the SAVE Rule, and the district court granted their request in part, enjoining the loan forgiveness provisions of the SAVE Rule while leaving the remaining provisions in effect. After the injunction, the Department revived the pre-existing loan forgiveness provisions under REPAYE that the SAVE Rule had amended and continued forgiving loans after twenty or twenty-five years of payments. In response, the states requested the district court clarify that its

-8-

preliminary injunction prohibited forgiveness under ICR plans, which the district court denied.

Both parties appealed, and the states sought an administrative stay and injunction pending appeal of the SAVE Rule and the revived forgiveness. We granted in part the states' request, enjoining the federal officials "from any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing SAVE's payment-threshold provisions." *Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024). The Supreme Court denied the federal officials' application to vacate our injunction. *Biden v. Missouri*, No. 24A173, 145 S. Ct. 109 (2024). We then granted in part the federal officials' motion for an expedited appeal.

On appeal, the federal officials assert the states lack standing and the district court erred in granting any injunction. The states seek a broadened injunction of the entire rule, contesting both the district court's assessment of the proper scope of preliminary relief and their likelihood of success on the merits of their other challenges to the rule.

## II. Analysis

"We review the grant [or denial] of a preliminary injunction for abuse of discretion." *Wilbur-Ellis Co. v. Erikson*, 103 F.4th 1352, 1355 (8th Cir. 2024) (quoting *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1142 (8th Cir. 2007)). "A district court abuses its discretion when 'it rests its conclusions on clearly erroneous factual findings or erroneous legal conclusions.'" *Id.* (quoting *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1013–14 (8th Cir. 2021)). Thus, we review underlying factual findings regarding the states' injuries for clear error and legal conclusions about the states' likelihood of success in their challenges to the rule de novo. *See Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023).

-9-

## A.  Standing

We first turn to the threshold question of standing to ensure we have jurisdiction over this case.  *See Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000).  Standing requires (1) that the plaintiff will "suffer[] an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The states raise various theories to show they have standing.  We agree with the district court that at least one state, Missouri, has standing to sue due to financial harms to the Higher Education Loan Authority of the State of Missouri (MOHELA), and its standing is sufficient to resolve this appeal.

As the Supreme Court previously held, Missouri suffers a cognizable financial harm when the Secretary enacts a plan that discharges student loans and closes accounts serviced by MOHELA.  *Nebraska*, 143 S. Ct. at 2366.  The SAVE Rule does so — it leads to loan forgiveness and closure of accounts serviced by MOHELA in as few as ten years of repayments.  *See* SAVE Rule, 88 Fed. Reg. at 43902–03.  Once an account is closed, MOHELA loses future fees for servicing the accounts, which reduces its profits and ability to fund education in Missouri.  *See Nebraska*, 143 S. Ct. at 2366.  Under the SAVE Rule, around 28,000 accounts held by MOHELA have already been closed, with 53,000 more identified as eligible for forgiveness.  "This financial harm is an injury in fact directly traceable to the Secretary's plan" and redressable through the relief sought by the states.  *Id.* Nevertheless, the federal officials assert Missouri lacks standing because the SAVE Rule provides some benefits to MOHELA and MOHELA has also requested some accounts it previously serviced be transferred to other loan servicers.  We disagree.

First, we reject the federal officials' offsetting-benefits argument.  The federal officials argue the SAVE Rule reduces some of MOHELA's servicing costs because it "will cost almost nothing to service" any borrower whose payments are $0, and fewer accounts means the loan portfolio will be easier for MOHELA to manage.  But

-10-

once a plaintiff shows injury, we do not separately inquire whether the plaintiff gains some benefit from other portions of the regulation. *See, e.g.*, *NCAA v. Governor of New Jersey*, 730 F.3d 208, 223 (3d Cir. 2013), *abrogated on other grounds by N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453 (2018); *Peters v. Aetna Inc.*, 2 F.4th 199, 218 (4th Cir. 2021); *Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 657 (9th Cir. 2011). "Our standing analysis is not an accounting exercise," so the existence of some purported benefit from an injurious government action does not preclude standing. *NCAA*, 730 F.3d at 223. The supposed benefits asserted by the federal officials are thus irrelevant considering MOHELA's undisputed lost servicing fees. Even if we did conduct the balancing sought, the district court found "[a]ny potential 'benefits' MOHELA receives are incidental," are "not of the same type nor [do they] arise from the same transaction" as MOHELA's injury, and "do not offset the alleged and actual harms experienced by MOHELA." The federal officials fail to show any clear error in these factual findings that warrant disturbing the district court's conclusions. Instead, they merely imagine benefits that could accrue.

We also are not swayed by the federal officials' argument that MOHELA cannot claim injury by a loss in accounts it services because it had separately requested that certain accounts be transferred from it. It is true that in April 2024, MOHELA asked the Department "to transfer 1.5 million borrower accounts to one or more different loan servicers." The facts surrounding this request to transfer are highly contested as to what accounts were implicated and the reasons for the request. According to the states, MOHELA's request primarily concerned accounts subject to the Public Service Loan Forgiveness (PSLF) program and changed loan servicing contracts under which these accounts were already set to be transferred to other servicers. Regardless of the exact circumstances, MOHELA's request to transfer some accounts cannot be construed as a request for most of its remaining accounts to close sooner. MOHELA serves 8.02 million borrowers, with 2.24 million accounts already enrolled in SAVE. While the federal officials estimate that approximately 5.25 million borrowers serviced by MOHELA would not be eligible

-11-

for the shortest forgiveness timeline under the SAVE Rule, that still leaves nearly 3 million accounts that could be eligible, approximately double the amount MOHELA sought to have transferred. Moreover, these 5.25 million accounts could still be eligible for later forgiveness, depriving MOHELA of fees it would otherwise collect. The federal officials also fail to address the long-term financial impact of the SAVE Rule as new accounts enter repayment, enroll in SAVE, are assigned to MOHELA, and close sooner than they would without SAVE's forgiveness provisions. MOHELA's one-time request for transfer does not show MOHELA is not harmed by the continuous closure of accounts through forgiveness under SAVE.

In sum, we conclude MOHELA is harmed by the SAVE Rule, so Missouri has standing to sue. We therefore proceed to the merits of the preliminary injunction.

## B. Preliminary Injunction

We consider four factors when evaluating a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on the other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Wilbur-Ellis Co.*, 103 F.4th at 1355–56 (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)). No factor is determinative but "the probability of success factor is the most significant." *Id.* at 1356 (quoting *Home Instead*, 721 F.3d at 497). Ultimately, "[t]he primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Id.* at 1355 (quoting *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789–90 (8th Cir. 1989)). We conclude each factor supports a preliminary injunction.

## 1. Probability of Success on the Merits

We first consider the most important factor — whether the states have shown a probability of success on the merits. *See id.* at 1355–56. Ordinarily, a party need

Appellate Case: 24-2332    Page: 12    Date Filed: 02/18/2025 Entry ID: 5486384

only show a "'fair chance' of success on the merits," but if it requests an injunction of "government action based on presumptively reasoned democratic processes," it "must show that [it] 'is likely to prevail on the merits.'" *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (first quoting *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019); and then quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc)). We assume, as the parties do, the heightened standard applies to preliminary injunctions of agency rulemakings. *See Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024). The states assert the SAVE Rule exceeds the Secretary's authority on multiple fronts. We agree with the district court that the states are likely to succeed in their claim that the Secretary cannot forgive loans through an ICR plan. It is unnecessary to reach their remaining claims at this stage.

The states' challenge is one of statutory interpretation. We start with "the statute's plain language," looking to "the meaning that proper grammar and usage would assign" the text. *United States v. Lester*, 92 F.4th 740, 742 (8th Cir. 2024) (quoting *United States v. Moreira-Bravo*, 56 F.4th 568, 571 (8th Cir. 2022)). We "must give effect, if possible, to every clause and word of a statute" and "look to the structure of the statute and the language surrounding the term to ascertain its meaning." *United States v. Zam Lian Mung*, 989 F.3d 639, 642–43 (8th Cir. 2021) (first quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014); and then quoting *United States v. Kowal*, 527 F.3d 741, 746 (8th Cir. 2008)). If the text is clear, "the judicial inquiry must end." *Lester*, 92 F.4th at 742 (quoting *United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013)). The court must aim to determine the statute's "best meaning" by "deploying its full interpretative toolkit." *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2271 (2024).

The federal officials primarily rest their authority to forgive student loans at the end of the ICR payment period on 20 U.S.C. § 1087e(d)(1)(D), which directs the Secretary to offer an ICR plan "with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." *See* 20 U.S.C. § 1087e(d)(1)(D). They derive

-13-

two principles from the statute: (1) "how much a borrower repays each year will be 'based on the income of the borrower'"; and (2) "no borrower will be required to make payments indefinitely."  They contend only forgiveness at the end of the payment period "complies with both of those principles" because if a borrower had to pay the full amount within the repayment period, at minimum, the "final payment would be based not on her income, but rather on her outstanding balance."  And they assert the "not to exceed 25 years" phrase acts as merely an upper limit on the time the Secretary could require payments, but she can lower the term for payments before forgiveness as she sees fit.  Their argument rests on a flawed assumption. They assume ICR makes income the primary or only consideration in assessing a borrower's loan payments.  They make income paramount rather than considering *both* income and the loan balance together to ensure the borrower contributes a sufficient portion of her income to repay her loan.  The statutory scheme demonstrates this latter approach of considering both income and the loan balance is the one Congress enacted.

At the time ICR was first codified, the statute had four generally applicable options for borrowers to repay "principal and interest" on their loans:

- a standard repayment plan with a fixed payment made over a set number of years, not to exceed ten years;

- an extended repayment plan with a fixed annual repayment amount paid over an extended period of time;

- a graduated repayment plan, "with annual repayment amounts established at 2 or more graduated levels and paid over a fixed or extended period of time, except that the borrower's scheduled payments shall not be less than 50 percent, nor more than 150 percent, of what the amortized payment on the amount owed would be if the loan were repaid under the standard repayment plan"; and

- an income contingent repayment plan, with varying payments based on income paid over an extended time period, not to exceed twenty-five years.

-14-

*See* 20 U.S.C. §§ 1078(b)(1)(D), 1087e(d)(1) (1993). While Congress has enacted some modifications and added IBR, these four repayment options remain largely the same today. *See* 20 U.S.C. § 1087e(d)(1) (2024). Borrowers may choose to repay their federal direct loans through (1) fixed payments over a period not exceeding ten years; (2) increasing payments over a period not exceeding ten years; (3) fixed or graduated payments over a period not exceeding twenty-five years; or (4) varying payments based on income over a period not exceeding twenty-five years. *Id.* §§ 1078(b)(9)(A), 1087e(d)(1).

No one disputes the first three repayment plans in section 1078e(d)(1) require the loans to be repaid in full by the end of the payment period. The Secretary does not claim, for example, the standard repayment plan would authorize her to establish fixed monthly payments of $5 for ten years before discharging a $100,000 loan balance. Instead, the fixed monthly payments of the standard plan are designed such that a borrower makes monthly payments of an amount high enough for the loan to be repaid within ten years. After all, these are *repayment* plans — plans to repay or return lent money. *See* Repayment, Oxford English Dictionary (2009); Repayment, Webster's Third New International Dictionary (2002). Thus, for each, the Secretary starts with the loan balance and determines payments to satisfy full repayment of the loan under the terms of the plan. In the standard repayment plan, the borrower pays a fixed sum calculated to ensure full payment by the end of the payment period. 20 U.S.C. §§ 1078(b)(9)(A)(i), 1087e(d)(1)(A). In the extended repayment plan, the borrower pays a fixed or graduated sum large enough to ensure full payment at the end of the extended payment period. *Id.* §§ 1078(b)(9)(A)(iv), 1087e(d)(1)(C). In the graduated repayment plan, the borrower pays a set sum each year that increases over the payment period to ensure payment in full. *Id.* §§ 1078(b)(9)(A)(ii), 1087e(d)(1)(B). Likewise, in the ICR plan, the borrower must make payments in amounts that can fluctuate based on income in a manner designed to ensure payment in full at the end of the payment period. *See id.* § 1087e(d)(1)(D). The Secretary considers both the loan balance and the borrower's income to determine an

-15-

appropriate portion of his adjusted gross income to ensure repayment.[3]  *See id.*
§ 1087e(d)(1)(D), (e).

Given that the three preceding repayment plans and their accompanying time
periods require payment in full, we would expect the fourth subclause to include
some evidence that it uniquely permits forgiveness, like Congress did when adding
IBR as the fifth subclause by specifying that the "Secretary shall repay or cancel any
outstanding balance of principal and interest" after a certain number of payments.
*Id.* §§ 1087e(d)(1)(E), 1098e(b)(7).  Without similar clear language for ICR, the
federal officials claim the absence of the phrase "full repayment" and the presence
of the words "income contingent" signify Congress expected loan repayment to be
fully contingent on whether a borrower earned enough income and borrowed a small
enough amount of money.  We disagree.

None of the preceding repayment plans include the word "full" but they
undisputedly anticipate full repayment.  *See id.* § 1087e(d)(1).  Thus, the absence of
"full" under ICR does not mean repayment is partial, especially because the default
expectation when one discusses repayment of loans is full recompense.  If someone
requests repayment, we assume he requests return of the entire amount lent, plus
interest as applicable.  Indeed, we would expect some qualifier if partial repayment
was contemplated, and Congress provided none.  To the contrary, Congress

---

[3]For example, similar to past ICR plans, the Secretary could require payments
of a set portion of a borrower's income, readjusting the appropriate percentage if
necessary during the repayment period so that a borrower would stay on track for
repayment.  *See* ICR Rule, 59 Fed. Reg. at 61698–99.  Alternatively, the Secretary
could determine how much a borrower would have to pay annually over twenty-five
years to ensure full repayment, calculate the percentage of the borrower's then-
income that would equal that amount, and require the borrower to pay that
percentage annually during the repayment period with the actual amount paid
varying as the borrower's income increases or decreases.  Thus, despite the federal
officials' claims, an ICR plan resulting in actual loan repayment need not be carried
out in a manner identical to the extended repayment plan.  A reading requiring
repayment under ICR does not make another repayment plan superfluous.

Appellate Case: 24-2332     Page: 16     Date Filed: 02/18/2025 Entry ID: 5486384

explained the repayment plans are "for repayment of such loan, including principal and interest" and "[t]he balance due" on an ICR loan "shall equal the unpaid principal amount of the loan, any accrued interest, and any fees." *See id.* § 1087e(d)(1), (e)(5). This language reaffirms the default understanding of full repayment. Moreover, we are not required to guess what an "income contingent repayment plan" means — the statute explains that, unlike the preceding plans, a borrower's payments can shift year-to-year, increasing or decreasing as his income changes. In other words, the amount paid on the loan for each year depends on the borrower's income, but his ultimate liability is still to repay the loan. As enacted by Congress, it is not a program that allows a borrower to evade full repayment because of his income.

The federal officials claim this approach would "establish[] a student-loan repayment plan that would end in a borrower's default." This assumes the Secretary administers an ICR plan in a way that does not ensure the borrower's ICR payments result in loan payoff at the end of the period. ICR would not result in default for most borrowers if the Secretary requires a sufficient portion of the borrower's income to be paid towards the loan to ensure full payment. And Congress provided safeguards if a particular borrower's payment would be too burdensome or insufficient: an alternative, case-by-case repayment plan or, in later amendments, IBR. The alternative repayment plan allows the Secretary to

> provide, on a case by case basis, an alternative repayment plan to a borrower of a loan made under this part who demonstrates to the satisfaction of the Secretary that the terms and conditions of the repayment plans available under paragraph (1) are not adequate to accommodate the borrower's exceptional circumstances.

20 U.S.C. § 1087e(d)(4). Thus, for the borrower for whom repayment based on income over twenty-five years is inadequate to repay the loan, the Secretary could offer an alternative repayment plan to that borrower.

-17-

IBR similarly protects eligible borrowers by effectively enacting a statutory limit on how much of their income they would have to dedicate to loan repayment. *See* 20 U.S.C. § 1098e(a)(3), (b)(1), (b)(7), (e). With IBR, a borrower's monthly payments are limited to one-twelfth of 10 or 15% of his adjusted gross income above 150% of the federal poverty line. *Id.* A borrower, who otherwise must dedicate more than 10 or 15% of his adjusted gross income above 150% of the federal poverty line to loan repayment under the standard repayment plan, can choose IBR, capping his monthly payments with forgiveness available after twenty to twenty-five years of payments, as applicable based on borrowing date. *Id.* This cap alleviates a potential burden for borrowers for whom repayment under ICR would require a significant percentage of their income by giving them an alternative payment plan with lower payments to select. If full repayment under ICR would require paying more than 10 or 15% of a borrower's discretionary income throughout the twenty-five-year repayment period, the borrower could switch to IBR to reduce his payments, assuming the statute's other eligibility requirements are satisfied. *See id.*

Rather than implying by omission or other ambiguities, Congress has spoken clearly when creating a repayment plan with loan forgiveness or otherwise authorizing it — explicitly stating the Secretary should cancel, discharge, repay, or assume the remaining unpaid balance. *See id.* §§ 1078-10(b), 1078-11(a)(1), 1087, 1087e(m)(1), 1087j(b), 1087ee, 1098e(b)(7). The statutory text enabling the creation of an ICR plan provides no comparable language. *See id.* § 1087e(d)(1)(D), (e).

The federal officials' remaining arguments are unable to overcome the plain text and context of 20 U.S.C. § 1087e(d)(1)(D) and (e). First, they point to the ICR Rule and the Department's unchanged position that it can forgive any outstanding balance at the end of the repayment period. *See, e.g.*, ICR Rule, 59 Fed. Reg. at 61666, 61678, 61699. True, courts give "respect" to "an Executive Branch interpretation [that] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *See Loper Bright*, 144 S. Ct. at 2258. But "respect" simply means "[t]he views of the Executive Branch could inform the

-18-

judgment of the Judiciary, but d[o] not supersede it." *Id.* "[T]he basic nature and meaning of a statute does not change when an agency happens to be involved" or "has happened to offer its interpretation." *Id.* at 2271. The agency's consistently wrong interpretation cannot rewrite the statute's text to change its meaning. *See Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024), *cert. granted*, 2025 WL 65914 (U.S. Jan. 10, 2025).

The federal officials also cite amendments to section 1087e(e) requiring the Department to count periods of deferment based on economic hardship toward the ICR borrower's maximum repayment period as supporting their argument that ICR allows loan forgiveness. *See* 20 U.S.C. § 1087e(e)(7)(B)(i). Put another way, although a borrower can postpone payments because of economic hardship, the maximum repayment period clock continues to tick. The federal officials claim it makes little sense to count time when a borrower is experiencing an economic hardship towards the repayment period if there is no forgiveness because it would move a borrower closer to the deadline for full payment. However, these amendments themselves say *nothing* about forgiveness despite being enacted alongside provisions explicitly providing for forgiveness. *See id.*; College Cost Reduction & Access Act §§ 203, 205, 401, 121 Stat. at 792–96, 800–01. In any event, the amendment is not irrational if forgiveness is unavailable. It could indicate Congress wanted to ensure the federal government would receive full repayment within twenty-five years and did not want certain economic hardship to excuse delay. After all, in most contexts, lenders have wanted to ensure prompt repayment of a debt rather than looking for ways to forgive it. Moreover, the IBR plan, created in the same act, minimizes harm to the borrower caused by counting such deferment towards the repayment period. A borrower with an economic hardship sufficient to qualify for deferment would generally have full-time employment making at most minimum wage or 150% of the federal poverty line. *See* 20 U.S.C. § 1085(o). Such a borrower would likely qualify for and have minimal payments under IBR based on its statutory payment provisions, so he could switch to IBR to eventually obtain forgiveness, with the time in deferment for economic hardship counting toward his required payments. *See id.* § 1098e(a)(3), (b)(1), (7).

-19-

Even if the federal officials' interpretation were plausible, we would expect greater textual or contextual clues than the ones here to suggest the Department has the authority to forgive loans under ICR rather than to build a payment schedule for repayment by the end of the payment period. *See Nebraska*, 143 S. Ct. at 2372–75. We are hard-pressed to conclude that Congress, by directing the Secretary to enact a *repayment* plan with varying payments based on income over a period not exceeding twenty-five years, believed it authorized the Secretary to wipe out any remaining principal or interest of any borrower in as few as ten years of low or no payments. After all, if Congress had given that power through ICR, creating IBR and requiring low-income borrowers to make payments for twenty or twenty-five years to obtain forgiveness would have been unnecessary. The separate program for loan forgiveness in ten years for public service employees would similarly be superfluous. *See* 20 U.S.C. § 1087e(m). It makes little sense to enact these programs if the Secretary has always had the statutory power to wipe away debt through accounting tricks. If the federal officials' interpretation of the power under ICR is accepted, the Secretary could simply require a borrower to pay 0.5% of the total of his adjusted gross income minus 5000% of the federal poverty line for a payment period of ten years before having his loans forgiven. Indeed, their only cited limit is the Secretary's discretionary determination of what constitutes an "appropriate portion" of a borrower's income. *See id.* § 1087e(e)(4); *e.g.*, SAVE Rule, 88 Fed. Reg. at 43826–27, 43832–34, 43838–39. But the Secretary's exercise of discretion is hardly a limit one would expect Congress to solely rely upon in light of the breathtaking power claimed by the Secretary. The Secretary envisions the ability to establish ICR plans as a nearly limitless power to transform federal loans into grants by virtue of modifying payment thresholds and forgiveness timelines.[4] It has an

---

[4]The consequences of the vast discretion the Secretary claims include disruption of the student borrower's expectations. The Secretary deems ten years of payments as sufficient for certain borrowers, while prior ones have required twenty-five years. A borrower could spend nine years in repayment under SAVE expecting forgiveness the following year, only for a new secretary to exercise his discretion to deem a greater number of years to be more "appropriate." *See Loper Bright*, 144 S.

even greater economic impact than the sweeping loan forgiveness program attempted through the HEROES Act, which the Supreme Court recognized as an attempt "to exercise control over 'a significant portion of the American economy.'" *See Nebraska*, 143 S. Ct. at 2373 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

As with the previous attempt at loan forgiveness, the major questions doctrine informs our analysis. We assume Congress would have provided clear signs if it authorized such significant power to the Secretary. *See id.* It did not. By creating the ICR plan, Congress simply created a different method to calculate payments to repay student loans. The states are therefore likely to succeed in their challenge to the SAVE Rule's forgiveness provision.

## 2. Irreparable Harm

The district court concluded the states showed irreparable harm through MOHELA's lost servicing fees. We agree. Irreparable harm exists "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Once accounts are closed through SAVE's forgiveness provisions, they cannot be reopened, and MOHELA will permanently lose any future fees. Missouri cannot recoup that financial loss through a damages award because of sovereign immunity, so this constitutes an irreparable injury. *See Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996).

---

Ct. at 2285 (Gorsuch, J., concurring) ("[B]ecause the reasonable bureaucrat may change his mind year-to-year and election-to-election, the people can never know with certainty what new 'interpretations' might be used against them."). It is unclear why Congress would establish a repayment plan where the overall repaid amount of the balance of the loan turns substantially on the whims of the then-secretary, leaving borrowers in a state of uncertainty.

-21-

Nevertheless, the federal officials assert we should ignore this harm because the states waited until nine months after the SAVE Rule was published and three months after the Secretary announced early implementation of forgiveness to seek an injunction. The district court did not abuse its discretion in concluding the states' delay did not warrant denying injunctive relief. The notice of early implementation of forgiveness was not published until January 2024, only three months prior to the states' motion. Early Implementation of Forgiveness, 89 Fed. Reg. at 2489. While some forgiveness started prior to the request for a preliminary injunction, including some accounts held by MOHELA, many more accounts that could be forgiven under the SAVE Rule had not yet been processed. Moreover, the continual nature of accounts becoming eligible for forgiveness each month under the SAVE Rule indicates that the greatest harm from implementation of the rule is yet to occur. Under these circumstances, the states' brief delay does not undermine their claim of irreparable harm.

### 3. Balance of the Equities and Public Interest

The balance of the equities and the public interest also support a preliminary injunction. These two factors merge here because the federal government is the party opposing the injunction. *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1018 (8th Cir. 2023). In analyzing these factors, we ask "whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). As we noted in a similar case, "the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have." *See Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022). In contrast, the federal officials' interest in implementing the SAVE Rule is minimal given the states' strong likelihood of success in showing it exceeds agency authority. *See, e.g.*, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (same). There is no doubt some harm to borrowers who are enrolled in the SAVE plan. This harm,

Appellate Case: 24-2332     Page: 22     Date Filed: 02/18/2025 Entry ID: 5486384

however, is minimized by the fact their loans have been placed in forbearance and they have a preexisting obligation to repay their loans. Any change in borrowers' expectations was caused by the likely unlawful agency action challenged here. *See* SAVE Rule, 88 Fed. Reg. at 43820, 43822, 43835. In sum, the concrete, ongoing harm to MOHELA exceeds these other harms, weighing these factors in favor of a preliminary injunction.

## C. Scope of Relief

Finally, having determined a preliminary injunction is appropriate, we turn to the parties' dispute over the proper scope of relief. The district court blocked the SAVE Rule's early forgiveness provision nationwide. The federal officials request we narrow the district court's injunction to cover only loans held by MOHELA, while the states assert we should broaden the injunction to preclude the entire SAVE Rule and the restoration of the REPAYE forgiveness provisions. We conclude the district court correctly did not limit its injunction to MOHELA but erred by not preliminarily enjoining the entire rule and the resurrected REPAYE forgiveness.

First, "an injunction limited to the plaintiff States, or even more broadly to student loans affecting the States, would be impractical and would fail to provide complete relief to the plaintiffs." *Nebraska*, 52 F.4th at 1048. A servicer-dependent injunction would create chaos and uncertainty for borrowers and be difficult to administer because loan accounts can shift between servicers. Through a process called rebalancing, the Department can move student loan accounts from one servicer to another. A borrower could spend nine years living in Kansas, paying off loans thinking he would obtain forgiveness, only to move to Missouri in year ten or have his accounts shifted to MOHELA and no longer be eligible under the federal officials' preferred approach. Furthermore, reducing the overall number of existing loans by forgiving loans held by other servicers creates the risk that rebalancing reduces the accounts held by MOHELA. With fewer accounts, MOHELA would ultimately incur the same loss of its servicing fees, albeit indirectly. A nationwide

Appellate Case: 24-2332     Page: 23     Date Filed: 02/18/2025 Entry ID: 5486384

injunction is no more burdensome on the federal officials than necessary and is more workable.  *See id.*

Second, we conclude the entire SAVE Rule must be preliminarily enjoined. Upon ultimate success in an Administrative Procedure Act challenge, the default remedy is to set aside or vacate the rule.  *See Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).  In certain circumstances, portions of a rule can be severed if doing so would "not impair the function of the statute as a whole, and there is no indication that the regulation would not have passed" had the unlawful provision not been included.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988).  Otherwise, the entire rule rises and falls with its challenged provisions.  *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  Considering these principles, the default scope of preliminary relief should apply to the rule as a whole unless the offending provision is severable.

Here, the district court enjoined only the forgiveness provision after concluding the remainder of the rule "can function sensibly" without forgiveness. We conclude otherwise.  As the federal officials themselves argue, "it would make little sense for an ICR plan to end in default," which is what will happen for most borrowers enrolled in SAVE if forgiveness is enjoined while other provisions like the payment provisions remain in effect.  The Secretary's estimates detail how most borrowers repaying under SAVE will not repay even the principal of their loans if they follow the prescribed payment plan.  SAVE Rule, 88 Fed. Reg. at 43880–81. Consequently, if forgiveness is enjoined, those borrowers will default at the end of the payment period unless they are able to pay the entire outstanding balance at once. Given the repeated references in the SAVE Rule of its aim to avoid default, *e.g.*, *id.* at 43820, 43822–24, 43826, there is strong evidence the regulation would not have been promulgated in the absence of a forgiveness provision.  Even in the SAVE Rule's discussion of how various provisions could function independently, the Secretary did not claim she would implement these regulations absent forgiveness of loans.  *See id.* at 43828–29.  The forgiveness provisions undergird the entire

-24-

SAVE plan and therefore are not severable.  Enjoining forgiveness necessitates enjoining the entire rule.

Finally, we turn to the hybrid rule, which the federal officials implemented after the district court enjoined the SAVE Rule's forgiveness provisions. Essentially, the federal officials resuscitated the forgiveness provisions of the 2015 REPAYE Rule to fill in the gap created after the SAVE Rule's forgiveness was enjoined, relying on it to continue the same, likely unlawful, action the district court had enjoined.  Generally, in the absence of "special circumstances," "prior regulations remain valid until replaced by a valid regulation or invalidated by a court." *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 297 (8th Cir. 1985).  Under this principle, the pre-amendment REPAYE forgiveness provision could be reinstated as the Secretary did here.  However, we find this case presents such special circumstances, namely the portion of the old rule the federal officials seek to revive suffers from the same legal errors as the one challenged here — the Secretary lacks the power to authorize loan forgiveness in an ICR plan.  We therefore conclude the district court's injunction should be broadened to enjoin the Secretary's attempt to forgive loans in the SAVE plan through the old REPAYE provisions.

## III.  Conclusion

In sum, we affirm the district court's entry of a preliminary injunction and remand for further proceedings and with instructions to modify the preliminary injunction to enjoin the entire SAVE Rule as well as the hybrid rule.  The injunction pending appeal imposed by our order of August 9, 2024, will dissolve upon the district court's modification of its injunction.

-----------------------------

Appellate Case: 24-2332     Page: 25     Date Filed: 02/18/2025 Entry ID: 5486384